| | |
|---|---|
| **UNITED STATES OF AMERICA** | * |
| | * |
| **V.** | * |
| | *     **CRIM. NO. 19-00410-ELH** |
| **MATTHEW E. BLAIR,** | * |
| | * |
| **DEFENDANT** | * |
| | * |
| | * |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**DEFENDANT'S MOTION TO DISMISS COUNTS 29 TO 33**
**OF SUPERSEDING INDICTMENT AS IMPERMISSIBLY VAGUE**

Matthew E. Blair ("Mr. Blair"), by and through undersigned counsel and in accordance with Rule 12(b)(3)(B) of the Federal Rules of Criminal Procedure, files this Motion to Dismiss Counts 29 to 33 of the Superseding Indictment (ECF No. 20) (the "Indictment") as being impermissibly vague and, therefore, failing to provide the constitutionally-required notice. Counts 29 to 33 charge violations of the Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)(2)(A)) ("AKS") but, as discussed below, that statute, in light of its regulatory guidance and judicial interpretations, is unconstitutionally vague, particularly in view of the allegations charged here. Accordingly, pursuant to Rule 12(b)(3)(B), Counts 29 to 33 should be dismissed.

## I.     INTRODUCTION AND SUMMARY OF ARGUMENT

From approximately 2014 through late 2016, Mr. Blair, an entrepreneur who has successfully started several small businesses, formed and organized a compounding pharmacy called Blair Pharmacy (the "Pharmacy"), filling prescriptions written by doctors for patients suffering from, among other things, debilitating pain, nutritional imbalance, and scarring.

Prior to founding the Pharmacy, Mr. Blair had experience working in medical sales and marketing for pharmacies and other health care providers learning, in the process, about the significant benefit of and local demand for compounded medications. Wishing to fill this urgent

need, Mr. Blair drew upon his existing connections and modest resources to establish the Pharmacy as an independent business venture.

Mr. Blair is not a pharmacist, so, in order to obtain a Maryland pharmacy license, the Pharmacy was required to (and did) acquire the services of a licensed Maryland pharmacist. *See* Md. Code Ann. Health Occ. § 12-403(c)). To that end, the Pharmacy employed Dr. Timothy Schnupp ("Dr. Schnupp"), a licensed Maryland pharmacist to act as the "pharmacist-in-charge" of the Pharmacy during the relevant time period in this case. Dr. Schnupp, as he later acknowledged and as is required by law, was "responsible for all pharmacy operations," including "ensur[ing] compliance state, federal and third party regulations," and participated in "market[ing]" the Pharmacy's products to local physicians.[1] To assist with informing physicians of the compounds available at the Pharmacy, Mr. Blair hired independent contractors to market the products prepared at the Pharmacy – as he believed (and observed) was widely permissible in the industry. The Indictment only charges Mr. Blair for payments made to one independent contractor – Atlas Group, LLC ("Atlas Group")[2] – who was hired to promote the Pharmacy's products to local physicians. For several years, the Pharmacy achieved great financial success.

Years later, however, Mr. Blair was indicted for the practices and processes of the Pharmacy via an Indictment that glaringly omits any charges against, among others, Atlas Group – despite that much of the conduct described in the Indictment was undertaken by and/or the responsibility of Atlas Group. Separate from the Government's tunnel vision in charging Mr. Blair with conduct that undeniably was within the purview of others, the Government

---

[1] Keystone Medicinals, LLC (Primary Contact, Timothy Schnupp) Medical Marijuana Dispensary Permit Application, Pennsylvania Dept. of Health at pp. 20, 53-54, http://www.health.state.pa.us/mmrtk/docs-dispensaries-revised/D-1021-17_final.pdf (last visited Sept. 23, 2020).

[2] The Atlas Group was formed by its principal, Ben Alavi ("Alavi").

conspicuously omits any discussion of the then-existing regulatory guidance and/or precedent addressing the AKS violations charged in Counts 29 (alleging that Mr. Blair infrequently failed to bill and/or collect copayments and/or coinsurance for TRICARE beneficiaries) and 30 to 33 (alleging that Mr. Blair made several payments to Atlas Group for their marketing services). Those omissions are for good reason, because, as discussed in detail below, it is not clear, and was not clear at the time of the alleged acts, that the conduct charged in all five of the subject counts (Counts 29 to 33) actually constituted any violation of the law — let alone a criminal one.

Fed. R. Crim. Proc. 12(b)(3)(B) permits a defendant to challenge a defect in the indictment prior to trial, including where, as here, a charge is based on an unconstitutionally vague statute. Moreover, consideration of the instant motion to dismiss is procedurally proper at this stage because Mr. Blair presents a solely legal question: whether the AKS provisions at issue, in light of the below-detailed regulatory guidance and judicial construction, are void for vagueness? Mr. Blair submits the answer is affirmative; because an individual is entitled to fair notice that his/her conduct was illegal *before* such conduct was undertaken so as to permit individuals to conform their conduct to the law, a criminal prosecution predicated on a statute that fails to provide such notice is void-for-vagueness. As a result, Counts 29 to 33, alleging violations of the AKS, should be dismissed.

## II.    APPLICABLE LEGAL FRAMEWORK

### A.    The Anti-Kickback Statute

The Anti–Kickback Statute is a criminal statute that prohibits the knowing and willful payment of remuneration to induce referrals for items or services paid for by a federal health care program such as Medicare. *See* 42 U.S.C. § 1320-7b. The statute is intended to avoid fraud against federal health care programs by preventing "'increased costs and abusive practices resulting from provider decisions that are based on self-interest rather than cost, quality of care

or necessity of services'" and "protect[ing] patients from doctors whose medical judgments might be clouded by improper financial consideration." *United States v. Patel*, 778 F.3d 607, 612 (7th Cir. 2015) (citations omitted). Here, Mr. Blair is being prosecuted for allegedly paying unlawful "remuneration" to (1) TRICARE beneficiaries, by failing to bill for and/or collect copayments (Count 29), and (2) an independent sales marketer (Atlas Group), by hiring it as an independent contractor to market the Pharmacy and its unique compounds (Counts 30 to 33). *See* Indictment at 17 to 18.

The relevant provisions of the AKS include its core prohibition on paying remuneration for referrals for items paid for by federal health care programs like TRICARE:

> (b) Illegal remunerations
> . . .
> (2) Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person –
>
> > (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, []
> > . . .
> shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b(b)(2)(A).

**B.      The AKS Safe Harbors**

The prohibitions of the AKS are not absolute. Its exceptions, many of which are codified in the AKS and its implementing regulations, include three relevant to this motion: (1) the "Employee" Safe Harbor, (2) the "Agent" Safe Harbor, and (3) the Copayment Exception. As discussed below, these three exceptions, which broadly permit payments to certain categories of individuals and/or payment practices where certain conditions are met, have shaped the regulatory backdrop (and subsequent judicial interpretations) of the AKS, all of which bear on

whether Mr. Blair had fair notice that the conduct charged in this case was criminal at the time he purportedly undertook it.

1.   The "Employee" Safe Harbor

One exception to the payment of so-called "renumeration" is compensation for *bona fide* employees.  Pursuant to the AKS, its prohibitions against receiving or paying remunerations "shall not apply to . . . (B) any amount paid by an employer to an employee (who has a bona fide employment relationship with such employer) for employment in the provision of covered items or services."  42 U.S.C. § 1320a-7b(b)(3)(B).  The Department of Health and Human Services ("HHS") has also promulgated regulations establishing a number of safe harbors for certain payment practices that are excepted from the scope of and not treated as a criminal offense under the AKS.[3]  *See* 42 C.F.R. § 1001.952.  The "Employee" Safe Harbor is further codified in HHS regulations as follows:

> *Employees*. As used in section 1128B of the Act, "remuneration" does not include any amount paid by an employer to an employee, who has a bona fide employment relationship with the employer, for employment in the furnishing of any item or service for which payment may be made in whole or in part under Medicare, Medicaid or other Federal health care programs. For purposes of paragraph (i) of this section, the term *employee* has the same meaning as it does for purposes of 26 U.S.C. 3121(d)(2).

*Id.* (italics in original).  The cited statute in this regulation refers to the IRS Code's definition of "employee" as "any individual who, under the usual common law rules applicable in determining the employer-employee relationship, has the status of an employee." 26 U.S.C. § 3121(d)(2).

---

[3] "'According to the [HHS-OIG'S] [] commentary to the proposed and final regulations, these exceptions reflected a concern that the AKS had been so broad that "some relatively innocuous commercial arrangements were technically covered by the statute and therefore were subject to criminal prosecution.'" *United States v. Aids Healthcare Found., Inc.*, 262 F. Supp. 3d 1353, 1361 (S.D. Fla. 2017) (citing Medicare and Medicaid Programs: Fraud and Abuse, OIG Anti–Kickback Provisions, 54 Fed. Reg. 3088, 3088 (Jan. 23, 1989) (proposed rule); Medicare and State Health Care Programs: Fraud and Abuse; OIG Anti–Kickback Provisions, 56 Fed. Reg. 35,952, 35,952 (July 29, 1991) (codified at 42 C.F.R. § 1001.952 (2005)) (final rule)).

2. The "Agent" Safe Harbor

A separate exception has been promulgated for "personal services and management contracts," which expressly defines "renumeration" to "not include any payment made by a principal to an agent as compensation for the services of the agent" ***so long as the agent's engagement meets seven strict requirements***:

(1) The agency agreement is set out in writing and signed by the parties.
(2) The agency agreement covers all of the services the agent provides to the principal for the term of the agreement and specifies the services to be provided by the agent.
(3) If the agency agreement is intended to provide for the services . . . on a periodic, sporadic or part-time basis . . . , the agreement specifies exactly the schedule of such intervals, their precise length, and the exact charge for such intervals.
(4) The term of the agreement is for not less than one year.
(5) The aggregate compensation paid to the agent over the term of the agreement is set in advance, is consistent with fair market value in arms-length transactions and is not determined in a manner that takes into account the volume or value of any referrals or business otherwise generated between the parties for which payment may be made [by Federal health care programs].
(6) The services performed under the agreement do not involve the counselling or promotion of a business arrangement or other activity that violates any State or Federal law.
(7) The aggregate services contracted for do not exceed those which are reasonably necessary to accomplish the commercially reasonable business purpose of the services.

42 C.F.R. § 1001.952(d).

3. The Copayment Exception

The third relevant exception is one that concerns when "remuneration" under the AKS includes the waiver of copayments. This exception was acknowledged in published guidance by HHS-OIG for decades before it was formally enacted in 2016. *See* Publication of OIG Special Fraud Alerts, 59 F.R. 65,372, 65,375 (Dec. 19, 1994) (the "Special Alert") (republishing "Special Fraud Alert: Routine Waiver of Copayments or Deductibles Under Medicare Part B"

issued in May 1991). The Special Alert identified an important exception to the AKS' apparent outright ban on "remuneration" where it takes the form of waiving copayments:[4]

> *In certain cases*, a provider . . . who routinely waives Medicare copayments or deductibles also could be held liable under the Medicare and Medicaid anti-kickback statute. 42 U.S.C. 1320a-7b(b). . . . When providers . . . forgive financial obligations for reasons other than genuine financial hardship of the particular patient, they may be unlawfully inducing that patient to purchase items or services from them.
> . . .
> One important exception to the prohibition against waiving copayments and deductibles is that providers . . . may forgive the copayment in consideration of a particular patient's financial hardship. This hardship exception, however, must not be used *routinely*; it should be used occasionally to address the special financial needs of a particular patient. Except in such special cases, a good faith effort to collect deductibles and copayments must be made.

*Id.* (emphasis added) (the "Copayment Exception"); *accord* Re: (name redacted) Advisory Opinion No. 97-4, OIG Advisory Opinion No. 97-4 (1997), at *4 (noting that HHS-OIG had previously stated that "providers who routinely waive Medicare Copayments" or "forgive financial obligations for reasons other than genuine financial hardship of the particular patient" may be liable under the AKS).

The Special Alert continues by listing practices that HHS-OIG considers potential "indications of improper waiver of deductibles and copayments":

- Advertisements which state: "Medicare Accepted As Payment in Full," "Insurance Accepted As Payment in Full," or "No Out-Of-Pocket Expense."

- Advertisements which promise that "discounts" will be given to Medicare beneficiaries.

---

[4] "Copayments," are a fixed amount that a beneficiary pays for a covered health care service. Copayments are similar to (and sometimes confused with) "coinsurance," which is the portion of the cost of an item or service which the beneficiary must pay. *See* 59 F.R. 65,372, 65,374.

- Routine use of "Financial hardship" forms which state that the beneficiary is unable to pay the coinsurance/deductible (i.e., there is no good faith attempt to determine the beneficiary's actual financial condition).

- Collection of copayments and deductibles only where the beneficiary has Medicare supplemental insurance ("Medigap") coverage . . . .

- Charges to Medicare beneficiaries which are higher than those made to other persons for similar services and items . . . .

- Failure to collect copayments or deductibles for a specific group of Medicare patients for reasons unrelated to indigency (e.g., a supplier waives coinsurance or deductible for all patients from a particular hospital, in order to get referrals).

- "Insurance programs" which cover copayments or deductibles only for items or services provided by the entity offering the insurance. . . .

59 F.R. 65,372, at 65,375.

HHS-OIG finally amended the "Exceptions" regulation at 42 C.F.R. § 1001.952 to codify the Copayment Exception in 2016.  *See* 42 C.F.R. § 1001.952(k) (titled "Waiver of beneficiary copayment, coinsurance and deductible amounts").

## III.    THE INDICTMENT'S AKS COUNTS

This motion seeks to dismiss five AKS counts charged in the Indictment: Count 29, for alleged remuneration to beneficiaries through waiving of co-pays, and Counts 30 to 33, for alleged remuneration to independent sales marketers to induce referrals.

### A.    "Remuneration" Allegations (Counts 30 to 33)

In Counts 30 to 33, the Government contends that Mr. Blair paid unlawful remuneration to "independent sales marketers," namely, Atlas Group.  *See* Indictment at 17 to 18.  As to these charges, the Indictment includes a perfunctory recitation of certain statutory elements:

> BLAIR did knowingly and willfully offer to pay and did pay, remuneration . . . to Atlas Group, LLC and others, to induce them to refer individuals and prescriptions to Blair Pharmacy for the furnishing of prescription compound drugs, payment for which

was made in whole and in part, under a federal health care benefit program . . . .

*Id.* The Indictment then lists several specific payments made by the Pharmacy to Atlas Group as the substantive counts. *Id.*

In the wire fraud scheme section of the Indictment, which is incorporated into Counts 30 to 33, the Government asserts that:

> BLAIR paid independent sales marketers to market his compound drugs and to provide the prescription forms he created to doctors, namely, BLAIR paid independent contractors, such as Atlas Group, LLC, remuneration in the form of a percentage of the money that health care benefit programs reimbursed to his pharmacy . . . .

*Id.*, ¶ 21.

Taken together, the Government alleges that Mr. Blair paid purportedly unlawful remuneration by compensating Atlas Group for marketing services, including efforts to "market his compound drugs" and "provide the prescription forms" created by the Pharmacy to physicians. *Id.* The Government then makes the incredible (and unsupportable) leap that the payments were undertaken to "induce" the marketer (Atlas Group) to "refer individuals and prescriptions" to the Pharmacy. *Id.* at 17. Notably, the Indictment does not allege that Mr. Blair or anyone else on his behalf, including Atlas Group paid remuneration to any heath care provider. *See generally id.* Based on these allegations (and omissions), Mr. Blair can only assume that it is the *mere payment* of compensation to an "independent sales marketer[]" that the Government contends constitutes illegal remuneration intended to "induce" referrals and prescriptions to the Pharmacy in violation of the AKS.

## B.    Copayment Allegations (Count 29)

The allegations underpinning Count 29 are materially different from those in Counts 30 to 33 but suffer the same flaw. In this charge, the Government essentially claims that Mr. Blair

waived co-payment obligations and thus paid "remuneration" to TRICARE beneficiaries (the patients). In relevant part, the Indictment specifically alleges that Mr. Blair "failed to bill for and collect copayments and coinsurance from TRICARE beneficiaries related to reimbursements TRICARE paid to [the] pharmacy." Indictment at 17 (Count 29). Like Counts 30 to 33, the Indictment makes separate allegations in the wire fraud scheme (incorporated into Count 29) arguably pertinent to the Government's copayment allegations,[5] including that Mr. Blair purportedly failed to bill and/or collect copayments or coinsurance monies from both government and/or private insurance beneficiaries, and speculating as to certain reasons why he allegedly did so, including to induce prescriptions to be filled at the Pharmacy. *Id.*, ¶ 35. Despite the long-recognized Copayment Exception, the Indictment is conspicuously silent about whether the alleged failure to collect copayments and/or coinsurance was "routine," or whether such conduct was a result of the beneficiaries' financial hardship (or lack thereof), or whether any good faith efforts to collect these monies were made by the Pharmacy. *See supra*, Part II.B.3.

## IV. COUNTS 29 TO 33 ARE VOID FOR VAGUENESS AND MUST BE DISMISSED

### A. Legal Standards for Vagueness Challenges

The vagueness doctrine has its roots in the Due Process Clause of the Fifth Amendment. A criminal conviction cannot comport with the dictates of due process where it is based on a law that is too vague. The three guiding principles of the vagueness doctrine were eloquently explained by the Supreme Court as follows:

> Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary

---

[5] As detailed in a separate motion to strike, the allegations of Paragraph 35 as they pertain to *private insurers* should be stricken. As discussed in that motion, those allegations are not pertinent to Count 29 and, indeed, are confusing and prejudicial to Mr. Blair. *See* Defendant's Motion to Strike Certain Allegations in Paragraph 35 and Certain Alleged Loss Amounts in Superseding Indictment (filed contemporaneously herewith).

intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standard for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application. Third, but related, where a vague statute abuts upon sensitive areas of basic First Amendment freedoms, operates to inhibit the exercise of (those) freedoms. Uncertain meanings inevitably lead citizens to steer far wider of the unlawful zone . . . than if the boundaries of the forbidden areas were clearly marked.

*Grayned v. City of Rockford*, 408 U.S. 104, 108-109 (1972).[6]

As a matter of due process, vagueness may invalidate a law for either of two independent reasons. *City of Chicago v. Morales*, 527 U.S. 41, 58 (1999). First, the law may fail to provide a person of ordinary intelligence fair notice of what is prohibited; second, it may be so standardless that it authorizes or encourages seriously discriminatory enforcement. *See, e.g.*, *id.* at 56; *United States v. Williams*, 553 U.S. 285, 304 (2008); *Manning v. Caldwell for City of Roanoke*, 930 F.3d 264, 272 (4th Cir. 2019) (citations omitted).

The fair notice requirement is intended to enable ordinary citizens to conform their conduct to the law. *Morales,* 527 U.S. at 58 ("No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes."). The statute is void for vagueness if it fails to provide any standard by which persons can determine whether they are violating the statute. *Manning*, 930 F.3d at 274 (citing *Kolender v. Lawson*, 461 U.S. 352, 358 (1983)).

Moreover, "Supreme Court precedent requires that statutes be based on objectively

---

[6] Vagueness challenges are often preceded by overbreadth challenges; if a statute is not facially overbroad, the next inquiry should be whether it is void for vagueness. *Hoffman Estates v. The Flipside, Hoffman Estates*, 455 U.S. 489, 494-95 (1989). In a separate motion, Mr. Blair has moved to dismiss Counts 30 to 33 of the Indictment on the grounds that the AKS provisions are overly broad under the First Amendment and infringe upon his and others' free speech rights. *See* Defendant's Omnibus Motion to Dismiss Counts 30 to 33 of Indictment as Constitutional Violations (filed contemporaneously herewith).

discernable standards." *Id.* at 278 (collecting cases). A law with "no basis on which to conclude that [the] conduct was clearly prohibited . . . invites the very type of arbitrary enforcement that the Constitution's prohibition against vague statutes is designed to prevent." *Id.* (citing *Cooper*, 842 F.3d at 842-43) (holding Virginia statute concerning "habitual drunkards" was unconstitutionally vague and district court erred in dismissing plaintiffs' vagueness challenge).

The degree of vagueness tolerated in a law depends in part on whether the statute is civil or criminal in nature. *Manning*, 930 F.3d at 272. For laws that impose criminal penalties, "a stricter standard is applied in reviewing the statute for vagueness." *Id.* at 273 (citing *Hoffman*, 455 U.S. at 498–99). The long-standing rule of lenity requires the court to interpret such vague and overbroad laws in favor of the defendant. *Rewis v. United States*, 401 U.S. 808, 812 (1971) (citing *Bell v. United States*, 349 U.S. 81, 83 (1955)).

**B.      The "Remuneration" Counts Fail to Give Mr. Blair Constitutionally Required Notice.**

Dismissal of Counts 30 to 33 is warranted because Mr. Blair lacked adequate notice that the conduct charged by the Government in these counts—simply paying an independent marketer for marketing services—was illegal at the time he engaged in such conduct. As discussed below, a variety of factors led to the vague nature of the charged AKS provisions, including years' worth of regulatory guidance and judicial decisions that failed to provide objective standards by which individuals could determine what conduct is permissible, on the one hand, and illegal, on the other. For those reasons, at the time Mr. Blair undertook the alleged conduct, he could not have known it was illegal.

### 1.      Regulatory Guidance

The AKS has seemingly drawn a distinction between providers hiring employees for marketing as lawful and hiring a certain class of independent contractors for marketing as

unlawful, even though the individuals hired perform the exact same conduct. In 2015, the application of the AKS was sufficiently vague as it did not and does not define when an arrangement, which did not squarely fit in a safe harbor, would be considered a violation of the AKS so an ordinary person was left to guess as to what standard was applicable and, accordingly, the government's enforcement of the AKS on a case-by-case basis becomes arbitrary and discriminatory, and too vague to give proper notice of an act which the government deems criminal in nature. *E.g.*, *Morales*, 527 U.S. at 58.

Over the years, the government has issued a number of publications to provide guidance, to ordinary citizens and law enforcers alike, with respect to this issue. For example, the Medicare and Medicaid Patient and Program Protection Act of 1987 provided new authority to HHS-OIG to exclude a person or entity from participation in federal health care programs if it is determined that the party is engaged in a prohibited remuneration scheme. *See* Medicare and Medicaid Programs; Fraud and Abuse OIG Anti-Kickback Provisions, 54 F.R. 3088-01. The law simultaneously required the "promulgation of regulations specifying those payment practices that will not be subject to criminal prosecution under section 1128B of the Act," due to concerns that "the language proscribing remuneration that induces referrals is so broadly written as to encompass many harmless or efficient arrangements as well." *Id.*

Since 1989, the government has indicated that agreements with independent contractors are not *per se* illegal solely because referrals are made. *See, e.g., id.* For example, in describing the "Agent" Safe Harbor discussed above, the government stated that agreements between providers to perform services for each other on a mutually beneficial basis are not *per se* illegal solely because referrals between the parties occur. *Id.* It went on to provide three examples of "abusive arrangements," but each indicates that the person being paid the purportedly

impermissible remuneration is the same person making the actual referral. *See id.* (the second example is "a hospital-employed respiratory therapist is paid by a supplier for servicing home oxygen equipment, but only in cases where the therapist is the *source of the patient referral*") (emphasis added). As discussed below, that is not alleged here, nor is there evidence to support such a claim.

Chief among the relevant publications is a 1998 OIG advisory opinion in which HHS-OIG determined that an independent sales representative whose principal, a medical manufacturer, paid him a commission for sales would *not* be subject to prosecution. *See* Re: Advisory Request No. 98-10, 1998 WL 35287765, at *1 (Sept. 8, 1998) ("OIG Opinion 98-10"). That opinion was requested by an independent sales representative who was retained by a manufacturer of disposable medical supplies. *Id.* The salesman negotiated contracts on behalf of the manufacturer with potential purchasers, each of which was a hospital system or purchaser for hospital systems whose patients would use the manufacturer's products. *Id.* The manufacturer paid the salesman a monthly commission based on the amounts bought by the purchasers. *Id.* Of note, the salesman had no financial arrangements with any of the purchasers, and the manufacturer had no relationship with the purchasers except through the salesman. *Id.* at *2.

HHS-OIG noted that sales agents are in the business of recommending or arranging for the purchase of the items or services on behalf of their principals, typically manufacturers or other sellers. *Id.* at *3. "Accordingly, any compensation arrangement between a Seller and an independent sales agent for the purpose of selling health care items or services that are directly or indirectly reimbursable by a Federal health care program potentially implicates the anti-kickback statute, irrespective of the methodology used to compensate the agent." *Id.* HHS-OIG stated that "safe harbor protection is only afforded to those arrangements that precisely meet all of the

conditions set forth in the safe harbor." *Id.*

Nevertheless, HHS-OIG then concluded that, although the particular commission-based sales arrangement at issue **did not meet the safe harbor**, **it did not believe that it was sanctionable under the AKS**. *Id.* at *3-4. In reaching this decision, HHS-OIG explained that it had "identified several characteristics of arrangements among Sellers, sales agents, and purchasers that appear to be associated with an increased potential for program abuse," including but not limited to: compensation based on sales volume; direct contact between the salesman and physicians in a position to order items or services that are then paid for by a federal health care program; direct contact between the salesman and beneficiaries; use of sales agents who are health care professionals or persons in a similar position to exert undue influence on purchasers or patients; or that the items or services marketed are separately reimbursable by a federal health care program. *Id.* "[T]he more factors that are present, the greater the scrutiny we ordinarily will give an arrangement." *Id.* at *4. And, HHS-OIG continued to advise that, "[o]f course, in all cases the statue is not violated unless the parties have the requisite intent to induce referrals." *Id.*

Based on this and similar HHS-OIG guidance, health care attorneys published commentary espousing the consistent idea that illegality under the provisions of the AKS and the safe harbors which are the subject of Counts 30 to 33 requires:

> …something more than just a seller's intent to incentivize the agent to arrange for or recommend the purchase of covered items. That "something more," . . . is the seller's intent for the agent to *use improper influence to subvert another person's or entity's decision regarding the ordering or purchasing of a covered item*.

Lynch, Joseph E., "*Does Intent Matter? Applying the Federal Anti Kickback Law to Marketing Arrangements,*" American Health Lawyers Assn., Connections, Aug. 2012, at 19 (emphasis

added). As discussed below, the existence of some undue influence on the prescribers or beneficiaries has been considered by some courts as a basis for distinguishing lawful from criminal arrangements.

HHS-OIG's case-by-case approach continues to be reflected in recent guidance, such as the Office of Inspector General Fact Sheet, Notification of Proposed Rulemaking OIG-0936-AA10-P, October 2019, which states:

> Healthcare providers and others may voluntarily seek to comply with statutory and regulatory safe harbors so that they have the assurance that their business practices will not be subject to any anti-kickback enforcement action. (see 42 CFR sec. 1001.952). Parties may use any applicable safe harbor into which they can squarely fit. **However, failure to fit in a safe harbor does not mean that an arrangement violates the anti-kickback statute. Arrangements that do not fit in a safe harbor are analyzed on a case by case basis, including whether the parties had the requisite criminal intent."**

*Id.* (emphasis added).

In sum, HHS-OIG has made it clear that there is *some conduct* with respect to the payment of independent marketers on a commissioned basis that falls outside the safe harbors but still is considered to *not violate* the AKS; yet, HHS (or any other governmental entity) has not described that conduct with objectively discernable standards, leaving the government free to prosecute a defendant (like Mr. Blair) who had no way to determine in 2015 what was legal and what was not. *Cf. Manning*, 930 F.3d at 278.

2.     Judicial Decisions

Far from eliminating the vagueness, judicial decisions have added to the ambiguity and confusion in interpreting the AKS in conjunction with the "Employee" and "Agent" Safe Harbors. The due process guarantees underpinning the vagueness doctrine, however, bar courts from applying a novel construction of a criminal statute that neither the law nor prior judicial

decisions has fairly disclosed. *United States v. Lanier*, 520 U.S. 259, 266 (1997).

Some court rulings demonstrate an interpretation consistent with the concept that "*something more*" than a principal's desire to earn business through increased referrals is required to subject its marketing efforts using independent agents to AKS liability. *See* Lynch, at 19. In particular, many judicial decisions relied heavily on the fact that the agent at issue, whether an independent sales representative (such as Atlas Group) or patient advocate, used improper influence over a purchaser, prescriber, or patient's decision to order or purchase a covered item. *See*, *e.g.*, *United States v. Vernon*, 723 F.3d 1234, 1256 (11th Cir. 2013); *United States v. Miles*, 360 F.3d 472, 480 (5th Cir. 2004); *United States v. Polin*, 194 F.3d 863, 866 (7th Cir. 1999).

For example, where the salesman's "recommendation" was the functional equivalent of the prescriber's or patient's decision, courts have found that a principal's payments to the salesman necessarily were intended "to induce referrals" and gave rise to illegal remuneration. *See, e.g., Polin*, 194 F.3d at 866 (salesman's recommendation was never once rejected by a physician in his 14-year career, so physician's authorization was "more of a formality or rubber stamping of [salesman's] referral"); *Vernon,* 723 F.3d at 1256 (beneficiaries would invariably follow the recommendation of "patient advocate"). On the other hand, where the sales representative had no authority or control to act on behalf of a doctor in selecting the provider of the item or service paid for by the federal health care program, courts have held that payments to marketers were not "remuneration" within the meaning of the AKS and did not constitute kickbacks. *See, e.g., Miles*, 360 F.3d at 480 (finding "no evidence that [sales representation] had any authority to act on behalf of a physician in selecting the particular home health care provider"); *accord United States v. Shoemaker*, 746 F.3d 614, 630 (5th Cir. 2014) (noting that

the AKS has broad liability to "reach operatives who leverage fluid, informal power and influence").[7]

In light of these authorities, it was not clear—and remains unclear—whether payments to a marketer who promoted a pharmacy and its unique products, without exerting any undue influence, would fall squarely within the conduct proscribed by the AKS. The Government's charges based on such conduct are, therefore, void for vagueness.

### 3.    Counts 30 to 33 Fail to Provide Mr. Blair Adequate Notice.

At the time Mr. Blair allegedly made the payments giving rise to Counts 30 to 33, he could not have known, in light of the then-available government guidance and precedent discussed above, that the alleged payments were criminal.[8] Because the Indictment omits any allegations that Atlas Group used improper influence to induce doctors to prescribe compounded drugs filled by the Pharmacy, the Government's singular allegation is that the *mere payment* of monies to Atlas Group alone constitutes an AKS criminal violation.[9] *See* Indictment, ¶ 21. However, as explained above, Mr. Blair could not have known from the state of the law and guidance in mid-2015 (the alleged improper remuneration having purportedly been paid in March, April, and May 2015), that the mere payment of monies to an independent contractor for marketing services could alone constitute a criminal AKS violation. Indeed, since employer-

---

[7] *See also Vernon*, 723 F.3d at 1254-56 (accepting *Miles* for the proposition that a kickback must be paid to a "relevant decisionmaker" in order for liability to attach, but distinguishing *Miles* factually); *United States v. Medina*, 485 F.3d 1291, 1298 (11th Cir. 2007) (holding, despite evidence concerning kickbacks to patient recruiters among others, that "paying kickbacks alone is not sufficient to establish health care fraud").

[8] The mere fact that the arrangement with Atlas Group and the Pharmacy was memorialized in a written agreement and was not clandestine further confirms that Mr. Blair could not have known such conduct was improper at the time.

[9] Indeed, considering that Atlas Group (or any other marketers) are not defendants in this action confirms that the Government has no evidence of improper influence or payments to physicians because, surely if there was such evidence, Mr. Blair would not be the lone defendant in this case.

contractor relationships that do not squarely fit within a safe harbor do not necessarily constitute a criminal act, and since the presence of "suspect" indications promulgated by HHS-OIG[10] also, in and of themselves, do not necessarily state a criminal offense, Mr. Blair could not have had notice that the Pharmacy's arrangement with Atlas Group was criminal.

As described *supra*, pre-2015 regulatory guidance advised that an independent sales representative who was paid commissions for sales for a medical manufacturer, without anything more, as is alleged here, would *not* be subject to prosecution.[11] Indeed, the regulatory guidance at the time indicated that enforcement would be appropriate only if "abusive arrangements" (such that the person being paid improper remuneration was the same person making the actual referral) existed[12] or if certain characteristics "associated with an increased potential for program abuse" (such as direct contact between salesmen and beneficiaries, the existence of "undue influence on purchasers or patients," and the like) were present.[13] As noted above, the Government alleges *none* of these facts in the Indictment, nor could it.

Likewise, pre-2015 judicial precedent indicated that where, as here, the sales representative had no authority or control to act on behalf of a doctor in selecting the provider of the item or service paid for by the federal health care program, payments to marketers were not "remuneration" within the meaning of the AKS and therefore did not constitute kickbacks. *See, e.g., Miles* (finding "no evidence that [sales representative] had any authority to act on behalf of a physician in selecting the [provider]"). Moreover, in 2014, shortly before the payments at issue in Counts 30 to 33, the Court of Appeals for the Fifth Circuit revisited and clarified its decision

---

[10] *See* OIG Opinion No. 98-10 at *3-4.

[11] *See id.* at *4.

[12] 54 F.R. 3088-01.

[13] OIG Opinion 98-10 at *3-4.

in *Miles*:

> Where advertising facilitates an independent decision to purchase a healthcare good or service, and where there is no evidence that the advertiser "unduly influence[s]" or "act[s] on behalf of" the purchaser, the mere fact that the good or service provider compensates the advertiser following each purchase is insufficient to support the provider's conviction for making a payment "to refer an individual to a person" under 42 U.S.C. § 1320a–7b(b)(2)(A).

*Shoemaker*, 746 F.3d at 628 (citing *Miles*, 360 F.3d at 480).

In addition, the fact that experienced attorneys, like the courts, came to differing conclusions, underscores the vague, ambiguous, and inconsistent nature of the AKS safe harbors and related OIG guidance. *See, e.g.*, Lynch, at p. 18-23. Even *the Government* is not applying this AKS provision consistently. Neither Atlas Group nor any other individual marketers (nor any health care providers) have been charged with the so-called AKS violations described in Counts 30 to 33. The Government's selective enforcement of the statute against Mr. Blair further illustrates that the statute's vagueness makes it ripe for arbitrary and discriminatory application.

Because of such vagueness, neither the AKS and its regulations nor governmental guidance provide fair notice to the ordinary person (such as Mr. Blair) of what is prohibited thereunder. As a result, the Government's interpretation of the AKS in this case and its arbitrary and discriminatory enforcement of the AKS against Mr. Blair violates Mr. Blair's due process rights. The charges in Counts 30 to 33 therefore cannot stand and must be dismissed.

### C. The Copayment Allegations are Impermissibly Vague.[14]

Like Counts 30 to 33, it also was unclear at the time of Mr. Blair's alleged failure to

---

[14] Mr. Blair also raises constitutional notice challenges to the Government's rote recitation of mere statutory language in Count 29 in his Motion to Dismiss Count 29 of Superseding Indictment for Failure to State an Offense (filed contemporaneously herewith).

infrequently collect copayments from TRICARE beneficiaries—as is alleged in Count 29—that somehow this was illegal.

### 1. Regulatory Guidance

Since at least 1994, HHS-OIG has explained that billing for and not collecting copayments is not, in and of itself, a violation of the AKS. *See* Special Alert, 59 F.R. 65,372, at 65,375. Indeed, HHS-OIG's guidance on waivers of copayments in the 1994 Special Alert remained the operative guidance through 2016, including through mid-2015 when the copayment waivers in this case are alleged to have occurred.[15] As discussed above, that guidance advised that only in certain circumstances—*i.e.,* advertisements which promised discounts on copayments or "routine" waivers of copayments—would non-collection of copayments constitute an AKS violation. *See supra* Part IV.B.1.

In fact, the vagueness plaguing the AKS extended to one of the most fundamental aspects of the statute: the definition of "remuneration." While the AKS specifically states that "remuneration" includes any "kickback, bribe, or rebate," it does not otherwise define the term, which may be direct or indirect, overt or covert, in cash or in kind. *See* 42 U.S.C. § 1320a-7b(b)(2). However, the Civil Monetary Penalties Law ("CMPL"), a related statute that imposes civil penalties based on inducements (kickbacks) offered to patients, does define "remuneration." 42 U.S.C. § 1320a-7a(i)(6). Significantly, it *excludes* "the waiver of coinsurance and deductible amounts by a person" as remuneration where the waiver meets these conditions:

    (i)   the waiver is not offered as part of any advertisement or solicitation;
    (ii)  the person does not routinely waive coinsurance or deductible amounts; and
    (iii) the person—
           (I)   waives the coinsurance or deductible amounts after determining in good faith that the individual is in financial need; or

---

[15] A December 2016 publication by HHS-OIG encouraged stakeholders to review the Special Alert, describing it as "our guidance on routine waiver of cost sharing obligations." 81 F.R. 88371 (Dec. 7, 2016).

> (II) fails to collect coinsurance or deductible amounts after making reasonable collection efforts[.]

*Id.* Those conditions are notably similar to those espoused by HHS-OIG in the Special Alert establishing the Copayment Exception. *See* Special Alert, 59 F.R. 65,372, at 65,375.[16]

Importantly, in early 2015, just prior to the alleged copayment waivers at issue in Count 29, the United States Department of Justice (the "DOJ") suggested that "remuneration" *for purposes of the AKS* is interpreted consistent with the CMPL definition of "remuneration." In January 2015, the DOJ filed an amicus brief in *Ameritox, Ltd. v. Millennium Laboratories, Inc.*, 803 F.3d 518 (11th Cir. 2015), in which it cited the *CMPL* definition of "remuneration" to argue how *the AKS* defines that term. *See* Appellate Case No. 14-14281, Corrected Brief For the United States of America As Amicus Curiae Supporting Appellee, filed Feb. 2, 2015. Consequently, it was reasonable to believe that the government considered the CMPL definition of "remuneration"—expressly excluding non-routine and hardship-based waivers of coinsurance—to apply in interpreting the AKS' scope and determining whether copayment practices were actionable.

### 2. Judicial Decisions

Similarly, a review of published federal judicial decisions as of early 2015 would have revealed numerous court rulings that applied the CMPL definition of "remuneration" in interpreting what constitutes "remuneration" under the AKS. *E.g.*, *United States ex rel. Grenadyor v. Ukrainan Vill. Pharmacy, Inc.*, 895 F. Supp. 2d 872 (N.D. Ill. 2012) (quoting conditions of CMPL remuneration definition's copayment exception); *United States ex rel.*

---

[16] The Special Alert reflects HHS-OIG's similar exclusion: "One important exception to the prohibition against waiving copayments and deductibles is that providers . . . may forgive the copayment in consideration of a particular patient's financial hardship. This hardship exception, however, must not be used *routinely*; it should be used occasionally to address the special financial needs of a particular patient. Except in such special cases, a good faith effort to collect deductibles and copayments must be made." *Id.*

*Freedman v. Suarez–Hoyos,* 781 F. Supp. 2d 1270, 1281 (M.D. Fla. 2011) (favorably citing

*United States ex rel. Westmoreland v. Amgen, Inc.*, 738 F. Supp. 2d 267 (D. Mass. 2010), for

applying CMPL's definition of remuneration when analyzing kickback claims asserted under the

AKS and rejecting  defendant's attempt to distinguish statutes).[17] Some even characterized it as

**the AKS'** definition.  *See Bilotta,* 50 F. Supp. 3d at 514; *Carroll*, 320 F. Supp. 2d at 756; *Fair*

*Lab. Practices Assocs.*, 2011 WL 1330542, at *2.  This again goes to show that the available

guidance from the courts, like governmental authorities, gave the reasonable impression that the

AKS' prohibition on paying "remuneration" for referrals did not criminalize the mere waiver of

copayments, because an exception existed for non-routine, hardship-based waivers of

copayments and waivers after reasonable efforts to collect.

Beyond that, such a review of case law too would have provided little clarity.  Most

significantly, it would have revealed **no case** in which the government criminally prosecuted a

defendant for violating the AKS by infrequently failing to collect or bill for copayments.  While

allegations of improper copayment waivers have given rise to several civil *qui tam* suits asserting

the submission of false claims to the government under the False Claims Act ("FCA"), the

rulings in those cases would have confirmed that not *all* copayment waivers are illegal.[18]  Mr.

---

[17] *See also United States ex rel. Bilotta v. Novartis Pharm. Corp.,* 50 F. Supp. 3d 497, 514 (S.D.N.Y. 2014); *United States ex rel. Fair Lab. Practices Assocs. v. Quest Diagnostics Inc.,* No. 05cv5393, 2011 WL 1330542, at *2 (S.D.N.Y. Apr. 5, 2011), *aff'd,* 734 F.3d 154 (2d Cir. 2013); *United States v. Carroll,* 320 F. Supp. 2d 748, 56 (S.D. Ill. 2004).

[18] *See Grenadyor*, 895 F. Supp. 2d at 878 (finding, after government declined to intervene, pharmacist stated FCA claim against pharmacies where he "specifically alleged the copay waivers were done as part of over-the-phone solicitations, routinely and without regard to customers' financial needs"); *United States ex rel. Sharp v. E. Oklahoma Orthopedic Ctr.*, No. 05-CV-572-TCK-TLW, 2009 WL 499375, at *24 (N.D. Okla. Feb. 27, 2009) (holding complaint sufficiently alleged the submission of false claims because defendant "waived co-insurance for one particular patient for every visit the patient made between July 28, 2003 and February 9, 2004" but did not allege AKS "kickbacks" absent claim that defendant "provided the waiver for the purpose of inducing the patient to purchase services").  *But see United States ex rel. Grayson v. Genoa Healthcare*, No. C09-506Z, 2011 WL 2670079, at *3 (W.D. Wash. July 6, 2011) (dismissing FCA claims premised on allegation that defendant "routinely waived copayments," but lacking allegation of claim submission, upon finding plaintiff cited no "current statute, regulation,

Blair simply would not have had reasonable notice of the Government's position in the Indictment—that waiving copayments was illegal even where the waiver was not alleged to have been provided either routinely, in the absence of genuine financial hardship, or without good faith collection efforts.

### 3.    The Copayment Allegations Are Impermissibly Vague.

In sum, at the time Mr. Blair allegedly waived copayments as charged in Count 29, he could not have known that conduct was criminal.  Based on the operative HHS-OIG guidance at the time, as well as judicial interpretations of the AKS, it was reasonable for Mr. Blair to interpret the AKS restriction on paying "remuneration" to not outright exclude any and all waivers of copayments.  This shows that the AKS is necessarily vague and the AKS charges based on copayment waivers therefore violate Mr. Blair's due process.

More particularly, the Indictment fails to allege that the alleged waiver, or failure to bill and collect, copayments was (1) done "routinely" and (2) "for reasons other than genuine financial hardship of the particular patient," as required by HHS-OIG guidance. OIG Opinion 98-10, at *3.   Further, none of the other "indications" of purportedly-improper waivers of deductibles and copayments—things like advertisements promising discounts and the like—is alleged. *See id.* at *3-4.[19]

Hence, the statute, as interpreted by HHS-OIG and the courts, gave "no basis on which to conclude that [Mr. Blair's] conduct was clearly prohibited." *Manning*, 930 F.3d at 274 (alteration not in original). Mr. Blair would have had no reason to believe in March-May 2015 that his

---

or case authority stating that the waiver of copayments alone could result in a false claim").

[19] The same argument – that no indications of "improper" copayment waivers are alleged – is the basis of a separate motion filed by Mr. Blair concurrently herewith to dismiss Count 29.  *See* Defendant's Motion to Dismiss Count 29 of Superseding indictment For Failure to State An Offense.

alleged infrequent waiver of copayments over that brief time for particular TRICARE beneficiaries experiencing financial hardship—circumstances wholly consistent with the allegations of the Indictment—would violate the AKS.

## V.    CONCLUSION

For the reasons set forth above, defendant Matthew E. Blair respectfully asks that this Court dismiss Counts 29 to 33 of the Indictment as impermissibly vague and, therefore, as violative of due process.

Respectfully submitted,

**BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, PC**

/s/

BY: _____

Ty Kelly Cronin (Bar No. 27166)
100 Light St., 19th Floor
Baltimore, Maryland 21202
Telephone: (410) 862-1049
Facsimile: (410) 547-0699
E-mail: tykelly@bakerdonelson.com

Matthew S. Chester (pro hac vice pending)
201 St. Charles Avenue, Suite 3600
New Orleans, Louisiana 70170
Telephone: (504) 566-5200
Facsimile: (504) 636-4000
E-mail: mchester@bakerdonelson.com

Joseph Murtha (Bar No. 23725)
**Murtha, Psoras, Lanasa LLC**
Heaver Plaza, Suite 200
1301 York Rd.
Lutherville, Maryland 21093
Telephone: (410) 583-6969
Facsimile: (410) 583-4706
Email: jmurtha@mpllawyers.com

**ATTORNEYS FOR DEFENDANT
MATTHEW E. BLAIR**

## CERTIFICATE OF SERVICE

I hereby certify that on October 19, 2020, the foregoing pleading was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to all counsel of record by operation of the Court's electronic filing system.

/s/

_____

TY KELLY CRONIN