### UNITED STATES DISTRICT COURT
### DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **V.** | * | |
| | * | **CRIM. NO. 19-00410-ELH** |
| **MATTHEW E. BLAIR,** | * | |
| | * | |
| **DEFENDANT** | * | |
| | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

### DEFENDANT'S OMNIBUS MOTION TO DISMISS COUNTS 30 TO 33 OF SUPERSEDING INDICTMENT AS CONSTITUTIONAL VIOLATIONS

Matthew E. Blair ("Mr. Blair"), by and through undersigned counsel, and pursuant to Rule 12(b) of the Federal Rules of Criminal Procedure, files this Omnibus Motion to Dismiss Counts 30 to 33 of the Superseding Indictment (ECF No. 20) (the "Indictment") As Constitutional Violations.

## I.    INTRODUCTION

In this case, the Government has charged, through Counts 30 to 33, Mr. Blair with violations of the Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)(2)(A)) ("AKS"). However, because the relevant AKS provisions, in light of its safe harbors, are unconstitutional, both facially and as applied to Mr. Blair's alleged conduct, as discussed below, these charges (Counts 30 to 33) should be dismissed. First, the AKS is an overbroad speaker-based regulation that violates the First Amendment's protections for commercial speech, and the U.S. Supreme Court and Fourth Circuit have, in recent years, struck down speaker-based regulations similar to the AKS provisions charged here.  Second, the AKS discriminates between persons exercising their fundamental free speech rights without a compelling reason or tailored means, managing to be both overbroad and underinclusive given the Government's stated justification.  For these reasons, Counts 30 to 33 of the Indictment should be dismissed.

## II.    FACTUAL BACKGROUND AND SUMMARY OF ARGUMENT

From approximately 2014 through late 2016, Mr. Blair, an entrepreneur who has successfully started several small businesses, formed and organized a compounding pharmacy called Blair Pharmacy (the "Pharmacy"), filling prescriptions written by doctors for patients suffering from, among other things, debilitating pain, nutritional imbalance, and scarring, and as an alternative to overprescribed addictive pharmaceuticals.  Prior to founding the Pharmacy, Mr. Blair had experience working in the field of sales and marketing for pharmacies and other health care companies, where he learned about the significant benefit of and demand for compounded medications,[1] which was not being timely met by existing compounding pharmacies.  Wishing to fill this urgent need, Mr. Blair drew upon his existing connections and modest resources to establish the Pharmacy as an independent business venture.

The fledgling Pharmacy had limited funds to get off the ground.  As is widely recognized, the hiring of W-2 employees generally requires greater capital outlay from an employer than hiring a 1099 independent contractor.[2]  For that reason, Mr. Blair hired an independent contractor, Atlas Group, LLC ("Atlas Group"), a sales representative force that had extensive experience in marketing compound drugs for several large national compounding pharmacies,[3] to market his new pharmacy and promote its unique compounds, as he believed (and observed) was widely permissible in the industry.  Atlas Group is the only marketer

---

[1] As the Supreme Court has explained, compounded drugs are uniquely formulated and mixed by a pharmacist, unlike retail pharmacies:  "Drug compounding is a process by which a pharmacist or doctor combines, mixes, or alters ingredients to create a medication tailored to the needs of an individual patient . . . and is typically used to prepare medications that are not commercially available, such as medication for a patient who is allergic to an ingredient in a mass-produced product."  *Thompson v. W. States Medical Ctr.*, 535 U.S. 357, 360-61 (2002).

[2] W-2s and 1099s are tax forms for reporting payments to the Internal Revenue Service (IRS).  A W-2 form is used to report payments made to employees, while 1099-MISC is used to report payments to independent contractors or nonemployees. See generally IRS, Publication 15-A, "Employer's Supplemental Tax Guide" (Dec. 23, 2019).

[3] The Atlas Group was formed by its principal, Ben Alavi ("Alavi").

identified in the Indictment.

That decision uniquely and singularly has resulted in the Government charging Mr. Blair with paying unlawful remuneration in Counts 30 to 33. Had Mr. Blair elected to undertake the Pharmacy's marketing efforts (and had sufficient capital to do so) by hiring Atlas Group personnel as *employees* rather than independent contractors, *no charges* could have been brought under the AKS even if every other allegation in the Indictment remained exactly the same. However, years later, Mr. Blair finds himself under indictment for the practices and processes of the Pharmacy that he rightfully understood to be permissible and lawful. Curiously, the Indictment omits any mention of, among others, the Pharmacy's licensed pharmacist who filled the prescriptions, the licensed physicians who wrote the prescriptions, other commissioned 1099 contractors, and the marketer who purportedly "induced" those prescriptions—despite that all the conduct described in the Indictment was undertaken by and/or the responsibility of those individuals or entities. In fact, the Government has not charged *any* of those actors for the very same acts they did on behalf of the Pharmacy that give rise to Counts 30 to 33 against Mr. Blair.

The Government's only justification for this arbitrary distinction is its misguided (and unsupportable) belief that employers are "more motivated to supervise and control" employees than contractors.[4] However, the Government bears, at best, an indirect interest in the employer-employee relationship and this indirect, limited interest is not narrowly drawn in view of the severe consequences the AKS regulations impose which include, among other things, restricting and/or prohibiting the marketing and educating of physicians by pharmacy agents, who are better educated on compounded drugs, their ingredients, their advantages, and alternatives; inhibiting

---

[4] Preamble to 1991 Final Safe Harbor Rules, 56 Fed. Reg. 35952, at 35981 (July 29, 1991) ("We are confident that the employer-employee relationship is unlikely to be abusive, in part because the employer is generally fully liable for the actions of its employees and is therefore more motivated to supervise and control them.").

the participation and competition from independent, start-up pharmacies in the marketplace by creating significant financial and personnel barriers to entry; and preventing the free flow of truthful information concerning pharmacies and prescription drugs (the restricting of which being to the ultimate detriment of patients).

In summary, the Government's interpretation seeks to penalize Mr. Blair for speech protected by the First Amendment through a speaker-based ban that encompasses—and extracts significant costs on—the publicly-valued, protected speech of Mr. Blair and others.

## III.   THE ALLEGED OFFENSES

### A.   The Anti-Kickback Statute

The Anti–Kickback Statute is a criminal statute that prohibits the knowing and willful payment of remuneration to induce referrals for items or services paid for by a federal health care program such as Medicare.  *See* 42 U.S.C. § 1320a-7b.  The statute is intended to prevent fraud against federal health care programs by preventing "'increased costs and abusive practices resulting from provider decisions that are based on self-interest rather than cost, quality of care or necessity of services'" and "protect[ing] patients from doctors whose medical judgments might be clouded by improper financial consideration."  *United States v. Patel*, 778 F.3d 607, 612 (7th Cir. 2015) (citations omitted).

The relevant provisions of the AKS include its core prohibition on paying remuneration for referrals for items paid for by federal health care programs like TRICARE:

> (b) Illegal remunerations
> . . .
> (2) Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person –
>
> > (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, []

> . . .
> shall be guilty of a felony and upon conviction thereof, shall be fined not
> more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b(b)(2)(A).  There are, however, exceptions to this prohibition.

### B.    The Relevant AKS Safe Harbors

Recognizing that the prohibitions of the AKS were facially so broad as to cover "many . . . advertising activities and marketing activities [that] do not warrant prosecution,"[5] numerous exceptions have been codified in the statute and its implementing regulations.[6]  *See id.* § 1320a-7b(b)(3)(B); 42 C.F.R. § 1001.952.  Two such "safe harbors" are relevant here: one for payments to "employees" (the "Employee" Safe Harbor) and another for payments pursuant to "personal services and management contracts" (the "Agent" Safe Harbor).

The "Employee" Safe Harbor permits "any amount paid by an employer to an employee (who has a bona fide employment relationship with such employer) for employment in the provision of covered items or services."  42 U.S.C. § 1320a-7b(b)(3)(B). The "Employee" Safe Harbor is further defined and codified in Department of Health and Human Services ("HHS") regulations as follows:

> *Employees.* As used in section 1128B of the Act, "remuneration"
> does not include any amount paid by an employer to an employee,
> who has a bona fide employment relationship with the employer,
> for employment in the furnishing of any item or service for which
> payment may be made in whole or in part under Medicare,
> Medicaid or other Federal health care programs. For purposes of
> paragraph (i) of this section, the term *employee* has the same

---

[5] 56 Fed. Reg. 35952, at 35974.

[6] Indeed, "'[a]ccording to the [HHS-OIG] commentary to the proposed and final regulations, these exceptions reflected a concern that the AKS had been so broad that "some relatively innocuous commercial arrangements were technically covered by the statute and therefore were subject to criminal prosecution.'" *United States v. Aids Healthcare Found., Inc.*, 262 F. Supp. 3d 1353, 1361 (S.D. Fla. 2017) (citing Medicare and Medicaid Programs: Fraud and Abuse, OIG Anti–Kickback Provisions, 54 Fed. Reg. 3088, 3088 (Jan. 23, 1989) (proposed rule); Medicare and State Health Care Programs: Fraud and Abuse; OIG Anti–Kickback Provisions, 56 Fed. Reg. 35,952, 35,952 (July 29, 1991) (codified at 42 C.F.R. § 1001.952 (2005)) (final rule)).

meaning as it does for purposes of 26 U.S.C. 3121(d)(2).

42 C.F.R. § 1001.952(i) (italics in original).  This regulation incorporates the IRS Code's definition of "employee" as "any individual who, under the usual common law rules applicable in determining the employer-employee relationship, has the status of an employee." 26 U.S.C. § 3121(d)(2).

The "Agent" Safe Harbor is a separate exception covering an "agent," such as an independent contractor, whose engagement agreement meets very specific conditions.  42 C.F.R. § 1001.952(d) (titled "Personal services and management contracts").  HHS regulations define "illegal renumerations" to "not include any payment made by a principal to an agent as compensation for the services of the agent" *so long as the agent's engagement meets seven strict requirements*:

> (1) The agency agreement is set out in writing and signed by the parties.
> (2) The agency agreement covers all of the services the agent provides to the principal for the term of the agreement and specifies the services to be provided by the agent.
> (3) If the agency agreement is intended to provide for the services . . . on a periodic, sporadic or part-time basis . . . , the agreement specifies exactly the schedule of such intervals, their precise length, and the exact charge for such intervals.
> (4) The term of the agreement is for not less than one year.
> (5) The aggregate compensation paid to the agent over the term of the agreement is set in advance, is consistent with fair market value in arms-length transactions and is not determined in a manner that takes into account the volume or value of any referrals or business otherwise generated between the parties for which payment may be made [by Federal health care programs].
> (6) The services performed under the agreement do not involve the counselling or promotion of a business arrangement or other activity that violates any State or Federal law.
> (7) The aggregate services contracted for do not exceed those which are reasonably necessary to accomplish the commercially reasonable business purpose of the services.

*Id*.  Notably, no agency agreement can qualify for the safe harbor if payments are commission-

or volume-based. *Id.* § 1001.952(d)(5).

### C.    The Allegations of the Indictment Pertinent to Counts 30 to 33

At issue here are Counts 30 to 33 of the Indictment, which allege that Mr. Blair paid "illegal remuneration" to "independent sales marketers" for the Pharmacy, naming only one, Atlas Group. Indictment, ¶ 21. According to the Government, the alleged "remuneration" occurred on four dates over three months (March 17-May 28, 2015), not long after the Pharmacy had become operational. *See id.*, ¶ 2.  As to these charges, the Indictment alleges merely that:

> BLAIR paid independent sales marketers to market his compound
> drugs and to provide the prescription forms he created to doctors,
> namely, BLAIR paid independent contractors, such as Atlas
> Group, LLC, remuneration in the form of a percentage of the
> money that health care benefit programs reimbursement his
> pharmacy . . . .

*Id.*, ¶ 21.[7]  These allegations are incorporated into Counts 30 to 33, which has a perfunctory recitation of the elements:

> BLAIR did knowingly and willfully offer to pay and did pay,
> remuneration . . . to Atlas Group, LLC . . . , to induce them to refer
> individuals and prescriptions to Blair Pharmacy for the furnishing
> of prescription compound drugs, payment for which was made in
> whole and in part, under a federal health care benefit program . . . .

*Id.* at p. 17.

Taken together, the Government alleges that Mr. Blair paid "renumeration" by compensating Atlas Group for marketing services, including efforts to "market his compound drugs" and "provide the prescription forms" created by the Pharmacy to physicians. *Id.*, ¶ 21. The Government then makes the incredible (and unsupportable) leap that these payments to Atlas Group were undertaken to "induce" doctors  to "refer individuals and prescriptions" to the Pharmacy.  *Id.* at p. 17.  Notably, the Indictment does not allege that Mr. Blair or anyone else on

---

[7] It is also alleged that the sales marketer, like Mr. Blair, "was also not a doctor or a pharmacist." *Id.*, ¶ 33.

his behalf, including Atlas Group (or any individual marketers), paid remuneration to any physician. *See generally id.*

## IV.     APPLICABLE LEGAL STANDARDS

### A.     Law Governing a Rule 12 Motion to Dismiss Based on Defective Indictment

Fed. R. Crim. Proc. 12(b) permits a defendant to challenge a defect in the indictment prior to trial, including where a charge fails to state an offense because it is based on an unconstitutional statute. Fed. R. Crim. P. 12(b)(3)(B)(v).  The assertion that the statute named in the indictment does not proscribe the alleged conduct is properly brought through a motion to dismiss. *E.g., United States v. Payne*, 382 F. Supp. 3d 71, 73 (D.D.C. 2019).  In reviewing a motion to dismiss an indictment for failure to state an offense, a court must accept the factual allegations in the indictment as true. *United States v. Oaks*, 302 F. Supp. 3d 716, 720 (D. Md. 2018) (citing *Boyce Motor Lines v. United States,* 342 U.S. 337, 343 n.16 (1952)).  The Court should construe the indictment in a "practical," rather than "purely technical," manner. *Id.* (citing *United States v. Matzkin*, 14 F.3d 1014, 1019 (4th Cir. 1994)).

### B.     Challenges Based on the First Amendment Overbreadth

Overbreadth challenges commonly arise where a law seeks to prohibit or criminalize acts protected by the First Amendment.[8]  A criminal statute is facially overbroad, and thus invalid, if it "prohibit[s] or chill[s]" a substantial amount of protected speech in the process of banning unprotected speech, especially when that statute imposes criminal sanctions. *Virginia v. Hicks*, 539 U.S. 113, 119 (2003) (citations omitted).

Generally, a person may not be prosecuted under a statute that is facially overbroad in

---

[8] Overbreadth is distinguishable from, but related to, "vagueness," as an overbroad law is often too vague for a reasonable person to understand what behavior is actually covered. *See City of Chicago v. Morales*, 527 U.S. 41, 52-56 (1999) (distinguishing between overbreadth and vagueness attacks on imprecise laws).  Mr. Blair has filed (contemporaneously herewith) a motion to dismiss Counts 29 to 33 based on vagueness. *See* Defendant's Motion to Dismiss Counts 29 to 33 of Superseding Indictment as Impermissibly Vague.

violation of the First Amendment, even if some of the conduct for which he is prosecuted is not constitutionally protected. *United States v. Williams*, 553 U.S. 285, 304-05 (2008). Although ordinarily "[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others," courts have relaxed that requirement in the First Amendment context, considering arguments that a statute is overbroad because it is unclear whether it regulates a substantial amount of protected speech. *Id.* In other words, the overbreadth doctrine permits challenges by a defendant based on the First Amendment rights of both himself and of others. *Bd. of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 483 (1989).

The overbreadth analysis requires several steps. Because "it is impossible to determine whether a statute reaches too far without first knowing what the statute covers," the Court must first construe the challenged statute. *Williams*, 553 U.S. at 293. In so doing, it must seek to avoid any "constitutional problems" by asking whether the statute is "subject to [] a limiting construction." *New York v. Ferber*, 458 U.S. 747, 769 n.24 (1982). The Court must then determine whether, so construed, the statute "criminalizes a substantial amount of protected expressive activity." *Williams*, 553 U.S. at 297. Finally, if the statute proves "impermissibly overbroad," the Court must assess whether "the unconstitutional portion" is "severable" from the remainder; if so, only that portion "is to be invalidated." *Ferber*, 458 U.S. at 769 n.24. As explained below, the AKS provisions at issue here bear all the hallmarks of overbreadth.

## C.     Challenges Based on the Equal Protection Clause

The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, § 1. "This clause is 'essentially a direction that all persons similarly situated should be treated alike.'" *Hardwick ex rel. Hardwick v. Heyward*, 711 F.3d 426, 442 (4th Cir.

2013) (quoting *City of Cleburne, Tex. v. Cleburne Living Ctr.,* 473 U.S. 432, 439 (1985)); *see also Plyler v. Doe*, 457 U.S. 202, 216 (1982).

In an equal protection challenge, the issue is not whether the government's interference with a protected right is defensible, but rather whether the government's *discrimination as to who can exercise the right* is justified by a sufficient purpose. *Williams v. King*, 420 F. Supp. 2d 1224, 1232 (N.D. Ala. 2006), *aff'd sub nom. Williams v. Morgan*, 478 F.3d 1316 (11th Cir. 2007) (citing Erwin Chemerinsky, *Constitutional Law: Principles and Policies* § 10.1.1 (2d ed. 2002), at 763)). "[I]f a law denies a right to some, while allowing it to others, the discrimination can be challenged as offending equal protection." *Id.* (citing Chemerinsky, § 10.1.1, at 763)). While equal protection does not require the law to apply to all persons identically, "a distinction made have some relevance to the purposes for which the classification is made." *Baxstrom v. Herold,* 383 U.S. 107, 111 (1966).

Commercial speech protected from governmental restrictions by the free speech guarantees of the First Amendment is likewise protected from discriminatory governmental regulations under the Equal Protection Clause. *See Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 94-95 (1972). Specifically, where a law "restricts some speech more than other speech, the Court may analyze it not only under the First Amendment but also under the Equal Protection Clause of the Fourteenth Amendment." *Id.* Indeed, when an equal protection violation is based on infringement of a First Amendment right, the courts' analysis "fuse[s] the First Amendment into the Equal Protection Clause." *R.A.V. v. City of St. Paul, Minn.,* 505 U.S. 377, 384–85 n. 4 (1992); *accord Hardwick*, 711 F.3d at 442. Accordingly, the same level of scrutiny—strict scrutiny, intermediate scrutiny, and rational basis—is generally appropriate to apply to Equal Protection and First Amendment challenges in the same case. *See*, *e.g.*, *Wagner v. F.E.C.*, 793

F.3d 1, 32-33 (D.C. Cir. 2015) (citations omitted).

## V.     THE AKS, TAKEN WITH ITS SAFE HARBORS, IS UNCONSTITUTIONAL ON ITS FACE AND AS APPLIED TO MR. BLAIR.

### A.     Mr. Blair's Commercial Speech Is Protected by the First Amendment.

#### 1.     The First Amendment protects commercial speech.

It is well established that the First Amendment protects commercial speech.[9]  *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 557 (2011); *Central Hudson Gas & Electric Corp. v. Public Service Comm'n of N.Y.*, 447 U.S. 557, 566 (1980). This includes overt speech, like commercial advertisements and solicitation,[10] as well as expressive speech, like contributions to political campaigns.[11]  The protections afforded speech extend to both the speaker, as disseminator of information, as well as the audience, as recipient of the information (in the commercial context, the consumer).  *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 756 (1976).  The Supreme Court has recognized that, practically, a "consumer's concern for the free flow of commercial speech often may be far keener than his concern for urgent political dialogue."  *Sorrell*, 564 U.S. at 557 (quoting *Bates*, 433 U.S. at 364).

First Amendment protections for commercial speech extend beyond the oral or written word to activity that might otherwise appear to be mere "conduct."  *Billups v. City of Charleston, S.C.*, 961 F.3d 673, 683 (4th Cir. 2020) ("[I]t is well-established that a law aimed at regulating businesses can be subject to First Amendment scrutiny even though it does not directly regulate speech.") (citing *Holder v. Humanitarian Law Project*, 561 U.S. 1, 28 (2010) ("The law here

---

[9] The Supreme Court has long recognized that First Amendment protection extends to both individuals and corporations.  *E.g.*, *Citizens United v. Federal Election Com'n.*, 558 U.S. 310, 342 (2010) (collecting cases).

[10] *See, e.g.*, *Bates v. State Bar of Ariz.*, 433 U.S. 350, 384 (1977); *Ohralik v. Ohio State Bar Ass'n,* 436 U.S. 447, 455 (1978); *Cantwell v. Connecticut,* 310 U.S. 296 (1940).

[11] *See, e.g.*, *Citizens United,* 558 U.S. at 325.

may be described as directed at conduct . . . but as applied to plaintiffs the conduct triggering coverage under the statute consists of communicating a message.")); *Am. Entertainers, L.L.C. v. City of Rocky Mount, N.C.*, 888 F.3d 707, 715 (4th Cir. 2018) (First Amendment applies even if challenged regulation "was adopted for a purpose unrelated to the suppression of expression")). In fact, the fundamental right to free speech "is implicated when information [the speaker] possesses is subjected to **'restraints on the way in which the information might be used' or disseminated**." *Sorrell*, 564 U.S. at 568 (emphasis added) (quoting *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 32 (1984)) (regulation on sales of compiled prescriber data restricted speech); *see also Expressions Hair Design v. Schneiderman*, 137 S.Ct. 1144, 1151 (2017) (regulation barring sellers from charging a surcharge on credit card transactions restricted seller's communication of its pricing and thus regulated speech, not conduct); *Citizens United*, 558 U.S. at 339 (prohibition on corporate expenditures on political advertising is a ban on speech). In other words, a company's act of using or paying for a particular medium to disseminate its message does not deprive the message of the First Amendment protection it otherwise deserves;[12] that act is integral to disseminating the message and thus is *protected as part of the "speech" itself*.

> 2.   Pharmaceutical marketing speech is protected and recognized by the Supreme Court for its significant public value.

The Supreme Court has stated unambiguously that "[s]peech in aid of pharmaceutical marketing [] is a form of expression protected by the Free Speech Clause of the First

---

[12] Moreover, "profit motive on the speaker's part does not transform noncommercial speech into [less protected] commercial speech." *Adventure Commc'ns, Inc. v. Ky. Registry of Election Fin.*, 191 F.3d 429, 441 (4th Cir. 1999); *accord* Billups, 961 F.3d at 683; *see also United States ex rel. Integra Med Analytics, L.L.C. v. Baylor Scott & White Health*, 816 F. App'x 892 (5th Cir. 2020) (CMS' own guidelines state there is nothing "inappropriate, unethical or otherwise wrong" with "taking full advantage of coding opportunities to maximize Medicare payment that is supported by documentation in the medical record"); *U.S. ex rel. Bennet v. Medtronic, Inc.*, 747 F. Supp. 2d 745, 783 (S.D. Tex. 2010) (exploiting legitimate profits does not create reasonable inference that providers knowingly submitted false claims).

Amendment." *Sorrell*, 564 U.S. at 557.  Indeed, the Court has recognized time and again that the marketing of pharmacies and pharmaceuticals, like marketing other nonstandard professional services (such as compounding services), offers particular benefits to patients and the public. *See id.* at 566 (commercial free speech has "great relevance in the fields of medicine and public health, where information can save lives"); *Thompson v. Western States Med. Ctr.*, 535 U.S. 357, 374 (2002) (prohibitions on soliciting prescriptions for, and advertising, compounded drugs violate the First Amendment); *see also Edenfield v. Fane*, 507 U.S. 761, 776-77 (1993) (direct solicitation, which enables sellers to tailor their messages to buyers and buyers to better compare alternative products, provides particularly significant benefits with respect to nonstandard products like professional services).[13]

In *Virginia State Board of Pharmacy*, for example, the Supreme Court invalidated a Virginia law making it "unprofessional conduct" for a pharmacist to advertise the prices of prescription drugs, finding that the advertising ban was undermined by the already-existing extensive professional regulation of pharmacists and that the First Amendment mandated *more* information being available to consumers, not less. *See* 425 U.S. at 769-70. Likewise, in *Thompson*, the Supreme Court invalidated provisions of a law that prohibited advertising and soliciting prescriptions for compounded drugs. 535 U.S. at 363, 377. In striking down the solicitation and advertising ban, the Court made clear that the law swept too broadly—in other words, that the regulation was more extensive than necessary.  *Id.* at 371-73.  The Court also rejected governmental concerns over fraud, waste, and abuse, finding that concerns over doctors prescribing unnecessary medication would not justify the infringement on First Amendment

---

[13] The Court has strongly endorsed the value of solicitation of business as an important component of commercial speech.  *Edenfield,* 507 U.S. at 766 (explaining that "[i]n the commercial context, solicitation may have considerable value" and finding consumer protection act solicitations to be protected speech).

rights.  *See id.* at 374-76.  The Court characterized the prohibition on advertising as a "merely convenient" rather than "necessary" means of achieving its interest and thus impermissible, because "[i]f the First Amendment means anything, it means that regulating speech must be a last—***not first***—resort."  *Id.* at 373 (alteration and emphasis added).

### 3.  Speaker-based restrictions are subject to heightened scrutiny.

The First Amendment prohibits "restrictions distinguishing among different speakers, allowing speech by some but not others." *Citizens United*, 558 U.S. at 340 (citing *First Nat. Bank of Boston v. Bellotti,* 435 U.S. 765, 784 (1978)).  Unsurprisingly, therefore, restrictions that discriminate in favor of some speakers and not others are subject to heightened scrutiny. *See id.*[14]

In *Sorrell*, for instance, the Supreme Court struck down a speaker-based restriction in the context of pharmaceutical marketing.  564 U.S. at 557.  In that case, to address certain practices through which pharmaceutical manufacturers promote their drugs, known as "data mining" and "detailing,"[15] Vermont enacted a statute providing that absent the prescriber's consent, prescriber-identifying information could not be sold by pharmacies, disclosed by pharmacies for marketing purposes, or used for marketing by pharmaceutical manufacturers.  *Id.* at 558-59.  In striking down the law, the Supreme Court held, as a speaker-based restriction, the law was subject to heightened scrutiny and that it unconstitutionally disfavored not only certain content, but also specific speakers, namely pharmaceutical manufacturers.  *Id.* at 564, 571. In so finding

---

[14] The Court previously recognized the particular chilling effect of speaker-based restrictions, particularly where the speaker bias reflected inherent viewpoint discrimination, but *Citizens United* and its progeny like *Sorrell* have more clearly articulated it as a basis for strict or heightened scrutiny.  *See, e.g.*, *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 658 (1994) (clarifying its decision in *Buckley v. Valeo*, 424 U.S. 1 (1976), to "stand[] for the proposition that speaker-based laws demand strict scrutiny when they reflect the government's preference for the substance of what the favored speakers have to say (or aversion to what the disfavored speakers have to say").

[15] In short, pharmacies receive what is called "prescriber-identifying information" when processing prescriptions. They in turn sell the information to "data miners." The data miners produce reports on prescriber behavior and lease their reports to pharmaceutical manufacturers. "Detailers" employed by pharmaceutical manufacturers then use the reports to refine their marketing tactics and increase sales to doctors.  *See Sorrell*, 564 U.S. at 557-58.

that the statute could not survive heightened scrutiny, the Court rejected the state's argument that the law regulated mere "conduct," not speech, finding that "the creation and dissemination of information are speech within the meaning of the First Amendment." *Id.* at 570.

Following *Sorrell*, recent Fourth Circuit decisions have reinforced that speaker-based regulations on speech are constitutionally suspect.  For example, in *Education Media Co. at Virginia Tech v. Insley*, 731 F.3d 291, 294 (4th Cir. 2013), the Fourth Circuit struck down a Virginia regulation prohibiting college student newspapers from printing alcohol advertisements that were both speaker- and content-based, holding that the regulation impermissibly discriminated against certain speakers (college student newspapers) and could not pass even the *Central Hudson* intermediate level of scrutiny.  Most recently, in *Billups*, the Fourth Circuit, relying on *Sorrell*, reversed a finding that a "content-neutral" speaker-based ordinance in the City of Charleston, which fined tour guides who offered paid tours in the City without a license, failed to pass intermediate scrutiny.  961 F.3d at 677-78, 690.

B.     **First Amendment Facial Challenge to the AKS**

1.     The AKS provisions charged in Counts 30 to 33 infringe on speech protected by the First Amendment.

The AKS provisions at issue here cover pharmacy marketing speech which, as discussed above, is protected commercial speech.  The speaker-based AKS restrictions criminalize speech by commissioned-based independent contractors where the same speech by an employee – even one paid commissions – is deemed lawful.  The AKS regulations at issue, therefore, restrict the flow of information and ideas between pharmacies, physicians, and patients, and, because they do so without any adequate (much less compelling) justification or narrow tailoring, the AKS provisions are facially unconstitutional.

On their face, the AKS provisions impermissibly sweep in a significant amount of

protected speech, particularly marketing and solicitation on behalf of pharmacies – which is precisely what is attacked here. *See supra*, Part III.C. As noted above, myriad cases protect the marketing of pharmacies and pharmaceuticals, which is exactly what the Government, through the AKS, deems as criminal here. *E.g.*, *Sorrell*, 564 U.S. at 557 ("Speech in aid of pharmaceutical marketing . . . is a form of expression protected by the Free Speech Clause of the First Amendment."); *Thompson*, 535 U.S. at 1508-09 (holding prohibitions on advertising and soliciting prescriptions for compounded drugs amounted to unconstitutional restrictions on commercial speech); *Va. State Bd. of Pharmacy*, 435 U.S. at 771-73 (concluding that statutory bans on advertising prescription drug prices violated the First Amendment free speech rights of both sellers and consumers).

Furthermore, the AKS' restrictions are plainly speaker-based because they apply to independent contractors and their principals, but not to employees and their employers who engage in the same speech. *See* 42 C.F.R. § 1001.952(i). The statute's provisions, taken with the Employee Safe Harbor, mean a marketer (such as Atlas Group and its personnel) can convey the ***same truthful information about the exact same covered drug to the exact same physician*** and the only difference as to whether it is an alleged AKS violation by the marketer and his principal (here, Mr. Blair via the Pharmacy) is whether the marketer is paid as a bona fide commissioned employee or a commissioned independent contractor. An employee falls within the Employee Safe Harbor, and the independent contractor does not. *E.g.*, *Carrel v. AIDS Healthcare Found., Inc.*, 898 F.3d 1267, 1274 (11th Cir. 2018) (finding employee safe harbor applied despite employees receiving bonuses for referrals because "the employee exemption covers '*any amount* paid by an employer to an employee' without specifying the terms, method,

or frequency of payment") (quoting 42 U. S. C. § 1320a-7b(b)(3)(B)) (emphasis in original).[16]

The arbitrary and overbroad nature of this AKS provision is illustrated by the following scenario: a pharmacy pays a salesman a sales commission to promote its unique compounded drug (a covered item under Medicare) to doctors with the hopes that the doctors treat patients who could benefit from the use of the drug and will prescribe the drug upon exercising their medical judgment, thereby increasing sales for the pharmacy. The salesman markets and recommends that compounded drug to a doctor, but no remuneration is offered or exchanged, no undue or fraudulent influence is exerted, and no misrepresentations are made about the drug. The doctor elects to prescribe the compounded drug in a medically necessary and appropriate manner, and the pharmacy mixes and fills the prescription for a beneficiary.[17]  Under the AKS, if the salesman is a bona fide employee, the scenario is lawful; if the salesman is a commissioned independent contractor, however, the pharmacy—and the salesman—have committed AKS violations.  Importantly, the content of the marketing could be identical, but the statute would criminalize that of the independent contractor (and not that of the bona fide employee). Because this interpretation allows identical speech to be communicated with disparate resulting criminality, their distinction advances no interest.

Even the Government has acknowledged, at least implicitly, that the AKS is broader than necessary to deter fraud and abuse: "We, of course, recognize that ***many* … *advertising activities***

---

[16] While the separate Agent Safe Harbor exists for payments to certain qualified independent contractors, coverage thereunder is precluded if compensation is volume-based or commissions-based. 42 C.F.R. § 1001.952(d)(5) (conditioning safe harbor on requirement that "aggregate compensation paid to the [contractor] . . . is not determined in a manner that takes into account the volume or value of any referrals or business generated between the parties"). The Agent Safe Harbor contains six other requirements apart from prohibiting commission- or volume-based pay, so even independent contractors who are *not* paid commissions very well may not fall within that exception.

[17] The scenario does not materially or legally change under the AKS if, as the Government alleges here, the salesman, when marketing the pharmacy's services to the doctor, provides a pre-printed prescription pad (on which, for example, the compounded drug formula and the pharmacy name appear). *See* Indictment, ¶¶ 21, 33.

***and marketing activities do not warrant prosecution*** …." 56 Fed. Reg. 35952, at 35974 (emphasis added); *see also* HHS-OIG Advisory Opinion 98-10 (declining prosecution of independent marketer paid commissions).  Indeed, this was the impetus for the codification of safe harbors; nevertheless, the existing safe harbors cannot save the AKS' overbreadth in criminalizing a significant amount of protected speech without adequate justification.

The effect of the overbroad nature of the AKS is significant—in scope and severity—for pharmacies, prescribing physicians and, most importantly, patients.  To begin with, the subject AKS provisions impact which pharmacies can compete in the marketplace by essentially preventing, or severely chilling, any marketing by anyone other than a bona fide employee of a provider of a covered item or service.  First, the provisions foreclose certain means (here, the speaker) through which the pharmacy can market to physicians and patients.  The AKS requires that the pharmacy spend its marketing dollars on an employee's guaranteed compensation and benefits and training (and the costs of ensuring the circumstances of bona fide employment are present) rather than an independent contractor—which almost always means spending *more* dollars.[18]  By restricting otherwise lawful marketing efforts, the AKS is similar in nature to restrictions that have been struck down before it.  *See*, *e.g.*, *Sorrell*, 564 U.S. at 557; *Thompson*, 535 U.S. at 1508-09; *Va. State Bd. of Pharmacy*, 435 U.S. at 771-73.

In addition, this restriction creates significant barriers to entry for independent, start-up pharmacies in the marketplace.  New, independent pharmacies, like many other start-ups, typically have limited capital to get the business off the ground; they may not be able to either attract or afford to compensate workers as employees.[19]  The disadvantage of new entrants as

---

[18] Yet, the First Amendment's general prohibition on the suppression of speech based on the speaker's identity mean that "speech cannot be limited based on a speaker's wealth." *Citizens United*, 558 U.S. at 350.

[19] *See*, *e.g.*, *Lamson v. Blumenthal*, 75 F. App'x 811, 813 (2d Cir. 2003) (upholding statutory classification of certain

compared to incumbents is the hallmark of an entry barrier. *Los Angeles Land Co. v. Brunswick Corp.,* 6 F.3d 1422, 1428 (9th Cir. 1993). Such barriers into the marketplace have been accepted as injurious to competition. *See, e.g., F.T.C. v. Procter & Gamble Co.*, 386 U.S. 568, 578 (1967) (antitrust analysis finding that barriers to entry "may substantially reduce the competitive structure of the industry" and "dissuad[e] the smaller firms from aggressively competing"). Indeed, in the *Thompson* case, the government argued the opposite position it takes here: that there was an important public interest in "small-scale compounding," as opposed to large-scale manufacturers, "so that patients with particular needs may obtain medications suited to those needs." 535 U.S. at 369-70. Compounding pharmacies also create unique compound formulas and modify existing formulas regularly to tailor drugs to patients who cannot tolerate retail mediations[20] (exactly the business of the Pharmacy);[21] limiting competition may stifle or slow the development of new formulas. For these reasons, the subject regulations, like any barrier in entry that may inhibit new competitors to the market, are subject to heightened scrutiny with good reason.

Separately, the overbroad nature of the AKS limits important information that can, and should, be shared with physicians. Physicians rely on the unique expertise of pharmacy

---

law enforcement as independent contractors and finding "cost savings" of classification as independent contractors rather than employee was a rational basis for statute); *Francois v. Gulf Coast Transp., Inc.*, No. 816CV1061T24TBM, 2016 WL 4097108, at *4 (M.D. Fla. Aug. 2, 2016) (finding allegations that defendant misclassified its employees as independent contractors, "result[ing] in substantial cost savings to [d]efendant (due to its not having to pay employment taxes)," stated a cause of action for unfair trade practices); *Johnson v. Serenity Transp., Inc.*, 141 F. Supp. 3d 974, 987 (N.D. Cal. 2015) (finding "one could reasonably infer that [employer] received the cost-savings benefit – *i.e.*, withheld wages and benefits – that resulted from classifying [workers] as independent contractors instead of employees").

[20] As the Supreme Court explained, "[d]rug compounding is a process by which a pharmacist or doctor combines, mixes, or alters ingredients to create a medication tailored to the needs of an individual patient . . . and is typically used to prepare medications that are not commercially available, such as medication for a patient who is allergic to an ingredient in a mass-produced product." *Thompson*, 535 U.S. at 360-61. *Compare* Indictment, ¶ 5.

[21] *See* Indictment, ¶¶ 2, 5, 6.

marketers in assisting with the prescriptions they write. "If pharmaceutical marketing affects treatment decisions, it does so because doctors find it persuasive." *Sorrell*, 564 U.S. at 576.[22] Indeed, the Supreme Court has recognized that there is more "clinical skill involved in the compounding of drugs" than in retail drug dispensing. *Va. State Bd. of Pharmacy*, 425 U.S. 748, 766. "The pharmacist, a specialist in the potencies and dangers of drugs, may even be consulted by the physician as to what to prescribe," *id.* at 767; a pharmacist's marketer, of course, may provide the same knowledge. *See, e.g., Thompson*, 535 U.S. at 365 (unconstitutional ban on compounding pharmacy advertising would have covered promotional materials by mail and at medical conferences to inform physicians and patients of the use and effectiveness of specific compounded drugs).

In fact, it is just as (if not more) likely that a marketer who works for *multiple* compounding pharmacies—which lends itself to contracting rather than employment—will be ***more*** knowledgeable about competing and alternative compounded drugs on the market than a marketer employed by a single pharmacy who promotes only that pharmacy's products. Like the professional accounting services at issue in *Edenfield*, compounding formulas are a nonstandard product that can significantly benefit from marketing, particularly by marketers who are knowledgeable not just about one pharmacy's products but also about competing formulas in the market. *See* 507 U.S. at 776-77 (direct solicitation provides significant benefits for "nonstandard products"). Speech cannot be burdened out of fear that people will make bad decisions if given more information; as in *Sorrell*, this idea "appl[ies] with full force when the audience, in this case prescribing physicians, consists of 'sophisticated and experienced' consumers." 564 U.S. at 577 (quoting *Edenfield*, 507 U.S. at 775); *see also Thompson*, 535 U.S. at 376.

---

[22] *See also id.* at 578 (noting one affected physician as stating: "We have a saying in medicine, information is power. And the more you know, or anyone knows, the better decisions can be made.").

Finally, and most importantly, the subject regulation deprives patients, as the ultimate consumers, of information and ideas that they have a *right* to receive—especially in the field of medicine, "where information can save lives." *Sorrell*, 564 U.S. at 566.  The Supreme Court has long recognized a recipient's "First Amendment right to 'receive information and ideas' and that freedom 'necessarily protects the right to receive.'" *Va. State Bd. of Pharmacy*, 425 U.S. at 756 (quoting *Kleindienst v. Mandel*, 408 U.S. 753, 762-63 (1972)); *see also Bellotti,* 435 U.S. at 783; *accord Willis v. Town Of Marshall, N.C.*, 426 F.3d 251, 260 (4th Cir. 2005).  The Court has pragmatically recognized that patients' interest in information about prescription drugs, which may be a regular purchase or expense for them, may be *just as or even more acute* than their interest in (highly protected) political debate.  *Va. State Bd. of Pharmacy*, 425 U.S. at 763. Hence, even commercial marketing that lacks "a very great public interest element" is just as "indispensable" to the free flow of information.  *Id.* at 764-65.

Yet, the AKS acts to suppress information about pharmacy services and pharmaceuticals—specifically, information that is disseminated through and by a certain class of speaker—thereby detrimentally restricting the free flow of information to patients. "It is precisely this kind of choice, between the dangers of suppressing information, and the dangers of its misuse if it is freely available, that the First Amendment makes for us." *Thompson*, 535 U.S. at 375 (restraint on pharmacy advertising, despite alternative non-speech restrictions, unconstitutionally resulted in "keeping the public in ignorance of the entirely lawful terms that competing pharmacists are offering").

2.   The AKS Provisions Fail Under Scrutiny.

In reviewing a challenge to a restriction on commercial speech, "[i]t is well established that the party seeking to uphold a restriction on commercial speech carries the burden of justifying it." *Edenfield,* 507 U.S. at 770 (internal quotation marks omitted).  In enacting the

21

AKS safe harbors at issue,[23] the government stated that it was only extending the broad Employee Safe Harbor to bona fide employees, not most independent contractors, because it was "confident that the employer-employee relationship is unlikely to be abusive, in part because the employer is generally fully liable for the actions of its employees and is therefore more motivated to supervise and control them."  56 Fed. Reg. 35952, at 35981.  The government has attributed, without support, the "existence of widespread abusive practices by salespersons who are independent contractors" solely to the lack of "appropriate supervision and control" ***by employers*** to explain why it uses *the manner of employment* to deem some acts "criminal" but not others.  *Id.*  Indeed, in enacting the safe harbor, it was specifically requested that the HHS-OIG extend the broad employee exception to independent contractors, but it refused, instead making the unsupportable and discriminatory supposition that employer-employee relationships were not likely to be abusive, apparently assuming the converse—and derogatorily casting all employer-contractor relationships as problematic—without any evidence.  *Id.*

As explained below, this "rationale" is fatally flawed, and neither fits nor justifies the resulting chilling effect on the commercial speech of those, including Mr. Blair's, it restrains.  It is clear that the AKS provisions charged cannot withstand either strict scrutiny or intermediate scrutiny.  And, even if the AKS regulations were subjected to the rational basis test—which they unquestionably are not—they would not survive that test, either.

### i. Strict Scrutiny

The Supreme Court in *Sorrell* instructed that speaker-based regulations on commercial

---

[23] By statute, HHS is directed to consider several factors in deciding whether to protect a particular payment practice under a "safe harbor": (A) "patient freedom of choice among health care providers"; (B) "competition among health care providers"; and (C) the "existence or nonexistence of any potential financial benefit to a health care professional or provider which may vary based on their decisions" whether "to order … or … arrange for a referral of health care items or services to a particular practitioner or provider."  42 U.S.C. § 1320a-7d(a).

speech are subject to a "heightened," strict scrutiny test.  564 U.S. at 557[24]; *see also Reed v. Town of Gilbert, Ariz.,* 576 U.S. 155, 170 (2015); *Greater Philadelphia Chamber of Commerce v. City of Philadelphia*, 949 F.3d 116, 139-40 (3d Cir. 2020) (where a statute disfavors particular speakers as well as particular content, *e.g.*, marketing, "[s]trict scrutiny [i]s therefore required").[25]  Strict scrutiny requires "the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest."  *Reed*, 576 U.S. at 171.  The court "then asks what is the least restrictive alternative that can be used to achieve that goal." *Ashcroft v. Am. Civil Liberties Union*, 542 U.S. 656, 666 (2004).

Here, the AKS fails strict scrutiny for several important reasons.  First, the Government has no compelling interest in preventing commissioned independent contractors – but not commissioned employees – of pharmacies from relaying truthful information about compounded drugs to physicians and patients.  The Government's stated justification for the Employee Safe Harbor (and omitting independent contractors therefrom)—namely, employers' risk of vicarious liability creating increased motivation for oversight—is at best anecdotal and certainly not "compelling."[26]  *See* 56 Fed. Reg. 35952, at 35981.

---

[24] The *Sorrell* Court ultimately held that the regulation at issue in that case failed to pass muster under even the intermediate scrutiny test set forth in *Central Hudson*.  564 U.S. at 557.  Notably, although the courts are clear that speaker-based restrictions are subject to "heightened scrutiny," neither the Supreme Court nor the Fourth Circuit has been compelled to apply strict scrutiny to a speaker-based restriction because the laws challenged in these cases have not even been able to pass muster under intermediate scrutiny.  *See, e.g., id.*; *Educ. Media Co. at Va. Tech,* 731 F.3d at 297.  To uphold such a restriction under intermediate scrutiny, the government must show that its interpretation "directly advances a substantial governmental interest and that the measure is drawn to achieve that interest."  *Sorrell*, 564 U.S. at 572.

[25] The Third Circuit ultimately found that the law at issue precluding all employers from inquiring into an applicant's wage history, which applied "*without regard to the employee's prior salary or job title*," did not constitute speaker-based discrimination requiring strict scrutiny.  *Id.* (emphasis added).

[26] Although "compelling" has not been defined by the Court, it is obviously intended to be a stronger interest than an "important," "substantial" or "rational" one, which are the benchmarks for tests of lesser scrutiny (the rational basis and intermediate scrutiny test).

As an initial matter, the Government has, at most, an *indirect* interest in the employee-employer relationship of non-governmental employees and presents no evidence that employers' "supervision" is an adept or reliable mechanism to deter kickbacks. Indisputably, examples abound of employers committing health care fraud through the use of "employees" rather than "contractors."[27]  Further, the premise that an "employer is generally fully liable for the actions of its employees" only makes sense here if the converse is true of independent contractors. However, that is not accurate (or, at least, not so simple).  "[I]t is a familiar principle of agency that 'a principal is liable for the willful acts of his agent committed within the scope of the agent's actual authority.'"[28] *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 661 (4th Cir. 2019), *cert. denied*, 140 S. Ct. 676 (2019) (quoting Restatement (Third) of Agency § 7.04)).  The liability distinction is tenuous and relies on common law that may vary from state to state. Moreover, it puts the onus on employers to police their own workers' "abusive practices," even when it may be the *same employers* who are offering to pay or paying the workers remuneration for referrals.  This is not "rational," much less compelling.

Second, the subject regulation can advance no compelling governmental interest because there is no basis whatsoever to distinguish identical information based on whether it is provided to physicians from employees or independent contractors.  Even if the government has an interest in mitigating the speaker's financial motive, the government's interpretation prohibits an

---

[27] *See, e.g., United States, et al., ex rel. Guzman v. Insys Therapeutics, Inc., et al.,* 13-cv-5861; *United States ex rel. Andersson v. Insys Therapeutics, Inc.,* 14-cv-9179; *United States ex rel. John Doe and ABC, LLC v. Insys Therapeutics, Inc., et al.,* 14-cv-3488; *United States ex rel. Erickson and Lueken v. Insys Therapeutics, Inc.,* 16-cv-2956; and *United States ex rel. Jane Doe, et al. v. Insys Therapeutics, et al.,* 16-cv-7937. "Opiod Manufacturer Insys Therapeutics Agrees to Enter $225 Million Global Resolution of Criminal and Civil Investigations," Dept. of Justice Press Release, June 5, 2019, https://www.justice.gov/opa/pr/opioid-manufacturer-insys-therapeutics-agrees-enter-225-million-global-resolution-criminal (last visited Oct. 2, 2020); *United States v. Insys Pharma, Inc.*, No. 1:19-CR-10191 (D. Mass. 2019) (ECF No. 3 – Plea Agreement at pp. 12-18 (detailing criminal conduct of Insys Pharmaceuticals, including the use of employees to generate prescriptions through physician speaker programs).

[28] The AKS criminalizes only knowing and willful acts, not negligent ones.  42 U.S.C. § 1320a-7b(b)(2).

independent contractor-marketer from presenting *identical speech through identical means* as that of an employee marketer. This distinction is arbitrary, illogical, and lacks adequate justification to make the independent contractor (and its principal) subject to steep criminal sanctions, including a $100,000 fine and 10-year prison sentence. 42 U.S.C. § 1320a-7b(b)(2). Further, this restraint is particularly suspect where the public interest in the continuation of compounding pharmacy services is undisputed, *see Thompson*, 535 U.S. at 369, and the Court has recognized the value and relevance of advertising, specifically marketing pharmacies and pharmaceuticals, to the fields of medicine and public health, *e.g.*, *Sorrell*, 564 U.S. at 566.

Third, even assuming, *arguendo*, that the government has an interest in employee oversight and liability, the interpretation is overly broad because it criminalizes truthful, non-misleading speech.  It is not disputed that false and misleading speech are unprotected and are the proper subject of governmental regulation.  However, the AKS is overbroad because no distinction is made between inducing referrals through *inherently or independently unlawful* means, such as through fraud, deceit, undue influence, or kickbacks to the beneficiary or prescribing doctor directly, and seeking referrals through *lawful* means, such as truthful advertising, marketing, and educational efforts.  Indeed, the allegations of the Indictment, which premise Mr. Blair's charges on paying independent sales marketers to market his compound drugs and to provide the prescription forms he created to doctors (*e.g.*, Indictment, ¶ 21), illustrate that the AKS charges against Mr. Blair do not go to disseminating false and misleading information.  The government's stated interest provides no justifiable basis to encompass and restrain truthful speech, including solicitation, protected by the First Amendment. *See Edenfield*, 507 U.S. at 774-75.

Fourth, there is a serious risk that the arbitrariness and disparateness of the Employee

Safe Harbor will result in discriminatory enforcement against small-scale individual independent pharmacies (or other providers).  Independent start-up businesses are generally less likely to be able to commit the additional resources necessary to guarantee the salary and benefits of a W-2 employee and therefore more likely to engage a 1099 contractor, as opposed to large-scale pharmaceutical enterprises or manufacturers.  As discussed above, this creates a chilling effect and barrier to entry that may hamper competition, innovation, and the market's ability to meet patient demand (the very reason Mr. Blair got into the business).

Finally, "[e]ven when the government has a compelling interest for restricting speech, it may not seek to further that interest by creating arbitrary distinctions among speakers that bear no 'reasonable fit' to the interest at hand." *Nat'l Fed'n of the Blind v. F.T.C.*, 420 F.3d 331, 346-47 (4th Cir. 2005) (citation omitted).  Even before *Sorrell* confirmed the heightened scrutiny applicable to speaker-based regulations, the Fourth Circuit, in *Nat'l Fed'n of the Blind*, had recognized that a law distinguishing among speakers "renders implausible the government's claim that the regulation making this distinction is narrowly tailored to address a certain interest." *Id.*  The flaws addressed above—allowing employees to lawfully engage in the conduct prohibited for independent contractors; allowing employers to pay volume-based commissions to employees but not contractors in the same circumstances; restricting information when disseminated by one speaker but not another; criminalizing truthful information depending on its method of dissemination—all illustrate why the AKS and its safe harbors provisions are not narrowly tailored to fit the government's stated concerns here.  Prohibiting the speech of independent contractors but not employees in the same situation makes little sense in preventing

fraud against the government, or even in relying on employer self-policing to prevent fraud.[29]

Furthermore, the patent underinclusiveness of the Employee Safe Harbor—omitting potential criminal conduct by "employees"—reveals that, even if the government's stated justification is compelling, the AKS is not actually narrowly tailored.  "Underinclusiveness can raise 'doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint.'"  *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 448 (2015) (internal quotations and citation omitted); *Republican Party of Minn. v. White,* 536 U.S. 765, 780 (2002).

Lastly, the Government has failed to use the least restrictive and least discriminatory alternatives to reach its objective in the AKS provisions at issue.  *See Ashcroft*, 542 U.S. at 666. The existence of non-discriminatory alternatives is made abundantly clear because other such alternatives have been, in fact, *ultimately implemented by HHS*.  For example, implementation of cost-cutting methods for compound drugs instituted by TRICARE's pharmacy benefits manager, Express Scripts, in October of 2014 was intentionally delayed by TRICARE until May of 2015; when implemented, they resulted in immediate and substantial savings to TRICARE's costs for compounded medications.[30]  Thus, there was available to TRICARE a proven method of controlling compounding costs, which met the government's cost-cutting objectives without

---

[29] Marketing restrictions have been found to be not narrowly tailored to preventing doctors from prescribing medication to patients who do not need them.  *See Thompson*, 535 U.S. at 374, 376 (rejecting the idea that the government could justify the restriction on speech "on the questionable assumption that doctors would prescribe unnecessary medications" or that a ban on advertising would prevent the prescribing of unnecessary drugs).

[30] *See* U.S. Department of Defense Inspector General, Report No. DODIG-2016-105, "Controls Over Compound Drugs at the Defense Health Agency Reduced Costs Substantially, but Improvements Are Needed," July 1, 2016, https://media.defense.gov/2016/Jul/01/2001714256/-1/-1/1/DODIG-2016-105.pdf (last accessed Oct. 17, 2020) (finding that "[a]fter costs for compound drugs rapidly increased, [Defense Health Agency] personnel implemented controls in May 2015 to screen compound ingredients, which reduced costs from approximately $497 million in April 2015, to $10 million in June 2015").

impeding the commercial free speech of pharmacies.[31]  Despite alternatives that posed a lesser restriction on speech and removed any discriminatory distinction in speakers, the Government choose, as in *Thompson*, to restrict commercial free speech in violation of the First Amendment without it clearly being a last resort.

### ii.        Intermediate Scrutiny

After the *Sorrell* Court held that a speaker- and content-based regulation were subject to "heightened scrutiny" (but failed to pass muster even under intermediate scrutiny), the majority of courts have found intermediate scrutiny itself sufficient to strike down commercial speech restraints discriminatorily implicating content- or speaker-based restrictions on speech.  *City of Philadelphia*, 949 F.3d at 137.  In recent years, the Supreme Court articulated the intermediate scrutiny test, asking (a) whether the commercial speech concerns unlawful activity or is misleading; then if not, (b) whether the government's interest in the regulation is "substantial," and, if so, (c) whether the restriction advances the asserted interest and is not more extensive than necessary to serve that interest.  *Thompson*, 535 U.S. at 367 (citing *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 566 (1980)).

Here, for all the same reasons that the AKS fails under the strict scrutiny analysis, it cannot survive intermediate scrutiny.  First, the Government cannot sustain the substantial impairment of free speech based on its stated interest that employers are more motivated to supervise their employees, as employer supervision has not been shown to be a proxy (much less a strong or reliable one) for fraud deterrence, as discussed above.  Second, it cannot show that

---

[31] Other cost cutting measures which did not impede free speech were also available to TRICARE and other federal health care programs, such as carve-in models which had been shown to reduce overall pharmaceutical costs substantially, but which TRICARE declined to pursue.  *See generally* U.S. Government Accountability Office, Report to the Committee on Armed Services, U.S. Senate, "Evaluation of TRICARE Pharmacy Services Contract Structure is Warranted," September 2013, gao.gov/assets/660/658332.pdf  (last accessed Oct. 17, 2020) (proposing that carve-in pharmacy contract would lead to better financial and health outcomes).

the AKS' independent contractor restriction on commercial speech, particularly in light of the blanket safe harbor afforded employees and their employers and the encroachment on legitimate marketing and solicitation, *directly advances* any substantial governmental interest.  Third, the Government has already conceded that the AKS improperly captures some legitimate marketing speech,[32] making the regulation more extensive than necessary to serve the Government's interest in deterring health care fraud and abuse, while the safe harbors are, if anything, underinclusive of its aims.  *See Cent. Hudson,* 447 U.S. at 557, 566; *see also Thompson*, 535 U.S. at 371 ("[If] the Government could achieve its interests in a manner that ***does not restrict speech, or that restricts less speech***, the Government ***must do so***." (emphasis added)); *see supra*, Part V.B.2.i (identifying less restrictive alternatives).

As discussed above at length, this intermediate scrutiny has felled many other comparable speaker-based and content-based regulations recently reviewed by the Supreme Court and Fourth Circuit.  *See, e.g., Sorrell*, 564 U.S. at 571-72 (finding that neither of the state's justifications for restriction on pharmaceutical marketing, namely, "to protect medical privacy" and "improved public health and reduced healthcare costs" withstood scrutiny, noting, "the outcome is the same whether a special commercial speech inquiry or a stricter form of judicial scrutiny is applied"); *Educ. Media Co. at Va. Tech, Inc.*, 731 F.3d at 298 ("[L]ike the Court in *Sorrell,* we need not determine whether strict scrutiny is applicable here, given that . . . we too hold that the challenged [speaker- and content-based] regulation fails under intermediate scrutiny[.]"); *Thompson*, 535 U.S. at 368-74 (neither party challenging the applicability of *Central Hudson*, finding that none of the government's interests—preserving the FDA's drug approval process and the availability of compounded drugs, and balancing those two interests—

---

[32] 56 Fed. Reg. 35952, at 35974.

was directly advanced by the prohibition on compounding pharmacy advertising, which prohibited more than necessary to serve those interests); *Billups*, 961 F.3d at 685 (finding ordinance requiring for-profit tour guide licensing could not survive even intermediate scrutiny and declining to determine whether it would pass strict scrutiny).

Just as other speaker-based restrictions have failed to pass even intermediate scrutiny, the AKS and its safe harbors likewise fail to do so in this case.

### iii.        Rational Basis

The third and final standard is the "rational basis test," which applies where a statute impacts only business or economic interests and does not implicate fundamental rights or employ "suspect criteria" to define the class of persons benefitted or burdened by the legislation. *See F.C.C. v. Beach Communications, Inc.,* 508 U.S. 307, 314 (1993). This standard requires courts to evaluate the content of a statute to its purported purposes, and to determine whether the law constitutes a reasonable means of accomplishing (*i.e.,* "is rationally related to") a legitimate end or purpose of state government. Statutes and regulations tested under this standard are deemed constitutional if "there is any reasonably conceivable state of facts that could provide a rational basis for the statute." *Id.*; *United States v. Sugiyama*, 113 F. Supp. 3d 784, 789 (D. Md. 2015) (rational basis test assesses whether governmental decisions are "rationally related to a state interest"). Though not a high bar, even if this Court were to find that the AKS regulations at issue do not burden fundamental rights (which Mr. Blair strongly disputes), the charged provisions in this case cannot clear this standard.

As discussed at length above, the Government's stated justification for the distinction between employees and independent contracts—greater employer oversight and vicarious liability—is not a legitimate concern in this context. It is not rationally related to preventing government fraud or, as the Employee Safe Harbors appears to do, to "motivating" employers to

root out fraud.  It is not logical to assume that employers will self-police with regard to bona fide employees but not any other employees or independent contractors.[33]  It cannot be a reasonably conceivable basis for the distinction when there is ample evidence of *employers* spearheading or supporting employees' fraud.  Indeed, large-scale, well-funded companies have *institutionalized*, not deterred, massive, large-scale health care fraud.[34]

### C.      First Amendment As-Applied Challenge to the AKS

Separate from the facial challenge, the AKS and its safe harbors, as applied to Mr. Blair, impermissibly restrict Mr. Blair's protected speech. An "as-applied" challenge under the First Amendment calls for the same judicial analysis as a facial challenge.  Thus, the AKS and safe harbors fail for the same reasons that they fail under the strict scrutiny, intermediate scrutiny, and rational basis analyses presented *supra*.

As applied to Mr. Blair, the Government uses the AKS to criminalize Mr. Blair's election to use a commissioned independent contractor—rather than an employee—to market his start-up pharmacy.[35]  Counts 30 to 33 allege that Mr. Blair's payments to Atlas Group to allegedly market the Pharmacy's compounded drugs and provide prescription forms to physicians constituted illegal remuneration.  Indictment, ¶ 21.

It is significant that there is no "classic" kickback scheme alleged here.  *See generally id.*

---

[33] Notably, non-employees under the AKS would include those who the company may consider employees and use a W-2 form but who ultimately fail the common law test for "bona fide employee" status.  42 C.F.R. § 1001.952(i) (defining covered employees as those who meet the IRS Code definition of "bona fide employee" under usual common law rules).

[34] In one recent example, Insys Therapeutics was a well-funded business with the means to employ and supervise W-2 employees—and did so. Far from deter abusive practices, however, it trained its employed sales representatives in practices that violated the AKS.[34]  It was these employees who engage in a massive health care fraud scheme against Medicare and Medicaid for which the company agreed in January 2020 to pay $225,000,000 in fines, forfeitures, and civil False Claims Act settlements.

[35] Obviously neither type of worker would agree to work for free for a newcomer business, so any argument that this does not stifle the means to employ others to disseminate information about the Pharmacy would be absurd and disingenuous.

at 17.  There is no allegation (and no evidence) that Mr. Blair paid kickbacks to physicians or healthcare providers or beneficiaries, or that Atlas Group (or any of independent sales marketers) paid kickbacks to physicians or healthcare providers or beneficiaries on Mr. Blair's behalf.  Nor is there any suggestion of undue influence or fraudulent inducement to "induce referrals." Likewise, the Government does not allege that the marketing and prescription pads were not truthful or misleading.

As described above, the Government's application of the AKS to Mr. Blair for these payments is unconstitutional because, among other things: (1) the payments themselves are not otherwise illegal and do not promote false or misleading speech; (2) the use of Atlas Group to market and disseminate information about the start-up Pharmacy and its unique compounds is otherwise lawful, protected speech, *see Sorrell*, 564 U.S. at 568; *Thompson*, *Thompson*, 535 U.S. at 374; *Expressions Hair Design*, 137 S. Ct. at 1151; (3) the AKS as applied here unconstitutionally discriminates between speakers, *see Sorrell*, 564 U.S. at 564; *Billups*, 961 F.3d at 677-78, 690; *Educ. Media Co.*, 731 F.3d at 294; (4) the use of the AKS here does not further a "substantial" government interest, *see Central Hudson*, 447 U.S. at 566; and (5) even if the government interest is substantial, the Government's allegations against Mr. Blair are significantly more extensive than necessary, sweeping in protected speech by using a distinction without a difference, *see Thompson*, 535 U.S. at 373.  The application of the AKS in these circumstances plainly violates Mr. Blair's First Amendment rights.[36]

---

[36] While Mr. Blair acknowledges that as-applied challenges often require fact-finding and are found to be premature in criminal cases for that reason, he respectfully submits that the allegations and reasonable inferences of the Indictment suffice to make an appropriate as applied challenge on First Amendment grounds. To the extent the Court believes that it would be necessary to engage in additional fact-finding, Mr. Blair expressly preserves his as applied arguments and intends to raise it at the appropriate juncture at trial, as necessary.

### D.    Equal Protection Facial Challenge to the AKS

As the Equal Protection analysis incorporates the appropriate level of scrutiny required by the First Amendment challenge, the AKS fails to satisfy Equal Protection guarantees for the same reasons that it cannot survive even modest judicial scrutiny (described above). Again, taken together, the AKS and the safe harbors at issue, on their face, treat businesses who compensate contractors differently from businesses who compensate employees for the same act—regardless of whether that act implicates a fundamental right, like marketing and disseminating the employer's commercial information. *See* Indictment, ¶ 21; *Sorrell*, 564 U.S. at 557; *Thompson*, 535 U.S. at 1508-09; *Va. State Bd. of Pharmacy*, 435 U.S. at 771-73. It does so despite, and in contravention of, Mr. Blair's First Amendment right and discretion to spend money in furtherance of the marketing and dissemination of information on behalf of the Pharmacy. After all, the selection of and payment for those particular means of marketing are intertwined with the right to disseminate the marketing message. *See Sorrell*, 564 U.S. at 568. In other words, Mr. Blair's act of using or paying for a particular medium—such as independent contractors—to disseminate his message does not deprive the message of the First Amendment protection it otherwise deserves; that act is integral to disseminating the message and thus is protected just as the "speech" itself. *See id.*[37]

Hence, Equal Protection is violated by the AKS' discrimination—with criminal penalties—of Mr. Blair's use of one medium to market but not another. As applied to Mr. Blair, the AKS violates his free speech rights, as expressed by marketing his pharmacy how he chooses and selecting the speaker to disseminate his marketing message. Mr. Blair was financially

---

[37] *See also Expressions Hair Design v. Schneiderman*, 137 S.Ct. 1144, 1151 (2017) (regulation barring sellers from charging a surcharge on credit card transactions amounted to restriction on seller's communication of its pricing and thus regulated speech, not conduct); *Citizens United*, 558 U.S. at 339 (prohibition on corporate expenditures on political advertising is a ban on speech).

compelled to market the Pharmacy through independent marketers, believing it was the best interests of his entrepreneurial venture, especially given the Pharmacy's limited funding as a start-up business. Yet, as noted above, the Government's interpretation of the AKS here criminalizes Mr. Blair's—but not others'—conduct simply because the marketer was paid as a 1099 contractor.  This distinction—which, as set forth above, is not justified by a compelling or substantial government interest and even if it is, sweeps entirely too broadly into the fundamental rights of others (*see, supra*, Parts V.B.1 and V.B.2.i)—can be the difference between freedom and jail.  *See* 42 U.S.C. § 1320a-7b(b)(2)(A).

The AKS provisions at issue restrict some speakers more than other speakers by prohibiting payment practices for certain workers but not others, and thus disparately impact those businesses who can afford to hire and pay certain marketers but not others.  Because this differential treatment involves expressive conduct that is protected by the First Amendment, it is subject to "heightened scrutiny."  *Sorrell*, 564 U.S. at 565, 571.  Moreover, because it does so through a suspect, speaker-based distinction, it is subject to strict scrutiny; however, as illustrated above, it cannot be sustained under intermediate scrutiny or rational basis tests much less strict scrutiny based on the government's stated justifications in distinguishing employees from independent contractors. *See, supra*, Part V.B.2.ii-iii.  The government's treatment of compounding pharmacies and their independent, commissioned marketers amounts to an unsubstantiated, arbitrary, discriminatory line in the sand and cannot withstand any sort of judicial scrutiny.

### E.   Equal Protection As-Applied Challenge to the AKS

Again, for the same reasons detailed above, the AKS, as applied to Mr. Blair in this case, lacks any compelling or legitimate interest to support the discriminatory scheme that has

arbitrarily given rise to the charges based solely on Mr. Blair's method of disseminating his marketing message through the Atlas Group as the Pharmacy's independent marketer. The Government's interpretation and application to Mr. Blair under these circumstances clearly violate both the protections afford by the First Amendment and the Equal Protection Clause as to his use of Atlas Group as the means of marketing and disseminating information to promote the Pharmacy.  There is no compelling or legitimate justification for the blanket restraints set forth in the AKS (*see, supra*, Part V.B.2.i (particularly the tenuous and unsubstantiated Government interest in employer-employee relationships), and even with the safe harbors enacted—which are themselves vague and ambiguous—the statute is ripe for discriminatory and arbitrary enforcement against employers, and particularly entrepreneurs like Mr. Blair.  Regardless, Mr. Blair submits that the Government cannot not meet the standards set for strict scrutiny, intermediate scrutiny, or even rational basis analyses, and adopts and incorporates the arguments set forth in the preceding sections of Part IV to demonstrate the fatal defects of the Indictment. Therefore, Mr. Blair submits that the AKS provisions that the Government attempts to enforce in Counts 30 to 33 are unconstitutional as applied to Mr. Blair.[38]

## VI.    CONCLUSION

For the reasons set forth above, defendant Matthew E. Blair respectfully asks that this Court dismiss Counts 30 to 33 of the Superseding Indictment as violative of the First Amendment and Equal Protection Clause.

---

[38] Mr. Blair incorporates note 36, *supra*, and reiterates that he believes the allegations and reasonable inferences of the Indictment suffice to make an as applied challenge on Equal Protection grounds. To the extent the Court believes that it would be necessary to engage in additional fact-finding, Mr. Blair preserves his as applied arguments and intends to raise it at the appropriate juncture at trial, as necessary.

Respectfully submitted,

**BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, PC**

/s/

BY: _____

Ty Kelly Cronin (Bar No. 27166)
100 Light St., 19th Floor
Baltimore, Maryland  21202
Telephone:  (410) 862-1049
Facsimile: (410) 547-0699
E-mail:  tykelly@bakerdonelson.com

Matthew S. Chester (pro hac vice pending)
201 St. Charles Avenue, Suite 3600
New Orleans, Louisiana  70170
Telephone:  (504) 566-5200
Facsimile: (504) 636-4000
E-mail:  mchester@bakerdonelson.com

Joseph Murtha (Bar No. 23725)
**Murtha, Psoras, Lanasa LLC**
Heaver Plaza, Suite 200
1301 York Rd.
Lutherville, Maryland 21093
Telephone: (410) 583-6969
Facsimile: (410) 583-4706
Email: jmurtha@mpllawyers.com

**ATTORNEYS FOR DEFENDANT
MATTHEW E. BLAIR**

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on October 19, 2020, the foregoing pleading was filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this filing will be sent to all counsel of record by operation of the Court's electronic filing system.

/s/

_____

TY KELLY CRONIN