**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | * |
| | * |
| **V.** | * |
| | *   **CRIM. NO. 19-00410-ELH** |
| **MATTHEW E. BLAIR,** | * |
| | * |
| **DEFENDANT** | * |
| | * |
| | * |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**DEFENDANT'S MOTION TO STRIKE**
**CERTAIN ALLEGATIONS IN PARAGRAPH 35 AND**
**CERTAIN ALLEGED LOSS AMOUNTS IN SUPERSEDING INDICTMENT**

Matthew E. Blair ("Mr. Blair"), by and through undersigned counsel, in accordance with Rule 7(d) of the Federal Rules of Criminal Procedure, files this Motion to Strike Certain Allegations in Paragraph 35 and Certain Alleged Loss Amounts in the Superseding Indictment (ECF No. 20) (the "Indictment").

## I.      INTRODUCTION

Through this Motion, Mr. Blair seeks to strike (a) certain, below-enumerated allegations contained in Paragraph 35 of the Indictment concerning copayment and/or coinsurance collection practices with respect to private insurance companies; and (b) allegations concerning certain "loss amounts" listed in the Indictment.  The allegations in Paragraph 35 of the Indictment – particularly those that allege that Mr. Blair failed to bill for and collect, and conversely, at times, paid, copayments and/or coinsurance monies for private insurer beneficiaries – even if they could be proven to be true, are not probative of the charges in the Indictment, and their inclusion would impermissibly cause juror confusion, thus prejudicing Mr. Blair.  As to the loss amounts, where, as here, alleged "loss amounts" are not an element of any of the charged offenses, courts have

held such language to be impermissible surplusage.  Accordingly, pursuant to Fed. R. Crim. Proc. 7(d), these allegations should be stricken.

## II.     FACTUAL BACKGROUND AND SUMMARY OF ARGUMENT

The factual recitation of the opening of Blair Pharmacy, Inc. (the "Pharmacy"), the success of that business, and the Government's multi-year investigation, conducted with 20/20 hindsight and predicated on the word of a cooperator who bore ultimate responsibility for the Pharmacy's operations, has been detailed in prior motions; that recitation is hereby incorporated by reference.[1]

Paragraph 35 of the Indictment alleges that Mr. Blair was the mastermind of a wire fraud scheme that intended to defraud certain entities, including TRICARE and private insurance companies (such as Blue Cross Blue Shield ("BCBS")), in connection with the collection of patient copayments and/or coinsurance.  *See* Indictment, ¶ 35. More specifically, the Government complains that Mr. Blair failed to bill for and/or collect copayments or coinsurance monies which, according to the Indictment, operated to defraud these insurance companies and programs.  However, as discussed below, these alleged practices (if true), as a matter of law, could not defraud anyone and therefore, the Government's allegations do not state an offense. Nor are the Government's allegations relevant to any of the other offenses charged.  As a result, these allegations would almost certainly serve to confuse the jury by allowing it to, among other things, be misled into believing Mr. Blair could be convicted of wire fraud (or any of the other charged offenses) on the basis of these assertions, when he cannot.  To avoid this prejudice at trial, the allegations in Paragraph 35 of the Indictment should be stricken.

---

[1] *See* Defendant's Omnibus Motion to Dismiss Counts 30 to 33 of Superseding Indictment As Constitutional Violations, pp. 2-3.

Separately, seemingly in a further effort to prejudice Mr. Blair and inflame the jury, the Indictment sets forth certain dollar figures, most of which are subsumed within the wire fraud scheme, which are misleading and irrelevant to the charges. Neither wire fraud nor the Anti-Kickback Statute ("AKS"), for instance, have as an element of those alleged offenses a monetary threshold.  Moreover, despite the presence of these large figures in the Indictment, the Government's forfeiture notice betrays a much different view of the facts, as it only seeks a forfeiture judgment of approximately $200,000 – less than 2% of the $10 million it alleges elsewhere – for the wire fraud scheme.  It thus appears that the Government has chosen to include its eye-popping figures (totaling approximately $10 million in supposed "losses") to inflame a jury and prejudice Mr. Blair – precisely the reasons why striking these assertions is appropriate.

## III.     PERTINENT ALLEGATIONS OF THE INDICTMENT

### A.     Allegations Regarding Mr. Blair's Purported Collection of Copayments and/or Coinsurance (Paragraph 35)

The Indictment broadly alleges that Mr. Blair "devised and intended to devise a scheme and artifice to defraud insurance companies and health care benefit companies, such as BCBS … by means of materially false and fraudulent pretenses, representations, and promises." Indictment, ¶ 14.  In Paragraph 35 specifically, the Government alleges one of the "manner and means" of the scheme to defraud as follows:

> BLAIR knowingly failed to bill for and collect copayments and coinsurance from beneficiaries of health care benefit programs. Blair entered into contractual agreements with health care benefit programs, such as TRICARE, BCBS and CVS/Caremark, which required Blair to collect copayments and coinsurance.  However, BLAIR failed to collect the required copayments and coinsurance, and he would sometimes pay the copayment and coinsurance for the beneficiary, without the knowledge of the beneficiary.  BLAIR engaged in this conduct for the purpose of: inducing prescriptions to be filled at his pharmacy; concealing the cost of repeated

3

> copayments and coinsurance; reducing patient complaints
> regarding copayments and coinsurance; and reducing patient
> visibility and complaints regarding his pharmacy's dispensing
> process and the high cost of his compounded drugs.

*Id.*, ¶ 35.  These allegations are contained within the wire fraud scheme in the Indictment and are

incorporated by reference into all 36 substantive counts charged, including wire fraud (Counts 1

to 21), identity theft (Counts 22 to 28), AKS violations (Count 29 to 33), and money laundering

(Count 34 to 36).  Because these allegations are immaterial to the charges against him, Mr. Blair

seeks to strike, in part, the allegations in Paragraph 35 pertaining to the failure to bill for and

collect copayments and coinsurance from commercial entities such as CVS/Caremark

("Caremark") and BCBS (hereinafter the "Subject Allegations").

### B.    Allegations Regarding Certain Loss Amounts

Separately, the Government also makes a number of references in the Indictment to

purported loss amounts.  For example, Paragraphs 25 to 27 allege losses in amounts exceeding

$10 million.  Indictment, ¶¶ 25-27.  Because these loss (or payment) figures are misleading and

are not relevant to the charges against Mr. Blair, they should be stricken as surplusage.[2]

Specifically, Mr. Blair seeks to strike the following underlined passages:

- Paragraph 25 – Alleging that Mr. Blair "received reimbursement
  from health care benefit programs <u>related to these invalid and
  misbranded claims into his Bank of America Account # 9799 in
  the approximate amount of $2,987,000.00</u>."

- Paragraph 26 – Alleging that Mr. Blair "received reimbursement
  from health care benefit program <u>related to these invalid,
  misbranded and overbilled claims into his Bank of America
  Account # 9799 in the approximate amount of $1,599,000.00</u>."

---

[2] While there are dozens of figures and amounts referenced throughout the Indictment that are clearly irrelevant to
the charges – for example, the reimbursement amounts for each prescription (*see*, *e.g.*, *id.*, ¶¶ 28, 32 and pp. 10-14
(Counts 1 to 21)) – Mr. Blair has chosen to move to strike those that he believes are the most inflammatory and
prejudicial.

- Paragraph 27 – Alleging that Mr. Blair "received reimbursement from health care benefit programs <u>related to these invalid, overbilled and under filled compound drugs into his Bank of America Account # 9799 in the approximate amount of $5,776,000.00.</u>"

- Paragraph 34 – Alleging that Mr. Blair "received reimbursement from TRICARE <u>related to this altered prescription form and Vitamin Formula #2 into his Bank of America Account # 9799 in the approximate amount of $364,000.00.</u>"

As discussed below, these loss figures (or payment figures) are misleading and not relevant to the charges lodged. Under Rule 7(d), they should accordingly be struck.

## IV.    GOVERNING LAW

Fed. R. Crim. Proc. 7(d) permits a court to strike "surplusage" from an indictment. Fed. R. Crim. Proc. 7(d). "The purpose of Rule 7(d) is to protect a defendant against prejudicial allegations that are neither relevant nor material to the charges made in an indictment[], or not essential to the charge[], or unnecessary, or inflammatory[.]" *United States v. Poore*, 594 F.2d 39, 41 (4th Cir. 1979) (citations omitted and alterations not in original). An allegation is also prejudicial, and subject to being stricken, where it tends to cause jury confusion. *See*, *e.g.*, *United States v. Bullock*, 451 F.2d 884, 888 (5th Cir. 1971) (citations omitted); *United States v. Renzi*, No. 08-CR-212, 2009 WL 995474, at *4 (D. Ariz. Jan. 13, 2009); *United States v. Struckman*, No. 04-CR-00229, 2007 WL 9701146, at *1-2 (W.D. Wash. Apr. 2, 2007); *United States v. Lazar*, No. 04-CR-20017, 2004 WL 7331839, at *1 (W.D. Tenn. Oct. 26, 2004); *United States v. Mandel*, 415 F. Supp. 997, 1009 (D. Md. 1976), *vacated*, 591 F.2d 1347 (4th Cir. 1979), *overruled on other grounds*, *United States v. Long*, 651 F.2d 239, 241 (4th Cir. 1981). Under this rubric, courts have stricken allegations[3] in charging instruments that, among other things,

---

[3] It is of no moment that the allegations at issue in this Motion appear as assertions in the "manner and means" portion of the speaking Indictment rather than a substantive count. Courts have held that the "manner and means" of

reference immaterial facts or allegations, list prejudicial aliases with no bearing on facts at issue in the case, or set forth other facts that are irrelevant to charges asserted.  *See, e.g., United States v. Reyes-Canales*, No. 17-CR-0589, 2019 WL 2865375, at *3 (D. Md. July 3, 2019); *United States v. Malik*, No. 16-CR-0324, 2017 WL 11458498, at *2-4 (D. Md. June 22, 2017) (granting, in healthcare fraud case, motion to strike references to payments that do not constitute legal violations); *United States v. Perry*, No. 12-CR-0173, 2012 WL 4356780, at *1 n.2 (D. Md. Sept. 21, 2012) (striking references to defendant's alias "to the extent the Indictment refers to Defendant's migrating to the United States or is suggestive of his citizenship status").  Moreover, where loss amounts referenced in a charging instrument are not essential elements of the offense or pertinent to the lodged charges – particularly because, among other things, they may be confusing, may inflame the passions of a jury, and thus, may improperly prejudice a defendant – they may be stricken as "surplusage."  *See United States v. Rush*, 807 F. Supp. 1263, 1265-66 (E.D. La. 1992); *see also United States v. Najor*, No. 13-20462, 2014 WL 2608067, at *4-6 (E.D. Mich. June 11, 2014).   The failure to strike objectionable language in a criminal case may require reversal post-conviction where such language was prejudicial to the defendant.  *See Poore*, 594 F.2d at 41.

---

a conspiracy or scheme is one of several ways in which the government can allege the essential elements of the charge and put a defendant on notice of the allegations he must defend.  *See, e.g., United States v. Tracy*, 456 F. App'x 267, 271, 2011 WL 5966930, at *4 (4th Cir. 2011) (unpublished) (finding listing of elements, along with factual allegations in "manner and means" portion of conspiracy charge sufficiently put defendant on notice of particulars of criminal charge); *United States v. Elbaz*, 332 F. Supp. 3d 960, 969-70 (D. Md. 2018).  Furthermore, because the subject paragraphs are incorporated into the subsequent counts of the Indictment, the improper allegations pervade the entirety of the Indictment, thus necessitating the striking of these allegations.  *See United State v. Chikvashvili*, 859 F.3d 285, 290-91 (4th Cir. 2017) (rejecting contention that allegations in indictment constituted a "narrative" not applicable to criminal charges when those allegations were incorporated into criminal counts and holding that earlier allegations may "clarify the scope" of a criminal charge).

## V.     THE ALLEGATIONS OF PARAGRAPH 35 MUST BE STRICKEN

### A.     "Copayments" and "Coinsurance" Defined

As an initial matter, while the Government in Paragraph 35 asserts factual claims against Mr. Blair concerning his alleged collection practices relating to "copayments" or "coinsurance" monies, the Indictment fails to define these terms.  According to the U.S. Centers for Medicare & Medicaid Services, a "copayment" is a "fixed amount" paid by the patient to the health care provider (doctor's office, pharmacy, or other provider) usually at the time the service is provided.  *See* "Copayment," U.S. Centers for Medicare & Medicaid Services, https://www.healthcare.gov/glossary/co-payment/ (last visited Oct. 19, 2020); *see also* "Co-payment," Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/co-payment (last visited Oct. 19, 2020); "Copays, Deductibles, and Coinsurance," Cigna, https://www.cigna.com/individuals-families/understanding-insurance/copays-deductibles-coinsurance (last visited Oct. 19, 2020).  On the other hand, "coinsurance" payments are generally a percentage of costs of a health care service which, like copayments, are billed to the patient by the health care provider and are paid by the patient directly to the health care provider. *See* "Coinsurance," U.S. Centers for Medicaid & Medicare Services, https://www.healthcare.gov/glossary/co-insurance/ (last visited Oct. 19, 2020); *see also* "Coinsurance," Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/coinsurance (last visited Oct. 19, 2020); "Copays, Deductibles, and Coinsurance," Cigna, https://www.cigna.com/individuals-families/understanding-insurance/copays-deductibles-coinsurance (last visited Oct. 19, 2020).  In the context of a pharmacy, it is undisputed that these monies are due and owing to the health care provider (*e.g.* the pharmacy), not the government or insurance companies.  *See* TRICARE Pharmacy Program, Apr. 2019, at pp. 16-17, https://tricare.mil/~/media/Files/TRICARE/Publications-

/Handbooks/Pharmacy_HBK.ashx (last visited Oct. 19, 2020) (discussing different copayments to be paid by patient to pharmacy).  Indeed, the Government's own evidence confirms this to be true.  For example, the Pharmacy's agreement with Caremark (one of the private insurers alleged to be defrauded in the Indictment) generally requires the Pharmacy to collect from the patient the applicable copayment amounts as compensation.  *See* Caremark Provider Agreement with Blair Pharmacy, Inc., Aug. 1, 2014, produced at S-CVS-001075-78, at p. 1, ¶ 4 (attached as Exhibit "A" hereto (filed under seal)).

**B.     Mr. Blair's Alleged Actions Concerning Copayment Collection Obligations With Private Insurers Do Not State A Criminal Offense**

As an initial matter, the Subject Allegations in Paragraph 35 do not state a federal offense.  For example, Counts 1 to 21 of the Indictment allege wire fraud.  The essential elements of a wire fraud offense are (1) a defendant's intentional scheme to defraud through, among other things, (2) the use of materially false representations, that (3) employed the use of a wire communication in furtherance of the scheme.  *See United States v. Raza*, 876 F.3d 604, 614 (4th Cir. 2017) (citing 18 U.S.C. § 1343).  A "scheme to defraud" has been defined by this Court as "the intentional use of false or fraudulent representations for the purpose of gaining a valuable undue advantage or working some injury to something of value held by another."  *Mandel*, 415 F. Supp. at 1005 (citing cases).  Here, the Subject Allegations in Paragraph 35 do not state a claim for wire fraud because they fail to allege a scheme to defraud these private insurers of a "valuable undue advantage" or that Mr. Blair "work[ed] some injury" on these entities involving "something of value."  *See id.*

For instance, as to the Government's claim that Mr. Blair would "sometimes" pay copayments or coinsurance on behalf of private insurance beneficiaries (*see* Indictment, ¶ 35), that claim, even if it could be proven to be true, does not allege that Mr. Blair "work[ed] an

injury" on another, nor does it allege that he gained some "valuable undue advantage." *See Mandel*, 415 F. Supp. at 1005.  In fact, the Government's allegations confirm just the opposite to be true: Mr. Blair and the Pharmacy would have *incurred* financial charges (and thus, injury) for making these payments.  In other words, the Indictment makes no allegations about the private insurers (the purported "victims" of the scheme) being injured, in any way, from this conduct. The same holds true for the Government's contradictory allegation that Mr. Blair, at times, would fail to bill for and/or collect these copayments or coinsurance from some of the private beneficiaries.  *See* Indictment, ¶ 35.  The Government makes no allegation that the private insurers were victimized in any way by Mr. Blair's alleged failure to bill or and collect these monies.  Nor could it; as discussed above, the copayments and/or coinsurance payments are monies owed to the *Pharmacy*, not the insurers.  The Subject Allegations thus do not state a federal offense for wire fraud.[4]

## C.      The Subject Allegations in Paragraph 35 Are Immaterial and Improperly Prejudicial

Having established that the Subject Allegations in Paragraph 35 of the Indictment do not, by themselves, state a federal offense, the only remaining question is whether these allegations are probative to the charged criminal offenses.  As discussed below, they are not and, indeed, if allowed to be included, such allegations would prejudice Mr. Blair by creating juror confusion.

---

[4] Nor do the Subject Allegations in Paragraph 35 state any other federal offense.  Counts 22 to 28 assert claims for aggravated identity theft (18 U.S.C. § 1028A), with which the Subject Allegations have nothing to do.  *See United States v. Abdelshafi*, 592 F.3d 602, 607 (4th Cir. 2010) (listing elements of aggravated identity theft offense). Likewise, Counts 34 to 36 allege money laundering violations which, again, are wholly irrelevant to the Subject Allegations in Paragraph 35.  *See* 18 U.S.C. § 1957(a) (money laundering statute).  Finally, Counts 29 to 33 allege criminal violations of the AKS with respect to TRICARE beneficiaries.  The Subject Allegations in Paragraph 35, which bear on conduct with respect to private insurers (not government insurers), are thus irrelevant to Counts 29-33.  *See United States v. Miles*, 360 F.3d 472, 479-80 (5th Cir. 2004) (listing elements of AKS violation); 42 U.S.C. § 1320a-7b(b).

1.      **The Subject Allegations in Paragraph 35 pertaining to copayment collection practices for private insurance are irrelevant and may cause jury confusion**

To begin with, the Subject Allegations that Mr. Blair allegedly failed to bill for and/or collect copayments are not probative of the wire fraud charges against him.  In fact, the allegations at issue in Paragraph 35 *contradict* the wire fraud scheme, as the alleged victims of that conduct (in this case, the private health insurers), were not victimized *at all*; as set forth above, the only party harmed by the alleged failure not to collect co-pays is the Pharmacy.  The Subject Allegations in Paragraph 35 are therefore irrelevant to the wire fraud charges.

Notwithstanding that the Subject Allegations in Paragraph 35 are irrelevant to the instant charges against Mr. Blair, they also would almost certainly cause juror confusion.  Among other things, because these allegations are included in the wire fraud scheme, jurors may improperly conclude that Mr. Blair could be guilty of wire fraud by failing to collect for and/or bill for these copayments or coinsurance monies under non-federal health care benefit programs.  That would clearly be contrary to law, as discussed above.

The similarity between this language in Paragraph 35 and Count 29 only increases the risk for juror confusion and prejudice.  In Count 29, the Government asserts that Mr. Blair's failure to collect copayments for TRICARE beneficiaries constitutes a federal offense; the Subject Allegations in Paragraph 35, by contrast, are directed at *private insurers* (not TRICARE), contain contradictory allegations (*e.g.*, that Mr. Blair sometimes "paid" these copayments, as opposed to failing to bill for them), and alone do not state at offense.  A juror reasonably could be confused that Mr. Blair's conduct in Paragraph 35 (which, as noted above, does not state an offense by themselves and, as discussed above, are not probative of any other charges) could render him subject to conviction for Count 29, without any additional or different

proof.[5]   Additionally, and equally concerning, given that the Subject Allegations in Paragraph 35, by the Government's own admission, constitute no more than civil breaches of contract, *see Indictment*, ¶ 35 (alleging that Mr. Blair "entered into contractual arrangements with health care benefit programs … [and he] failed to collect the required copayments and coinsurance …"), jurors may conclude that such conduct – unquestionably not criminal – could serve as a basis to criminally convict Mr. Blair.

Finally, the allegations in Paragraph 35 conflate the waiver of copayments in a commercial setting (*i.e.*, Caremark, BCBS, etc.) with the waiver of copayments in a federal health care program (as charged, for example, in Count 29), giving the ordinary reader – and the ordinary juror – the (mis)impression that the rules are the same in both instances.   That impression is untrue and, importantly, prejudicial to Mr. Blair.   Some of the significant differences between these circumstances are:

- It is not illegal under federal law to fail to collect copayments or coinsurance; under federal law, it is only illegal to **routinely** waive copayments and coinsurance or fail to bill for copayments and coinsurance or make reasonable attempts to collect copayments and coinsurance.[6]

- The TRICARE health care program did not require any payment of coinsurance, did not charge copayments for any active military participants, and charged copayments of only $17 per brand name script (later $20 per script) for dependents of active military.[7]

---

[5] Indeed, as currently drafted, Paragraph 35's allegations involving private insurers would raise federal nexus concerns had it been included in the AKS violations.

[6] *See* 42 U.S.C. § 1320a-7(b)(b)(3) (stating that AKS violations at issue do not apply to certain waivers or reductions by pharmacies); 42 U.S.C. § 1320a-7a (supplying the conditions where waivers and reductions by pharmacies are not impermissible, including where waivers are not offered as part of any advertisement, where they are not "routinely" waived, and where "reasonable collection efforts" of the copayments are made).

[7] The 2015 National Defense Authorization Act prompted TRICARE to increase many pharmacy co-payments for generic, brand name, and other medicines not in TRICARE's formulary effective February 1, 2015.  *See* Kime, Patricia, Military Times, "New Tricare Pharmacy co-payments in effect, Feb. 3, 2015, https://militarytimes.com/pay-benefits/military-benefits/health-care/2015/02/03/new-tricare-pharmacy-co-payments-

- There is no federal law which prohibits the waiver of copayments and coinsurance in a commercial setting. Rather, the issue of waiver and non-payment of copayments and coinsurance is a contractual one which, in accordance with industry custom, is handled by claw-backs and/or termination of contracts.

The confusion that stems from this misimpression runs the other way as well.   By lumping the commercial and federal situations together, the allegations in Paragraph 35 wrongfully suggest that a waiver of a co-payment under TRICARE violates the contract the Pharmacy had with Express Scripts, TRICARE's pharmacy benefits manager.   In fact, the agreement between Express Scripts and the Pharmacy requires the Pharmacy to follow any applicable laws or regulations in collecting or changing any applicable copayments.[8]

### 2.    Applicable precedent supports the striking of Paragraph 35's allegations concerning private insurers

Furthermore, jurisprudence supports striking these immaterial and confusing allegations. For example, in *Mandel*, a public corruption case, this Court struck references in an indictment to the Maryland Code of Ethics as being immaterial to the racketeering and wire fraud charges lodged and as improperly presenting confusing issues of law for the jury.   *See* 415 F. Supp. at 1003-09.   There, the government sought to reference the Code of Ethics as providing the underlying duties imposed upon the Governor-defendant which the government alleged were corruptly violated.   *See id.* at 1008-09.   This Court, however, held that while a wire fraud charge had adequately been stated, the inclusion of the state ethics code would be confusing for a jury because "it contains the clear implication that the Code of Ethics is applicable to [the] defendant

---

in-effect/ (last visited Oct. 19, 2020).

[8] Exhibit A to Express Scripts Agreement with Blair Pharmacy, Inc., § 4.5 (attached as Exhibit "B" hereto (filed under seal)).  As noted above, under 42 CFR § 1001.952(k), collection of copayments is not required under federal health care programs and it is only routine waivers of copayments or the failure to make reasonable collection efforts that are prohibited.

… and that its violation, in and of itself, constitutes a fraud ….” *Id.* at 1009 (alteration not in original). If the Subject Allegations in Paragraph 35 here are permitted to be part of the jury's deliberations, a jury may be misled into believing that Mr. Blair's alleged failure to collect copayments and/or coinsurance for private insurers (simply a breach of contract) constitutes a violation of federal criminal law, a situation which this Court cautioned against in *Mandel*. Accordingly, these allegations are prejudicial and should be stricken.

Other district courts from across the country have likewise struck other accusations – including uncharged criminal conduct – contained in charging instruments that are irrelevant to the charged offenses because of their prejudicial nature and the confusion they inject. *See, e.g. United States v. Pendleton*, No. 16-CR-41, 2017 WL 1399571, at *2 (E.D. La. Apr. 19, 2017) (striking allegations concerning uncharged tax fraud allegations); *United States v. Reed*, No. 15-CR-100, 2016 WL 54903, at *2-3 (E.D. La. Jan. 5, 2016) (striking assertions concerning uncharged honest services fraud and campaign finance allegations). For example, in *Reed*, a district court struck certain allegations referring to potential violations of honest services fraud and/or campaign finance fraud, even though both of those theories were not charged by the government as substantive counts in the subject indictment. *See* 2016 WL 54903, at *2-3. That district court held that these allegations of extraneous conduct were “prejudicial and confusing” because “they create the perception of additional charges and victims” by referring to a separate scheme “which is not the subject of any charge in the Indictment.” *Id.* at *2. Likewise, in *Struckman*, a federal district court, in a tax fraud case, struck allegations concerning a defendant's purportedly-wrongful activities at certain seminars, whereby the defendant supposedly advocated for anti-tax schemes or fraudulent methods of eliminating income taxes, as being irrelevant to the charges in that case and prejudicial because “they could lead a jury to

13

conclude that the Defendant is charged with conspiring to defraud people attending the seminars, rather than the IRS."  2007 WL 9701146, at *2.

The rationale in *Reed* and *Struckman* holds true here; the inclusion of the Subject Allegations in Paragraph 35 would give the jury the impression that another scheme (failing to collect copayments from private insurance beneficiaries and/or paying those copayments for private beneficiaries), with separate victims (private insurance companies), has been lodged against Mr. Blair and that he faces legal jeopardy for such conduct when, as discussed at length above, these allegations do not state a federal offense and are not probative to any of the charged offenses.  Indeed, it is precisely because the Subject Allegations in Paragraph 35 do not, by themselves, state a federal offense (unlike the stricken assertions in *Reed*, for example) that this case presents a *stronger* one for striking these assertions.  The allegations at issue simply amount to no more than a civil breach of contract.  If uncharged criminal conduct is impermissible for inclusion (as in *Reed* and *Struckman*), then certainly uncharged purported civil wrongdoing is improper, as well.

## VI.   THE "LOSS AMOUNT" ALLEGATIONS ARE IRRELEVANT TO THE CHARGES AND MUST ALSO BE STRICKEN

*All* of the "loss amount" allegations Mr. Blair seeks to strike by this Motion (those listed above, *see supra,* Part III.B) fall under the wire fraud scheme set forth in the Indictment.  The offense of wire fraud prohibits an individual from "devis[ing] any scheme or artifice to defraud… for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire []  communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice…"  18 U.S.C. § 1343 (alterations not in original); *see also Raza*, 876 F.3d at 614 (listing elements of wire fraud).  The alleged loss is

not an element of the offense.[9]  Thus, by definition, such language is mere surplusage and should be stricken.

Courts from across the country have held similarly.  For example, in *Rush*, a district court struck an alleged speculative loss amount in connection with a financial fraud case.  807 F. Supp. at 1265-66.  In *Rush*, the indictment alleged that the defendant's purportedly fraudulent activities cost one of the victims $10 million, which the government claimed was necessary for inclusion in the charging document to "put[] [the] defendant on notice" of the scope of his supposed crimes, was accurate as it was based on a "carefully calculated" expert report, and was thus relevant to the fraud charges.  *Id.* at 1265 (alterations not in original).  The district court disagreed, holding that, while the government is free to prove this specific monetary harm at trial, the inclusion of this dollar amount "is not necessary in the indictment, and, in fact, its inclusion could prejudice the defendant."  *Id.* at 1266.  In *Rush* (as here), there was no monetary threshold as an element of the charged offenses, and the inclusion of such amounts, the district court concluded, thus "ha[d] no place in the indictment" and "its presence simply [was] further evidence of the dangers inherent" in long-winded, one-sided government "narrative accounts." *Id.* (alterations not in original).

Finally, the forfeiture count of the Indictment paints a very different picture than the $10 million figures contained in the "manner and means" allegations.  This inconsistency illustrates that the figures included in the "manner and means" section are not operative, and their inclusion is not only inflammatory, but confusing.  For this reason, alone, the loss amounts should be stricken.  *See*, *e.g.*, *Najor*, 2014 WL 2608067, at *5 (striking multiple references to loss amounts

---

[9] There is a separate monetary threshold of $1,000,000 where the alleged wire fraud violation affects a financial institution or occurs in connection with a presidentially declared major disaster or emergency, *see* 18 U.S.C. § 1341, but the Government does not make such allegations here.

of approximately $10 million and $6 million in bank fraud case where one section of the indictment alleged losses of $10 million borne by the victims of the scheme, but later asserted that it sought a forfeiture judgment in excess of $6.5 million).

Viewing the allegations in the Indictment related to the wire fraud and AKS violations against the forfeiture notice (in the same charging document) here highlights that the potential for jury confusion – and thus prejudice – is great in this case.  Indeed, in the substantive charges of the Indictment, the Government references loss amounts (or suspect payment amounts) totaling approximately $10 million in connection with the wire fraud and AKS allegations.  *See*, *supra*, Part III.B.  On the other hand, in the forfeiture section of the Indictment, the Government seeks a wire fraud judgment of less than $200,000 – approximately two percent of the $10 million it alleges earlier.  *See* Indictment at 21.  Like *Najor*, there is no question that a jury would be confused by these multiple (and inconsistent) amounts in the same charging document – particularly when such amounts are not an essential element of any of the pertinent crimes – and that Mr. Blair  would be prejudiced as a result.   Accordingly, the Court should appropriately strike these amounts from the Indictment.

## VII.    CONCLUSION

For the reasons set forth above, defendant Matthew E. Blair respectfully asks that this Court strike the above-referenced (a) Subject Allegations contained in Paragraph 35 of the Indictment; and (b) "loss amounts" contained in Paragraphs 25 to 27 and 34 of the Indictment.

Respectfully submitted,

**BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, P.C.**

/s/

BY: _____
Ty Kelly Cronin (Bar No. 27166)
100 Light St., 19th Floor
Baltimore, Maryland  21202
Telephone:  (410) 862-1049
Facsimile: (410) 547-0699
E-mail:  tykelly@bakerdonelson.com

Matthew S. Chester (pro hac vice pending)
201 St. Charles Avenue, Suite 3600
New Orleans, Louisiana  70170
Telephone:  (504) 566-5200
Facsimile: (504) 636-4000
E-mail:  mchester@bakerdonelson.com

Joseph Murtha (Bar No. 23725)
**MURTHA, PSORAS, LANASA, LLC**
Heaver Plaza, Suite 200
1301 York Rd.
Lutherville, Maryland 21093
Telephone: (410) 583-6969
Facsimile: (410) 583-4706
Email: jmurtha@mpllawyers.com

**ATTORNEYS FOR DEFENDANT
MATTHEW E. BLAIR**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 19, 2020, the foregoing pleading was filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this filing will be sent to all counsel of record by operation of the Court's electronic filing system.

/s/

_____

TY KELLY CRONIN