**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | **CRIMINAL NO. ELH-19-410** |
| | * | |
| MATTHEW BLAIR, | * | |
| | * | |
| Defendant. | * | |
| | * | |

**\*\*\*\*\*\*\*\*\*\***

**GOVERNMENT'S CONSOLIDATED RESPONSE
TO DEFENDANT'S PRE-TRIAL MOTIONS**

The United States of America respectfully submits this consolidated response to the following pre-trial motions filed by the Defendant Matthew Blair ("Defendant" or "Blair"): (1) Motion for a Bill of Particulars (ECF No 36); (2) Motion to Dismiss Count 29 (ECF No. 37); (3) Motion to Dismiss Count 29 - 33 as Impermissibly Vague (ECF No. 38); (4) Motion to Dismiss Counts 30 – 33 for Constitutional Violations (ECF No. 39); and (5) Motion to Strike Paragraph 35 and loss amounts in the Superseding Indictment (the "Indictment") (ECF No. 40). The Government respectfully requests that the Court deny each of Defendant's motions.

**Background**

The Defendant is charged in the Indictment with devising and participating in a scheme and artifice to defraud health care programs and insurance companies, and laundering the funds that he derived from his scheme to defraud. He is charged with twenty-one counts of wire fraud, seven counts of aggravated identity theft, five counts of paying illegal remunerations in violation of the Anti-Kickback statute, and three counts of money laundering.

As detailed in the Indictment, in 2014, Defendant opened a pharmacy in Timonium, Maryland that dispensed compounded creams, such as "scar cream," "pain cream," and "vitamins." Defendant created and modified prescription forms that he used at his pharmacy, and

he included lists of compound ingredients on his prescription forms.  Defendant created a process by which his prescription forms were funneled back to his pharmacy electronically, and he caused the electronic submission of reimbursement claims based upon those prescription forms to health care benefit programs.

Defendant received reimbursement from health care benefit programs based on fraudulent pretenses, representations, and promises that the compounds were authorized by a doctor, that the compounds were medically necessary and dispensed for medical purposes as opposed to being based on reimbursement rate, and that the compounds he caused to be dispensed actually contained the amount and quantity of ingredients that he billed to the health care benefit programs. Additionally, the Indictment details that Defendant committed aggravated identity theft during the course of his scheme and artifice to defraud, by using the identification features of other individuals without lawful authority.  As further detailed in the Indictment, Defendant improperly remunerated TRICARE beneficiaries by improperly waiving copayments, and he also improperly induced TRICARE referrals to his pharmacy based upon illegal payments he made to his agent, in that he paid his agent a commission-based percentage for any successfully reimbursed TRICARE claim that the agent referred to his pharmacy.  Lastly, the Indictment details the money that Defendant laundered, after receiving funds into his bank account derived from the tainted, invalid and fraudulent reimbursement claims that he caused to be submitted to, and reimbursed by, health care benefit programs.

<u>**Government Response to Defendant's Pre-Trial Motions**</u>

**I.      The Motion For A Bill Of Particulars (ECF No. 36) Should Be Denied.**

In his Motion for a Bill of Particulars, Defendant seeks a host of information, which he claims he is entitled to so that he "can effectively prepare for trial," ECF No. 36 at 2.  But what Defendant actually seeks is information concerning the Government's theory of the case, which

he is not entitled to through use of a bill of particulars or otherwise.  Moreover, Defendant has received ample discovery in this matter to date, including some *Jencks* materials, which have been provided well in advance of a typical schedule for the disclosure of such materials.  For these reasons, the Court should deny Defendant's motion.

### A.    Applicable Law.

Rule 7(f) of the Federal Rules of Criminal Procedure provides:

> The court may direct the government to file a bill of particulars. The defendant may move for a bill of particulars before or within 14 days after arraignment or at a later time if the court permits. The government may amend a bill of particulars subject to such conditions as justice requires.

Fed. R. Crim. P. 7(f).

A bill of particulars is intended "to fairly apprise the defendant of the charges against [them] so that [they] may adequately prepare a defense and avoid surprise at trial" but must "not ... be used to provide a detailed disclosure of the government's evidence in advance of trial." *United States v. Automated Med. Labs., Inc.*, 770 F.2d 399, 405 (4th Cir. 1985). Instead, "[i]t merely amplifies the indictment by providing missing or additional information so that the defendant can effectively prepare for trial."  *United States v. Fletcher*, 74 F.3d 49, 53 (4th Cir. 1996).  Simply put, a bill of particulars is not designed to be a discovery device or to permit defendants to preview the evidence or the Government's theory of the case. *See, e.g.*, *Automated Medical Labs., Inc.*, 770 F.2d at 405 (bill of particulars is not to be used for disclosure of the evidence the government intends to introduce at trial); *United States v. Hsuan Bin Chen*, 2011 WL 332713, at *7 (N.D. Cal. Jan. 29, 2011) (denying motion for bill of particulars where "defendants seek extremely detailed evidence to which they are not entitled through a bill of particulars"); *United States v. Allen*, 2009 WL 2496472, at *1 (D. Mass. Aug. 7, 2009) ("A defendant is not entitled to recover evidentiary matters by filing a motion for a bill of particulars."); *United States v. Ojeikere*, 299 F. Supp. 2d 254, 261 (S.D.N.Y. 2004) (rejecting a request for a bill of particulars

that was "merely an impermissible attempt to compel the Government to provide the evidentiary details of its case"); *United States v. Mitlof*, 165 F. Supp. 2d 558, 569 (S.D.N.Y. 2001) (denying motion for bill of particulars that sought the "'wheres, whens and with whoms' that Courts have held to be beyond the scope of a bill of particulars"); *United States v. Guerrerio*, 670 F. Supp. 1215, 1225 (S.D.N.Y. 1987) ("A bill of particulars is not a discovery tool and is not intended to allow defendants a preview of the evidence or the theory of the government's case."). "To hold otherwise would incorrectly require the government to disclose its trial strategy for proving its allegations." *United States v. DeNunzio*, 2015 WL 3454714, at *1 (D. Mass. May 29, 2015).

Whether to grant or deny a motion for a bill of particulars is within the Court's discretion. *See Wong Tai v. United States*, 273 U.S. 77, 82 (1927); *United States v. Anderson*, 481 F.2d 685, 690 (4th Cir. 1973).

**B.    The Defendant's Requests Seek Discovery, Which Has Already Been Provided, And Not Notice Of The Charges.**

Defendant is not confused about the nature of the charges he faces, but rather would simply like to know what evidence the Government will rely on at trial.  This is an improper basis for a bill of particulars.

Regarding the wire fraud charges in Counts 1, 2, 3, 4, 5, 7, and 11, Defendant seeks a litany of information to which he is not entitled.  He seeks to have the Government:

> (a)    as to Counts 1, 2, 3, 4, 5, 7, and 11 specify what are the false material misrepresentations that were made by Mr. Blair and in what way the prescriptions "were not authorized by a doctor;"
>
> (b)    as to Counts 1, 2, 3, 4, 5, 7, and 11, specify the precise manner in which Mr. Blair is alleged to have committed the charged offenses;

(c)     as to Counts 1, 2, 3, 4, 5, 7, and 11, specify the identity of any witnesses who are alleged to have been present when the charged offenses occurred;

(d)     as to Counts 1, 2, 3, 4, 5, 7, and 11, specify the actions of Mr. Blair that are alleged to have constituted the charged offenses;

ECF No. 36 at 1-2.  By the plain language of these requests, it is beyond question that Defendant is "attempting to compel the production of the very type of evidentiary minutiae that is not appropriate in a bill of particulars." *Mitlof*, 165 F. Supp. 2d at 569.  Indeed, Defendant is seeking the "'wheres, whens and with whoms' that courts have held to be beyond the scope of a bill of particulars." *Mitlof*, 165 F. Supp. 2d at 569; *see also United States v. Xiaojie Shun*, 2019 WL 4396237, at *12 (W.D. N.Y. 2019) ("[T]he Government may not be compelled to provide a bill of particulars disclosing the manner in which it will attempt to prove the charges, the precise manner in which the defendants committed the crimes charged, or a preview of the Government's evidence or legal theories."); *United States v. Johnson*, 504 F.2d 622, 628 (7th Cir. 1974) ("It is well settled that a bill of particulars cannot be used to obtain a list of the government's witnesses, or evidentiary detail."). While Defendant undoubtedly would like this information, it is well beyond what the law requires.

The same is true as to the information sought with respect to Counts 22 and 28.  ECF No. 36 at 2.  Defendant seeks to have the Government provide the "precise date when the alleged action of Mr. Blair took place that led to the charged offenses."  *Id.*  Yet the Indictment includes dates in Counts 22 and 28.  ECF No. 20 at 15-16.  He likewise asks the Government to "specify the identity of any witnesses who are alleged to have been present when the charged offenses occurred."  ECF No. 36 at 2.  But this request is not a proper use of a Bill of Particulars either.  *See, e.g.*, *United States v. Akroush*, No. 15-CR-00286, 2019 WL 2391808, at *6 (E.D. Cal. June 6, 2019) ("[A] bill of particulars [is not] to be used to discover the witnesses the government intends to call at trial.");

*United States v. Cheatham*, 500 F. Supp. 2d 528, 533 (W.D. Pa. 2007) (denying request for bill of particulars as to the identities of witnesses to defendant's "conspiratorial acts").

Defendant further seeks to have the Government specify, as to Counts 22 and 28, "the actions of Mr. Blair that are alleged to have constituted the charged offenses."  ECF No. 36 at 2. But the Indictment identifies (1) the dates of the offense, (2) the means of identification used (the initials of victim J.S. and the last four digits of his N.P.I.[1] number); (3) the underlying felony during which the identifiers were used (Counts One and Eleven); and (4) all of the attendant allegations associated with those underlying felonies.

All of this detailed information obviates the need for any bill of particulars here.  Indeed, Defendant's request essentially boils to an attempt to require the Government to preview its evidence and legal theories, which is not the purpose of a bill of particulars.  *See Shun*, 2019 WL 4396237, at *12 (government may not be compelled to provide a bill of particulars disclosing the "precise manner in which the defendant[] committed the crimes charged, or a preview of the Government's evidence or legal theories").[2]

Defendant next seeks, as to Count 10, 15, and 20—all wire fraud counts—to have the Government specify:

---

[1] N.P.I. stands for National Provider Identifier—a unique number used to identify an individual provider or healthcare entity.

[2] *United States v. Trie*, 21 F. Supp. 2d 7, 21(D.D.C. 1998), is inapposite.  The full quotation from the case—without Defendant's alteration—makes this plain:  "A defendant faced with *false statements* charges should not have to waste precious pre-trial preparation time guessing *which statements* he has to defend against or which contributors may be witnesses against him at trial when the government knows precisely *the statements* on which it intends to rely and can easily provide the information."  *Id.* at 21 (emphasis added) (citing cases involving false statements and ordering government to provide specific details concerning the false statements alleged in the indictment).  *United State v. Anderson*, 441 F. Supp. 2d 15, 19 (D.D.C. 2006), applied *Trie*, and it too involved particular false and fraudulent statements.  *United States v. O'Neill*, 20 F.R.D. 180, 181 (E.D.N.Y. 1957), contains little in the way of reasoning as to why a bill of particulars is warranted.  *United States v. Am. Stevedores, Inc.*, 16 F.R.D. 164, 170 (S.D.N.Y. 1954), did not address the issue of a whether a bill of particulars was warranted at all.

(h)    as to Count 10, specify what are the false material

misrepresentations that were used by Mr. Blair in this count that the Government alleges offered

Blair Pharmacy some undue advantage or worked some injury to TRICARE;

(i)    as to Counts 10, 15, and 20, specify who was defrauded and in what way;

(j)    as to Counts 10, 15, and 20, specify what are the false material

misrepresentations that were used by Mr. Blair in this count;

(k)    as to Counts 10, 15, and 20, specify any meetings or conversations at which

the Government will contend Mr. Blair formed, joined or enlisted others to join the violations

alleged in those counts;

But these requests misunderstand the nature of the wire fraud charge.  Wire fraud does not require

"false misrepresentations" or that any such misrepresentation be "used by" a defendant.  The

essential elements of a wire fraud offense are "(1) the existence of a scheme to defraud and (2) the

use of ... a wire communication in furtherance of the scheme." *United States v. Curry*, 461 F.3d

452, 457 (4th Cir. 2006).  And it is well settled that in wire fraud prosecutions, "each mailing or

wire transmission in furtherance of the fraud scheme constitutes a separate offense, and it may be

separately punished."  *United States v. Jefferson*, 674 F.3d 332, 367 (4th Cir. 2012).  The

Indictment alleges in great detail the object of the scheme to defraud, ECF No. 22 ¶ 15, and the

manner and means of the scheme to defraud, *id.* ¶¶ 16-35.  And page 23 of the Indictment likewise

makes plain "who was defrauded"—*i.e.*, health care benefit companies that paid Defendant

reimbursements for his pharmacy's compounded drugs.

Further, regarding his request for the Government to provide information concerning

instances in which Defendant "formed, joined, or enlisted others" to join his crimes—*i.e.*,

information concerning any criminal conspiracy.  But the Indictment does not charge a conspiracy.

And, even if it did, the "general rule in conspiracy cases is that the defendant is not entitled to

obtain detailed information about the conspiracy in a bill of particulars." *United States v. Diaz*,

303 F. Supp. 2d 84, 89 (D. Conn. 2004).

Finally, Defendant seeks, as to Count 29, to have the Government specify:

> (l)       as to Count 29, specify what patients and prescriptions are the subject of the allegations contained in this count; and
>
> (m)      as to Count 29, specify all dates and amounts of co-payments are the subject of the allegations contained in this count.

ECF No. 36 at 2.  However, this request—like Defendant's others—amounts to seeking a preview of the of the Government's evidence at trial.  Defendant is well-aware of the Government's theory that Defendant would fail to collect copayments and coinsurance and that he would, at times, pay the copayment and co-insurance for the beneficiary.  And the Indictment states as much.

Defendant is likewise aware from discovery of the Government's theory that he would use pre-paid cards or "burner cards" to pay patient co-pays.  Moreover, he has the Blair Pharmacy dispense report records that reflect the prescriptions processed by Blair Pharmacy during the time period referenced in Count 29, as well as, among other things, his own records concerning patient co-pays collected or purportedly collected, including records kept in a storage unit for which law enforcement obtained a search warrant.[3]  At bottom, the information Defendant seeks is precisely the sort evidentiary minutiae that is not appropriate in a bill of particulars." *Mitlof*, 165 F. Supp. 2d at 569.

What's more, as Defendant concedes, the Government has made significant discovery disclosures to date.  ECF No. 36 at 4 (referring to the discovery as "voluminous").  Indeed, since September 2019, the Government has made eight productions to Defendant and provided at least 140GB of data.  The Government has likewise provided Defendant some materials subject to the

---

[3] Defendant and counsel have physically inspected these records, and, after the physical inspection, the Government provided scanned copies of the records seized from Defendant's storage unit in discovery.

*Jencks* act—months ahead of the trial in this matter, including information related to Defendant's use of pre-paid cards or "burner cards" to pay patient co-pays. And, even before any charging instrument was returned, in the fall of 2018, Government counsel met with counsel to Defendant concerning, among other things, the Government's legal theories in the case and provided a preview of some of the evidence in this case when it was under no obligation to do so.

Courts throughout the country have routinely held that detailed discovery provided to criminal defendants obviates the need for a bill of particulars—precisely the situation here. *See e.g.*, *United States v. Blanchard*, 542 F.3d 1133, 1140 (7th Cir. 2008) (bill of particulars unnecessary if the information relevant to preparation of defense—"elements of each charged offense, the time and place of the accused's allegedly criminal conduct, and a citation to the statute or statutes violated"—"is available through some other satisfactory form, such as discovery") (citation and internal quotation marks omitted); *United States v. Sepulveda*, 15 F.3d 1161, 1193 (1993) (noting that "[m]otions for bills of particulars are seldom employed in modern federal practice" and denying bill of particulars where defendants "enjoyed the benefits of modified open-file discovery, i.e., automatic discovery that encompassed all relevant data except Jencks Act material related to witnesses not employed in law enforcement"); *United States v. Long*, 706 F.2d 1044, 1054 (9th Cir. 1983) ("Full discovery will obviate the need for a bill of particulars."); *United States v. Godfrey*, 2013 WL 1414887, at *3 (D. Mass. Apr. 5, 2013) (denying bill of particulars where indictment is specific enough and discovery has been provided in searchable format); *United States v. Kemp*, 2004 WL 2757867, at *8 (E.D. Pa. Dec. 2, 2004) ("Courts are especially reluctant to direct the filing of a bill of particulars when the government has provided the defendant with extensive pre-trial discovery.").

Defendant points to a number of cases in support of his argument that a bill of particulars is warranted. ECF No. 36 at 3. None helps him. *United States v. Previti*, 644 F.2d 318, 319 (4th

Cir. 1981), did not address the issue of whether a bill of particulars was warranted at all.  Rather, the Fourth Circuit addressed the question of a whether a charge of willful misapplication of bank funds was sufficiently alleged and concluded that it was.  *United States v. Chandler*, 753 F.2d 360, 362 (4th Cir. 1985), likewise did not involve a bill of particulars but instead whether a U.S. Fish and Wildlife violation notice concerning the taking of what waterfowl gave the defendants adequate notice of the alleged violation; the Fourth Circuit concluded that it did.  *McMullen v. United States*, 96 F. 2d 574, 579 (D.C. Cir. 1938), is likewise inapposite.  The "vague, uncertain, and duplicitous" indictment there, *id.* at 579, bears no resemblance to the detailed, 23 page indictment here.  The same is true of the charging instrument at issue in *United States v. Williams*, which charged violations of sugar rationing regulations.  The Fifth Circuit granted a bill of particulars, reasoning that a bill was warranted in light of various factors, none of which is present here—"the very short time between the filing of the information and the brin[g]ing of the case on for trial, the large number of counts in the information, the vague and general terms in each count thereof, the unfamiliarity of the bar with ration orders, rules, and regulations, the rapidity with which such rules and regulations were amended and changed."  164 F.2d 302, 304 (5th Cir. 1947).[4]

Defendant does not seek a Bill of Particulars to obtain notice in this case, but rather, in the improper attempt to obtain detailed information about the Government's evidence and theory of the case.  As such, the Government respectfully requests that the Court deny this motion.

## II.     The Motion To Dismiss Count 29 For Failure To State An Offense Should Be Denied (ECF No. 37).

Defendant next moves to dismiss Count 29 of the Indictment, which charges a violation of 42 U.S.C. § 1320a-7b(b) (the "Anti-Kickback Statute" or "AKS"), claiming that it is insufficiently pled.  ECF No. 37.  For the reasons that follow, Defendant is wrong, and the Court should deny

---

[4] *United States v. Lamont*, 18 F.R.D. 27, 31 (S.D.N.Y. 1955), did not involve whether a bill of particulars was warranted but instead the question of the sufficiency of indictments in that matter.

his motion.

### A.      Applicable Law.

Fed. R. Crim. P. 7(c)(1) governs the required content and form of an indictment.  It provides that an indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged." Ordinarily, an indictment that tracks the statutory language is constitutionally sufficient if "'accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense' . . .  with which he is charged." *Hamling v. United States*, 418 U.S. 87, 117–18 (1974) (citation omitted). "More specifically, an indictment is legally sufficient (1) if it alleges the essential elements of the offense, that is, it fairly informs the accused of what he is to defend; and (2) if the allegations will enable the accused to plead an acquittal or conviction to bar a future prosecution for the same offense." *United States v. Rendelman*, 641 F.3d 36, 44 (4th Cir. 2011).

The Fourth Circuit articulated the standards for the sufficiency of an indictment in *United States v. Brandon*, 298 F.3d 307 (4th Cir. 2002), stating:

> [A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." Usually "an indictment is sufficient if it alleges an offense in the words of the statute," as long as the words used in the indictment "fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence[.]" However, simply parroting the language of the statute in the indictment is insufficient. When the words of a statute are used to describe the offense generally, they "must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offence, coming under the general description, with which he is charged." Thus, the indictment must also contain a "statement of the essential facts constituting the offense charged."

*Id.* at 310 (internal citations omitted); see also *United States v. Wicks*, 187 F.3d 426, 427 (4th Cir. 1999); *United States v. Darby*, 37 F.3d 1059, 1063 (4th Cir. 1994). The Indictment here easily satisfies this low standard.

**B.    Count 29 Indictment Sufficiently Alleges A Violation Of The Anti-Kickback Statute.**

Count 29 of the Indictment charges Defendant a violation of 42 U.S.C. § 1320a-7b(b) and does so sufficiently.   For starters, the Indictment incorporates the General Allegations in the Indictment, Indictment at 17 ¶ 1, and then tracks the statutory language of the AKS.   The Indictment provides that Defendant:

> did knowingly and willfully offer to pay and did pay, remuneration directly and indirectly, overtly and covertly, in cash and in kind, to Atlas Group, LLC and others, to induce them to refer individuals and prescriptions to Blair Pharmacy for the furnishing, and arranging for the furnishing of prescription compound drugs, payment for which was made in whole and in part, under a federal health care benefit program, namely TRICARE, each payment forming a separate count as follows:

| Count | Date | Monetary Transaction |
|-------|------|----------------------|
| 29 | March 6 – August 1, 2015 | BLAIR submitted, and caused to be submitted, claims for compounded drugs to TRICARE, for which he received reimbursements from TRICARE, and BLAIR offered and paid remuneration to TRICARE beneficiaries to wit: BLAIR failed to bill for and collect copayments and coinsurance from TRICARE beneficiaries related to reimbursements TRICARE paid to his pharmacy. |

Indictment at 17.  Meanwhile, 42 U.S.C. § 1320a-7b(b)—the statutory provision of the AKS that the Indictment tracks—provides in relevant part as follows:

> **(2)** Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—

> **(A)**   to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

> **(B)** in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more
than $100,000 or imprisoned for not more than 10 years, or both.

Moreover, contrary to Defendant's contention, the Indictment does more than simply track the
language of the AKS; it contains a sufficient statement of the facts surrounding the offense.

The statute is broad.  Indeed, a person who knowingly and willingly offers or pays, solicits
or receives any remuneration directly or indirectly, overtly or covertly, in cash or in kind to any
person to induce such person to purchase, lease, order, or arrange for or recommend purchasing,
leasing, or ordering any good, facility, service, or item for which payment may be made in whole
or in part under a Federal health care program violates the Anti-Kickback Act so long as "*one
purpose* of the offer or payment is to induce" Federal healthcare program referrals; it is not
necessary to show that this was the primary purpose.  *United States v. McClatchey*, 217 F.3d 823,
834 (10th Cir. 2000) (emphasis added); *cf. United States v. Berkeley Heartlab*, Inc., 225 F. Supp.
3d 487, 499 n.3 (D.S.C. 2016) ("The appropriate test for whether the waiver of a copay constitutes
remuneration is whether [it has been] alleged that at least one of the purposes of the waiver was to
induce patient referrals.") (citation omitted).

Here, the Indictment alleges details regarding Defendant's failure to bill for and collect
copayments and coinsurance from beneficiaries of Federal healthcare programs and why he did
so—(1) to induce prescriptions to be filled at Blair Pharmacy (*i.e.*, induce beneficiary referrals);
(2) to conceal the costs of the copayments and coinsurance; (3) to reduce patient complaints about
copayments and coinsurance; and (4) reduce patient visibility and complaints concerning the
pharmacy's dispensing processes and the high cost of his compounded drugs.  Indictment ¶ 35.
Indeed, Paragraph 35 of the Indictment provides in its entirety as follows:

13

35.     It was further part of the scheme to defraud that, in a continuing course of conduct starting in approximately September 2014 and continuing through on or about August 30, 2015, **BLAIR** knowingly failed to bill for and collect copayments and coinsurance from beneficiaries of health care benefit programs.  Blair entered into contractual agreements with health care benefit programs, such as TRICARE, BCBS and CVS/Caremark, which required Blair to collect copayments and coinsurance.  However, **BLAIR** failed to collect the required copayments and coinsurance, and he would sometimes pay the copayment and coinsurance for the beneficiary, without the knowledge of the beneficiary.  **BLAIR** engaged in this conduct for the purpose of: inducing prescriptions to be filled at his pharmacy; concealing the cost of repeated copayments and coinsurance; reducing patient complaints regarding copayments and coinsurance; and reducing patient visibility and complaints regarding his pharmacy's dispensing process and the high cost of his compounded drugs.

In other words, Defendant waived co-pays or paid co-pays—*i.e.*, provided "remuneration"—to TRICARE beneficiaries for the purpose of having the beneficiaries' prescriptions filled at his Pharmacy and to induce the beneficiaries to keep their prescriptions with (and thus give their business to) his pharmacy.

Defendant enumerates what the Indictment does not allege and suggests that such allegations are required.  ECF No. 37 at 5 (noting that the Indictment does not allege, for example, that Defendant routinely waived co-pays or that he failed to make reasonable collection efforts as to copays); *see also* ECF No. 37 at 4 (quoting 42 U.S.C. § 1320a-7b(b)(3)).  But this argument is a red herring:  Each of the provisions cited by Defendant (that he claims the Government is required to allege) are AKS affirmative defenses—that must be proven by Defendant, not the Government.  *United States v. George*, 900 F.3d 405, 413 (7th Cir. 2018) (noting that "[o]nce the government establishes the elements of a violation of the Anti-Kickback Statute, the burden shifts to a defendant to demonstrate by a preponderance of the evidence that her conduct fell within the safe harbor provision of the statute" and examining safe harbor provisions of 42 U.S.C. § 1320a-

7b(b)(3)); *United States v. Vernon*, 723 F.3d 1234, 1271 (11th Cir. 2013) (safe-harbor provisions are an affirmative defense that must be proven by the defendant). Indeed, "the United States need not prove, as an element of its case, that defendant's conduct does not fit within a safe harbor or exception." *United States v. Rogan*, 459 F. Supp. 2d 692, 716 (N.D. Ill. 2006*) aff'd*, 517 F.3d 449 (7th Cir. 2008).[5] Thus, since an indictment need only allege the "elements of the offense," *Rendelman*, 641 F.3d at 44, it of course follows that an indictment need not contain allegations that disprove affirmative defenses either.[6] So too here.

Defendant's contention that Count 29 should be dismissed because it fails to provide him "adequate notice" of the charges against him, ECF No. 37 at 6, likewise misses the mark. *First*, Defendant states that the Indictment recites "certain statutory language – but not all of it, see *supra*" ECF No. 37 at 6, presumably referring to statutory language regarding the AKS defenses. However, this argument fails for the reasons just discussed: The Government is not required to include allegations that tend to rebut any affirmative defense that Defendant may choose to raise at trial. *Second*, Defendant complains that the Indictment does not include specifics as to which prescriptions were induced or which co-pays were not collected and maintains that this amounts to a failure to set forth the elements of the offense. ECF No. 37 at 6. Not so. Such "evidentiary minutiae" is not even warranted in a bill of particulars." *Mitlof*, 165 F. Supp. 2d at 569, let alone an indictment. Again, the Indictment tracks the language of the AKS and more than sufficiently informs Defendant with a "statement of the essential facts constituting the offense charged," *Brandon*, 298 F.3d at 310—both through Count 29 itself, as well the other allegations in the

---

[5] Further, as noted in more detail below, the safe harbor regulation regarding routine waiver of copayments was not published until 2016, and as such, was not applicable to the Defendant's conduct, which occurred in 2014 and 2015.

[6] Under Fourth Circuit law, "an affirmative defense does not negate an element of a crime; it excuses punishment for a crime the elements of which have been established and admitted." *United States v. Thompson*, 554 F.3d 450, 452 n. 2 (4th Cir.2009) (internal quotations omitted). By contrast, an essential element of an offense is one "whose specification is necessary to establish the very illegality of the behavior[.]" *United States v. Hooker*, 841 F.2d 1225, 1232 (4th Cir.1988).

Indictment such as Paragraph 35.  *Finally*, Defendant hangs his hat on the Court's decision in *United States v. Wharton*, No. CRIM. ELH-13-0043, 2014 WL 1430387 (D. Md. Apr. 10, 2014), but that case actually supports the Government's position.  There, the Court *denied* Defendant's motion to dismiss the indictment on the grounds that it was constitutionally defective, even where the Indictment covered a *16 year* time period and the indictment "identifie[d] with particularity only the events of October 1996," *id.* at *3 ("The defense insists that, based on the allegations in the Superseding Indictment, the government is not entitled to argue to the jury that Ms. Wharton violated the law on the basis of unspecified misrepresentations within the 16 year period. In their view, the government is limited to the alleged representation made in October 1996."); *id.* at *10. Suffice it to say the detailed 23 page Indictment and Count 29—which covers just a five month period—is a far cry from the indictment at issuing in *Wharton*.

At bottom, the Indictment includes sufficient factual detail to apprise Defendant of the charges against him, and Count 29 contains adequate specificity and provide ample notice to Defendant as to the charge.  The Court should deny Defendant's motion

## III.   The Anti-Kickback Statute Is Not Void For Vagueness, and the Motion to Dismiss Counts 29 - 33 as Impermissibly Vague (ECF No. 38) Should Be Denied.

The AKS is a critical tool in the Government's ongoing effort to prevent fraud, waste and abuse in the provision of health care services.  For decades, the statute has been used to combat fraud, and over the years, many defendants have attempted to challenge the constitutionality of the statute.  All such challenges have failed.  A myriad of courts have repeatedly and universally rejected constitutional challenges to the AKS.

### A.  The AKS and Its History.

The AKS prohibits, among other things, "knowingly and willfully" offering or paying remuneration to induce a referral "for an item or service for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. §1320a-7b(b).  It is well settled that

"remuneration" under the AKS encompasses "anything of value in any form whatsoever." *Dhaliwal v. Salix Pharm., Ltd.*, 752 F. App'x 99, 100 (2d Cir. 2019) (unpublished). Indeed, "remuneration" includes "any kickback, bribe or rebate" and broadly applies to benefits provided "directly or indirectly, overtly or covertly, in cash or in kind." 42 U.S.C. § 1320a-7b(b)(1) & (2).

The AKS represents a culmination of several years of Congressional effort to combat fraud and abuse in federal health care programs. *United States v. Neufeld*, 908 F. Supp. 491, 493 (S.D. Ohio 1995). In 1977, Congress amended the Social Security Act by adding the Medicare-Medicaid Antifraud and Abuse amendments, the purpose of which was to address the "disturbing degree [of] fraudulent and abusive practices associated with the provision of health services financed by the Medicare and Medicaid programs." *United States v. Shaw*, 106 F. Supp. 2d 103, 110 (D. Mass. 2000) (citing H.R. Rep. No. 95-393, pt. 2, at 44 (1977), reprinted in 1977 U.S.C.C.A.N. 3039, 3047). Congressional findings, at the time of the amendment, include the following:

> a broad range of improper activities which are not restricted to one particular class of providers or treatment settings. In whatever form it is found … fraud in these health care financing programs adversely impacts on all Americans. It cheats taxpayers who must ultimately bear the financial burden of misuse of funds in any government-sponsored program. It diverts from those most in need, the nation's elderly and poor, scarce program dollars that were intended to provide vitally needed quality health services.

*Id*. at 110-111 (quoting 1977 U.S.C.C.A.N. at 3047).

The purpose of the statute was to combat rampant fraud in federal health care programs. The Government has a legitimate and very important interest in deterring and preventing fraud, waste and abuse in these programs. The scope of the AKS is broad, so Congress enacted certain statutory exceptions (i.e. safe harbors) that protect several specific business activities that would otherwise be considered illegal under the AKS. *Shaw*, 106 F. Supp. 2d at 108; *see also* 42 U.S.C. § 1320a-7b(b)(3). One such statutory exception permits an employer to pay a bona-fide employee regarding activity that would otherwise be illegal under the AKS, as follows:

(3) Paragraphs (1) and (2) shall not apply to …

> (B) any amount paid by an employer to an employee (who has a bona fide employment relationship with such employer) for employment in the provision of covered items or services …

42 U.S.C. § 1320a-7b(b)(3)(B).

From the inception of the amendments described above, a tension existed between what the AKS identified as an illegal remuneration and certain common business practices. *Shaw*, 106 F. Supp. 2d at 111. In 1987, Congress enacted the Medicare and Medicaid Patient and Program Protection Act, Pub. L. No. 100-93, to address issues regarding the breadth of the AKS. This included the requirement that Department of Health and Human Services, Office of the Inspector General ("OIG") promulgate regulations to identify specific business practices that might otherwise be misconstrued as illegal remunerations under the AKS but would, after the promulgation of the regulations, fall into a category protected from criminal liability. *Shaw*, 106 F. Supp. 2d at 111-112; *see also* 56 Fed. Reg. 35, 952 (1991).

These regulations have become known as "safe harbors" and have been officially codified into the AKS at 42 U.S.C. § 1320a-7b(b)(3)(E) (excluding "any payment practice specified by the Secretary in regulations promulgated pursuant to section 14(a) of the Medicare and Medicaid Patient and Program Protection Act of 1987" from liability under paragraphs (1) and (2) of section 1320a-7b(b)). *Shaw*, 106 F. Supp. 2d at 112. By granting the OIG the authority to protect certain business practices under the AKS, Congress intended for the regulations to be an evolving set of rules that the OIG would periodically update to reflect changing business practices and technologies in the health care industry. *Id.*, *see also* Department of Health and Human Services, Office of Inspector General, Medicare and State Health Care Programs: Fraud and Abuse; OIG Anti-Kickback Provisions, 64 Fed. Reg. 63,518, 63,518.

The regulation implementing these safe-harbor provisions, 42 C.F.R. § 1001.952, identifies and sets forth the precise form that business arrangements must take, in order to be protected under the safe-harbor provisions from the possibility of criminal prosecution under the anti-kickback statute. *Shaw*, 106 F. Supp. 2d at 112; *see also* 42 U.S.C. § 1320a-7b(b)(3)(E); 42 C.F.R. § 1001.952.

Two safe harbor regulations are potentially relevant in the present case: (1) the "agent" safe harbor exception, and (2) the "employee" safe harbor exception. The "agent" safe harbor exception provides as follows:

> **Personal services and management contracts**. As used in section 1128B of the Act, "remuneration" does not include any payment made by a principal to an agent as compensation for the services of the agent, as long as all of the following seven standards are met –
>
> (1) The agency agreement is set out in writing and signed by the parties.
>
> (2) The agency agreement covers all of the services the agent provides to the principal for the term of the agreement and specifies the services to be provided by the agent.
>
> (3) If the agency agreement is intended to provide for the services of the agent on a periodic, sporadic or part-time basis, rather than on a full-time basis for the term of the agreement, the agreement specifies exactly the schedule of such intervals, their precise length, and the exact charge for such intervals.
>
> (4) The term of the agreement is for not less than one year.
>
> (5) The aggregate compensation paid to the agent over the term of the agreement is set in advance, is consistent with fair market value in arms-length transactions and is not determined in a manner that takes into account the volume or value of any referrals or business otherwise generated between the parties for which payment may be made in whole or in part under Medicare, Medicaid or other Federal health care programs.
>
> (6) The services performed under the agreement do not involve the counselling or promotion of a business arrangement or other activity that violates any State or Federal law.

(7) The aggregate services contracted for do not exceed those which are reasonably necessary to accomplish the commercially reasonable business purpose of the services.

For purposes of paragraph (d) of this section, an agent of a principal is any person, other than a bona fide employee of the principal, who has an agreement to perform services for, or on behalf of, the principal.

42 C.F.R. § 1001.952(d) (2015)

In additional to the employee exception specifically referenced in the statutory language of the AKS, the "employee" safe harbor exception also provides as follows:

**Employees**.  As used in section 1128B of the Act, "remuneration" does not include any amount paid by an employer to an employee, who has a bona fide employment relationship with the employer, for employment in the furnishing of any item or service for which payment may be made in whole or in part under Medicare, Medicaid or other Federal health care programs. For purposes of paragraph (i) of this section, the term employee has the same meaning as it does for purposes of 26 U.S.C. 3121(d)(2).

42 C.F.R. § 1001.9529(i) (2015).

With respect to the waiver, or non-collection of copayments from health care program beneficiaries, no statutory exception or safe harbor regulation existed at the time of Defendant's conduct.[7]  The safe harbor regulations were updated in 2016, after the conduct at issue in the present case, and the OIG formally published a safe harbor regulation regarding the waiver of copayments in certain circumstances.  42 C.F.R. § 1001.952(k) (2017).  Although this safe harbor regulation was not in existence when Defendant committed the crimes charged in the Indictment, the 2016 safe harbor provision provides as follows:

**Waiver of beneficiary copayment, coinsurance and deductible amounts**.  As used in section 1128B of the Act, "remuneration" does not include any reduction or waiver of a Federal health care program beneficiary's obligation to pay copayment, coinsurance or deductible (for purposes of this subparagraph (k) "cost-sharing") amounts as long as all the standards are met within one of the following categories of health care providers or suppliers…

---

[7] Several fraud alerts warning the public about fraud, waste and abuse problems associated with waivers of copayments were published by the HHS OIG before the conduct described in the Indictment, which are discussed in more detail below.

(3) If the cost-sharing amounts are owed to a pharmacy … for cost-sharing imposed under a Federal health care program, the pharmacy may reduce or waive the cost-sharing amounts if:

(i) The waiver or reduction is not offered as part of an advertisement or solicitation; and

(ii) Except for waivers or reductions offered to subsidy-eligible individuals (as defined in section 1860D-14(a)(3)) to which only requirement in paragraph (k)(3)(i) of this section applies:

(A) The pharmacy does not routinely waive or reduce cost-sharing amounts; and

(B) The pharmacy waives the cost-sharing amounts only after determining in good faith that the individual is in financial need or after failing to collect the cost-sharing amounts after making reasonable collection efforts.

42 C.F.R. § 1001.952(k) (2017)

### B. Courts Across The Country Have Universally Concluded That The AKS Is Not Void For Vagueness.

Defendant challenges the constitutionality of the AKS, arguing that the statute is void for vagueness, as applied to him, in Counts 29 - 33 of the Indictment.  He claims that judicial decisions and regulations fail to provide objective standards by which an individual could determine what constituted illegal conduct under the AKS.  Yet, many other courts have reviewed similar constitutional challenges to the AKS by similarly situated defendants, and no court has ever found the AKS to be unconstitutional.  Instead, courts have repeatedly and universally rejected vagueness challenges to the AKS.

The void for vagueness doctrine is rooted in the Due Process Clause of the Fifth and Fourteenth Amendments.  *Manning v. Caldwell*, 930 F.3d 264, 272 (4th Cir. 2019) (citing *Doe v. Cooper*, 842 F.3d 833, 842 (4th Cir. 2016)).  To survive a vagueness challenge, a statute must give a person of ordinary intelligence adequate notice of what conduct is prohibited and must include sufficient standards to prevent arbitrary and discriminatory enforcement.  *Papachristou v. City of*

*Jacksonville*, 405 U.S. 156, 160 (1972); *Martin v. Lloyd*, 700 F.3d 132, 135 (4th Cir. 2012); *see also Kolender v. Lawson*, 461 U.S. 352, 358 (1983) (requiring that criminal statutes contain "minimal guidelines to govern law enforcement" (citation omitted)).

The purpose of the "fair notice" requirement is to enable citizens to conform their conduct to the proscriptions of the law. *Manning*, 930 F.3d at 274; *see City of Chicago v. Morales*, 527 U.S. 41, 58, (1999); *Lanzetta v. New Jersey*, 306 U.S. 451, 453 (1939); *Kolender*, 461 U.S. at 357. If a statute fails to provide any standard of conduct by which a person can determine whether they are violating the statute, or if a statute does not provide "minimal guidelines to govern law enforcement," the statute is unconstitutionally vague. *See Kolender*, 461 U.S. at 358; *Cooper*, 842 F.3d at 842.

As courts across the country have concluded, the AKS provides fair notice. The statute provides a clear standard by which a person can determine whether they are violating the AKS. Further, the statute itself, in addition to the accompanying regulations, provides guidelines and safe harbors, which govern the enforcement of the AKS. These standards and guidelines include a heightened *mens rea* requirement, requiring the Government to prove that a defendant knowingly and willfully violated the statute, and they include statutory exceptions and regulatory safe harbor provisions that protect lawful conduct from enforcement, as detailed further below.

For example, in a recent 2017 case in the District Court of South Carolina, the court reviewed void for vagueness claims made in numerous other AKS cases, and the court declared "[t]he Court is not aware of any decision by a federal court finding that the AKS is void for vagueness, and federal courts have consistently rejected such vagueness challenges to the AKS." *Berkeley HeartLab*, 2017 U.S. Dist. LEXIS 174733, at *34, 2017 WL 4803911, at *11 (quoting *United States v. Williams*, 218 F. Supp. 3d 730, 740-41 (N.D. Ill. 2016)).

In another recent case, the District Court for the Northern District of Illinois also upheld the constitutionality of the AKS where the defendant made the same void for vagueness claim that Defendant makes here.  *See United States v. Williams* 218 F. Supp. 3d 730 (N.D. Ill. 2016).  In *Williams*, the defendant claimed the AKS was void for vagueness because it did not provide sufficiently fair warning of what conduct was considered illegal.  *Id*.  The Court analyzed the vagueness argument as an "as-applied" challenge under the Due Process Clause, because such challenges are analyzed "as-applied," unless First Amendment interests are threatened.  *Id*. at 740. The Court held:

> The Anti–Kickback Statute provision at issue does provide a person of
> ordinary intelligence with a reasonable opportunity to know what is
> prohibited.  At its basic level, the statute clearly forbids receiving money
> or goods, in any way, in exchange for referrals of Medicare patients to
> providers of services and goods.  In this case, as discussed above, the
> government demonstrated that [the defendant] received cash indirectly
> (through her company) in exchange for referring patients to receive home
> healthcare services paid for by Medicare.  This conduct is clearly covered
> by the statute.

*Williams*, 218 F. Supp. 3d 730, 740.

The Court noted that even if the AKS was ambiguous, that "a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice" a defendant receives. *Williams*, at 740 (citing *Hoffman Estates v. Flipside*, *Hoffman Estates*, 455 U.S. 489, 499 (1982)). Because the AKS explicitly includes a high scienter requirement—that a defendant "knowingly and willfully" received a kickback, this strong scienter requirement overcomes any potential vagueness in the statute, "because a person who would otherwise be ensnared without notice does not violate the statute."  *Id*.

Accordingly, "[m]yriad courts have previously considered vagueness challenges to the Anti–Kickback Statute and rejected them, largely on the basis that the requirement of willfulness—

knowledge that the act is unlawful—mitigates any vagueness concerns".[8]  *Williams*, at 740; *see also United States v. Lahue*, 261 F.3d 993, 1006 (10th Cir. 2001) (rejecting vagueness challenge to the Anti–Kickback Statute); *United States v. Starks*, 157 F.3d 833, 840 (11th Cir. 1998) ("although the statute does provide for criminal penalties, it requires 'knowing and willful' conduct, a *mens rea* standard that mitigates any otherwise inherent vagueness in the Anti–Kickback statute's provisions"); *Hanlester Network v. Shalala*, 51 F.3d 1390, 1398 (9th Cir. 1995) ("These factors militate against finding the anti-kickback statute void for vagueness.  The statute regulates only economic conduct.  It chills no constitutional rights.  While the statute allows for criminal penalties, it requires 'knowing and willful' conduct, a requirement which mitigates any vagueness in the statute."); *United States v. Bay State Ambulance & Hosp. Rental Serv.*, 874 F.2d 20, 32 (1st Cir. 1989) ("When the Medicare Fraud statute is analyzed under the applicable standards, and in light of the fact that inducement is the gravamen of the offense, the statute passes constitutional muster even though the criminal nature of the statute requires "a relatively strict test" for constitutionality.").

The court in *Williams* further determined "[i]n fact, this Court could find no decision in which a court found § 1320a–7b(b)(1)(A) unconstitutionally vague." *Williams*, at 741; *see, e.g.*, *United States v. Krikheli*, 2009 WL 4110306, at *3 (E.D.N.Y. Nov. 24, 2009) (rejecting vagueness challenge to AKS); *United States v. Mathur*, 2012 WL 4742833, at *11 (D. Nev. Sept. 13, 2012), *report and recommendation adopted*, No. 2:11–CR–00312–MMD, 2012 WL 4711960 (D. Nev.

---

[8] Under the AKS, the term "knowingly" "merely requires proof of knowledge of the facts that constitute the offense." *Bryan v. United States*, 524 U.S. 184, 192-193 (1998); *Dixon v. United States*, 548 U.S. 1 (2006).  The term "willfully" means that the defendant knew "that his conduct was unlawful," knew he was acting "with a bad purpose," or knew he was acting "with evil intent without justifiable excuse."  *Bryan*, 524 U.S. at 192-193; *see also United States v. Berkeley HeartLab, Inc.*, 2017 U.S. Dist. LEXIS 174733, at *11, 2017 WL 4803911, at *4.  Modern Federal Jury Instructions, Section 27A-31 provides as follows: "An act is done knowingly and willfully when it is done voluntarily and purposefully and with the intent to do something the law forbids, that is with the bad purpose either to disobey or disregard the law.  A person acts willfully if he or she acts unjustifiably and wrongly while knowing that his or her actions are unjustifiable and wrong."  Sand & Siffert, *Modern Federal Jury Instructions – Criminal*, Instruction 27A-31.

Oct. 3, 2012) (same); *United States v. Neufeld*, 908 F. Supp. 491, 493–97 (S.D. Ohio 1995); *United States v. Robinson*, 505 F. App'x 385, 387 (5th Cir. 2013) (per curiam); *United States v. Hagen*, No. 3:19-CR-0146-B, 2020 U.S. Dist. LEXIS 69591, at *28 (N.D. Tex. Apr. 21, 2020); *United States v. Nagelvoort*, 856 F.3d 1117, 1129-30 (7th Cir. 2017); *United States v. LaHue*, 261 F.3d 993, 1008 (10th Cir. 2001).

Indeed, as the Eleventh Circuit put it in *United States v. Starks*, "[the AKS] is not a highly technical tax or financial regulation that poses a danger of ensnaring persons engaged in apparently innocent conduct."  157 F.3d at 838.  Rather, "the giving or taking of kickbacks for medical referrals is hardly the sort of activity a person might expect to be legal."  *Id*.

### 1.    As-Applied To Defendant, The AKS Is Constitutional And Is Not Void-For-Vagueness (Regarding Counts 30-33 – Remuneration to Agents).

Defendant argues that, as applied to him, the AKS is impermissibly vague because it did not provide him with fair notice as to what conduct violates the statute.[9]  This claim is without merit because the AKS provided Defendant with fair notice that the volume-based commission compensation arrangement he entered into with an agent, as described in more detail below, was improper, and that it fell far outside any relevant safe harbor.  The Government is not required to prove that Defendant had knowledge of the specific statute.  However, here, the Government will introduce evidence at trial that Defendant—who had himself acted as an independent contractor sales marketer in the health care industry before he started his own pharmacy in 2014—had

---

[9] Although Defendant makes a facial challenge to the AKS with respect to his argument regarding commercial speech, discussed in more detail below, it appears that he only makes an "as-applied" challenge regarding vagueness. If making a "facial" challenge to the AKS, the Defendant would be arguing that the law "is invalid in toto -- and therefore incapable of any valid application."  *Steffel v. Thompson*, 415 U.S. 452, 474 (1974).  To succeed on such a challenge, a defendant must establish that "the enactment is impermissibly vague in all its applications."  *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc*., 455 U.S. 489, 495 (1982). "[O]rdinarily, 'a plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *United States v. Williams*, 553 U.S. 285, 128 S. Ct. 1830, 1845 (2008) (quoting *Hoffman Estates*, 455 U.S. at 495); *see Parker v. Levy*, 417 U.S. 733, 756 (1974).  Since "[o]ne to whose conduct a statute clearly applies may not successfully challenge it for vagueness," *Parker*, 417 U.S. at 756, "[a] court should … examine the complainant's conduct before analyzing other hypothetical applications of the law."  *Hoffman Estates*, 455 U.S. at 495.

specific knowledge of not only the AKS, but also how it may be implicated through improper payments to independent contractors to generate federal health care referrals for a pharmacy.

As detailed in the Indictment, Defendant is charged with paying over $1,500,000.00 in illegal remuneration to Atlas Group, LLC ("Atlas") in 2015 (Counts 30 – 33).  Defendant entered into an agency agreement with Atlas, and he agreed to pay a 50% volume-based commission for each successfully reimbursed claim that Atlas referred to his pharmacy.  Aware that Atlas worked primarily at Walter Reed National Military Medical Center (a hospital that offers health care to U.S. military service members, retirees, and their family members, all of whom are beneficiaries of the TRICARE federal health care benefit program), Defendant created a prescription form for Atlas with compound "cream" ingredient lists, which were items and services covered by TRICARE, containing ingredients which were reimbursed in very high dollar amounts.  Defendant created a process in which prescriptions generated by Atlas were submitted electronically, directly to Defendant's pharmacy, and Defendant financially incentivized Atlas to refer TRICARE business to his pharmacy, by paying Atlas commissions based upon the volume of successful referrals reimbursed into Defendant's bank account.

For instance, Defendant inserted a "scar cream" formula onto a prescription form that he created for Atlas, and after Atlas obtained "scar cream" prescriptions from TRICARE providers, Atlas submitted the forms to Defendant's pharmacy (and after the pharmacy submitted claims for the "scar cream" to TRICARE and received a reimbursement from TRICARE), Defendant would then split the reimbursement with Atlas 50% - 50%.  Defendant received approximately $17,336.30 per each "scar cream" claim submission to TRICARE, after which Defendant would then pay Atlas 50% (approximately $8.668.15 per "scar cream" referral).

Because of the process of direct, electronic submission of the prescription forms from Atlas to Defendant's pharmacy, many patients were not aware that they had received a prescription for

a cream.  Any creams related to those prescriptions, reimbursed by TRICARE, were sent to the patients in the mail, via Federal Express.  Oftentimes, the arrival of a package at their front door was the first time that patients became aware of Blair Pharmacy.  At this point, the patient / beneficiary was generally not aware of any cost associated with the cream, and in order for Defendant retain and continue to submit future refill claims on behalf of these beneficiaries, Defendant wanted to ensure that beneficiaries accepted, as opposed to rejected, his creams.

Because of this, Defendant did all that he could to encourage prescriptions but discourage patient complaints or refusals, so he obfuscated the sky-high costs associated with the creams. Defendant told doctors and marketers that there would be no cost to the patient.  Defendant did not routinely collect copayments or coinsurance from beneficiaries, because even a small copay would run the risk of causing beneficiaries to refuse the creams, or refills of the creams.  Thus, in some instances, Defendant paid copayments himself, using pre-paid stored value cards, so that pharmacy records would appear to be in order.  Defendant routinely waived cost-sharing amounts, and failed to determine in good faith that the individual is in financial need or failed to collect the cost-sharing amounts after making reasonable collection efforts.  The purpose behind this waiver of copayments was to generate revenue from federal health care reimbursed prescriptions, thereby increasing his profit.

As noted above, no Court has ever determined the AKS to be impermissibly vague.  The AKS provides clear standards by which a person can determine whether they are violating the statute.  Further, the safe harbor regulations provide clear guidelines to govern law enforcement's enforcement of the statute.

Although courts have universally and consistently held that the AKS does not pose a danger of ensnaring innocent conduct, Defendant claims that judicial decisions contribute to the AKS's vagueness.  Yet, a review of the cases cited by Defendant reveals the opposite:  Judicial decisions

that hold that the statute provides fair notice, and that the type of conduct that Defendant engaged in, falls squarely within the scope of the AKS.

In *United States v Vernon*, the Eleventh Circuit reviewed a very similar commission-based compensation payment structure between a pharmacy executive officer and an agent of the pharmacy. 723 F.3d 1234 (11th Cir 2013).  The Eleventh Circuit held that the pharmacy officer's conduct was a clear violation of the AKS.  *Vernon* involved a pharmacy CFO who paid an agent for referring prescriptions to his pharmacy.  *Id*. at 1256-1959.  The Eleventh Circuit determined that a reasonable jury could easily have found that the CFO acted willfully when he signed three checks payable to the agent, because: (1) the pharmacy CFO knew that the agent was a third-party entity (the agent was not an employee of the pharmacy); (2) the CFO knew the payments were for the agent's referral of clients to the pharmacy for prescription filling; (3) the CFO knew the commission-based nature of the payments; and (4) because the CFO knew the AKS criminalized such commission-based arrangements between Medicaid health care providers and agents.  *Id*. at 1259.

In *United States v. Polin*, a pacemaker monitoring company made payments to a pacemaker sales agent based on the number of patients that the agent signed up with the monitoring company. 194 F.3d 863, 864-65 (7th Cir. 2003).  The agent's responsibilities in *Polin* included selling pacemakers, attending implant procedures, and making sure that patients were monitored following implantation.  *Id*.  After marketing pacemaker services to a doctor, if a doctor later agreed to use a monitoring service, then the agent made the decision which service provider to contact for the patient.  *Id*. at 865.  Since the agent decided where to send the doctor's business in *Polin*, the Seventh Circuit upheld the convictions of defendants who paid the agent, because the agent's judgment was shown to have been influenced by the payments received from the defendants.  *Id*.

In *United States v. Miles*, the Fifth Circuit reversed the convictions of defendants charged with paying healthcare kickbacks in violation of the AKS.  360 F.3d 472 (5th Cir. 2004).  There, defendants paid an agent to distribute information, such as literature, business cards, and the occasional plate of cookies, to medical offices, and if a doctor from one of the offices referred a patient to the defendants' company, then the defendants paid the agent $300.  *Id*. at 480.  In *Miles*, the Court noted that agent had no role in selecting the particular home health care provider selected by the doctor, and because it was the doctor, and not the agent, who chose where to send the business, the Fifth Circuit held that the defendants did not violate the AKS.  *Id*. at 480-81.

Defendant attempts to broadly construe the facts in *Miles* to the present case.  But the facts of *Miles* are distinguishable from those here:  Defendant paid Atlas to improperly refer TRICARE business to Defendant, and Atlas did just that.  Importantly, the Fifth Circuit strongly discourages attempts to broadly construe the *Miles* case.  For instance, in *Shoemaker*, the Fifth Circuit rejected as "untenable" a district court's reading of *Miles* "to limit drastically the meaning of 'any person,' such that liability cannot attach unless the 'person' who receives remuneration is a 'relevant decisionmaker' with formal authority to effect the desired referral or recommendation."  *United States v. Shoemaker*, 746 F.3d 614, 627, 629 (5th Cir. 2014) (affirming a conviction in which defendants knowingly and willfully entered into an expansive kickback conspiracy with intent to induce recruiters to refer Medicare beneficiaries to the defendant's company).

In reasoning that the AKS broadly criminalizes referrals paid to "any person," the Fifth Circuit specifically noted that *Miles* stands "for a narrow legal proposition: where advertising facilitates an independent decision to purchase a healthcare good or service, and where there is no evidence that the advertiser "unduly influence[s]" or "act[s] on behalf of" the purchaser," the fact that the healthcare provider compensates the advertiser, on its own, is insufficient to support a conviction under the AKS.  *Shoemaker*, at 628 (quoting *Miles*, 360 F.3d at 480).  The outcome in

*Miles* did not turn on the status of the agent as a "relevant decisionmaker" but, instead, on the "payer's intent to induce 'referrals,' which is illegal, and the intent to compensate advertisers, which is permissible." *Id.*; *see also United States v. Krikheli*, No. 08-CR-528 (SLT), 2009 U.S. Dist. LEXIS 110230, at \*11 (E.D.N.Y. Nov. 24, 2009) ("The first problem with this argument is that neither § 1320a-7b(b)(2)(A) nor the cases cited by the [defendants] support the proposition that the individual being paid must be a decision-maker.").

Furthermore, the Fifth Circuit recently reaffirmed this narrow reading of *Miles* when the Court rejected a similar argument in *United States v. Gibson*, 875 F.3d 179, 189 (5th Cir. 2017). Again, the Fifth Circuit explained that "the [AKS] has no 'relevant decision maker' or 'medical judgment' requirement." *Id.* (quoting *Shoemaker*, 746 F.3d at 628-29). In *Gibson*, the Fifth Circuit held that it was enough for a defendant to make payments to a recruiter, because "[t]he statute criminalizes payments made to 'any person' with the requisite intent." *Id.*

Here, the Government does not seek to penalize Defendant for compensating an advertiser. Nor does the government seek to penalize Defendant for conduct that could be permissible under the AKS, i.e., a payment of fair market value compensation for services actually rendered between the parties that is not related directly or indirectly to referrals of Federal health care program beneficiaries or to generate revenue for defendant. Instead, the Government will establish that Defendant knowingly and willfully compensated Atlas for the improper purpose of inducing Atlas to refer TRICARE business to his pharmacy, and that he paid Atlas on a volume-based commission basis. No regulatory safe harbor can save Defendant, as he well knows, because he was aware that the AKS did not permit these types of payments arrangements.

      **a)**    **Regulatory Publications Regarding The Safe Harbor Provisions Provide Sound Guidance And Discernable Standards.**

Defendant also claims that regulatory guidance has contributed to the AKS's vagueness. The opposite is true. The Department of Health and Human Services Office of Inspector General

("OIG") is charged with providing guidance to the healthcare industry regarding anti-fraud laws, including the AKS. See 42 U.S.C. § 1320a-7d.  OIG advisory opinions provide clear and sound guidance regarding the application of the AKS to specific facts provided to OIG by the requestor of the opinion.  In particular, a 1998 OIG advisory opinion provides clear guidance regarding the fraud and abuse risks under the AKS a provider or supplier improperly pays remuneration to a marketer refer health care business to the provider.  The opinion plainly states that paying an independent contractor a high, per claim commission to induce federal health care referrals would implicate the AKS.   Advisory Opinion No. 98-10, 1998 WL 35287765 (Sept. 8, 1998).

In this OIG Advisory Opinion No. 98-10, the OIG concluded that payment of a sales commission to a sales agent by a manufacturer of medical supplies could constitute remuneration under the AKS.  "The arrangement provides multiple opportunities and financial incentives" for marketing activities "that may lead to more than a minimal risk of Federal health care program abuse." *Id*. at *8.

The OIG further states the "[t]his office has long been concerned about the potentially abusive marketing arrangements involving health care goods and services paid for in whole or in part by Federal health care programs."  *Id*. at * 5.  "Since publication of the 1991 rule, we have continued to learn of abusive relationships involving marketing activities that adversely affect the Federal health care programs and their beneficiaries."  *Id*.

Like Defendant's compensation arrangement with Atlas, the company in the OIG advisory opinion "does not qualify for safe harbor protection … since the majority of the compensation to be paid … is calculated based on a percentage of reimbursements collected by Company B for its sales of Company A products.  Thus the amount of compensation to be paid to Company B under the contract is not fixed in advance and is determined in a manner that takes into account the value

or volume of the business generated between the parties, including Federal health care program." *Id.*

"Percentage compensation arrangements are potentially abusive however, because they provide financial incentives that may encourage overutilization of items and services and may increase program costs." *Id.*   The OIG determined that the percentage-based compensation arrangement described in its opinion was problematic because: (1) the arrangement included significant financial incentives that increased the risk of abusive marketing practices; (2) the marketing company had opportunities to unduly influence referral sources because the arrangements involved active marketing with direct contacts with the physicians who ordered the products; and (3) the arrangement contained no safeguards against fraud or abuse, in particular because the products are paid for by third-party payers, including the government.  *Id.*

Although the facts in the advisory opinion are different then the facts in the present case, the reasoning is relevant because Defendant financially incentivized Atlas by paying a per-claim commission for every successfully reimbursed claim.  The amount of compensation paid to Atlas under this compensation agreement was fair market value in an arm's length transaction.  It was determined in a manner that took into account the value or volume of the business generated between Defendant and Atlas.   A review of the OIG's reasoning is instructive, in that: (1) Defendant paid Atlas a 50% per claim commission on creams that regularly reimbursed for over $10,000 each, which certainly increased the risk of abusive marketing practices; (2) Atlas could influence TRICARE physicians because, as Defendant knew, Atlas had direct contact with doctors at Walter Reed Hospital with whom Atlas was financially incentivized by Defendant to induce referrals to Defendant's pharmacy for creams related to TRICARE beneficiaries; and (3) Defendant received prescriptions electronically directly from Atlas and he electronically submitted claims to TRICARE for federally reimbursable prescription creams.

The OIG advisory noted that the marketing arrangement in the opinion posed an "unacceptable risk of fraud and abuse." *Id*. at *6. The arrangement provided multiple opportunities and financial incentives for marketing activities that may lead, individually or collectively, to more than a minimal risk of Federal health care program abuse." *Id*. at *8.

The advisory opinion clearly noted that any determination of an actual AKS violation in any given case depends on the totality of the facts and circumstances of each case. *Id*. at *7. In other words, the conduct must be evaluated on a case-by-case basis, in light of all of the surrounding facts, by a fact finder. This caveat reasonably restates the standard that applies in all criminal cases.

This is not the first time that the OIG reminds all that the legality of any particular business arrangement must be determined by comparing the particular facts to the proscriptions of the statute. *See* Department of Health and Human Services, Office of Inspector General, Medicare and State Health Care Programs: Fraud and Abuse; OIG Anti-Kickback Provisions, 56 Fed. Reg. 35,952, 35,954; 59 Fed. Reg. 37,202, 37,203 (1994) (clarifying the effect of the safe-harbor provisions by saying that "whether a particular payment practice violates the statute is a question that can only be resolved by an analysis of the elements of the statute as applied to that set of facts).

In evaluating the facts of any case, the *mens rea* element is the gravamen of the crime. The importance of the intent element when deciding criminal liability under the AKS has been specifically addressed by the OIG:

> It is unfortunately not possible to provide safe harbor protections for all business arrangements that are not abusive. There are certain arrangements that, although themselves legitimate, are structurally so similar to abusive arrangements that protection by way of new safe harbor provisions will inevitably also protect abusive practices as well. For example, equipment rental arrangements made between parties in a position to make and accept referrals do not receive safe harbor protection if the payments are based on utilization (sometimes known as the "wear and tear" clause). We recognize that equipment becomes less valuable the more it is used, and that its owner deserves compensation for such wear

> and tear.  However, it is also a relatively easy matter to disguise such a wear and tear payment as a payment for referrals.  Thus, we need to examine the intent of the parties on a case-by-case basis even though a large majority of such payments may represent only legitimate compensation to the owner of the equipment.  The recent case, *United States v. Bay State Ambulance and Hospital Rental Service, Inc*., … emphasizes that the gravamen of the violation of the statute is "inducement" and not necessarily the structure of the arrangement. Thus, such case by case inquiries must necessarily focus on the intent of the parties.

56 Fed. Reg. 35,952, 35,955 (1991).

As in any other criminal case, whether Defendant possessed the requisite *mens rea* in this case is a matter fact.  The Government will present evidence that Defendant knowingly and willfully paid Atlas remuneration to induce TRICARE referrals to his pharmacy in violation of the AKS.  Ultimately, a jury must decide these facts.

> ### 2.      As-Applied To The Defendant, The AKS Is Constitutional, And Is Not Void-For-Vagueness (Regarding Count 29 – Waiver of Copayments).

Defendant next argues that, as applied to him, Count 29 is impermissibly vague.  This argument also fails.  As described above, Defendant used the non-collection and waiver of beneficiary copayments to enhance profits at his pharmacy.  He did not assess the hardship or financial need of beneficiaries—instead, in order to reduce rejections of the creams, and refills of the creams, and to obfuscate the costs associated with these creams, Defendant purposefully failed to collect copayments (and he sometimes covertly paid copayments himself) as a way to maintain the beneficiaries claims at his pharmacy, thereby inducing federal health care business to his pharmacy.

> #### a)      Safe Harbor Regulation Related to Non-Collection of Copayments and the HHS OIG "Special Fraud Alert"

At the time Defendant failed to collect copayments from beneficiaries, the AKS clearly proscribed remunerations made to induce federal health care program business.  There was no specific safe harbor regulation that made an exception for the waiver of copayments based on

financial hardship.  Only in 2016, after the time period of Defendant's conduct in this case, did the OIG formally publish a safe harbor provision regarding the copayment waiver issue.

The OIG published a "Special Fraud Alert," which contained a notice regarding abusive practices related to copayment waivers.  HHS-OIG Special Fraud Alerts, 59 Fed. Reg. 65,372 (Dec. 19, 1994) ("Special Fraud Alert").

In the 1994 Special Fraud Alert, the OIG stated that it uses "fraud alerts as a vehicle to identify fraudulent and abusive practices within the health care industry" and that these "Special Fraud Alerts have served to provide general guidance to the health care industry on violations of Federal law." *Id*. at *65373.  To help reduce fraud in the program, the OIG warned that it was "actively investigating health care providers, practitioners and suppliers of health care items and services who (1) are paid on the basis of charges and (2) routinely waive (do not bill) Medicare deductible and copayment charges to beneficiaries for items and services covered by the Medicare program." *Id*.

In the Special Fraud Alert, the OIG answered the question "why is it illegal for 'charged-based' providers to routinely waive Medicare copayments and deductibles," by stating that "[r]outine waiver of deductibles and copayments by charge-based providers, practitioners or suppliers is unlawful because it results in (1) false claims, (2) violations of the anti-kickback statute, and (3) excessive utilization of items and services paid for by Medicare." *Id*. at *65374.

With respect to false claims, this alert warned that a provider who routinely waived copayments was misstating the actual charge of a health care item or service. *Id*.  "When providers, practitioners or suppliers forgive financial obligations for reasons other than genuine financial hardship of the particular patient, they may be unlawfully inducing that patient to purchase items or services from them." *Id*. at *65375.

The OIG "Special Fraud Alert" further warned about the impact of routine cost-sharing waivers on Federal health care programs.   The Alert identified an exception to beneficiary inducements in the Civil Monetary Penalties Act, regarding waiver of copayments based upon genuine financial hardship and further discussed issues regarding copayment waiver practices, as follows:

> At first glance, it may appear that routine waiver of copayments and deductibles helps Medicare beneficiaries.   By waiving Medicare copayments and deductibles, the provider of services may claim that the beneficiary incurs no costs.  In fact, this is not true.  Studies have shown that if patients are required to pay even a small portion of their care, they will be better health care consumers, and select items or services because they are medically needed, rather than simply because they are free. Ultimately, if Medicare pays more for an item or service than it should, or if it pays for unnecessary items or services, there are less Medicare funds available to pay for truly needed services.

> One important exception to the prohibition against waiving copayments and deductibles is that providers, practitioners or suppliers may forgive the copayment in consideration of a particular patient's financial hardship. This hardship exception, however, must not be used routinely; it should be used occasionally to address the special financial needs of a particular patient.   Except in such special cases, a good faith effort to collect deductibles and copayments must be made.  Otherwise, claims submitted to Medicare may violate the statutes discussed above and other provisions of the law.

> Indications of Improper Waiver of Deductibles and Copayments.

> To help you identify charge-based providers, practitioners or suppliers who routinely waive Medicare deductibles and copayments, listed below are some suspect marketing practices.  Please note that this list is not intended to be exhaustive but, rather, to highlight some indicators of potentially unlawful activity.

> - Advertisements which state: "Medicare Accepted As Payment in Full," "Insurance Accepted As Payment in Full," or "No Out-Of-Pocket Expense."

> - Advertisements which promise that "discounts" will be given to Medicare beneficiaries.

> - Routine use of "Financial hardship" forms which state that the beneficiary is unable to pay the coinsurance/deductible (i.e., there is

> no good faith attempt to determine the beneficiary's actual financial condition)…
>
> - Failure to collect copayments or deductibles for a specific group of Medicare patients for reasons unrelated to indigency …

HHS OIG 1994 Special Fraud Alert at *65376.

Defendant cannot argue that its conduct met any safe harbor to the AKS.  Defendant failed to undertake an individual assessment of financial need for each patient before waiving cost-sharing owed by beneficiaries.  He did not collect cost-sharing nor did he engage in good faith efforts to collect beneficiary cost-sharing.

But, ultimately, whether there was a formal regulation in existence in 2015 regarding the AKS and waiver of copayments, or not, is irrelevant here.  Defendant did not make financial hardship evaluations in this case, routinely, or otherwise.  He did not make a good faith effort to collect copayments.  Nor did he conduct an analysis regarding any financial hardship of beneficiaries.  Instead, Defendant conducted his business in the manner that the "Special Fraud Alert" attempted to ward against—maintaining a fraudulent and abusive practice within the health care industry.

### b) The Meaning Of The Word "Remuneration" Is Plain And Is Not Void-For-Vagueness.

Defendant next attacks the word "remuneration" in the statute and argues that the lack of a definition of the term causes the AKS to be impermissibly vague.  This argument is meritless.  The word "remuneration" has a simple and plain meaning.

Congress introduced the broad term "remuneration" in the 1977 amendment of the statute to clarify the types of financial arrangements and conduct to be classified as illegal under Medicare and Medicaid.  *Hanlester Network v. Shalala*, 51 F.3d 1390, 1398 (9th Cir. 1995) (citing H.R. Rep. No. 95-393, Pt. II, 95th Cong., 1st Sess. 53 reprinted in 1977 U.S.C.C.A.N. 3039, 3056).  The

phrase "any remuneration" was intended to broaden the reach of the law which previously referred only to kickbacks, bribes, and rebates. *Id.*

In construing a statute, the Fourth Circuit applies the plain meaning of statutory language, unless there is a clearly expressed legislative intent to the contrary or "when a literal application would frustrate the statute's purpose or lead to an absurd result." *Nat'l. Coal. for Students with Disabilities Educ. & Legal Def. Fund v. Allen*, 152 F.3d 283, 288 (4th Cir. 1998). Where the statutory language has a plain meaning, the court's inquiry is complete and it will enforce the statute as written. *Stephens ex rel. R. E. v. Astrue*, 565 F.3d 131, 137, 140 (4th Cir. 2009). A statute's plain meaning is defined by the statutory language's common and ordinary meaning, absent an indication from Congress that the language should have a different meaning, *id.* at 137, and by both the specific context in which the language is used and in the broader context of the statute as a whole. *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997). The use of dictionary definitions can be authoritative when construing a statute's common and ordinary meaning. *United States v. Groce*, 398 F.3d 679, 682 (4th Cir. 2005)

The AKS provides that "whoever knowingly and willfully offers or pays any *remuneration* (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person - to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program ..." (emphasis added).

Upon a plain reading of the statute, the term "remuneration" includes, among other things, kickbacks, bribes and rebates. The Merriam-Webster online dictionary defines the term "remuneration" as follows: "remuneration: something that remunerates: Recompense, Pay."[10] The

---

[10] The Merriam-Webster Dictionary provides the following synonyms for the word remuneration: "compensation, disbursement, giving, paying, payment, remitment, remittance."

statute's use of the term "remuneration" in the context of the sentence as a whole, has a straightforward and plain meaning:  It simply means "to pay."  *See, e.g.*, *United States v. Greber*, 760 F.2d 68, 71 (3d Cir. 1985) ("The text refers to 'any remuneration.' That includes not only sums for which no actual service was performed but also those amounts for which some professional time was expended. 'Remunerates' is defined as "to pay an equivalent for service.") (quoting Webster Third New International Dictionary (1966)).

The AKS uses an important word to modify the term "remuneration" – "any."  The word "any" certainly has a straightforward meaning, and the plain language of the combined language "any remuneration" in the context of the statute's sentence as a whole, makes clear that the statute proscribes a broad range of payments.  The statute plainly proscribes "any" payment "in cash or in kind; "overt or covert;" "direct or indirect;" made "in whole or in part."  This statutory language is clearly and plainly meant to be broad in scope, and to cover a very wide range of payments - so long as the payment is made with the requisite *mens rea*.  The word "remuneration" has a plain meaning, and is not vague as applied to Defendant.

> **c)    A Civil Statute, The Civil Monetary Penalties Law, Contains  A Statutory Definition Of The Word "Remuneration," But That Definition Is Not Applicable To A Criminal Case Involving the AKS.**

Defendant erroneously argues that the definition of the word "remuneration" found in a civil statute controls the meaning of the word "remuneration," as used in the AKS.[11]  The Civil

---

[11] In a very recent Advisory Opinion, OIG Advisory Opinion 20-05, the OIG explained the distinct nature of the definition of "remuneration" under the Beneficiary Inducements CMP.  The OIG noted that a distinct definition of "remuneration" applies exclusively to section 1128A of the Act, which includes the Beneficiary Inducements CMP.  Specifically, section 1128A(i)(6) of the Act defines "remuneration" to include "the waiver of coinsurance and deductible amounts (or any part thereof), and transfers of items or services for free or for other than fair market value."  Section 1128A(i)(6) of the Act also sets forth a number of exceptions to the definition of "remuneration" that apply for purposes of section 1128A of the Act. These exceptions protect certain remuneration from violating the Beneficiary Inducements CMP. These exceptions apply only for the purposes of the definition of "remuneration" applicable to section 1128A of the Act (the CMP statute); they do not apply for purposes of section 1128B(b) of the Act (the Federal anti-kickback statute).  The OIG further noted that the Beneficiary Inducements CMP (section 1128A(a)(5) of the Act) contains a different, narrower prohibition than the AKS (section 1128B(b) of the Act) and uses a definition of "remuneration" that does not apply for purposes of the Federal anti-kickback statute.  *See* https://oig.hhs.gov/fraud/docs/advisoryopinions/2020/AdvOpn20-05.pdf.

Monetary Penalties Law ("CMPL") is a civil statute which provides penalties for improperly filed claims and various other misconduct related to improper claim submissions to the United States. 42 U.S.C.S. § 1320a-7a.

The CMPL § 1320a-7a(a)(5) imposes a civil monetary penalty on an individual who "offers to or transfers remuneration to any individual eligible" for various state and federal health care programs, where that person knows that the remuneration "is likely to influence such individual in order to receive" the health benefit. *United States v. Narco Freedom, Inc.*, 95 F. Supp. 3d 747, 756-57 (S.D.N.Y. 2015). Section 1320a-7a(i)(6) of the CMPL defines "remuneration" for that subsection to include "the waiver of coinsurance and deductible amounts (or any part thereof), and transfers of items or services for free or for other than fair market value." Section 1320a-7a(i)(6)(A)-(H) of the CMPL, in turn, exempts a number of practices from § 1320a-7a(i)(6)'s definition of "remuneration," as follows:

> The term "remuneration" includes the waiver of coinsurance and deductible amounts (or any part thereof), and transfers of items or services for free or for other than fair market value. The term "remuneration" does not include—
>
> > (A) the waiver of coinsurance and deductible amounts by a person, if—
> >
> > > (i) the waiver is not offered as part of any advertisement or solicitation;
> > >
> > > (ii) the person does not routinely waive coinsurance or deductible amounts; and
> > >
> > > (iii) the person—
> > >
> > > > (I) waives the coinsurance and deductible amounts after determining in good faith that the individual is in financial need; or
> > > >
> > > > (II) fails to collect coinsurance or deductible amounts after making reasonable collection efforts;

42 U.S.C.S. § 1320a-7a(i)(6)(2020).

The AKS cross-references one of the exceptions to the definition of "remuneration" in § 1320a-7a(i)(6)(A)-(H). *Narco Freedom, Inc.*, 95 F. Supp. 3d at 756-57. Thus, if Congress intended the exceptions to "remuneration" in § 1320a-7a(i)(6)(A)-(H) to apply to § 1320a-7b's definition of remuneration, it would have said so explicitly. *Id.* It did not.

The statutory exceptions listed in section 1128A(i)(6) of the CMPL apply only to the definition of "remuneration" applicable to the CMPL. *See* Medicare and State Health Care Programs, 79 Fed. Reg. at 59,724; *see also Ameritox, Ltd. v. Millennium Labs., Inc.*, 20 F. Supp. 3d 1348, 1356 (M.D. Fla. 2014) ("[T]he AKS does not contain exceptions to the broad definition of remuneration.").[12]

Defendant notes that a number of courts have cited the CMPL definition of "remuneration" in § 1320a-7a(i)(6). That is true, particularly related to the CMPL provision regarding "transfers of items or services for free or for other than fair market value," when interpreting the AKS. *Narco Freedom, Inc.*, 95 F. Supp. 3d at 757 n.4. However, in *Narco Freedom*, the court distinguished these cases by noting that none of those other cases used the CMPL "remuneration" exceptions found in § 1320a-7a(i)(6)(A)-(H) to the AKS, which clearly specifies its own set of "safe harbors" (found at § 1320a-7b(b)(3) and the accompanying regulations). *Id. See, e.g.*, *United States ex rel. Bilotta v. Novartis Pharms. Corp.*, 50 F. Supp. 3d. 497 (S.D.N.Y. Sept. 30, 2014); *United States ex rel. Fair Lab. Practices Assocs. v. Quest Diagnostics Inc.*, LEXIS 37014, 2011 WL 1330542,

---

[12] Defendant cites to the government's amicus brief, filed in the Eleventh Circuit's appellate matter regarding the *Ameritox, Ltd. v. Millennium Labs., Inc.* case. Defendant proposed that the United States has previously taken the position that the CMPL definition of the term "remuneration" should control the term "remuneration" as it is used in the AKS. (ECF No. 38 at 22). However, a plain reading of the United States' amicus brief reveals that the government made no such representation. Appellate Case No. 14-14281, Corrected Brief For the United States of America As Amicus Curiae Supporting Appellee, filed Feb. 2, 2015. In the amicus brief, the government discusses the term "remuneration," which was at issue in the case, and provided several references to various laws where the term "remuneration" is defined. In this discussion, the government simply noted that "'[r]emuneration' is defined elsewhere to include 'transfers of items or services for free or for other than fair market value.' 42 U.S.C. 1320a-7a(i)(6)." United States Corrected Amicus Brief, page 9. Defendant cannot (credibly) claim that the government took the position in its amicus brief, that the civil statute definition controls the use of the term in the AKS. This suggestion by Defendant lacks credibility and is entirely without merit.

at *2 (S.D.N.Y. Apr. 5, 2011), *aff'd*,734 F.3d 154 (2d Cir. 2013); *United States ex rel. Freedman v. Suarez-Hoyos*, 781 F. Supp. 2d 1270, 1281 (M.D. Fla. 2011); *United States v. Carroll*, 320 F. Supp. 2d 748, 755-56 (S.D. Ill. 2004).[13]

It is significant that Congress included a specific exception regarding coinsurance waiver into the statutory language of the term "remuneration" in the CMPL, but failed to include any similar statutory exception to the term "remuneration" in the AKS.  If Congress had intended the coinsurance waiver exception in the CMPL to apply to the AKS definition of "remuneration," the Congress certainly would have said so explicitly.  Congress did not, so this Court should not.

The AKS is not void for vagueness.  No Court has ever found the statute to be impermissibly vague.  Here, the AKS did not ensnare innocent conduct.  Instead, as applied to Defendant, the statute provided fair notice.  The regulations provide a safe harbor for conduct that is not prohibited by the AKS. Routinely waving beneficiary copayments to induce federal health care business, is a remuneration that falls squarely within the scope of the AKS.  The statute is constitutional.  And, as in all other cases, it will be up to the jury to determine the facts as to whether the Defendant had the requisite *mens rea* at the time of his conduct.  Accordingly, the Government respectfully requests that the Court deny Defendant's motion to dismiss Counts 29 – 33.

## IV.    The Anti-Kickback Statute Is Not Overbroad, And The Motion To Dismiss Counts 30 – 33 (ECF No. 39) Should Be Denied.

Defendant also makes a facial and as-applied challenge to the constitutionality of the AKS, related to Counts 30-33 in the Indictment.  Defendant claims that the AKS impermissibly restricts commercial speech regarding the marketing of creams made by his pharmacy, and that this

---

[13] Defendant also cites *United States ex rel. Grenadyor v. Ukranian Vill. Pharmacy, Inc.*, 895 F. Supp. 2d 872 (N.D. Ill. 2012), but there the court dismissed a defective pleading in a civil case involving allegations of copayment misconduct, and the court merely noted the definition of remuneration in the various sections of the statutes, without further analysis.

restriction is an impermissible "speaker based" restriction, because it proscribes only the speech of agents, as opposed to bona-fide employees of the pharmacy. Defendant claims that this speaker-based ban makes the AKS facially unconstitutional for all defendants everywhere, and also unconstitutional as applied to him, regarding Counts 30 – 33.

This argument is wholly without merit. The AKS is constitutional. The statute does not impermissibly restrict commercial speech, facially, or as applied to this Defendant.

    **A.**    **The AKS is Constitutional, Because The Statute Proscribes Unlawful Conduct, And Does Not Improperly Restrict Speech.**

Defendant misunderstands the statute. The AKS regulates *conduct*, not *speech*. Like Defendant's allegation regarding vagueness above, similarly situated defendants have previously claimed that the AKS is an overbroad restriction of speech. These prior challenges have failed, and courts have consistently rejected this type of First Amendment challenge to the AKS.

Defendant refers to cases in which courts have determined that business solicitation and advertisement are forms of protected commercial speech. However, the cases cited by Defendant do not illuminate, nor are they analogous, to the conduct proscribed by the AKS. It is undisputed that a business has the right to advertise, however, the AKS does not impermissibly regulate this form of protected commercial speech. Nor does the statute discriminate against or improperly restrict a business's decision to hire and use independent contractors. Instead, the AKS prohibits an individual from engaging in certain *conduct*. The statute does not impermissibly restrict speech, it regulates conduct – namely, the conduct of paying an agent for the improper purpose of inducing the generation of federal health care program referrals. The AKS distinguishes between agent and employee, as described in more detail below, but this is not discrimination. This distinction does not restrict speech, nor does it impermissibly regulate a business owner's choice as to whom to hire – it simply proscribes paying an agent in a way that is known to be wasteful and abusive. A business is free to hire an independent contractor, but paying that agent a percentage based

compensation is inherently abusive because compensation is tied directly to the volume and value of referrals.

      **1.**    **The AKS is Not Overbroad, And Defendant's Facial Challenge To The Statute Fails (Regarding Counts 30-33).**

Unlike the vagueness challenge described above, standing to bring an overbreadth challenge is different in that an overbreadth challenge to a statute can be raised even by "a defendant whose conduct clearly falls within the law and may be constitutionally prohibited." *Morales*, 527 U.S. at 72. Under the overbreadth doctrine, "a statute is facially invalid if it prohibits a substantial amount of protected speech." *United States v. Williams*, 553 U.S. 285, 292, 128 S. Ct. 1830, 1838 (2008). The Supreme Court has recognized "that unconstitutional restriction of expression may deter protected speech by parties not before the court and thereby escape judicial review." *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*, 447 U.S. 557, 566 n.8 (1980). However, the Supreme Court has also made clear that the First Amendment overbreadth doctrine is "strong medicine" only to be used as a "last resort" where a statute implicates a substantial amount of protected expression. *New York v. Ferber*, 458 U.S. 747, 767 (1982).

The Supreme Court defines commercial speech as "expression related solely to the economic interests of the speaker and its audience." *Central Hudson Gas*, 447 U.S. at 561. Courts have reasoned that the overbreadth doctrine does not necessarily apply in all cases involving commercial speech. *Hoffman Estates*, 455 U.S. at 497 (citing *Central Hudson*, 447 U.S. at 566 n. 8). Certainly, commercial speech enjoys some protection under the First Amendment. *See, e.g., Virginia State Board of Pharmacy*, 425 U.S. at 771. However, as the Supreme Court noted in *Central Hudson*, "commercial speech, the offspring of economic self-interest, is a hardy breed of expression that is not 'particularly susceptible to being crushed by overbroad regulation.'" *Central Hudson*, 447 U.S. at 564, n. 6 (quoting *Bates v. State Bar of Arizona*, 433 U.S. 350, 381, 97 S. Ct. 2691, 53 L. Ed. 2d 810 (1977)). Accordingly, restraint on free speech - the evil that the overbreadth

doctrine was designed to combat - is "less likely where the expression is linked to 'commercial well-being' and therefore … not as easily deterred." *Id*., 447 U.S. at 566 n.8.

The AKS targets speech only insofar at the speech constitutes an offer to pay kickbacks. Speech "used as an integral part of conduct in violation of a valid criminal statute" is not protected by the First Amendment. *United States v. Stevens*, 559 U.S. 460, 471 (2010) (quoting *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 498, 69 S. Ct. 684, 93 L. Ed. 834 (1949)); *see also Cent. Hudson Gas & Elec. Corp.*, 447 U.S. at 557 ("[F]or commercial speech to come within [the First Amendment], it at least must concern lawful activity …")

Speech "used as an integral part of conduct in violation of the valid criminal statute" is not protected by the First Amendment. *Giboney*, 336 U.S. at 498. For instance, proscribing bribery does not infringe on any First Amendment rights because it neither chills, nor is intended to chill, constitutionally-protected activities. *United States v. Dischner*, 974 F.2d 1502, 1511-12 (1992), *overruled on other grounds by United States v. Morales*, 108 F.3d 1031, 1035 (9th Cir. 1997). Additionally, laws that  focus on criminal conduct such as perjury, tax or administrative fraud, or impersonating an officer are not protected under the First Amendment even though they can be violated by means of speech. *United States v. Alvarez*, 617 F.3d 1198, 1213 (9th Cir. 2010).

In *United States v. Krikheli*, a similar overbreadth constitutional challenge was made, and the Court determined that the AKS was not overbroad. *United States v. Krikheli*, 2009 WL 4110306, at *3-5. In *Krikheli*, the defendants were charged with violations of the AKS for soliciting and receiving kickbacks in exchange for referrals to a radiological imaging facility. The defendants claimed that the AKS was overbroad, but the Court reasoned that because the overbreadth challenge was premised upon alleged violations of commercial speech, the Court denied the defendants' motion to dismiss. *Id*.

In *United States v. Mathus*, the defendant made a similar overbreadth challenge to the AKS. *United States v. Mathur*, No. 2:11-cr-00312-MMD-PAL, 2012 U.S. Dist. LEXIS 143197, at *28 (D. Nev. Sep. 13, 2012).   In *Mathur*, the Court held that the AKS was not facially overbroad, because it did not involve content-based regulation of speech.  *Id*.  In that case, the Court concluded that, in light of the statute's plainly legitimate goal of combating health care fraud, the AKS was not unconstitutional.  *Id*. at *31.

In the present case, similar to the *Krikheli* and *Mathur* cases, the speech which the AKS is alleged to restrict is commercial speech.   Under these circumstances, Defendant cannot advance a facial challenge to the statute, even if the statute may be unclear with respect to other, hypothetical defendants.  *See Williams*, 128 S.Ct. at 1845; *Hoffman Estates*, 455 U.S. at 495; *Parker*, 417 U.S. at 756.   As such, his Defendant should not be permitted to use the overbreadth doctrine to argue that the AKS may chill the commercial speech of others.   The Defendant's facial overbreadth challenge to the AKS, therefore, must fail.

### 2.      The AKS is Not Overbroad, and Defendant's As-Applied Challenge To The Statute Must Fail (Regarding Counts 30-33).

Defendant next challenges the AKS as unconstitutionally overbroad, as applied to him. Defendant claims that the government "uses the AKS to criminalize Mr. Blair's election to use a commissioned independent contractor – rather than an employee – to market his start up pharmacy."  Defendant claims that his impermissible restriction on speech creates a "bar to entry" and violates the Equal Protection Clause, reasoning that when an equal protection violation is based on the infringement of a First Amendment right, the First Amendment fuses into the Equal Protection Clause of the Fourteenth Amendment.  Defendant argues that since the statute makes a distinction between agent and employee, that this "discrimination" is a "speaker-based ban" on speech that "creates significant barriers for independent, start-up pharmacies in the marketplace."

Defendant is wholly incorrect.  The Government does not charge Defendant based upon his choice to use an independent contractor, such as Atlas, in his business.  In fact, Defendant was free to hire anyone he chose, agent or employee, and he was free to engage in legal business practices, such as advertising, by and through any employee or agent that he chose to hire. However, Defendant ran afoul of the AKS in this case, not because he hired an independent contractor, but because he financially incentivized that independent contractor for the improper purpose of inducing federal health care referrals to his pharmacy.  He did not pay Atlas to advertise, he paid Atlas to improperly steer referrals, and after Defendant was reimbursed by TRICARE, Defendant paid Atlas a kickback percentage of the money he received from TRICARE.  When he induced his agent to improperly refer business to his pharmacy, Defendant did not engage in protected *speech*, he engaged in prohibited *conduct*.

Although Defendant characterized Atlas as a "marketer," he did not pay Atlas to advertise. Instead, Defendant paid Atlas if, and only if, Atlas generated referrals to his pharmacy and if, and only if, those referrals resulted in successfully reimbursed claims.  Indeed, Atlas did not earn a penny for advertising any of Defendant's products.  Instead, Defendant financially incentivized Atlas to steer federal health care program referrals towards his pharmacy, and away from other pharmacies.  He paid Atlas, not a fixed sum arranged in advance, but instead, a commission based upon the volume and value of the referrals that Atlas steered his way.  Defendant improperly incentivized Atlas by splitting the profit of any claim reimbursed to his pharmacy 50-50.

For example, Defendant inserted a "metabolic" compound formula on a prescription form that he created for Atlas.[14]  Defendant sent this form to Atlas, and he paid Atlas for any "metabolic" prescription that was referred to his pharmacy and reimbursed by TRICARE.  TRICARE

---

[14] This "metabolic" compound was nothing more than a 30 day supply of capsules that combined a few, common over-the-counter vitamins (which individually, are available at any corner drug store).

reimbursed the "metabolic" ingredients in the amount of approximately $4,348.25, after which Defendant paid Atlas 50% (approximately $2,174.12 per "metabolic" reimbursement).

As applied to this Defendant, the AKS penalizes his *conduct*, not his speech, nor the speech of his agent.  Defendant is charged under the AKS, not because he hired an independent contractor (as opposed to an employee) and not for exercising his right to protected commercial speech, but because he committed *misconduct* - he improperly induced a contractor to steer TRICARE business to his pharmacy.

Under the AKS, "whoever" knowingly and willfully solicits, receives, offers, or pays remuneration to induce a federal healthcare program related referral — whether an independent contractor or not — violates the statute.  42 U.S.C. § 1320a-7b(b)(1)-(2).  The statute creates safe harbor exceptions for employees (42 C.F.R. § 1001.952(i)), and for independent contractors pursuant to personal services agreements (42 C.F.R. § 1001.952(d).  As discussed below, neither safe harbor is applicable here.

The statutory language of the AKS expressly exempts bona-fide employees.

Paragraphs (1) and (2) shall not apply to …

> (B) any amount paid by an employer to an employee (who has a bona fide employment relationship with such employer) for employment in the provision of covered items or services …

42 U.S.C. § 1320a-7b(b)(3)(B).

In 1989, the HHS OIG published pending safe harbor regulations regarding bona-fide employees.  54 FR 3088.  In their publication, the OIG noted that Congress intended for safe harbor regulations to be evolving rules that would be periodically updated to reflect changing business practices and technologies.  In the House Committee Report accompanying Pub.L. 100-93, the Committee stated that it "believes that a mechanism for periodic public input is necessary to ensure that the regulations remain relevant in light of changes in health care delivery and payment and to

ensure that published interpretations of the law are not impeding legitimate and beneficial

activities." 54 FR 3088.  In the 1989 proposed regulations, the OIG further discussed the important

distinction between paying an employee a salary, and paying a contractor a commission:

> This statutory exemption permits an employer to pay an employee in whatever manner he or she chooses for having that employee assist in the solicitation of Medicare or State health care program business.  The proposed exemption follows the statute in that it applies only to bona fide employee-employer relationships.  We have decided to adopt the definition of employee from the Internal Revenue Service set forth in 26 U.S.C. 3121(d)(2).
>
> In response to the October 21, 1987 request for comments, many commenters suggested that we broaden the exemption to apply to independent contractors paid on a commission basis.  We have declined to adopt this approach because we are aware of many examples of abusive practices by sales personnel who are paid as independent contractors and who are not under appropriate supervision.  We believe that if individuals and entities desire to pay a salesperson on the basis of the amount of business they generate, then to be exempt from civil or criminal prosecution, they should make these salespersons employees where they can and should exert appropriate supervision for the individual's acts.

54 FR 3088, 54 FR 3088

As detailed above, in 1989 the OIG specifically noted that financial arrangements in which

independent contractors, paid on a commission basis, result in abusive practices.  The OIG further

noted that such abusive practices occur when the contractor is not under appropriate supervision.

The OIG later published safe harbor regulations and revised the language over the years.

The "agent" safe harbor provision currently provides as follows:

> **Personal services and management contracts**.  As used in section 1128B of the Act, "remuneration" does not include any payment made by a principal to an agent as compensation for the services of the agent, as long as all of the following seven standards are met –
>
> > (1) The agency agreement is set out in writing and signed by the parties.
> >
> > (2) The agency agreement covers all of the services the agent provides to the principal for the term of the agreement and specifies the services to be provided by the agent.

(3) If the agency agreement is intended to provide for the services of the agent on a periodic, sporadic or part-time basis, rather than on a full-time basis for the term of the agreement, the agreement specifies exactly the schedule of such intervals, their precise length, and the exact charge for such intervals.

(4) The term of the agreement is for not less than one year.

(5) The aggregate compensation paid to the agent over the term of the agreement is set in advance, is consistent with fair market value in arms-length transactions and is not determined in a manner that takes into account the volume or value of any referrals or business otherwise generated between the parties for which payment may be made in whole or in part under Medicare, Medicaid or other Federal health care programs.

(6) The services performed under the agreement do not involve the counselling or promotion of a business arrangement or other activity that violates any State or Federal law.

(7) The aggregate services contracted for do not exceed those which are reasonably necessary to accomplish the commercially reasonable business purpose of the services.

For purposes of paragraph (d) of this section, an agent of a principal is any person, other than a bona fide employee of the principal, who has an agreement to perform services for, or on behalf of, the principal.

42 C.F.R. § 1001.952(d)

A plain reading of this safe harbor provision is instructive. It reveals that the AKS does not prohibit a company from hiring an independent contractor. Defendant is flatly wrong when he claims that his freedom of commercial speech is violated by the AKS, because he chose to hire an independent contractor as opposed to an employee. On the contrary, as clearly detailed above, a business owner is certainly permitted to hire and pay – not only a bona fide employee - but also, an independent contractor. This "agent" safe harbor provision provides, without ambiguity, that the term "remuneration" does not include any payment made by a principal to an agent as compensation for the services of the agent, so long as certain standards are met. 42 C.F.R. § 1001.952(d).

There is no "bar to entry" violation here, because if a business owner drafts his contract with the independent contractor correctly, his compensation agreement with an independent contractor is plainly protected by the safe harbor provision.  If an arrangement meets the standards, then there simply is no AKS problem.  As such, paying an independent contractor is perfectly fine, because the remuneration a business owner pays is exempted from the statute.  In such a case, the owner of a pharmacy could pay an independent contractor to advertise his product and inform the world about his compounded formulas, without any fear of prosecution.

The problem for Defendant here is that he failed to meet several of the standards clearly and plainly outlined in the safe harbor provision.  Specifically, Defendant failed to meet the standard outlined in § 1001.952(d)(5), among others.  Sales agreements must meet the conditions of the safe harbor provisions governing personal services and management contracts.  *See* 56 FR 35952.  Because Defendant paid Atlas a huge commission based upon the volume and value of TRICARE referrals improperly steered to his pharmacy, Defendant violated the AKS and the safe harbor provision does not apply.

### 3.   The Court Need Not Apply Scrutiny Tests To The AKS, Because the Statute Does Not Impermissibly Restrict Speech.

Defendant urges this Court to strike down this decades-old criminal law—a law aimed at preventing fraud against United States taxpayers—as unconstitutional, even though courts have consistently rejected similar constitutional challenges in the past.  Surprisingly, Defendant even suggests that this Court apply a strict scrutiny test to the AKS, claiming strict scrutiny is the appropriate test to apply in matters involving claimed "speaker -based" restrictions.  However, in this case, applying any scrutiny to a law that regulates conduct, as opposed to speech, is unnecessary.  Defendant's position is meritless, and the cases advanced by Defendant regarding the application of scrutiny to the AKS can easily be distinguished from the present case.

In *Sorrell*, the Supreme Court struck down a Vermont privacy law that impermissibly restricted advertising by pharmacy marketers. *Sorrell v. IMS Health Inc*., 564 U.S. 552, 557, 131 S. Ct. 2653, 2659 (2011).  The Supreme Court determined that since the Vermont civil law was a restriction on protected expression, the State was required to show that the statute directly advanced a substantial governmental interest, and that the measure was drawn to achieve that interest.  *Id*. at 571-72; *see Board of Trustees of State Univ. of N. Y. v. Fox*, 492 U.S. 469, 480-481, 109 S. Ct. 3028, 106 L. Ed. 2d 388 (1989); *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N. Y.*, 447 U.S. 557, 566, 100 S. Ct. 2343, 65 L. Ed. 2d 341 (1980).  There must be a "fit between the legislature's ends and the means chosen to accomplish those ends." *Sorrell*, 564 U.S. at 572.  The Court held that these standards ensure not only that the State's interests are proportional to the resulting burdens placed on speech but also that the law does not seek to suppress a disfavored message.  *Id*.  The Court stated that "[i]t is true that content-based restrictions on protected expression are sometimes permissible, and that principle applies to commercial speech.  Indeed the government's legitimate interest in protecting consumers from 'commercial harms' explains 'why commercial speech can be subject to greater governmental regulation than noncommercial speech.  *Id*. at 579 (quoting *Discovery Network*, 507 U.S., at 426, 113 S. Ct. 1505, 123 L. Ed. 2d 99.)  "A State may choose to regulate price advertising in one industry but not in others, because the risk of fraud . . . is in its view greater there."  *R.A V. v. St. Paul*, 505 U.S. 377, 388-89 (1992) (citing *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council*, 425 U.S. 748, 771-772 (1976)).

In *Thompson*, a case involving a First Amendment commercial speech challenge regarding compounded drug advertisements, the Supreme Court rejected a provision in a civil law statute as an unconstitutional restriction on advertising.  *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 360, 122 S. Ct. 1497, 1500 (2002).  In *Thompson*, the Court noted that not all commercial speech

is protected by the First Amendment, and not all regulation of such speech is unconstitutional.  *Id.*, at 1503-04.  The Court applied the *Central Hudson* test, to determine whether a particular type of commercial speech regulation is constitutional.  *Id.*   As a threshold matter in *Central Hudson*, a case deciding whether a New York civil law's blanket ban on an electric company's advertisements, the Court first analyzed whether the commercial speech concerns *unlawful activity* or whether the speech was *misleading*.  *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 563-64, 100 S. Ct. 2343, 2350 (1980).   The government may ban forms of communication more likely to deceive the public than to inform it, and the government may ban commercial speech related to illegal activity.  *Id.*  If the communication is illegal or misleading, then the speech is not protected by the First Amendment, and the analysis ends.  *Id.*  However, if the speech concerns lawful activity and is not misleading, the court next asks whether the asserted governmental interest to be achieved by the restriction is substantial.  *Id.*  If so, then the court determines whether the regulation (1) directly advances the interest, and (2) is not more extensive than is necessary to serve the interest.  *Id.*

Defendant further cites to the rational basis test described in *FCC v. Beach Communications*.  In making a determination as to whether a civil law, the Cable Act was constitutional, the Supreme Court reasoned that "[w]hether embodied in the Fourteenth Amendment or inferred from the Fifth, equal protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices.  *FCC v. Beach Commc'ns*, 508 U.S. 307 at 313.  In that case, the Court noted that, in areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.  *Id.*  "On rational-basis review, a classification in a statute …. comes to us bearing a strong presumption of validity … and those attacking the

rationality of the legislative classification have the burden to negative every conceivable basis which might support it." *Id.* at 314 (internal citations omitted).[15]

These cases can clearly be distinguished from the present case and the present statute. The cases relied upon by Defendant involved civil statutes that proscribed speech. Advertising, a form of commercial speech that is clearly enjoys First Amendment protection, was the central issue in those cases. However, the AKS does not restrict advertising. In particular, as applied to this Defendant, the use of the AKS in this case has nothing to do with Defendant's right to advertise.

Further, the cases relied upon by Defendant contain language that limits the need for a Court to engage in the analysis of a case involving commercial speech, if the speech at issue involves illegal conduct or misrepresentation. *Cent. Hudson*, 447 U.S. at 563-64. The AKS does just that – the statute regulates abusive, fraudulent conduct – namely it proscribed paying bribes and kickbacks to induce federal health care program referrals. Defendant in this case is charged with that very misconduct. Further, Defendant is charged in the Indictment, not only with violations of the AKS, but also with committing numerous counts of wire fraud and aggravated identity theft. Defendant routinely made, and caused to be made, misrepresentations, and invalid submissions in his reimbursement claims to TRICARE regarding the amount of cream, the amount of ingredients, and the type of substances, among other things, that he caused to be dispensed at his pharmacy. His purpose in submitting invalid and misrepresented information was to increase the amount of reimbursement that he received from insurance companies, and was not for the

---

[15] As noted below, because the AKS regulates conduct, as opposed to speech, it is not necessary for this Court to make an analysis pursuant to strict scrutiny, intermediate scrutiny, or the rational basis test. If however, such a test were to be applied, the rational basis test is the appropriate test in a matter that does not proscribe speech. As discussed in more detail below, the purpose of the AKS is to advance the legitimate governmental goal of combatting fraud against federal health care programs. As such, prohibiting a commission based compensation arrangement in which an agent is improperly induced to steer health care program referrals based upon the volume and value of the referrals is clearly rationally related to the legitimate governmental goal of combatting fraud. Further, under this analysis, Defendant fails to meet the heavy burden imposed by the Supreme Court in, *FCC v. Beach Commc'ns*, to negative every conceivable basis which might support the basis of the statute. *FCC v. Beach Commc'ns*, 508 at 314.

welfare or benefit of any patient.   Defendant included information related to these misrepresentations on the prescription forms that he created for Atlas.   Simply put, Defendant engaged in exact kind of illegal conduct and misrepresentation that the Supreme Court excepts from further analysis pursuant to the *Central Hudson* test.   *Cent. Hudson*, 447 U.S. at 563-64.

Since the AKS proscribes conduct, not speech, this Court need not determine whether strict scrutiny vs. intermediate scrutiny vs. the rational basis test would apply in this case, because, there is no restriction on speech in this case.   Nor should the Court feel compelled to engage in an analysis of whether the government has an interest in regulating or restricting an employer's decision to hire an employee or an independent contractor, as Defendant invites the Court to do in his motion.   This rationale is a red herring, because the issue at hand is not whether the government has an interest in regulating the employer-employee relationship, as Defendant suggests, but whether the government has an interest in combatting the massive fraud that drains and wastes federal health care programs.

An example of this drain and waste is clearly present in Defendant's conduct relating to the inducement to steer his $17,000.00 "scar cream" formulas to his pharmacy.   The Government will prove at trial that this cream was a fraud against United States taxpayers in a variety of ways, including that the cream was not medically necessary, nor was it welcome or wanted by many of the patients who received the outrageously priced cream in the mail.   Percentage based compensation marketing arrangements with independent contractors are inherently abusive because the compensation is tied directly to the volume and value of referrals.   And the Defendant in this case engaged the very type of abusive practices that the AKS aimed at preventing.

Although it is not necessary for the Court to engage in a constitutional analysis regarding the purpose of the AKS, because the statute regulates conduct, not speech, it is abundantly clear that the reason Congress passed the AKS was to combat fraud.   The AKS represents a culmination

of several years of Congressional effort to combat fraud and abuse in federal health care programs. *United States v. Neufeld*, 908 F. Supp. 491, 493 (S.D. Ohio 1995).  In 1977, Congress amended the Social Security Act by adding the Medicare-Medicaid Antifraud and Abuse amendments, the purpose of which was to address the "disturbing degree [of] fraudulent and abusive practices associated with the provision of health services financed by the Medicare and Medicaid programs." *United States v. Shaw*, 106 F. Supp. 2d 103, 110 (D. Mass. 2000) (citing H.R. Rep. No. 95-393, pt. 2, at 44 (1977), reprinted in 1977 U.S.C.C.A.N. 3039, 3047).  This purpose of combatting massive fraud against the United States taxpayer is, without doubt, a compelling, substantial and legitimate governmental interest.

Further, the regulation regarding the "agent" safe harbor is specifically, and narrowly, aimed at combatting the fraud waged against federal health care programs.  Preventing abusive, commission based compensation arrangements directly advances, and is directly linked to the very important governmental interest of combatting fraud waste and abuse in payment practice that implicate federal health care programs.  There is a clear rational relationship between the government interest, proscriptions of the AKS, and the exceptions detailed in the safe harbor provisions.  In other words, even though analysis is not necessary for a statute that proscribes illegal conduct, as opposed to speech, the AKS clearly passes muster under strict scrutiny, intermediate scrutiny, and the rational basis test.

In the preamble to the 1991 safe harbor regulations, the OIG rejected the inclusion of independent contractors into the definition of employee "because of the existence of widespread abusive practices by salespersons who are independent contractors and, therefore, who are not under appropriate supervision and control … we cannot expand this provision to cover such relationships unless we can predict with reasonable certainty that they will not be abusive.  We are confident that the employer-employee relationship is unlikely to be abusive, in part because the

employer is generally fully liable for the actions of its employees and is therefore more motivated to supervise and control them.  56 FR 35952, at 35981 (July 29, 1991).

In 1998, the OIG published an advisory opinion regarding abusive marketing practices by independent contractors.  Advisory Request No. 98-10, 1998 WL 35287765 (Sept. 8, 1998).  The OIG stated that "[t]his office has long been concerned about the potentially abusive marketing arrangements involving health care goods and services paid for in whole or in part by Federal health care programs."  *Id*. at * 5.  "Since publication of the 1991 rule, we have continued to learn of abusive relationships involving marketing activities that adversely affect the Federal health care programs and their beneficiaries."  *Id*.

The OIG - the entity tasked by Congress to periodically update the safe harbors to guard against evolving trends in fraud, waste and abuse, and to ensure that the regulations remain current with respect to changes in technology and business practices - has identified that paying an independent contractor a high, per claim commission to induce federal health care referrals is abusive and would implicate the AKS.  Indeed, the OIG continues to encounter this problematic arrangement, and continues to warn against abusive financial arrangements with contractors.  *See* OIG Advisory Op. 12-06 (June 1, 2012), available at https://oig.hhs.gov/fraud/docs/ advisory opinions/2012/AdvOpn12-06.pdf ("The OIG has a long-standing concern about arrangements under which parties 'carve out' Federal health care program beneficiaries or business generated by Federal health care programs from otherwise questionable financial arrangements. Such arrangements implicate, and may violate, the anti-kickback statute by disguising remuneration for Federal health care program business through the payment of amounts purportedly related to non-Federal health care program business."); and OIG Advisory Op. No. 13-03, at 5 (June 7, 2013), available at https://oig.hhs.gov/fraud/docs/advisoryopinions /2013/AdvOpn13-03.pdf.

Further, several recent court cases use the reasoning described in these publications and reach the same conclusion. A recent 2017 civil case in the District Court of South Carolina involved a nearly identical legal argument to the First Amendment challenge made by Defendant in the present case. *United States v. Berkeley HeartLab, Inc.*, 2017 U.S. Dist. LEXIS 174733, at *36-37 (D.S.C. Oct. 23, 2017). In *Berkeley HeartLab, Inc.*, the defendants argued that the AKS violated First Amendment free speech protections by claiming that the statute proscribed the speech of independent contractors, but not the speech of employees. In that case, the Court noted that characterizing the government's case as a blanket restriction on independent contractors speaking about services was a misrepresentation. *Id.* Instead, the Court found that since the defendants knowingly and willingly offered and paid independent contractors remuneration to induce referrals, then there was no constitutional violation. *Id.*

Here, Defendant makes the same error made by the defendant in *Berkeley HeartLab, Inc*. Defendant here also misrepresents the government's case by characterizing it as a blanket, speaker-based ban on independent contractors engaging in protected commercial speech. This characterization is incorrect. Defendant is not charged with violating the AKS because he hired an agent to advertise his product, or because he hired an independent contractor as opposed to a bona-fide employee. Instead, Defendant is charged with violating the AKS because he financially incentivized an agent, by splitting volume based profits with that agent 50 % - 50%, for the purpose of inducing that agent to refer TRICARE business to his pharmacy. Speech is not penalized with this application of the AKS, but conduct is.

In another recent case, the District Court for the Middle District of North Carolina reviewed a fact pattern similar to the one here. *United States ex rel. Nicholson v. MedCom Carolinas, Inc*., 2020 U.S. Dist. LEXIS 44983, *24 (M.D.N.C. 2020). In *MedCom Carolinas, Inc*., the court reasoned that if a company uses an independent contractor to sell its product, and the product is

paid for by a government program, and the company pays a commission to the contractor based on the volume of sales, then that arrangement may indeed violate the AKS.  *Id.* at *24; citing 42 C.F.R. § 1001.952(d)(5) (noting that personal services contracts must not be based on the "volume or value of any referrals"); Medicare and Medicaid Programs; Fraud and Abuse OIG Anti-Kickback Provisions, 54 Fed. Reg. 3088-01 (Jan. 23, 1989) (declining to extend the bona fide employee safe harbor to contractors because of concerns about control over personnel).

Combatting fraud is a critically important, compelling, substantial governmental interest. And, restricting the conduct of business owners and their agents, to engage in certain abusive business practices is narrowly tailored, directly linked and rationally related to this very important governmental goal.  As noted by the OIG above, some independent contractors are not appropriately supervised.  Ensuring visibility and control over employees engaged in health care related marketing practices is paramount in the effort to reduce fraud and abusive practices.

A business owner can observe, direct and control an employee's conduct (if he chooses to do so).  As noted above, the employer is generally fully liable for the actions of its employees and is therefore more motivated to supervise and control them.  However, independent contractors are just that – independent.  A business owner does not control their conduct.  A business owner may have significantly less visibility over the conduct of an independent contractor, and certainly less ability to direct or control the actions of the contractor.  Even less control is available to the business owner who financially incentivizes an independent contractor to improperly steer referrals to his business by paying the contractor an outrageously high commission.  In some instances, that may even be the point of a business owner choosing to hire an independent contractor.

Defendant states that "examples abound of employers committing health care fraud through the use of 'employees' rather than contractors.  The government does not dispute that –

and will show that such conduct occurred in this case, as well as the improper inducement of an agent.  Generally speaking, the government will surely prosecute health care fraud committed by employers using a variety of different tools, including statutes such as mail fraud, wire fraud and health care fraud.  This argument by Defendant does not erode the position that employers have even less supervision and control over contractors than they do over their bona fide employees.

The OIG clearly and unambiguously declined to extend safe harbor protection to employment arrangements involving agents because, as the OIG noted from the beginning, "we are aware of many examples of abusive practices by sales personnel who are paid as independent contractors and who are not under appropriate supervision." 54 FR 3088, 54 FR 3088.  As such, proscribing volume based commission payments to independent contractors based on referrals of successful federal healthcare reimbursements is directly tied and rationally related to the critically important governmental interest of combatting fraud.  This distinction between employee and independent contractor is especially relevant, when as noted above, the OIG is aware of many examples of independent contractors engaging is abusive sales practices in order to profit from referrals.

The proscription against paying an independent contractor to generate federal health care referrals on a volume-based commission compensation structure comports with basic common sense.  This proscription will reduce fraud.  The proscription is not overbroad, because a business owner is free to hire an independent contractor to advertise, and to do any number of legal business activities, but the owner cannot conduct his business with that contractor in a way that remunerates based upon improper federal health care program referrals.  The restriction does not chill legitimate commercial speech, but rather combats fraud by penalizing conduct that improperly induces federal health care referrals.

The law makes a distinction between bona fide employee and agent, but it certainly does not impermissibly discriminate in violation of the Equal Protection Clause of the Fourteenth Amendment.  A business owner is clearly permitted to hire independent contractors – there is even a safe harbor that protect this arrangement from prosecution under the AKS.  Business owners "may obtain protection for payments from these arrangements by drafting their personal contracts to satisfy the safe harbor provision for personal services and management contracts."  56 FR 35952.  The AKS does not regulate a business owner's *speech*, but rather, it proscribes *conduct*. If a business owner chooses to engage in a percentage based compensation arrangement with an independent contractor, which is inherently abusive because the compensation is tied directly to the volume and value of referrals, then his conduct violates the AKS and fails to qualify for safe harbor protection.  As noted above, the Court need not engage in a scrutiny of the AKS for purposes of an Equal Protection Clause analysis, because the AKS does not restrict speech.

As detailed above, courts have consistently rejected claims challenging the AKS as it applies to independent contractors.  *See United States v. Krikheli*, 2009 WL 4110306, at *3-5; *United States v. Mathur*, 2012 U.S. Dist. LEXIS 143197, at *28; *United States v. Berkeley HeartLab, Inc.*, 2017 U.S. Dist. LEXIS 174733, at *36-37; *United States ex rel. Nicholson v. MedCom Carolinas, Inc.*, 2020 U.S. Dist. LEXIS 44983, *24.  There is no question that holding a person accountable for paying a contractor a kickback for improper inducement of TRICARE referrals is a proper, constitutional enforcement action by the government.  Whether that is what Defendant did in this case will be a fact for the jury to decide.  As applied to Defendant in this case, the AKS is not unconstitutionally overbroad, it does not restrict protected speech, it does not impermissibly discriminate, and as such, the Government respectfully requests that the Court deny the Defendant's motion to dismiss Counts 30 – 33.

**V.**     **The Motion To Strike Allegations In The Indictment (ECF No. 40) Should Be Denied.**

Defendant next moves to strike certain allegations in the Indictment—(1) allegations in Paragraph 35 of the Indictment, which discuss Defendant's practices with respect to co-payments and co-insurance; and (2) allegations as to loss amounts.  ECF No. 40 at 3-4.  Defendant argues that these allegations are "surplusage" that should be struck under Fed. R. Crim. P. 7(d). Defendant's Motion to Strike should be denied.  Defendant does and cannot establish—as he must—that the allegations he would have the Court strike are (1) irrelevant; (2) inflammatory; and (3) prejudicial.  Thus, his Motion should be denied.

**A.**     **Applicable Law.**

Fed. R. Crim. P. 7(d) provides that a court may strike surplusage from the indictment on the defendant's motion. The Advisory Committee Notes to Rule 7(d) explain that this rule is intended to "protect[] the defendant against immaterial or irrelevant allegations . . . which may, however, be prejudicial."  The Fourth Circuit has adopted a three-part test for determining whether matter in an indictment is subject to being struck as surplusage: "A motion to strike surplusage from the indictment should be granted only if it is clear that the allegations are not relevant to the charge and are inflammatory and prejudicial."  *United States v. Williams*, 445 F.3d 724, 733 (4th Cir. 2006) (quoting *United States v. Rezaq*, 134 F.3d 1121, 1134 (D.C. Cir. 1998)); *see also, e.g.*, *United States v. Graves*, 5 F.3d 1546, 1550 (5th Cir. 1993) ("For language to be struck from an indictment, it must be irrelevant, inflammatory, and prejudicial.").  And "[i]f evidence of the allegation is relevant and admissible to the charge, then regardless of how prejudicial the language is, it may not be stricken." *United States v. Scarpa*, 913 F.2d 993, 1013 (2d Cir. 1990).

"The standard for striking surplusage is exacting," *United States v. Liberto*, No. CR RDB-19-0600, 2020 WL 5994959, at *5 (D. Md. Oct. 9, 2020) (collecting authority), and as a result, motions to strike surplusage are rarely granted. *United States v. Hedgepeth*, 434 F.3d 609, 612 (3d

Cir. 2006); *United States v. Jordan*, 626 F.2d 928, 930 n.1 (D.C. Cir. 1980) ("The standard under Rule 7(d) has been strictly construed against striking surplusage."); *United States v. Bin Laden*, 91 F. Supp. 2d 600, 621 (S.D.N.Y. 2000) ("It has long been the policy of courts within the Southern District to refrain from tampering with indictments."); *United States v. Rezaq*, 908 F. Supp. 6, 8 (D.D.C. 1995) ("surplusage is ordered stricken only in the rarest of instances" and "are highly disfavored in this Circuit"); 1 C. Wright, FEDERAL PRACTICE AND PROCEDURE: CRIMINAL, § 127 at 639 (3d ed. 1999).

All three components of the standard must be met before language in an indictment can be stricken as surplusage: (1) the challenged language must be irrelevant and immaterial; (2) it must be inflammatory; and (3) it must be unfairly prejudicial.  If the contested language refers to facts that are relevant and admissible as part of the government's case at trial, then the inquiry ends at that point, and the defendant's motion to strike must be denied.  *United States v. Siegel*, 536 F.3d 306, 321 (4th Cir. 2008) (where evidence of other crimes or bad acts is not subject to exclusion under the rules of evidence, "there is simply no basis for striking the allegations" from the indictment).  Defendant comes nowhere close to meeting this exacting burden here.

### B. Defendant Cannot Meet His Burden As To The Allegations In Paragraph 35.

### 1. The Allegations In Paragraph 35 Are Relevant.

To begin, Defendant's Motion to Strike Paragraph 35 of the Indictment should be denied because its allegations are relevant.  Defendant claims that that allegations in Paragraph 35 should be stricken because the allegations—standing alone—"do not state a federal offense."  ECF No. 40 at 8.  But this is beside the point.  As Defendant himself recognizes, *id.* at 5 n.3, the allegation— one of the manner and means of the scheme to defraud alleged in the Wire Fraud counts—is one of many allegations made in connection with the Counts One through Twenty-One.  And the scheme to defraud underlying the Wire Fraud counts—to obtain money in the control of insurance

companies and health care benefit companies such as BCBS and TRICARE, by means of materially false and fraudulent pretenses, representations, and promises, Indictment ¶ 14—could not be clearer.[16]

Contrary to Defendant's contention, the test here is not whether a *single allegation* states a claim or a crime, but rather whether the allegation is irrelevant, inflammatory, and prejudicial. Here, paragraph 35 of the Indictment is undoubtedly relevant.

Under Rule 402 of the Federal Rules of Evidence, all "relevant" evidence is admissible unless specifically prohibited by the Constitution, a federal statute, or another evidentiary rule. Evidence is relevant "if it has any tendency to make the existence of any determinative fact more probable than it would be absent the evidence." *United States v. Van Metre*, 150 F.3d 339, 349 (4th Cir. 1998); Fed. R. Evid. 401. As the Fourth Circuit has observed, this is a low standard: "relevance typically presents a low barrier to admissibility. Indeed, to be admissible, evidence need only be worth consideration by the jury, or have a plus value." *United State v. Leftenant*, 341 F.3d 338, 346 (4th Cir. 2003) (citation and internal quotation marks omitted).

The allegations in Paragraph 35 certainly have such a "plus value." Paragraph 35 of the Indictment alleges that Defendant failed to collect copayments and coinsurance and that his payment, at times, of copayments and coinsurance for beneficiaries was for the purpose of:

---

[16] Defendant views Paragraph 35 of the Indictment in a vacuum and states that that single paragraph of the Indictment fails to allege a scheme to defraud private insurers. ECF No. 40 at 8. But he of course ignores the allegations in the Indictment concerning the scheme to defraud and the object of the scheme to defraud—to obtain money from insurance companies and health care benefit companies, including BCBS and TRICARE, by means of materially false and fraudulent, pretenses, representations, and promises. Indictment ¶¶ 14-15. And he ignores that each of the Wire Fraud counts reflect Defendant's submission of reimbursement claims to both BCBS and TRICARE in furtherance of the scheme. Defendant's claim that there is no allegation that "private insurers were victimized in any way," ECF No. 40 at 9, is meritless.

inducing prescriptions to be filled at his pharmacy; concealing the cost of repeated copayments and coinsurance; reducing patient complaints regarding copayments and coinsurance; and reducing patient visibility and complaints regarding his pharmacy's dispensing process and the high cost of his compounded drugs.

Evidence underlying these allegations is very probative, and provides information that makes it more probable that Defendant engaged in the conduct charged in the Indictment. Indeed, Defendant's actions with respect to copayments and coinsurance were critical to keeping the steady flow of prescriptions to the Pharmacy—and in turn reimbursements—on track. For example, if a patient knew that there was a very large cost and very large copayment associated with a prescription that required him or her to make payment to the pharmacy, the patient may elect not to receive the compounded drug (or any refills) at all and may complain to his or her doctor. (This is particularly so as to patients that did not want the compounded drugs to begin with.) Patient complaints to a prescribing doctor may in turn cause a doctor to stop prescribing these drugs altogether or cause the doctor to look into the excessively high reimbursements amounts for the drugs. A number of doctors that prescribed the compounded drugs at issue in this case will testify that had they known the amount that the creams were being reimbursed for, they would not have prescribed the drugs to begin with. Further, the conduct underlying Paragraph 35 is critical to the Defendant attempts to avoid insurance company audits, which could likewise result in insurance companies attempting to "claw-back" invalid or tainted reimbursements made to Defendant's pharmacy.

What's more, it is anticipated that witnesses from TRICARE, BCBS, and CVS Caremark will testify that the entities would not have authorized or reimbursed a claim for compounded ingredients if the entity knew that the pharmacy intentionally did not collect a co-pay from a patient for the purpose of reducing the patient's awareness, the possibility of a complaint, and the possibility that the patient would refuse the compound—precisely what is alleged in Paragraph 35.

And it is of course Defendant's submission of reimbursements that forms the basis of the Wire Fraud and Aggravated Identity Theft Counts.

Additionally, evidence underlying the allegations in Paragraph 35 undoubtedly has a "plus value" as to Count 29, which is premised upon Defendant's failure to collect copayments and coinsurance from TRICARE beneficiaries:

| 29 | March 6 – August 1, 2015 | **BLAIR** submitted, and caused to be submitted, claims for compounded drugs to TRICARE, for which he received reimbursements from TRICARE, and **BLAIR** offered and paid remuneration to TRICARE beneficiaries to wit: **BLAIR** failed to bill for and collect copayments and coinsurance from TRICARE beneficiaries related to reimbursements TRICARE paid to his pharmacy. |

Moreover, evidence underlying the allegations in Paragraph 35 undoubtedly has a "plus value" as to Counts 34 - 36, which, in part, are premised upon Defendant's failure to collect copayments and coinsurance (in addition to all of the other ways that the Defendant caused invalid, misbranded, and fraudulent claims to be submitted to insurance companies, and for which he received tainted reimbursements into his bank accounts) which form the basis of the Money Laundering Counts in the Indictment.  Counts 34 – 36 charge that the Defendant:

> did knowingly engage and attempt to engage in the following monetary transactions by, through, or to a financial institution, affecting interstate or foreign commerce, in criminally derived property of a value greater than $10,000, that is the transfer of funds, such property having been derived from a specified unlawful activity, that is, wire fraud in violation of 18 U.S.C. § 1343, in that **BLAIR** transferred criminally derived funds that he received from insurance companies and health care benefit programs such as BCBS, TRICARE and CVS/Caremark, for fraudulent, misbranded and misfilled compounded drugs, and that **BLAIR** used those funds to pay for personal expenditures, including as follows:

| Count | Date | Monetary Transaction |
|-------|------|----------------------|
| 34 | April 8, 2015 | On April 2, 2015, **BLAIR** wrote a check (#1478) in the approximate amount of $195,649.00, from his Bank of America Account #2812 to Green Tree, which was paid by Bank of America on April 8, 2015, the purpose of which was to pay off the remaining balance of a mortgage on a residential property owned by **BLAIR**, located at 15 Deep Dale Drive, Timonium, Maryland. |

| Count | Date | Monetary Transaction |
|-------|------|----------------------|
| 35 | June 16, 2015 | **BLAIR** caused a wire transaction in the approximate amount of $174,813.77, from his Bank of America Account #2812 to JP Morgan Chase Bank, the purpose of which was to pay off the remaining balance of a mortgage on a residential property owned by **BLAIR**, located at 7 80th Street, Unit # 301, Ocean City, Maryland. |
| 36 | September 28, 2015 | **BLAIR** caused a wire transaction in the approximate amount of $16,784.66, from his Bank of America Account #9429 to Title Inc. Affordable Housing Trust, related to his purchase of real property located at 1707 Thornton Ridge Road, Timonium, Maryland. |

Simply put, evidence underlying the allegations in Paragraph 35 is highly probative as to the wire fraud, AKS and money laundering claims.  Defendant does not and cannot establish that Paragraph 35 is irrelevant.  This is reason enough for the Court to deny Defendant's Motion as to Paragraph 35.  *See, e.g.*, *Scarpa*, 913 F.2d at 1013 ("[i]f evidence of the allegation is relevant and admissible to the charge, then regardless of how prejudicial the language is, it may not be stricken").

## 2. The Allegations In Paragraph 35 Are Neither Inflammatory Nor Prejudicial.

In any event, Defendant's Motion to Strike Paragraph 35 fails for still another reason:  He has not, and cannot, establish that the allegation is inflammatory and prejudicial.  Indeed, Defendant does not even try to establish that Paragraph 35 is inflammatory.  As for prejudice, Defendant states that he would be prejudiced by Paragraph 35 allegations because it would create "juror confusion."  ECF No. 40 at 9.  Not so.  This is certainly not a situation where "matter of

scant or cumulative probative force [has been] dragged in by its heels for the sake of its prejudicial effect," *United States v. Roark*, 753 F.2d 991, 994 (11th Cir. 1985).

*First*, Defendant states that jurors may conclude that he could be guilty of wire fraud by failing to collect for and/or bill for copayments or coinsurance because they are "included in the wire fraud scheme." ECF No. 40 at 10. But this argument turns the presumption that jurors "understand and follow instructions" from the Court on its head. *United States v. Zelaya*, 908 F.3d 920, 930 (4th Cir. 2018) (citation omitted). The jurors here will be instructed on the elements of wire fraud, and ultimately it will be up to jury to decide whether Defendant's actions as established by the Government at trial—including his actions with respect to copayments and coinsurance and the other means of his scheme to defraud—broke the law.

*Second*, Defendant claims that the similarity between the language of Paragraph 35 and Count 29 increases the risk for juror confusion and prejudice. ECF No. 40 at 10. But this argument is premised, once again, on his reading of Paragraph 35 in a vacuum and his claim the fact the allegations of the paragraph "alone do not state an offense." *Id.* As already discussed, this argument is nothing more than a distraction; Paragraph 35 is one of the many "manner and means" of Defendant's scheme to defraud.[17]

*Third*, Defendant's argues that Paragraph 35 will cause juror confusion because jurors will conflate waiver of copayments in a commercial setting (such as with BCBS and Caremark) with the waiver of copayments in a federal healthcare program (such as with TRICARE). ECF No. 40 at 11. But Defendant ignores the fact the Wire Fraud Counts are premised upon the scheme to defraud both private insurance companies *and* federal health care benefit programs such as

---

[17] Defendant's claim that the allegations in Paragraph 35 constitute "no more than civil breaches of contract," *id.*, likewise ignores the other allegations in the Indictment and the very purpose of the scheme to defraud—to obtain money from insurance companies and health care benefit companies, including BCBS and TRICARE, in the form of reimbursements.

TRICARE.  Indictment ¶¶ 14-15, Counts 1-21 (reflecting submission of reimbursement claims to

BCBS (counts 1-5) and TRICARE (counts 6-21)).[18]  Moreover, his concerns as to Count 29, ECF

No. 40 at 11, which charges an AKS violation, wrongly assumes (once again) that jurors will not

follow the Court's instructions as to the Government's burden with respect to proof of AKS

violations.[19]  In any event, even if there prejudice—and there is not—it will be mitigated by the

standard instruction that the Indictment is not evidence.  *See Williams*, 445 F.3d at 734 (district

court instructed jury that indictment was not evidence).

Because Defendant has not established that Paragraph 35 is irrelevant, inflammatory, and

prejudicial, the Court should deny the Motion as to Paragraph 35.

### C.    Defendant Has Not Met His Burden As To Striking The Dollar Amounts Listed In Paragraphs 25-27 And 34 Of The Indictment.

Defendant also asks the Court to strike certain reimbursements amounts listed in the

Indictment.  ECF No. 40 at 4-5.  But his argument as to these allegations fares no better than his

argument as to the allegations in Paragraph 35.

*First*, Defendant has not established that the reimbursement amounts listed in these

paragraphs are irrelevant.  He claims that dollar amounts constitute "surplusage" because "alleged

loss is not an element of the offense."  *Id.* at 15.  However, this is not the test.  Again, to be

"admissible, evidence need only be worth consideration by the jury, or have a plus value,"

*Leftenant*, 341 F.3d at 346—a standard easily satisfied here.  Indeed, the reimbursement amounts

---

[18] Thus, Defendant's claim that the Indictment "makes no allegation that the private insurers were victimized in any way," ECF No. 40 at 9, by Defendant's actions with respect to co-payments and co-insurance is clearly wrong.

[19] Defendant's cited-authority is inapposite.  In *United States v. Mandel*, 415 F. Supp. 997, 1009 (D. Md. 1976), the court struck a reference in an indictment to a Code of Ethics because under state law the Code did not apply to the office of governor, and therefore the reference was irrelevant and bound to prejudice the jury—a far cry from the circumstances here.  *Pendleton* and *Reed*—authority out of Louisiana—are likewise distinguishable inasmuch as both involved allegations of violations of criminal law that were present in the indictment but not charged.  *United States v. Reed*, No. 15-100, 2016 WL 54903, at *2 (E.D. La. Jan. 5, 2016) (striking allegation that defendant "caused the public filing of false and misleading campaign finance reports"); *United States v. Pendleton*, No. CR 16-41, 2017 WL 1399571, at *2 (E.D. La. Apr. 19, 2017) (striking allegation where "Defendant has not been charged with tax fraud, yet Paragraph 16 suggests this additional charge").

are integral to, and intertwined with, all of the facts of this case.  The reimbursement amount evidence is highly probative regarding elements of the various crimes charged in the Indictment, such as the knowledge and intent of Defendant to commit wire fraud, AKS violations and money laundering, for example.  Moreover, the evidence forms the basis of the criminally derived proceeds outlined in the money laundering charges.  It was for these very reasons, among others, that the specific amounts were noticed in the Indictment.

Simply put, the massive reimbursement amounts Defendant received are intrinsic to the conduct charged.  His receipt of the reimbursements "arose out of the same series of transactions as the charged offense" and undoubtedly "is necessary to complete the story of the crime on trial." *United States v. Kennedy*, 32 F.3d 875, 885 (4th Cir. 1994) (quotation omitted).  Indeed, Defendant's receipt of reimbursements—no matter their size and scope—*is the very object of his scheme to defraud*.  Indictment ¶ 15.

*United States v. Bajoghli*, 785 F.3d 957, 964 (4th Cir. 2015), controlling authority not cited by Defendant, is instructive.[20]  There, the Fourth Circuit—reversing the district court's decision limiting the government's proof in connection with health care fraud charges—concluded that evidence of conduct not charged in the "specific execution" of a fraudulent scheme charged may still be relevant to the "nature and scope of the scheme charged." 785 F.3d at 964.  The Circuit reasoned that "[w]hile fraud can be committed simply by engaging in an isolated transaction, *a scheme to defraud* requires a plot, plan, or arrangement that is executed by a fraudulent transaction." *Id.* at 962-63 (emphasis in original).  Here, of course, the reimbursement amounts Defendant sought to receive and did receive were not just part of the scheme to defraud—they

---

[20] *United States v. Rush*, 807 F. Supp. 1263, 1265-66 (E.D. La. 1992), a case that has only been cited by another court once in nearly three decades and whose reasoning has not been adopted by any other court, is inapposite. The court there struck an allegation that the defendant's misconduct had caused a $10 million loss but specifically held that "[t]he government is free to prove during trial specific monetary harm," thus acknowledging that the loss amount was relevant and admissible.  This makes clear of course that the decision is inconsistent with Fourth Circuit law, which allows only *irrelevant*, prejudicial, and inflammatory allegations to be struck.

were its very basis.  Moreover, the Fourth Circuit noted that "evidence of financial gain is particularly probative in a fraud case to establish the defendant's intent to defraud," *id.* at 966-67, precisely the situation here.[21]  *See also United States v. Grow*, 977 F.3d 1310, 1324 (11th Cir. 2020) (reasoning that "a reasonable jury could find an intent to defraud from the money Grow made from billing Tricare for creams and vitamins that were not medically necessary" and that "'[e]vidence that the defendant profited from a fraud may . . . provide circumstantial evidence of the intent to participate in that fraud'" (quoting *United States v. Machado*, 886 F.3d 1070, 1083 (11th Cir. 2018)).  Defendant comes nowhere close to establishing that the reimbursement amounts he seeks to strike are irrelevant.

Defendant likewise has failed to establish that the allegations prejudice him or are inflammatory.  Defendant focuses on the wire fraud forfeiture allegation and argues that jurors will be confused by the difference between the amounts listed in the forfeiture allegations and the reimbursement amounts he seeks to strike.  ECF No. 40 at 16.  But Defendant ignores the fact that the allegations he would have the Court strike—all of which are part of the manner and means of the scheme to defraud—are incorporated by reference into all of the other counts in the Indictment. Indictment at 15 (Counts 22-88) *id.* at 17 (Counts 29-33); *id.* at 19 (Counts 34-36).  And he likewise ignores that the forfeiture allegations—taken as a whole—provide notice of the Government's intent to forfeit substantial sums from Defendant, including real property, "*at least* $387,247.43 in U.S. Currency" in connection with any money laundering conviction, and *any* property derived property that constitutes or is derived from any AKS conviction—in addition to the "*at least* $198,135.72" referenced in the Wire Fraud forfeiture allegation.  It thus is clear—and will be clear (and not confusing) to the jurors—that the dollar amounts referenced in the forfeiture allegation

---

[21] Thus, Defendant's claim that "the figures included in the 'manner and means' section are not operative," ECF No. 40 at 15, is wrong.

constitute the floor[22] of what the Government will seek to forfeit, not the ceiling.  Accordingly,

even if Defendant could establish that the reimbursement amounts he seeks to have the Court strike

are irrelevant—and he cannot—he cannot establish that they are prejudicial and inflammatory.[23]

The Court should deny Defendant's motion.

**Conclusion**

For all of the foregoing reasons, the Government respectfully requests that the Court deny

Defendant's motions.

Respectfully submitted,

Robert K. Hur
United States Attorney

By:    _____/s/_____

Christine Duey
Paul A. Riley
Assistant United States Attorneys

---

[22] "The indictment or information need not identify the property subject to forfeiture or specify the amount of any forfeiture money judgment that the government seeks."  Fed. R. Crim. P. 32.2; *see also United States v. Segal*, 495 F.3d 826, 838–39 (7th Cir. 2007) (finding that a variance between the forfeiture amount alleged and the amount ultimately requested was not fatal because the phrase "at least" preceded the amount alleged in the indictment).

[23] *United States v. Najor*, No. 13-20462, 2014 WL 2608067, at *5 (E.D. Mich. June 11, 2014), is inapposite.  There, the court granted a motion to strike because the government took inconsistent positions with respect to the loss amount to financial institutions it intended to prove at trial and planned to present evidence as to only the smallest loss amount.  The scenario here is the opposite of the scenario in *Najor*: The Government intends to prove that Defendant received reimbursement amounts as provided for in the allegations that Defendant would have the Court strike.