IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA,

v.                                                          Criminal No. ELH-19-00410

MATTHEW EDWARD BLAIR

## MEMORANDUM OPINION

Matthew Blair, defendant, owned and operated a now defunct pharmacy, Blair Pharmacy, Incorporated ("Pharmacy"), which dispensed compounded drugs and creams. Blair, who is not a pharmacist, was indicted on August 27, 2019 (ECF 1) and later charged with multiple offenses in a 23-page Superseding Indictment filed on March 3, 2020. ECF 20. He is accused, *inter alia*, of devising a scheme to defraud federal health care programs and insurance companies and with laundering the funds that he derived from his scheme.

In particular, Counts One through Twenty-One charge wire fraud, committed between October 2014 and April 2015, in violation of 18 U.S.C. § 1343; Counts Twenty-Two through Twenty-Eight charge aggravated identify theft, in violation of 18 U.S.C. § 1028A(a)(1) and (b); Counts Twenty-Nine through Thirty-Three charge payments of remuneration, in violation of the Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b(b); and Counts Thirty-Four through Thirty-Six allege money laundering, in violation of 18 U.S.C. § 1957.[1]   In addition, the Superseding Indictment seeks forfeiture. *See* ECF 20 at 21-23.

In a fierce and vigorous challenge to the charges, the defense has filed a steady stream of motions.  In particular, the Court considers here the following defense motions: "Motion To

---

[1] The Superseding Indictment uses both letters and numbers to label the counts.

Dismiss Count 29 Of Superseding Indictment For Failure To State An Offense" (ECF 37); "Motion To Dismiss Counts 29 to 33 of Superseding Indictment As Impermissibly Vague" (ECF 38); "Defendant's Omnibus Motion To Dismiss Counts 30 to 33 of Superseding Indictment As Constitutional Violations" (ECF 39); "Defendant's Motion To Strike Certain Allegations In Paragraph 35 And Certain Alleged Loss Amounts In Superseding Indictment" (ECF 40); "Defendant's Motion . . . To Dismiss Count 29 For Failure To State An Offense" (ECF 108); "Defendant's Partial Motion To Dismiss Counts 6, 8, 9, 12-14, 16-19, and 21 of the Indictment And To Strike Related Paragraph 27 For An Improper Grand Jury Presentation or, Alternatively, Motion For Production of Certain Portions of Grand Jury Transcripts . . . ." (ECF 119).[2]

The government filed combined oppositions to the motions, docketed at ECF 49 and ECF 129. With respect to the Motion to Dismiss Count 29 (ECF 37), the defendant's reply is at ECF 63; the government's supplemental reply is at ECF 78; and Blair's supplemental reply is at ECF 93. And, the government's notice of supplemental authority is at ECF 100.

As to the Motion to Dismiss Counts 29 to 33 (ECF 38), the defendant's reply is at ECF 64. With respect to the Motion to Dismiss Counts 30 to 33 (ECF 39), defendant's reply is at ECF 65. And, the defendant's reply to the Motion to Strike (ECF 40) is at ECF 62. With leave of court (ECF 70), the government filed a surreply at ECF 73.  Defendant responded at ECF 102, and the government again replied at ECF 105.  As to defendant's Motion to Dismiss Count 29 for failure

---

[2] The Court held a motion hearing on January 29, 2021, at which argument was presented with respect to defendant's "Motion For A Bill Of Particulars" (ECF 36).  By Memorandum (ECF 79) and Order (ECF 80) of February 5, 2021, I granted the Motion for a Bill of Particulars as to Count 29 but otherwise denied the motion.

The parties have also submitted multiple filings with respect to cross-motions to exclude or limit opposing experts. The Court held a *Daubert* hearing on July 12, 2021, at which the testimony of two proposed expert witnesses was presented. ECF 133. The hearing is scheduled to resume on September 28, 2021.

to state an offense (ECF 108), defendant's reply is at ECF 140.  With respect to the motion to dismiss docketed at ECF 119, the defense reply is at ECF 139.

As to the motions set forth above, the Court held a hearing on August 6, 2021, at which argument was presented.  For the reasons that follow, I shall deny ECF 37; ECF 38; ECF 39; ECF 108; and ECF 119.  As to ECF 40, the government has agreed to strike the loss amounts in paragraphs 25-27 and 34 of the Superseding Indictment.  Therefore, I shall deny that portion of ECF 40 as moot, and deny the remainder of ECF 40.

## I.  SUMMARY OF CRIMINAL ALLEGATIONS[3]

In 2014, Blair opened the Pharmacy in Timonium, Maryland.  The Pharmacy, which was not a retail business, closed in November 2017.  As noted, Blair is not a pharmacist. ECF 20, ¶ 16.

The Pharmacy "primarily dispensed compounded drugs and creams." *Id.* ¶ 2. "Compounding" is a practice by which a licensed pharmacist combines drug ingredients "to create a drug tailored to the need of an individual patient." *Id.* ¶ 5. Compounded drugs are not FDA approved, but may be prescribed by a physician when an FDA-approved drug does not meet the health needs of a patient. *Id.* ¶¶ 5, 6.

In order for a pharmacy to be reimbursed by an insurance company or a federal health care benefit program for a compounded medication, it must be dispensed pursuant to a valid prescription and medically necessary for the treatment of a covered illness or medical condition. *Id.* ¶ 7. Health care benefit programs reimburse pharmacies that dispense compounded medications based on the average wholesale price of the individual ingredients contained within the compounded medication. *Id.* ¶ 13.

---

[3] Given the posture of the case, the factual background derives primarily from the Superseding Indictment (ECF 20).

The Superseding Indictment alleges that from October 1, 2014 to June 1, 2015, Blair engaged in a scheme to defraud health insurance companies and health care benefit companies, including Blue Cross Blue Shield ("BCBS") and TRICARE, a federal health care benefit program that provides benefits to members of the military, retirees, and their families. *Id.* ¶¶ 9-11, 14, 23.  In particular, Blair allegedly sought and obtained reimbursement for compounded drugs based on fraudulent pretenses, representations, and promises that the drugs were authorized by physicians, medically necessary, dispensed for medical purposes, not based on reimbursement rate, and contained the amount and specific ingredients that were billed to the health care benefit programs. *Id.* ¶ 15.

According to the Superseding Indictment, in connection with the scheme to defraud, Blair created modified compound drug prescription forms with modified lists of chemical ingredients. *Id.* ¶ 20. He paid independent sales marketers, such as Atlas Group, LLC ("Atlas"), to market his compounded drugs and provide his prescription forms to doctors. *Id.* ¶ 21.[4] And, he paid Atlas a "remuneration," in the form of a percentage of any successfully reimbursed claim that Atlas referred to the Pharmacy. *Id.*

As mentioned, Blair submitted the reimbursement claims to insurance companies and health care benefit providers, including BCBS and TRICARE.  In doing so, he used an internet-based software program to submit online reimbursement claims. *Id.* ¶¶ 3, 22, 23. The claims that Blair submitted for reimbursement included a doctor's name and National Provider Identity number, although it is alleged that not every prescription was authorized by a physician or medically necessary. *Id.* ¶ 24.

---

[4] Atlas was formed by Ben Alavi.  *See* ECF 38 at 2 n.2.

According to the Superseding Indictment, from December 1, 2014, through August 30, 2015, Blair submitted reimbursement claims to health care benefit programs for a base ingredient called Sterabase, but he did not actually dispense the ingredient. *Id.* ¶ 25. Further, Blair allegedly caused the compounded drugs related to those claims to be filled and dispensed by the Pharmacy with a different base ingredient—Lipoderm and Lipo Max. *Id.* And, he allegedly received reimbursement totaling $2,987,000 from health care benefit programs "related to these invalid and misbranded" ingredients. *Id.* In addition, Blair allegedly conducted a similar scheme with other compound chemical ingredients or medications, in which he billed for more of the product than was actually dispensed. These drugs included Gabapentin, "Vitamin Formula #1," and "Vitamin Formula #2." *Id.* ¶¶ 26-34.

Moreover, as part of the scheme, Blair allegedly "failed to bill for and collect copayments and coinsurance from beneficiaries of health care benefit programs," despite contractual agreements requiring him to do so. *Id.* ¶ 35. According to the Superseding Indictment, Blair "engaged in this conduct for the purpose of:  inducing prescriptions to be filled at his pharmacy; concealing the cost of repeated copayments and coinsurance; reducing patient complaints regarding copayments and coinsurance; and reducing patient visibility and complaints regarding his pharmacy's dispensing process and the high cost of his compounded drugs." *Id.*

The government has made significant discovery disclosures to the defense. *See*, *e.g.*, ECF 49 at 8. Between September 2019 and November 2020, the government provided at least 140GB of data. *Id.* And, the government has advised that discovery has been supplemented. In

addition, the government has already produced some materials subject to the Jencks Act, 18 U.S.C. § 3500. *Id.* at 8-9.[5]

## II. ANTI-KICKBACK STATUTE

Counts 29 through 33 charge Blair with violations of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b). Because several defense motions pertain to the charges under the AKS, I pause to review the relevant portions of the statute.

The AKS is "designed to prevent" fraud and abuse in connection with federal health care programs, including Medicare and Medicaid.   *United States v. Patel*, 778 F.3d 607, 612 (7th Cir. 2015).   It "was enacted to 'protect the Medicare and Medicaid programs from increased costs and abusive practices resulting from provider decisions that are based on self-interest rather than cost, quality of care, or necessity of services.'"   *Id.* (citation omitted).   In addition, the AKS seeks "'to protect patients from doctors whose medical judgments might be clouded by improper financial consideration.'"   *Id.* (citation omitted).

Section 1320a-7b(b) of 42 U.S.C. was enacted in 1977, when Congress amended the Social Security Act by adding the Medicare-Medicaid Anti-Fraud and Abuse Amendments.   *See United States v. Shoemaker*, 746 F.3d 614, 626 (5th Cir. 2014) (citing H.R. Rep. No. 95-393, pt. 2, at 44 (1977)); *United States v. Shaw*, 106 F. Supp. 2d 103, 110 (D. Mass. 2000). The amendment sought to address the "disturbing degree [of] fraudulent and abusive practices associated with the provision of health services financed by the Medicare and Medicaid programs." *Shaw*, 106 F. Supp. 2d at 110 (citing H.R. Rep. No. 95-393, pt. 2, at 44 (1977), reprinted in 1977 U.S.C.C.A.N. 3039, 3047). The primary effect of these amendments was to

---

[5] In response to ECF 108 and ECF 119, the government has also made an ex parte disclosure of grand jury materials to the Court.

turn fraudulent acts previously classified as misdemeanors into felonies. *Id.*; *see United States v. Neufield*, 908 F. Supp. 491, 493 (S.D. Ohio 1995).

To achieve these objectives, the AKS "criminalizes the payment of remuneration under two related circumstances[.]" *Shoemaker*, 746 F.3d at 626. The AKS provides, in relevant part, 42 U.S.C. § 1320a-7b(b):

**(b) Illegal Remunerations**

*****

(2) Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—

(A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $100,000 or imprisoned for not more than 10 years, or both.

From the inception of these amendments, "a tension existed between what the anti-kickback statute defined as illegal remuneration and the common business practice of offering discounts in order to increase sales." *Shaw*, 106 F. Supp. 2d at 111. And, because "of the broad reach of the statute, concern was expressed that some relatively innocuous commercial arrangements were covered by the statute and, therefore, potentially subject to criminal prosecution." Medicare and State Health Care Programs: Fraud and Abuse; Revisions to the Safe Harbors Under the Anti-Kickback Statute and Civil Monetary Penalty Rules Regarding Beneficiary Inducements, 81 Fed. Reg. 88368-01, 88368, 2016 WL 7103282 (Dec. 7, 2016).

As a result, in 1987 Congress again amended the fraud and abuse prohibitions of the AKS. *See* Pub. L. No. 100-93. One provision required the promulgation of regulations by the Department of Health and Human Services ("HHS"), Office of the Inspector General ("OIG"), specifying those payment practices that might be misconstrued as illegal remunerations under the statute, but would be protected from criminal liability under the amendment. These exceptions have become known as "safe harbors" and are recognized in the AKS at 42 U.S.C. § 1320a-7b(b)(3)(E). *See* 42 C.F.R. § 1001.952 (regulation implementing the safe harbor provisions); *Shaw*, 106 F. Supp. 2d at 112.  By granting HHS "the authority to protect certain arrangements and payment practices under the anti-kickback statute, Congress intended the regulations to be evolving rules that would be updated periodically to reflect changing business practices and technologies in the health care industry." Department of Health and Human Services, Office of Inspector General, Medicare and State Health Care Programs: Fraud and Abuse; OIG Anti–Kickback Provisions, 64 Fed. Reg. 63,518, 63,518 (1999).

Initially, the OIG promulgated ten safe-harbor provisions. *Shaw,* 106 F. Supp. 2d at 112. Those ten safe-harbor provisions included business arrangements concerning investment interests, space rental, equipment rental, referral services, warranties, employees, group purchasing organizations, the sale of practices, and discounts. *See* 42 C.F.R. § 1001.952 (1991).

In promulgating the safe harbors, the OIG was careful to state that they do "not expand the scope of activities that the statute prohibits. The statute itself describes the scope of illegal activities. The legality of a particular business arrangement must be determined by comparing the particular facts to the proscriptions of the statute." Department of Health and Human Services, Office of Inspector General, Medicare and State Health Care Programs: Fraud and Abuse; OIG Anti–Kickback Provisions, 56 Fed. Reg. 35,952, 35,954 (1991); *see also*

8

Department of Health and Human Services, Office of Inspector General, Medicare and State Health Care Programs: Fraud and Abuse; OIG Anti–Kickback Provisions, 59 Fed. Reg. 37,202, 37,203 (1994) (clarifying the effect of the safe harbor provisions; "Whether a particular payment practice violates the statute is a question that can only be resolved by an analysis of the elements of the statute as applied to that set of facts. Generally speaking, however, the original final [safe-harbor provisions] did describe payment practices that would be prohibited, where the unlawful intent exists, but for the safe harbor protection that has been granted.").

Three of the safe harbor provisions are relevant to this case: the employee safe harbor; the agent safe harbor; and the copayment waiver exception.

Under the employee safe harbor, payments to a bona fide employee are not within the scope of the AKS. The AKS provides, 42 U.S.C. § 1320a-7b(b)(3):

(3) Paragraphs (1) and (2) [of the AKS] shall not apply to—

*****

(B) any amount paid by an employer to an employee (who has a bona fide employment relationship with such employer) for employment in the provision of covered items or services;

The employee safe harbor, as set forth above, is also embodied in an HHS regulation. It provides, 42 C.F.R. § 1001.952(i) (2015):

(i) Employees. As used in section 1128B of the Act [i.e., the AKS], "remuneration" does not include any amount paid by an employer to an employee, who has a bona fide employment relationship with the employer, for employment in the furnishing of any item or service for which payment may be made in whole or in part under Medicare, Medicaid or other Federal health care programs. For purposes of paragraph (i) of this section, the term employee has the same meaning as it does for purposes of 26 U.S.C. 3121(d)(2).

As indicated, the regulation refers to 26 U.S.C. § 3121(d)(2), which contains the Internal Revenue Service's definition of "employee." There, an employee is defined as "any individual

who, under the usual common law rules applicable in determining the employer-employee relationship, has the status of an employee." *Id.*

The agent safe harbor provision is found in 42 C.F.R. § 1001.952(d).  It states, in relevant part:[6]

(d) Personal services and management contracts and outcomes-based payment arrangements.

(1) As used in section 1128B of the Act, "remuneration" does not include any payment made by a principal to an agent as compensation for the services of the agent, as long as all of the following standards are met:

(i)   The agency agreement is set out in writing and signed by the parties.

(ii)  The agency agreement covers all of the services the agent provides to the principal for the term of the agreement and specifies the services to be provided by the agent.

(iii) The term of the agreement is not less than 1 year.

(iv)  The methodology for determining the compensation paid to the agent over the term of the agreement is set in advance, is consistent with fair market value in arm's-length transactions, and is not determined in a manner that takes into account the volume or value of any referrals or business otherwise generated between the parties for which payment may be made in whole or in part under Medicare, Medicaid, or other Federal health care programs.

(v)   The services performed under the agreement do not involve the counseling or promotion of a business arrangement or other activity that violates any State or Federal law.

(vi)  The aggregate services contracted for do not exceed those which are reasonably necessary to accomplish the commercially reasonable business purpose of the services.

*****

(3) For purposes of this paragraph (d):

---

[6] I cite to the text implemented in January 2021.  Changes were made to the text at that time, but the changes are not material to the issues here.

(i) An agent of a principal is any person other than a bona fide employee of the principal who has an agreement to perform services for or on behalf of the principal.

As to the waiver of copayments, in 2016 OIG published a safe harbor regulation regarding waiver of copayments under certain circumstances. *See* 42 C.F.R. § 1001.952(k). Thus, that provision was not in effect at the time relevant to this case.

However, as discussed, *infra*, OIG published fraud alerts, special alerts, and advisory information in 1991, 1994, and 1997 regarding the waiver of copayments. For example, a Special Fraud Alert issued in December 1994, HHS-OIG Special Fraud Alerts, 59 Fed. Reg. 65,372, 65,375 (Dec. 19, 1994) ("Special Fraud Alert"), provided:

> In certain cases, a provider . . . who routinely waives Medicare copayments or deductibles also could be held liable under the Medicare and Medicaid anti-kickback statute. 42 U.S.C. § 1320a-7b(b). . . . When providers . . . forgive financial obligations for reasons other than genuine financial hardship of the particular patient, they may be unlawfully inducing that patient to purchase items or services from them.
>
> *****
>
> One important exception to the prohibition against waiving copayments and deductibles is that providers . . . may forgive the copayment in consideration of a particular patient's financial hardship. This hardship exception, however, must not be used routinely; it should be used occasionally to address the special financial needs of a particular patient. Except in such special cases, a good faith effort to collect deductibles and copayments must be made.

Moreover, since 2003, the AKS has provided a limited exception to cost-sharing waivers. In 42 U.S.C. § 1320a-7b(b)(3)(G), it states:

> (3) Paragraphs (1) and (2) [of the AKS] shall not apply to—
>
> *****
>
> (G) the waiver or reduction by pharmacies (including pharmacies of the Indian Health Service, Indian tribes, tribal organizations, and urban Indian organizations) of any cost-sharing imposed under part D of title XVIII [42

U.S.C. §§ 1395w-101 et seq.],[7] if the conditions described in clauses (i) through (iii) of section 1128A(i)(6)(A) [42 U.S.C. § 1320a-7a(i)(6)(A)] are met with respect to the waiver or reduction (except that, in the case of such a waiver or reduction on behalf of a subsidy eligible individual (as defined in section 1860D-14(a)(3) [42 U.S.C. § 1395w-114(a)(3)]), section 1128A(i)(6)(A) [42 U.S.C. § 1320a-7a(i)(6)(A)] shall be applied without regard to clauses (ii) and (iii) of that section)….

This provision refers to the Civil Monetary Penalties Law ("CMPL"), 42 U.S.C. § 1320a-7a(i)(6), found in Section 1128A(i)(6)(A) of the Social Security Act. It states, in part, *id.*:

(6) The term "remuneration" includes the waiver of coinsurance and deductible amounts (or any part thereof), and transfers of items or services for free or for other than fair market value. The term "remuneration" does not include—

(A) the waiver of coinsurance and deductible amounts by a person, if—

(i) the waiver is not offered as part of any advertisement or solicitation;

(ii) the person does not routinely waive coinsurance or deductible amounts; and

(iii) the person—

(I) waives the coinsurance and deductible amounts after determining in good faith that the individual is in financial need; or

(II) fails to collect coinsurance or deductible amounts after making reasonable collection efforts….

As indicated, the safe harbor provision with respect to copayments was implemented in 2016, after the time period in issue here. In 42 C.F.R. § 1001.952(k), it states:

(k) Waiver of beneficiary copayment, coinsurance and deductible amounts. As used in section 1128B of the Act [i.e., the AKS], "remuneration" does not include any reduction or waiver of a Federal health care program beneficiary's obligation to pay copayment, coinsurance or deductible (for purposes of this subparagraph (k) "cost-sharing") amounts as long as all the standards are met within one of the following categories of health care providers or suppliers…

---

[7] As discussed, *infra*, Part D of Title XVIII pertains to the Medicare Part D prescription drug program. *See* 42 U.S.C. § 1395w-101.

(3) If the cost-sharing amounts are owed to a pharmacy … for cost-sharing imposed under a Federal health care program, the pharmacy may reduce or waive the cost-sharing amounts if:

    (i)    The waiver or reduction is not offered as part of an advertisement or solicitation; and

    (ii)    Except for waivers or reductions offered to subsidy-eligible individuals (as defined in section 1860D-14(a)(3) [of the Social Security Act]) to which only requirement in paragraph (k)(3)(i) of this section applies:

        (A) The pharmacy does not routinely waive or reduce cost-sharing amounts; and

        (B) The pharmacy waives the cost-sharing amounts only after determining in good faith that the individual is in financial need or after failing to collect the cost-sharing amounts after making reasonable collection efforts.

## IV. DISCUSSION

### A. UNTIMELY MOTIONS (ECF 108, ECF 119)

As an initial matter, the government urges the Court to deny ECF 108 and ECF 119 because they were untimely filed and defendant has not established good cause to excuse their untimeliness.  ECF 129.  In particular, ECF 108 concerns Count 29, and ECF 119 pertains to multiple counts.

By Order of June 18, 2020 (ECF 31), I set a deadline of October 9, 2020, for the submission of defense motions, exclusive of *Daubert* motions concerning expert witnesses. *See Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993). The deadline was subsequently extended through October 19, 2020.  ECF 33; ECF 34. On that date, defendant filed four motions: ECF 37; ECF 38; ECF 39; ECF 40.  By Order of November 10, 2020 (ECF 48), I set motions hearings for January 29, 2021, March 26, 2021, and May 14, 2021.  ECF 48.  The Court held a motions

hearing on January 29, 2021 (ECF 74).  And, the other hearing dates were later modified.  ECF 95; ECF 101.

On April 27, 2021 and June 4, 2021, respectively, many months after the motions deadline had passed, the defense filed two additional motions to dismiss: ECF 108 and ECF 119. As to ECF 108, it is a third challenge to Count 29. *See* ECF 37 and ECF 38 (both challenging Count 29).  And, the motion presents a legal argument that could have been timely raised.  With respect to ECF 119, it relates to multiple counts of the Superseding Indictment.  It, too, contains arguments that could have been made within the time provided.  In other words, the arguments in these motions are legal in nature; they are not predicated on facts unknown to the defense by the motions deadline.

Motions must be filed by the deadline established by the court "if the basis for the motion is then reasonably available." *See* Fed. R. Crim. P. 12(b)(3)(C), 12(c). If a party does not meet the deadline established by the court, "the motion is untimely. But a court may consider the defense, objection, or request if the party shows good cause." Fed. R. Crim. P. 12(c)(3); *see also United States v. Sweat*, 573 F. App'x. 292, 295 (4th Cir. 2014); *United States v. Chavez*, 902 F.2d 259, 263-64 (4th Cir. 1990).

The motions in ECF 108 and ECF 119 were, indeed, belatedly filed.  And, defendant does not attempt to justify his untimely filing.  Nonetheless, given that trial is not scheduled until January 2022, there is no prejudice to the government as a result of the untimely filings.  In the interest of justice, I shall consider both motions on their merits.

### B.  MOTION TO DISMISS COUNT 29:  FAILURE TO STATE AN OFFENSE
### (ECF 37; ECF 38; ECF 108)

### 1.

Count 29 of the Superseding Indictment alleges that Blair violated the AKS, 42 U.S.C. § 1320a-7b(b), by failing to bill for and collect insurance copayments from TRICARE beneficiaries (*i.e.*, the patients), between March 6, 2015 and August 1, 2015. ECF 20 at 17. In particular, Count 29 of the Superseding Indictment states, *id.*:

> Blair submitted, and caused to be submitted, claims for compounded drugs to TRICARE, for which he received reimbursements from TRICARE, and **BLAIR** offered and paid remuneration to TRICARE beneficiaries to wit: **BLAIR** failed to bill for and collect copayments and coinsurance from TRICARE beneficiaries related to reimbursements TRICARE paid to his pharmacy.

In sum, defendant urges the Court to dismiss Count 29 of the Superseding Indictment for failure to state an offense under the AKS (ECF 37); because the AKS is unconstitutionally vague (ECF 38); and for improper pleading of an offense under the AKS (ECF 108).

Blair posits that non-routine waivers of insurance copayments are not criminal under the AKS. Rather, Blair maintains that the copayment exception is "'so embedded and integral' to the AKS that it is, in fact, an element that must be pled, as opposed to an affirmative defense." ECF 63 at 3; *see* ECF 93 at 2. He asserts, ECF 38 at 10: "Despite the long-recognized Copayment Exception, the Indictment is conspicuously silent about whether the alleged failure to collect copayments and/or coinsurance was 'routine,' or whether such conduct was a result of the beneficiaries' financial hardship . . . or whether any good faith efforts to collect these monies were made by the Pharmacy."  And, argues Blair, because Count 29 fails to include allegations regarding the copayment exception, the Count is fatally flawed. ECF 37 at 4-5 (citing 42 U.S.C. § 1320a-7b(b)(3)(G) & 42; U.S.C. § 1320a-7a).

Conversely, the government posits that the copayment exception constitutes an affirmative defense that the government is not required to plead or prove. ECF 49 at 14-16. Further, it argues that the statutory language on which Blair relies to support his argument— § 1320a-7b(b)(3)(G)—is inapplicable to this case. ECF 78.

To frame the discussion, I begin with a review of the legal principles that govern the sufficiency of an indictment.

An indictment implicates a defendant's due process right to reasonable notice of the charges. *See, e.g.*, *Stroud v. Polk*, 466 F.3d 291, 296 (4th Cir. 2006), *cert. denied*, 551 U.S. 1134 (2007). For an indictment to be legally sufficient, it "must contain the elements of the offense charged'" and "'fairly inform a defendant of the charge[.]'" *United States v. Kingrea*, 573 F.3d 186, 191 (4th Cir. 2009) (citations omitted); *see Hamling v. United States*, 418 U.S. 87, 117 (1974); *United States v. Janati*, 374 F.3d 263, 271 (4th Cir. 2004); *United States v. Williams*, 152 F.3d 294, 299 (4th Cir. 1998); *see also United States v. ReSendiz-Ponce*, 548 U.S. 102, 108 (2007).

A motion to dismiss an indictment "'tests whether the indictment sufficiently charges the offense set forth against [the] defendant.'" *United States v. Lindh*, 212 F. Supp. 2d 541, 575 (E.D. Va. 2002) (citation omitted). When an indictment fails to apprise the defendant, with reasonable certainty, of the accusation against him, it is defective. *Russell v. United States*, 369 U.S. 749, 765 (1962).

Fed. R. Crim. P. 7(c)(1) governs the required contents and form of an indictment. It provides that an indictment must set forth "a plain, concise and definite written statement of the essential facts constituting the offense charged . . . ." Ordinarily, an indictment that tracks the statutory language is constitutionally sufficient if "'accompanied with such a statement of the

facts and circumstances as will inform the accused of the specific offense' . . . with which he is charged." *Hamling*, 418 U.S. at 117-18 (citation omitted). "More specifically, an indictment is legally sufficient (1) if it alleges the essential elements of the offense, that is, it fairly informs the accused of what he is to defend; and (2) if the allegations will enable the accused to plead an acquittal or conviction to bar a future prosecution for the same offense." *United States v. Rendelman*, 641 F.3d 36, 44 (4th Cir. 2011), *cert. denied*, 565 U.S. 1246 (2012).  In other words, the indictment must enable the defendant to plead double jeopardy in a subsequent prosecution for a similar offense.  *Russell*, 369 U.S. at 764; *Williams*, 152 F.3d at 299.

Notably, "[i]f the indictment does not contain every essential element of the offense, it is invalid; and, a bill of particulars cannot cure the defect." *United States v. Loayza*, 107 F.3d 257, 260 (4th Cir. 1997).  The requirement that an indictment include all elements of an offense derives from the Fifth Amendment, which provides, in part: "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury[.]"  Thus, the grand jury must have considered and found all elements to be present.  *United States v. Hooker*, 841 F.2d 1225, 1230 (4th Cir. 1988).  The notice requirement also derives from the Sixth Amendment, which states: "In all criminal prosecutions, the accused shall enjoy the right . . . to be informed of the nature and cause of the accusation." *See Hooker*, 841 F.2d at 1230; *see also Russell*, 369 U.S. at 763.  And, "for an indictment to fulfill the functions of notifying the defendant of the charges against him and of assuring that he is tried on the matters considered by the grand jury, the indictment must state some fact specific enough to describe a particular criminal act, rather than a type of crime." *United States v. Pirro*, 212 F.3d 86, 92-93 (2d Cir. 2000).

The Fourth Circuit summarized the standards for the sufficiency of an indictment in *United States v. Brandon*, 298 F.3d 307 (4th Cir. 2002).  It said, *id.* at 310 (internal citations omitted):

> "[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." Usually "an indictment is sufficient if it alleges an offense in the words of the statute," as long as the words used in the indictment "fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence." However, simply parroting the language of the statute in the indictment is insufficient. When the words of a statute are used to describe the offense generally, they "must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offence, coming under the general description, with which he is charged." Thus, the indictment must also contain a "statement of the essential facts constituting the offense charged."

*See also United States v. Wicks*, 187 F.3d 426, 427 (4th Cir. 1999); *United States v. Darby*, 37 F. 3d 1059, 1063 (4th Cir. 1994); *United States v. Cobb*, 905 F. 2d 784, 790 (4th Cir. 1990), *cert. denied*, 498 U.S. 1049 (1991).

## 2.

Blair argues that, at the relevant time, it was "unclear" that the "alleged failure to infrequently collect copayments from TRICARE beneficiaries . . . was illegal."  ECF 38 at 20-21.  Further, he claims that "the vagueness plaguing the AKS extended to one of the most fundamental aspects of the statute:  the definition of 'remuneration.'"  *Id.* at 21 (citing 42 U.S.C. § 1320a-7b(b)(2)).

As indicated, at the time of Blair's alleged misconduct, the AKS set out a limited exemption with respect to the AKS's prohibition on the waiver of copayments.  The pertinent portion of 42 U.S.C. § 1320a-7b(b)(3)(G) provides (emphasis added):

(3) Paragraphs (1) and (2) [of the AKS] shall not apply to—

*****

(G) the waiver or reduction by pharmacies (including pharmacies of the Indian Health Service, Indian tribes, tribal organizations, and urban Indian organizations) of any *cost-sharing imposed under part D of title XVIII [42 U.S.C. §§ 1395w-101 et seq.],* if the conditions described in clauses (i) through (iii) of section 1128A(i)(6)(A) [42 U.S.C. § 1320a-7a(i)(6)(A)] are met with respect to the waiver or reduction (except that, in the case of such a waiver or reduction on behalf of a subsidy eligible individual (as defined in section 1860D-14(a)(3) [42 U.S.C. § 1395w-114(a)(3)]), section 1128A(i)(6)(A) [42 U.S.C. § 1320a-7a(i)(6)(A)] shall be applied without regard to clauses (ii) and (iii) of that section)....

The provision references § 1128A(i)(6)(A) of the Social Security Act, which is the CMPL, codified at 42 U.S.C. § 1320a-7a(i)(6)(A).  Section 1320a-7a(i)(6) of 42 U.S.C. defines "remuneration" as follows:

(6) The term "remuneration" includes the waiver of coinsurance and deductible amounts  (or any part thereof), and transfers of items or services for free or for other than fair market value. The term "remuneration" does not include—

(A) the waiver of coinsurance and deductible amounts by a person, if—

(i) the waiver is not offered as part of any advertisement or solicitation;

(ii) the person does not routinely waive coinsurance or deductible amounts; and

(iii) the person—

(I)   waives the coinsurance and deductible amounts after determining in good faith that the individual is in financial need; or

(II)  fails to collect coinsurance or deductible amounts after making reasonable collection efforts....

Blair relies on the definition of "remuneration" set out in § 1128A(i)(6)(A), and cross-referenced in § 1320a-7b(b)(3)(G), to support his argument that the government failed to plead

all the elements of an AKS offense in Count 29. Specifically, he argues that he "cannot have paid 'remuneration' subject to the AKS" in light of the definition of remuneration in the CMPL, *i.e.*, remuneration "does not include" the waiver of coinsurance, copayments, or deductible amounts if "the waiver is not offered as part of any advertisement or solicitation," the waiver is not "routinely" done, and the person waiving the payment does so "after determining in good faith that the individual is in financial need [or] fails to collect [such amounts] after making reasonable collection efforts." ECF 63 at 5; *see also* ECF 38 at 21.

Blair correctly notes that in 42 U.S.C. § 1320a-7b(b)(3)(G), the AKS cross-references one of the exceptions to the definition of "remuneration." But, he overlooks a critical limitation in § 1320a-7b(b)(3)(G). By its terms, the reference to "cost-sharing" pertains to that "imposed under part D of title XVIII," *i.e.*, 42 U.S.C. §§ 1395w-101 *et seq.* In other words, the exception protects waivers by pharmacies for cost-sharing under Medicare's Part D prescription drug benefit program. This case, however, involves cost-sharing waivers for drugs covered by TRICARE, not Medicare Part D. Therefore, this statutory exception is inapplicable. *See United States v. Narco Freedom, Inc*., 95 F. Supp. 3d 747, 756-57 (S.D.N.Y. 2015) (noting that "if Congress intended the exception to remuneration in § 1320a–7a(i)(6)(F) to apply to § 1320a–7b's definition of remuneration, it would have done so explicitly").

Defendant contends that the government's argument as to 42 U.S.C. § 1320a-7b(b)(3)(G) is overly technical and "bemoans the spirit of the AKS." ECF 93 at 5. According to Blair, the legislative history of the AKS and the regulatory guidance demonstrate that "for decades" remuneration had "exempted" the non-routine waiver of copayments. ECF 63 at 9 (citing HHS-OIG Special Fraud Alerts, 1994 WL 702552, 59 Fed. Reg. 65,372 at 65,375) (advising that in "certain cases" health care providers who "routinely waive[] copayments or deductibles" could

be criminally prosecuted for violating the AKS). And, defendant posits that "this narrowing of" the definition of remuneration was based on "the broad reach of the statute," coupled with the concern that certain "'innocuous commercial arrangements' would be potentially criminally sanctionable." *Id.* (citing 81 Fed. Reg. 88368-01, at 88368). Further, Blair asserts that his view is reflected in the events of 2016, when HHS adopted a safe harbor that establishes that non-routine waivers of copayments are not considered remuneration under the AKS. *See* 42 C.F.R. § 1001.952(k).

But, courts and the OIG have concluded that exceptions to the definition of remuneration in the CMPL apply only to the civil statute, codified in section 1128A of the Social Security Act, 42 U.S.C. § 1320a-7a.  *See* Re: OIG Advisory Opinion No. 20-05 (Sept. 18, 2020) (explaining that the distinct definition of "remuneration" and the related exceptions set forth in section 1128A(i)(6) "apply only for the purposes of the definition of 'remuneration' applicable to section 1128A of the Act (the CMP statute); they do not apply for purposes of section 1128B(b) of the Act (the Federal anti-kickback statute).")[8]; *Narco Freedom, Inc*., 95 F. Supp. 3d at 756-57; *Ameritox, Ltd. v. Millennium Labs., Inc*., 20 F. Supp. 3d 1348, 1356 (M.D. Fla. 2014) ("[T]he AKS does not contain exceptions to the broad definition of remuneration.").

To support his argument that the copayment waiver exemption is integral to the AKS and should be considered an element of the offense, defendant relies heavily, *inter alia*, on the district court's decision in *United States v. Rafiekian*, No. 1:18-CR-457, 2019 WL 3021769

---

[8] In his reply, Blair asserts that OIG Advisory Opinion No. 20-05 is irrelevant because it "post-dates the alleged acts. . . ." ECF 64 at 10 n.6. Further, he contends that "it is worth clarifying that while the Advisory Opinion says the CMPL definition applies only for section 1128A of the Act (the CMPL) and not section 1128B(b) of the Act (the AKS), HHS-OIG cites no authority for that point." *Id.*

(E.D. Va. July 9, 2019). But, that decision was recently reversed by the Fourth Circuit. *See United States v. Rafiekian*, 991 F.3d 529 (4th Cir. 2021).

In *Rafiekian*, the trial court considered whether a foreign agent registration statute, 18 U.S.C. § 951, included as an element an exception in the statute.   Specifically, 18 U.S.C. § 951(a) provides, in part: "Whoever … acts in the United States as an agent of a foreign government without prior notification … shall be fined under this title or imprisoned…"   The statute defines "agent" as an "individual who agrees to operate within the United States subject to the direction or control of a foreign government or official."   *Id.* § 951(d)(4).   But, it also provides several exceptions to the definition, including one that an "agent" does not include "any person engaged in a legal commercial transaction." *Id.* Thus, the question in *Rafiekian* was whether engagement in a "legal commercial transaction" constituted an element of the crime that had to be set forth in the indictment or instead amounted to an affirmative defense.

The district court concluded that the exception constituted a substantive element of the offense, "such that the Government must allege and prove that a defendant engaged in conduct *other than* a 'legal commercial transaction' in order to make out a § 951 violation." *Rafiekian*, 991 F.3d at 541. However, the Fourth Circuit disagreed.  It concluded that the "legal commercial transaction" exception constituted an affirmative defense and not an element of the crime that the government had to plead. The Court reasoned that, as "a rule of thumb," when the structure of a statute involves "an offense provision, a definitional provision, and a separate exception," the "initial burden of claiming such an exception generally falls to the defendant." *Id.* Moreover, this "rule of thumb" applies even if the exception would exclude "a large category of potential defendants."

*Rafiekian* supports the government's position here that the indictment need only include the elements contained in the "offense provision" of the AKS. And, because the copayment waiver exception is part of a "separate exception," the initial burden of claiming that exception falls to Blair. *Rafiekian* 991 F.3d at 541; *see also United States v. George*, 900 F.3d 405, 413 (7th Cir. 2018) (noting that "[o]nce the government establishes the elements of a violation of the Anti-Kickback Statute, the burden shifts to a defendant to demonstrate by a preponderance of the evidence that her conduct fell within the safe harbor provision of the statute" and examining safe harbor provisions of 42 U.S.C. § 1320a-7b(b)(3)); *United States v. Vernon*, 723 F.3d 1234, 1271 (11th Cir. 2013) (concluding that safe harbor provisions are an affirmative defense that must be proven by the defendant).

Blair also points to *United States v. Ukrainian Village Pharmacy, Inc.,* 772 F. 3d 1102 (7th Cir. 2014), *cert. denied*, 577 U.S. 818 (2015). *See* ECF 63 at 11. In that case, a qui tam relator lodged claims against a pharmacy under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et seq.*, alleging, among other things, that the pharmacy waived copayments for its customers so as to induce them to fill their prescriptions. *See* 772 F.3d at 1104. The Seventh Circuit affirmed the district court's dismissal of the FCA charges for failure to plead sufficient facts surrounding the claim that copayments were waived. *Id.* at 1106. However, this ruling is not persuasive because the complaint in the FCA case had to allege conduct with sufficient specificity to satisfy the high bar set out by Fed. R. Civ. P. 9(b). In contrast, the indictment in this case need only satisfy the standard set out in Fed. R. Crim. P. 7(c)(1).

To be sure, courts have cited the definition of "remuneration" in § 1320a-7a(i)(6) when interpreting the AKS, § 1320a-7b(b). But, they have not applied the exceptions contained within that definition to the AKS. *See, e.g., United States ex rel. Bilotta v. Novartis Pharm. Corp.*, 50

F.Supp.3d 497, 513–15 (S.D.N.Y. 2014); *United States ex rel. Fair Lab. Practices Assocs. v. Quest Diagnostics Inc.*, No. 05cv5393, 2011 WL 1330542, at *2 (S.D.N.Y. Apr. 5, 2011), *aff'd*, 734 F.3d 154 (2d Cir. 2013); *United States ex rel. Freedman v. Suarez–Hoyos*, 781 F. Supp. 2d 1270, 1281 (M.D. Fla. 2011); *United States v. Carroll*, 320 F. Supp. 2d 748, 755–56 (S.D. Ill. 2004).

In any event, even if the copayment exception applies in this case, the government is not required to plead it as an element of the offense in the Superseding Indictment. The Superseding Indictment contains all the elements of the charged offense of knowingly and willfully offering and paying remuneration to induce referrals, in violation of 42 U.SC. § 1320a–7b(b)(2).

Accordingly, I conclude that the copayment exception or safe harbor, if applicable, does not serve as an additional element of the crime. "It serves, instead, as a framework around which arguments of the parties regarding the evidentiary issues, such as how the government is to prove beyond a reasonable doubt that the defendant acted with the requisite state of mind, may be presented during trial." *Shaw*, 106 F. Supp. 2d at 122; *see* Department of Health and Human Services, Office of Inspector General, Medicare and State Health Care Programs: Fraud and Abuse; OIG Anti–Kickback Provisions, 59 Fed. Reg. 37,202, 37,203 (1994) (clarifying the effect of the safe harbor provisions; "Whether a particular payment practice violates the statute is a question that can only be resolved by an analysis of the elements of the statute as applied to that set of facts. Generally speaking, however, the [safe-harbor provisions] did describe payment practices that would be prohibited, where the unlawful intent exists, but for the safe harbor protection that has been granted.").

**C. Motion to Dismiss Count 29: Void for Vagueness (ECF 38)**

**1.**

Pursuant to Fed. R. Crim. P. 12(b)(3)(B), defendant seeks dismissal of Count 29, asserting that the AKS is unconstitutionally vague "in light of its regulatory guidance and judicial interpretations . . . ." ECF 38 at 1. According to Blair, this case appears to be the first and only case in which the government has criminally charged a defendant for violating the AKS by failing to bill for and collect insurance copayments. *Id.* at 23; ECF 64 at 8-10. He also complains about the government's "tunnel vision" in charging him with "conduct that undeniably was within the purview of others." ECF 38 at 2.

Defendant argues that, to the extent that the CMPL's definition of remuneration, including the copayment exception, does not apply to the AKS, the statute is fatally defective. ECF 93 at 9. In particular, Blair contends that it was unclear at the time of the alleged offense that "failure to infrequently collect copayments" was illegal under the AKS. ECF 38 at 20-21; *see* ECF 64 at 8; ECF 93 at 9-10. In fact, argues Blair, the OIG commentary and advisory materials consistently suggest that "*unless routine*, the waiver or failure to collect copayments did not give rise to AKS criminal liability." ECF 64 at 10 (emphasis in original).

The void for vagueness doctrine is grounded in the Due Process Clause of the Fifth Amendment, which provides, in part: "No person shall . . . be deprived of life, liberty, or property, without due process of law." *See United States v. Miselis*, 972 F.3d 518, 544 (4th Cir. 2020), *cert. denied*, ___ U.S. ___, 2021 WL 2405167 (June 14, 2021); *Manning v. Caldwell for City of Roanoke,* 930 F.3d 264, 272 (4th Cir. 2019); *Doe v. Cooper*, 842 F.3d 833, 842 (4th Cir. 2016). The Supreme Court reiterated in *Johnson v. United States*, 576 U.S. 591, 595 (2015): "Our cases establish that the Government violates this guarantee by taking away someone's life,

liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement."  The *Johnson* Court added, *id.* at 595-96: "The prohibition of vagueness in criminal statutes 'is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law[.]'" (Quoting *Connolly v. General Constr. Co.*, 269 U.S. 385, 391 (1926)).

To comport with due process, then, the statute at issue must "provide a person of ordinary intelligence fair notice of what is prohibited" and must not be "so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008); *see F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) *see also Miselis*, 972 F.3d at 544; *Manning,* 930 F.3d at 272; *Cooper*, 842 F.3d at 842; *Martin v. Lloyd*, 700 F.3d 132, 135 (4th Cir. 2012).  Put another way, the vagueness doctrine "'requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.'"  *United States v. Sun*, 278 F.3d 302, 309 (4th Cir. 2002) (citation omitted); *see Hill v. Colorado*, 530 U.S. 703, 732 (2000); *Miselis*, 972 F.3d at 544.

The "twin concerns of inadequate notice and arbitrary or discriminatory enforcement are especially pronounced 'where a vague statute abuts upon sensitive areas of basic First Amendment freedoms' because ambiguity" could "chill[] protected speech."  *Miselis*, 972 F.3d at 544 (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972)).  Indeed, "perhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights."  *Village of Hoffman Estates, Inc. v. The Flipside*, 455 U.S. 489, 499 (1982)*.  On the other hand, "'perfect clarity and precise

guidance have never been required even of regulations that restrict expressive activity.'" *Williams*, 553 U.S. at 304 (citation omitted).

In assessing whether a statute is unconstitutionally vague, "a court must consider both whether it provides notice to the public and whether it adequately curtails arbitrary enforcement." *United States v. Hammoud*, 381 F.3d 316, 330 (4th Cir. 2004), *vacated on other grounds*, 543 U.S. 1097 (2005). In *Village of Hoffman Estates, Inc.*, 455 U.S. 489, the Court enumerated various factors pertinent to a vagueness inquiry, noting that they should not be "mechanically applied." *Id.* at 498. It observed, *id.*: "The degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment." Notably, the Court observed that economic regulations are generally subject to a less strict vagueness test, because "businesses . . . can be expected to consult relevant legislation in advance of action.[]" *Id.* The Court added, *id.*: "Indeed, the regulated enterprise may have the ability to clarify the meaning of the regulation by its own inquiry, or by resort to an administrative process.[]" Further, the Court is more tolerant of "enactments with civil rather criminal penalties . . ." *Id.* at 499. And, "a scienter requirement" may mitigate vagueness. *Id.*

A determination of vagueness must be considered "as applied to the particular facts at issue, for '[a] plaintiff who engages in some conduct that is clearly proscribed [ordinarily] cannot complain of the vagueness of the law as applied to the conduct of others.'" *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18-19 (2010) (quoting *Village of Hoffman Estates, Inc.*, 455 U.S. at 495) (alternation in *Holder*). But, that requirement is "relaxed" in the context of the First Amendment, permitting a party "to argue that a statute is overbroad because it is unclear

whether it regulates a substantial amount of protected speech." *Williams*, 553 U.S. at 304; *see Village of Hoffman Estates, Inc.*, 455 U.S. at 494-95 and nn. 6, 7.

**2.**

As noted, the AKS provides that "[w]hoever knowingly and willfully offers or pays *any remuneration* (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person — (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program … shall be guilty of a felony . . . ." 42 U.S.C. § 1320a-7b(b)(2) (emphasis added).

Blair contends that the government "brazenly and implausibly declares that the plain language of the AKS, which prohibits a defendant from paying 'remuneration,' was notice enough that *any* waiving or failing to collect copayments was a crime." ECF 64 at 9. He adds that although the government took "liberties in the Opposition, the Indictment does not allege that Mr. Blair routinely waived or failed to collect copayments." *Id.* at 10.

According to Blair, because of "the dearth of case law" concerning copayments, it was reasonable for him to have considered the definition of remuneration in the CMPL, "which excluded non-routine waivers of copayments . . . ." *Id.* at 9. Moreover, he notes that the CMPL definition was ultimately incorporated into the AKS in the copayment waiver exception safe harbor of the AKS, adopted in 2016. *See* 42 C.F.R. § 1001.952(k). *Id.*; *see also* ECF 93 at 9-10. And, "[m]ost significantly," asserts Blair, there is "no case in which the government criminally prosecuted a defendant for violating the AKS by infrequently failing to collect or bill for copayments." ECF 38 at 23; *see also* ECF 93 at 9.

To support his argument, Blair relies, *inter alia*, on the HHS-OIG "Special Fraud Alert," 59 Fed. Reg. 65,372, published in December 1994. *See* ECF 38 at 21. As mentioned earlier, the Special Fraud Alert identified an exception to the prohibition in the AKS on "remuneration" in the context of waiver of copayments. It said, *id.* at 65,375:

> In certain cases, a provider . . . who routinely waives Medicare copayments or deductibles also could be held liable under the Medicare and Medicaid anti-kickback statute. 42 U.S.C. 1320a-7b(b). . . . When providers . . . forgive financial obligations for reasons other than genuine financial hardship of the particular patient, they may be unlawfully inducing that patient to purchase items or services from them.
>
> ***
>
> One important exception to the prohibition against waiving copayments and deductibles is that providers . . . may forgive the copayment in consideration of a particular patient's financial hardship. This hardship exception, however, must not be used routinely; it should be used occasionally to address the special financial needs of a particular patient. Except in such special cases, a good faith effort to collect deductibles and copayments must be made.

In opposition, the government maintains that "whether there was a formal regulation" exempting the non-routine waiver of copayments in 2015 "is irrelevant here" because Blair did not engage in any of the practices that would make him eligible for such an exception. ECF 49 at 37.[9] Moreover, the government insists that the AKS clearly prohibits remuneration, which has a "simple and plain meaning." *Id.* It characterizes that term as "broad," *id.*, noting that the "phrase 'any remuneration' was intended to broaden the reach of the law which previously referred only to kickbacks, bribes, and rebates." *Id.*at 38.

In general, the task of interpreting a statute begins with the text. *Murphy v. Smith*, __

---

[9] At the motions hearings, the government reiterated that the copayment exception was not "on the books in 2015." Rather, it was adopted as a safe harbor in 2016. But, the government has indicated that, if there is evidence that Blair qualifies for the current exception, then "equity would be that the defendant would be entitled to a jury instruction." ECF 85 at 77.

Presumably, the government would not seek to prosecute Blair for something that is not a crime at this point in time.

U.S. ___, 138 S. Ct. 784, 787 (2018) ("As always, we start with the specific statutory language in dispute."). To ascertain a statute's meaning, "'the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'" *Gundy v. United States*, ___ U.S. ___, 139 S. Ct. 2116, 2126 (2019) (quoting *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 666 (2007)). Terms that are not defined are "'interpreted as taking their ordinary, contemporary, common meaning.'" *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227 (2014) (citation omitted); *accord United States v. George*, 946 F.3d 643, 645 (4th Cir. 2020).

The word "remuneration" is not defined in the AKS. Of import here, the "'plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which the language is used, and the broader context of the statute as a whole.'" *Wikimedia Foundation v. National Security Agency*, ___ F.4th ___, 2021 WL 4187840, at *16 (4th Cir. Sept. 15, 2021) (citation omitted). And, a court may employ "structural canons of statutory interpretation" to guide its construction of a statute. *Id.*

Although "remuneration" is not defined in the text of the statute, the statute expressly includes the terms kickback, bribe, and rebate as examples of remuneration. ("Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) . . . .") Under the principle of *noscitur a sociis*, "a word is known by the company it keeps." *Wikimedia Foundation*, 2021 WL 4187840, at *16.[10] A court may also consult a dictionary to discern the "'plain or common meaning'" of an undefined term. *In re Construction Supervision Services, Inc.*, 753 F.3d 124, 128 (4th Cir. 2014) (quoting *Blakely v. Wards*, 738

---

[10] The canon of *ejusdem generis* provides that "general words" that follow "specific words" are "construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Wash. State Dep't of Soc. & Health Servs. v. Guardianship Estate of Keffeler*, 537 U.S. 371, 384 (2003); *see also CSX Transp., Inc. v. Ala. Dept. of Revenue*, 562 U.S. 277, 295 (2011). In the AKS, however, the specific words follow a more general term.

F.3d 607, 611 (4th Cir. 2013) (internal citations omitted)).  Moreover, a court may consider a statute's history and purpose to give effect to its language.  *See Gundy*, 139 S. Ct. at 2126. However, courts may "not resort to legislative history to cloud a statutory text that is clear." *Ratzlaf v. United States*, 510 U.S. 135, 147-48 (1994); *see Raplee v. United States*, 842 F.3d 328, 332 (4th Cir. 2016) ("If the meaning of the text is plain . . . that meaning controls.").

"Remuneration" is not an obscure word, and the absence of a precise definition does not, on its own, establish a violation of the Due Process Clause. *See United States v. Day*, 700 F.3d 713, 725 (4th Cir. 2012) ("It is beyond cavil that a criminal statute need not define explicitly every last term within its text, for as the Supreme Court has repeatedly explained, where "terms used in a statute are undefined, we give them their ordinary meaning."). Looking to the ordinary meaning of the word "remuneration," coupled with the three illustrations included in the text, it is not beyond comprehension. *See United States v. Berkeley HeartLab, Inc.*, No. CV 9:14-230-RMG, 2017 WL 4803911, at *11 (D.S.C. Oct. 23, 2017) ("Although some terms in the AKS are not expressly defined, this does not render the statute unconstitutional."); *United States v. Patel*, 17 F. Supp. 3d 814, 825-30 (N.D. Ill. 2014) (applying principles of statutory interpretation to determine the meaning of the term "refer," as that term is used in the AKS), *aff'd*, 778 F.3d 607 (7th Cir. 2015).

The Oxford English Dictionary defines "remuneration" as "reward, recompense; (now usually) money paid for work or a service; payment, pay." Oxford English Dictionary, oed.com, https://www.oed.com/view/Entry/162337?redirectedFrom=remuneration#eid (last accessed Aug. 15, 2021). Moreover, it includes, but is not limited to, kickbacks, bribes, and rebates.  The AKS also includes the word "any" to modify the term "remuneration." The inclusion of "any" as a modifier indicates that a wide range of conduct may constitute remuneration for purposes of the

statute. *See United States v. Gerber*, 760 F.2d 68, 71 (3rd Cir. 1985) ("The text refers to 'any remuneration.' That includes not only sums for which no actual service was performed but also those amounts for which some professional time was expended. 'Remunerates' is defined as "to pay an equivalent for service.") (quoting Webster Third New International Dictionary (1966)); *Hanlester Network v. Shalala*, 51 F.3d 1390, 1398 (9th Cir. 1995); *Klaczak v. Consol. Med. Transp.*, 458 F. Supp. 2d 622, 678 (N.D. Ill. 2006) ("Remuneration, for purposes of the AKS, is defined broadly, meaning 'anything of value.'").

This broad reading of the term is consistent with the legislative history of the AKS. "Congress's intent in placing the term 'remuneration' in the statute in 1977 was to cover the transferring of *anything* of value in any form or manner whatsoever." Medicare and State Health Care Programs: Fraud and Abuse; OIG Anti-Kickback Provisions, 56 Fed. Reg. 35952-01, 35,958 (July 29, 1991) (emphasis added); *Hanlester Network*, 51 F.3d at 1398 ("The phrase 'any remuneration' was intended to broaden the reach of the law which previously referred only to kickbacks, bribes, and rebates.").

Thus, the legislative history supports a reading of the term "remuneration" in accordance with the dictionary definition, as forbidding any offer or receipt of money or goods in exchange for referrals. *See United States v. Williams*, 218 F. Supp. 3d 730, 740 (N.D. Ill. 2016) ("At its basic level, the statute clearly forbids receiving money or goods, in any way, in exchange for referrals."); *Narco Freedom, Inc.*, 95 F. Supp. 3d at 756-57 (remuneration under AKS is anything of value and not limited to traditional bribes; remuneration may include an "in kind benefit [i.e., subsidized housing] provided at below market value to Medicaid beneficiaries"); *United States ex rel. McDonough v. Symphony Diagnostic Servs.*, 36 F. Supp. 3d 773 (S.D. Ohio 2014) (remuneration can be "anything of value").

Breadth and expansiveness do not equate to vagueness. The term "remuneration" would clearly encompass the conduct in which Blair allegedly engaged.  Moreover, as discussed, *infra*, the fact that the conduct must have occurred with the requisite *mens rea* "overcomes any potential vagueness." *Williams*, 218 F. Supp. 3d at 740.

### D.  Motion To Dismiss Count 29:  To Wit Language (ECF 108)

Defendant moves to dismiss Count 29 on the ground that "the Government's charging 'to wit' language contains a factual allegation that is *not* a criminal violation of the AKS." ECF 108 at 1-2 (emphasis in original).  In particular, he focuses on the portion of the allegation stating that Blair failed to "'bill for *and* collect' copayments."  *Id.* at 2 (emphasis in original).

As noted, Count 29 states, ECF 20 at 17 (italics added):

> Blair submitted, and caused to be submitted, claims for compounded drugs to TRICARE, for which he received reimbursements from TRICARE, and **BLAIR** offered and paid remuneration to TRICARE beneficiaries *to wit*: **BLAIR** failed to bill for and collect copayments and coinsurance from TRICARE beneficiaries related to reimbursements TRICARE paid to his pharmacy.

Blair contends that the AKS does not require "a health care provider to *physically collect* a copayment from a beneficiary . . . ." ECF 108 at 5 (emphasis in original). He adds, *id.* at 2: "[T]he *actus reus* with which the Government seeks to charge Mr. Blair is alleged criminal conduct *solely within the province* of another."  (Emphasis in original).  Because the government alleges that Blair was required to "bill for *and* collect" copayments, and because "failing to collect" is not an AKS violation, Blair insists that the government has charged conduct in Count 29 that is not actually criminal. *Id.* (emphasis added); *see* ECF 140 at 3. Paragraph 35, according to Blair, "recites the same 'failed to collect' language and adds an array of vague allegations…." ECF 140 at 2.

Further, in light of the government's use of this language in the Superseding Indictment, Blair contends that he "has serious concerns about… how the Grand Jury was instructed on the AKS." *Id.* Specifically, Blair suggests that the Grand Jury may have been erroneously instructed "that it is an AKS violation to fail to bill for and collect copayments…," which is "simply not the law." *Id.* at 12. According to Blair, "[w]here a prosecutor provided erroneous or misleading instructions to the grand jury, dismissal of an indictment may be justified." *Id.* at 11. Defendant posits that, considering "the complex and confusing nature of the AKS," he is entitled to review any legal instruction as to Count 29 that was provided to the Grand Jury or, alternatively, the Court should review the instruction *in camera*. ECF 108 at 12-13.[11]

In response, the government argues that paragraph 35 of the Superseding Indictment is "clearly incorporated into Count 29," ECF 129 at 6 n.1.  And, it contends: "The "language in paragraph 35 and in Count 29 plainly identifies that Defendant violated the AKS by knowingly and willfully providing remuneration in the form of cost-sharing waivers, directly and indirectly, overtly and covertly, by failing to bill for and collect copayments as further described in paragraph 35, in order to willfully induce TRICARE-related claims submissions associated with those TRICARE beneficiaries, at Defendant's pharmacy."  *Id.* at 6.  Moreover, the government points to the "well-established principal" [sic] that, when a statute "sets forth, disjunctively, several ways by which an offense may be committed, an indictment correctly and properly charges the different means of the statute conjunctively."  *Id.* (citing *United States v. Vann*, 660 F.3d 771, 774-75 (4th Cir. 2011)).

---

[11] The government has provided the Grand Jury transcripts to the Court for in camera review.  The submissions are extensive.  In an ex parte letter of August 12, 2021, the government pointed to portions of the transcripts pertinent to the issue.  I discerned no basis for relief.

In my view, defendant misapprehends Count 29 in regard to the requirements of an indictment. In that count, as discussed, the government plainly sets out all the elements of a claim under § 1320a-7b(b). That Blair allegedly failed "to bill for and collect copayments" is merely the recitation of how defendant allegedly committed this violation.  The language does not suggest that defendant would have violated the AKS because he billed a patient but was unsuccessful in collecting payment.

At trial, the defendant may demonstrate that he did, in fact, bill for *and* collect copayments, or that he billed but could not collect, and thus his conduct did not constitute remuneration under the AKS.  But, the government's inclusion of the conjunctive does not amount to a ground to dismiss Count 29.

### E.  MOTION TO DISMISS COUNTS 30 TO 33: VOID FOR VAGUENESS (ECF 38)

In ECF 38, pursuant to Fed. R. Crim. P. 12(b)(3)(B), defendant urges the Court to dismiss Counts 30 to 33, which charge violations of the AKS.  He claims that the AKS, 42 U.S.C. § 1320a-7b(b)(2)(A), is impermissibly vague and does not provide fair warning of what constitutes illegal conduct. ECF 38 at 1, 3.[12]   Again, he relies on regulatory guidance and judicial construction of the statute.  *Id.* at 3.

Counts 30 to 33 allege that Blair entered into an agency agreement with Atlas by which he agreed to pay Atlas a volume-based commission of 50% for each successfully reimbursed prescription claim that Atlas referred to the Pharmacy. In 2015, Blair allegedly paid Atlas over $1.5 million dollar in unlawful remuneration by compensating Atlas for marketing services. ECF 49 at 26.  This included Blair's provision of his own prescription forms to "induce" Atlas to

---

[12] The government suggests that in regard to ECF 38, Blair has made an "as applied" challenge.  *See* ECF 49 at 21, 25, and 25 n.9.

"refer individuals and prescriptions" to the Pharmacy. ECF 20 at 17-18. The alleged "remuneration" occurred on four dates over three months (March 17 to May 28 of 2015), not long after the Pharmacy had become operational. *Id.* ¶ 2.

Based on the charges in the Superseding Indictment, Blair argues that he "can only assume that it is the *mere payment* of compensation to an 'independent sales marketer[]' that the government contends constitutes illegal remuneration intended  to 'induce' referrals and prescriptions to the Pharmacy in violation of the AKS." ECF 38 at 9 (emphasis in original). Yet, according to Blair, "the relevant contemporaneous authorities [*i.e.*, judicial decisions and agency guidance] suggested that Mr. Blair's alleged acts were not necessarily prohibited by – or, in fact, were permissible under – the AKS." ECF 64 at 2.

Blair observes that the AKS has "drawn a distinction" between the lawful practice of providers hiring employees for marketing versus the unlawful practice of hiring independent contractors for "the exact same conduct."  ECF 38 at 12, 13.  Blair maintains that, at the time of the alleged offense, the AKS was too vague to provide proper notice as to when such an arrangement would be unlawful.  *Id.* at 13.

Defendant relies, *inter alia*, on a 1998 OIG advisory opinion to support his argument. *See* Re: Advisory Request No. 98-10, 1998 WL 35287765 (Sept. 8, 1998) ("OIG Opinion 98-10"). OIG Opinion 98-10 was issued in response to a request from an independent sales representative who was retained by a manufacturer of disposable medical supplies. *Id.* at *1. The salesman negotiated contracts with potential purchasers on behalf of the manufacturer; the customers were hospital systems whose patients would use the manufacturer's products. *Id.* The manufacturer paid the salesman a monthly commission based on amounts bought by the purchasers. *Id.*

36

In its analysis, the OIG explained that "any compensation arrangement between a Seller and an independent sales agent for the purpose of selling health care items or services that are directly or indirectly reimbursable by a federal health care program potentially implicates the anti-kickback statute, irrespective of the methodology used to compensate the agent," because the "arrangement provides multiple opportunities and financial incentives" for abuse of the federal health care program. *Id.* at *3. Further, "because such agents are independent contractors, they are less accountable to the Seller than an employee." *Id.*

According to the OIG, it had "identified several characteristics of arrangements among Sellers, sales agents, and purchasers that appear to be associated with an increased potential for program abuse," including but not limited to compensation based on sales volume; direct contact between the salesman and physicians in a position to order items or services that are then paid for by a federal health care program; direct contact between the salesman and beneficiaries; use of sales agents who are health care professionals or persons in a similar position to exert undue influence on purchasers or patients; or that the items or services marketed are separately reimbursable by a federal health care program. *Id.* at *3-*4.

The OIG noted that its concern with independent sales agency relationships "can be addressed by structuring a sales agency arrangement to fit into a safe harbor." *Id.* at *3. But, "safe harbor protection is only afforded to those arrangements that precisely meet all of the conditions set forth in the safe harbor." *Id.* In any event, "in all cases the statute is not violated unless the parties have the requisite intent to induce referrals." *Id.*

The applicable safe harbor regulation—the personal services and management contracts safe harbor, 42 C.F.R. § 1001.952(d)—did not apply to the arrangement at issue because "the nature of the services provided under the Contract precluded an exact specification of the

schedule for the performance of Sales Agent A's services and a determination of Sales Agent A's total aggregate compensation in advance, as required by the regulation." *Id.* at *3. Nonetheless, the OIG concluded that the independent sales representative would not be subject to sanction under the AKS because the costs of the items being sold reduced the amount of potential profit and thus created little incentive for abuse. *Id.*

Blair also cites an OIG Fact Sheet, Notification of Proposed Rulemaking OIG-0936-AAIOP, October 2019.  ECF 38 at 16.  It states, in part, that "failure to fit in a safe harbor does not mean that an arrangement violates the anti-kickback statute.  Arrangements that do not fit in a safe harbor are analyzed on a case by case basis, including whether the parties had the requisite criminal intent."  *Id.*

Based on such guidance, defendant asserts that the OIG has made it clear that there is some conduct that may fall outside the safe harbors, yet not amount to a violation of the AKS. ECF 38 at 16.  In Blair's view, HHS "has not described that conduct with objectively discernable standards, leaving the government free to prosecute a defendant (like Mr. Blair) who had no way to determine in 2015 what was legal and what was not." *Id.* Further, according to defendant, "judicial decisions have added to the ambiguity and confusion in interpreting the AKS in conjunction" with the employee and agent safe harbors. ECF 38 at 16-18.

In its opposition, the government observes that many courts have rejected constitutional challenges to the AKS. ECF 49 at 21-25. Moreover, the government insists that "the AKS provides clear standards by which a person can determine whether they are violating the statute." *Id.* at 27.

In his reply (ECF 64), defendant accuses the government of including "factual embellishments and analytical contortions" in its opposition as a "desperate attempt to salvage an

unprecedented prosecution." *Id.* at 1-2.  In addition, he contends that the cases cited by the government are inapposite because they do not concern the circumstances alleged to be violations in this case.  In his view, the "fact that the AKS was not impermissibly vague as to other defendants' conduct, in other circumstances, at other times, certainly does not mean that the AKS is not, or could never be, impermissibly vague in every circumstance." *Id.* at 3.

As I see it, the AKS provision at issue, read in conjunction with the two relevant safe harbor provisions, provides a person of ordinary intelligence with fair notice of what is prohibited. At its basic level, the statute clearly forbids payment or receipt of money or goods, in any way, in exchange for referrals of patients to providers of services and goods.

In the preamble accompanying the January 23, 1989 Proposed Rule as to the Employee Safe Harbor regulation, the OIG rejected the view of "'many commenters' [who] wanted to expand the safe harbor 'to apply to independent contractors and on a commission basis'. . . . ." *United States v. Mallory*, 988 F.3d 730, 738 (4th Cir. 2021).  HHS explained, 54 Fed. Reg. 3088, 3093 (Jan. 23, 1989);

> In response to the October 21, 1987, request for comments [on the proposed AKS safe harbors], many commentators suggested that we broaden the [employee] exemption to apply to independent contractors paid on a commission basis. We have declined to adopt this approach because we are aware of many examples of abusive practices by sales personnel who are paid as independent contractors and who are not under appropriate supervision. We believe that if individuals and entities desire to pay a salesperson on the basis of the amount of business they generate, then to be exempt from [AKS] civil or criminal prosecution, they should make these salespersons employees where they can and should exert appropriate supervision for the individual's acts.

In 1991, after "the Department finalized its safe harbor rules, it again refused to apply the commissions safe harbor to independent contractors 'because of the existence of widespread abusive practices by salespersons who are independent contractors.'" *Mallory*, 988 F.3d at 738 (quoting 56 Fed. Reg. 35,952 (July 29, 1991)). In the preamble accompanying the 1991 Final

Rule, the OIG reaffirmed the purpose of the AKS, stating, 56 Fed. Reg. 35,952 at 35,974: "The [AKS] on its face prohibits the offering or acceptance of remuneration, *inter alia*, for the purposes of 'arranging for or recommending the purchasing, leasing, or ordering any…service or item' payable under Medicare or Medicaid. Thus, we believe that many marketing and advertising activities may involve at least technical violations of the AKS."

Further, with respect to a safe harbor for commission marketing arrangements with independent contractors, the OIG explained that "commission sales agreements must meet the conditions of the safe harbor provisions governing personal services and management contracts." *Id.* at 35,974. The OIG said: "We continue to reject [safe harbor protection for commission sales arrangements with independent contractors] who are not under appropriate supervision and control." *Id.* at 35,981.

Moreover, case law has clarified the meaning of the provision and supports the government's construction. Indeed, the Fourth Circuit recently observed that the "Department of Health and Human Services has expressly recognized that [the employee] safe harbor does not cover independent contractors." *Mallory*, 988 F.3d at 738. Further, the *Mallory* Court observed that "federal appellate courts have frequently, and indeed invariably, upheld Anti-Kickback Statute violations based on commission payments to third parties." *Id.* (citing *United States v. St. Junius*, 739 F.3d 193, 209–10 (5th Cir. 2013); *Vernon*, 723 F.3d at 1256–58; *United States v. Polin*, 194 F.3d 863, 864–66 (7th Cir. 1999)).

For example, in *Nursing Home Consultants, Inc. v. Quantum Health Services, Inc.*, 926 F. Supp. 835 (E.D. Ark. 1996), *aff'd*, 112 F.3d 513 (8th Cir. 1997), an independent marketing agent entered into a marketing agreement with a supplier of medical equipment to help the supplier increase its sales by identifying the Medicare beneficiaries who needed the medical

supplies that Quantum sold. There is no indication that the agent had any ability to influence improperly anyone's decision to order or purchase the supplier's products. Nonetheless, the court concluded that the marketing agreement violated the AKS. It reasoned, *id.* at 843: "No matter how you slice it, the Marketing Agreement violates [the AKS], and accordingly the subject matter of that agreement (a referral scheme for the provision of Medicare-covered supplies) is prohibited by that statute, as is the performance of that agreement." *See also Zimmer, Inc. v. Nu Tech Medical, Inc.*, 54 Supp. 2d 850 (N.D. Ind. 1999).

As noted earlier, in assessing vagueness, a business can be expected to consult relevant authority to obtain clarification, including "resort to an administrative process." *Village of Hoffman Estates, Inc.*, 455 U.S. at 498. Moreover, even if a statute is arguably ambiguous, "a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice" to a defendant. *Id.* at 499; *see Posters 'N' Things, Ltd. v. United States*, 511 U.S. 513, 526 (1994); *Lindh*, 212 F. Supp. at 573.

Indeed, "[m]yriad courts have previously considered vagueness challenges to the [AKS] and rejected them, largely on the basis that the requirement of willfulness—knowledge that the act is unlawful—mitigates any vagueness concerns." *Williams*, 218 F. Supp. 3d at 740-41. Here, the statute explicitly includes a scienter requirement; to violate the AKS, the defendant must "knowingly and willfully" offer or pay an unlawful remuneration.[13] And, the "strong scienter requirement overcomes any potential vagueness in the statute because a person who would otherwise be ensnared without notice does not violate the statute." *Id.* at 740. *See, e.g.*, *United States v. Starks*, 157 F.3d 833, 840 (11th Cir. 1998) (stating that "although the statute does

---

[13] The parties acknowledge that "knowingly and willfully" does not require the defendant to have actual knowledge of the AKS or specific intent to violate it. ECF 64 at 12; ECF 49 at 25; *see* 42 U.S.C. § 1320a-7b(h).

provide for criminal penalties, it requires 'knowing and willful' conduct, a *mens rea* standard that mitigates any otherwise inherent vagueness in the Anti–Kickback statute's provisions"); *Hanlester Network*, 51 F.3d at 1398 ("These factors militate against finding the anti-kickback statute void for vagueness. The statute regulates only economic conduct. It chills no constitutional rights. While the statute allows for criminal penalties, it requires 'knowing and willful' conduct, a requirement which mitigates any vagueness in the statute."); *United States v. Bay State Ambulance & Hosp. Rental Serv.*, 874 F.2d 20, 32 (1st Cir. 1989) ("When the Medicare Fraud statute is analyzed under the applicable standards, and in light of the fact that inducement is the gravamen of the offense, the statute passes constitutional muster even though the criminal nature of the statute requires 'a relatively strict test' for constitutionality.").

I am not aware of any decision by a federal court finding the AKS void for vagueness. *See, e.g., United States v. Nagelvoort*, 856 F.3d 1117, 1129-30 (7th Cir. 2017); *United States v. Robinson*, 505 F. App'x 385, 387 (5th Cir. 2013) (per curiam); *United States v. LaHue*, 261 F.3d 993, 1008 (10th Cir. 2001); *Bay State Ambulance.*, 874 F.2d at 33; *Starks*, 157 F.3d at 840; *United States v. Holland*, No. 1:17-CR-00234-AT-CMS, 2018 WL 8838854, at *5 (N.D. Ga. June 1, 2018), *report and recommendation adopted*, 396 F. Supp. 3d 1210 (N.D. Ga. 2019); *United States v. Mathur*, No. 2:11–CR–00312–MMD, 2012 WL 4742833, at *11 (D. Nev. Sept. 13, 2012), *report and recommendation adopted*, No. 2:11–CR–00312–MMD, 2012 WL 4711960 (D. Nev. Oct. 3, 2012); *United States v. Krikheli*, No. 08–CR–528 (SLT), 2009 WL 4110306, at *3 (E.D.N.Y. Nov. 24, 2009); *United States v. Vaghela*, 970 F. Supp. 1018, 1022 (M.D. Fla. 1997); *United States v. Neufeld*, 908 F. Supp. 491 (S.D. Ohio 1995).

The cases cited by Blair to support his argument that the statute is vague are inapposite or distinguishable. ECF 38 at 16-18; *see*, *e.g.*, *Vernon*, 723 F.3d at 1256; *United States v. Miles*, 360 F.3d 472, 480 (5th Cir. 2004); *Polin*, 194 F.3d at 866.

In *Polin*, 194 F.3d 863, for example, the Seventh Circuit affirmed the AKS convictions of two defendants who were employees of a pacemaker monitoring service. There, the defendants made payments to an independent sales representative based on the number of patients referred by the representative to the pacemaker service. *Id.* at 864-65, 867. The evidence showed that the representative was responsible for selecting a pacemaker monitoring service as long as the doctor determined that the services were necessary. *Id.* at 865. In other words, the representative decided where to send the doctor's business.  Thus, the court upheld the convictions of the defendants who paid the representative, because the representative's judgment was shown to have been influenced by the payments received from the defendants. *Id.*; *see also Vernon*, 723 F.3d 1234 (upholding conviction on same grounds).

In contrast, in *Miles*, 360 F.3d 472, the Fifth Circuit reversed the convictions of defendants charged with paying healthcare kickbacks in violation of the AKS. In that case, the defendants paid a public relations firm to distribute marketing literature, business cards, and baked goods to doctors. *Id.* at 475, 480. If a doctor who received the marketing material referred a patient to the defendants' company, then the defendants paid the marketing firm $300. *Id.* at 480. The court concluded that the defendants' payments to the firm were not made to induce referrals because there was no evidence that the firm "had any authority to act on behalf of a physician in selecting the particular home health care provider." *Id.*

However, in *Shoemaker*, 746 F.3d 614, the Fifth Circuit revisited its decision in *Miles*. The *Shoemaker* Court affirmed a conviction in which the defendants entered into a kickback

conspiracy with intent to induce recruiters to refer Medicare beneficiaries to the defendants' company.

The court summarized the rule that emerged from *Miles*: "Where advertising facilitates an independent decision to purchase a healthcare good or service, and where there is no evidence that the advertiser 'unduly influence[s]' or [act[s] on behalf of' the purchaser, the mere fact that the good or service provider compensates the advertiser following each purchase is insufficient to support the provider's conviction for making a payment 'to refer an individual to a person' under 42 U.S.C. § 1320a–7b(b)(2)(A)." *Shoemaker*, 746 F.3d at 628 (quoting *Miles*, 360 F.3d at 480) (alterations in *Shoemaker*). But, the court also explained that "*Miles* drew a distinction not between types of *payees*—'relevant decisionmakers' and others—but between a *payer*'s intent to induce 'referrals,' which is illegal, and the intent to compensate advertisers, which is permissible." *Id.* at 628 (emphasis in original); *see also United States v. Gibson*, 875 F.3d 179, 189 (5th Cir. 2017) (finding that it was enough that government alleged that a defendant made payments to a recruiter, because "[t]he statute criminalizes payments made to 'any person' with the requisite intent").

Thus, these cases support the conclusion that the AKS prohibits the knowing and willful compensation of individuals for the purpose of inducing referrals. And, that is the conduct charged in Counts 30 to 33 of the Superseding Indictment.  That is, Blair is charged with knowingly and willfully compensating Atlas for the purpose of inducing Atlas to refer TRICARE business to the Pharmacy.

**F.   MOTION TO DISMISS COUNTS 30 TO 33 AS UNCONSTITUTIONAL:   THE AKS IS OVERBROAD AND VIOLATES THE FIRST AMENDMENT AND THE EQUAL PROTECTION CLAUSE (ECF 39)**

Pursuant to Fed. R. Crim. P. 12(b)(3)(B)(v), defendant seeks to dismiss Counts 30 to 33, claiming the relevant AKS provisions are unconstitutional, both facially and as applied to him. In particular, Blair first argues that the "AKS is an overbroad speaker-based regulation that violates the First Amendment's protections for commercial speech . . . ." *Id.* at 1.   Second, he asserts an equal protection claim, arguing that the AKS "discriminates between persons exercising their fundamental free speech rights without a compelling reason or tailored means, managing to be both overbroad and underinclusive given the Government's stated justification." *Id.*

### 1.   Overbreadth; the First Amendment

Generally, a law is not constitutional if it is "substantially overbroad."   *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973).   In an overbreadth challenge to a statute, "a defendant whose conduct clearly falls within the law and may be constitutionally prohibited can nonetheless have the law declared facially invalid to protect the rights of others. . . ." *City of Chicago v. Morales*, 527 U.S. 41, 73 (1999) (Breyer, J., concurring); *see Bd. of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 483 (1989).

A facial challenge presents "a claim that the statute is unconstitutional *not* as it applies to [the defendant's] own conduct, but rather 'on its face,' as it applies to the population generally." *Miselis*, 972 F.3d at 530 (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008)) (emphasis in *Miselis*).   Ordinarily, a facial challenge requires a showing that "no set of circumstances exists under which the Act would be valid . . . ." *Wash. State Grange*, 552 U.S. at 449 (cleaned up), or that the statute "lacks any plainly legitimate sweep."   *United*

*States v. Stevens*, 559 U.S. 460, 472 (2010) (cleaned up); *see Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor and City Council of Balt.,* 721 F.3d 264, 282 (4th Cir. 2013) (en banc). But, such claims are "'disfavored.'" *Miselis*, 972 F.3d at 530 (citation omitted). In contrast, an as-applied challenge is "based on a developed factual record and the application of a statute to a specific person[.]" *Richmond Med. Ctr. for Women v. Herring*, 570 F.3d 165, 172 (4th Cir. 2009) (en banc).

In the First Amendment context, "the fear of chilling protected expression 'has led courts to entertain facial challenges based merely on hypothetical applications of the law to nonparties.'" *Miselis*, 972 F.3d at 530 (citation omitted). Even if the law is constitutional as applied to a party, the overbreadth doctrine permits a party to lodge a facial First Amendment challenge by "'describing a substantial number of instances of arguable overbreadth of the contested law.'. . ." *Miselis*, 972 F.3d at 530 (citation omitted).

Pursuant to the overbreadth doctrine, "a statute is facially invalid if it prohibits a substantial amount of protected speech." *Williams*, 553 U.S. at 292. The Supreme Court has recognized "that unconstitutional restriction of expression may deter protected speech by parties not before the court and thereby escape judicial review." *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*, 447 U.S. 557, 565 n.8 (1980).

However, the "overbreadth doctrine is not casually employed. 'Because of the wide-reaching effects of striking down a statute on its face at the request of one whose own conduct may be punished despite the First Amendment, [the Court] ha[s] recognized that the overbreadth doctrine is 'strong medicine' and ha[s] employed it with hesitation, and then 'only as a last resort.'" *Los Angeles Police Dept. v. United Reporting*, 528 U.S. 32, 39 (1999) (quoting *New York v. Ferber*, 458 U.S. 747, 769 (1982)). The Supreme Court has "vigorously enforced the

requirement that a statute's overbreadth be substantial ... relative to the statute's plainly legitimate sweep," *Williams*, 553 U.S. at 292, and has placed "the burden of demonstrating ... substantial overbreadth" on the claimant. *Virginia v. Hicks*, 539 U.S. 113, 122 (2003); s*ee N.Y. State Club Ass'n v. City of New York*, 487 U.S. 1, 14 (1988) ("To succeed in its [facial-overbreadth] challenge, [the plaintiff] must demonstrate from the text of [the statute] and from actual fact that a substantial number of instances exist in which the Law cannot be applied constitutionally."). Notably, the overbreadth doctrine "'attenuates as the otherwise unprotected behavior that [a statute] forbids ... moves from "pure speech" toward conduct.'" *Hicks*, 539 U.S. at 124 (citation omitted).

In deciding whether a federal statute is overbroad, the court must construe the statute to avoid constitutional problems if the statute is subject to a limiting construction. *Ferber*, 458 U.S. at 769; *see Miselis*, 972 F.3d at 531. Additionally, even if a statute is overbroad and not subject to a narrowing construction, the entire law should not be stricken as invalid on its face if the "unconstitutional portion" is severable from the remainder of the statute.  *Ferber*, 458 U.S. at 769 n.24 (citing *United States v. Thirty–Seven Photographs*, 402 U.S. 363 (1971)); *see Miselis*, 972 F.3d at 541-42 (concluding that portions of the Anti-Riot Act are overbroad but severable, and invalidating only the text that is overbroad).  Rather, if the portion that is substantially overbroad is severable, only the unconstitutional portion should be declared invalid. *Id.*

The Supreme Court has been reluctant to strike down a statute on its face where there were several situations where it might be validly applied. *Parker v. Levy*, 417 U.S. 733, 760 (1974). Thus, even if there are marginal applications in which a statute would infringe on speech protected by the First Amendment, the court should not declare the statute facially invalid if it also covers a range of easily identifiable conduct that may be constitutionally proscribed. *Id.*

As noted, defendant relies on the First Amendment's protection of commercial speech to support his claim of unconstitutionality. The Supreme Court defines commercial speech, which is protected under the First Amendment, as "expression related solely to the economic interests of the speaker and its audience." *Central Hudson Gas*, 447 U.S. at 561. "Speech in aid of pharmaceutical marketing ... is a form of expression protected by" the First Amendment. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011). But, the Supreme Court has consistently determined that the Constitution "accords less protection to commercial speech than to other constitutionally safeguarded forms of expression." *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 64–65 (1983); *see, e.g.*, *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 250 (2010) (subjecting regulation of commercial speech to intermediate scrutiny); *Bd. of Trustees of State Univ. of N.Y.*, 492 U.S. at 474 (same). Further, "commercial speech, the offspring of economic self-interest, is a hardy breed of expression that is not 'particularly susceptible to being crushed by overbroad regulation.'" *Central Hudson Gas*, 447 U.S. at 564 n.6 (quoting *Bates v. State Bar of Arizona*, 433 U.S. 350, 381 (1977)).

Nevertheless, "a law aimed at regulating businesses can be subject to First Amendment scrutiny even though it does not directly regulate speech." *Billups v. City of Charleston, S.C.*, 961 F.3d 673, 683 (4th Cir. 2020); *see Holder*, 561 U.S. at 28 ("The law here may be described as directed at conduct ... but as applied to plaintiffs the conduct triggering coverage under the statute consists of communicating a message."); *Am. Entertainers, L.L.C. v. City of Rocky Mount, N.C.*, 888 F.3d 707, 715 (4th Cir. 2018) (explaining that the First Amendment applies even if the challenged regulation "was adopted for a purpose unrelated to the suppression of expression — e.g., to regulate conduct, or the time, place, and manner in which expression may

48

take place"). But, "the First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech." *See Sorrell*, 564 U.S. at 567.

And, for commercial speech to be protected under the First Amendment, the speech, "as a threshold matter...must not be misleading and must concern lawful activity." *United States v. Caronia*, 703 F.3d 149, 164 (2d Cir. 2012) (citing *Central Hudson Gas*, 447 U.S. at 566). Notably, speech and writing "used as an integral part of conduct in violation of the valid criminal statute" is not protected by the First Amendment. *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 498 (1949); *see United States v. Stevens*, 559 U.S. 460, 471 (2010). "[I]t has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written or printed." *Giboney*, 336 U.S. at 502 (citing *Fox v. Washington*, 236 U.S. 273, 277 (1915); *see Chaplinsky v. New Hampshire*, 315 U.S. 568 (1942)). Proscribing bribery, for example, does not infringe on any First Amendment rights because it neither chills, nor is intended to chill, constitutionally-protected activities. *United States v. Dischner*, 974 F.2d 1502, 1511–12 (1992), *overruled on other grounds*, *United States v. Morales*, 108 F.3d 1031 (9th Cir. 1997) (en banc). Similarly, laws that focus on criminal conduct, such as perjury, tax or administrative fraud, or impersonating a law enforcement officer, are not protected under the First Amendment even though they can be violated by means of speech. *United States v. Alvarez*, 617 F.3d 1198, 1213 (9th Cir. 2010).

## 2.  Defendant's Facial Challenge

In the First Amendment context, the Supreme Court has recognized that a law may be held invalid as overbroad if "'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *Stevens*, 559 U.S. at 473 (quoting

*Washington State Grange*, 552 U.S. at 449 n. 6) (cleaned up). The first step in overbreadth analysis is to construe the challenged statute because "it is impossible to determine whether a statute reaches too far without first knowing what the statute covers." *Williams*, 553 U.S. at 293.

Blair argues that Counts 30 to 33 "infringe on [protected] speech," criminalizing speech by "commissioned—based independent contractors where the same speech by an employee . . . is deemed lawful." ECF 39 at 15. He asserts that, on its face, the AKS, together with the Employee and Agent Safe Harbors, "impermissibly sweep in a significant amount of protected speech, particularly marketing and solicitation on behalf of pharmacies." ECF 39 at 15-16. According to Blair, these restrictions "are plainly speaker-based because they apply to independent contractors and their principals, but not to employees and their employers who engage in the same speech." *Id.* (citing 42 C.F.R. § 1001.952(i)).

As discussed, the AKS prohibits a person from knowingly and willfully offering or paying any remuneration (including any kickback, bribe or rebate) directly or indirectly, overtly or covertly, in cash or in kind to induce a person to refer an individual to a person for the furnishing or arranging of the furnishing for any item or service for which payment may be made in whole or in part under a federal health care program. The 1977 amendments to the AKS demonstrate the concern of Congress with regard to fraud and abuse in the Medicare and Medicaid systems and its goal of strengthening the government's ability to prosecute such fraud and abuse. *See Hanlester*, 51 F.3d at 1396. For example, "Congress introduced the broad term 'remuneration' in the 1977 amendment of the statute to clarify the types of financial arrangements and conduct to be classified as illegal under Medicare and Medicaid." *Id.* at 1398. The phrase "any remuneration" was intended to broaden the law which had earlier only referred to kickbacks, bribes, and rebates. *Id.*

In 1987, Congress again amended the fraud and abuse prohibitions of the AKS in response to concerns that the AKS could prohibit certain types of beneficial business relationships. At that point, the HHS OIG promulgated specific "safe harbors" for various payment and business practices that could potentially implicate the AKS. *See* 42 C.F.R. § 1001.952. As relevant here, the statute creates safe harbors for (a) employees, 42 C.F.R. § 1001.952(i), and (b) agents or independent contractors, pursuant to personal services agreements. *Id.* § 1001.952(d). These safe harbors ensure that certain relationships and conduct, although they may fall within the purview of the statute, will not be prosecuted as criminal offenses under the AKS.

In light of the statute's plainly legitimate goal of combating health care fraud, and the regulatory safe harbors that limit its purview, I am satisfied that a "substantial number of" AKS applications are not unconstitutional, "judged in relation to the statute's plainly legitimate" goal of combatting health care fraud. *Stevens*, 559 U.S. at 471; *see Mathur*, 2012 WL 4742833, at *4 (finding the AKS is not facially overbroad after considering the statute's purpose and the regulatory safe harbors).

Moreover, as discussed below, the AKS does not regulate speech protected by the First Amendment. *See Hanlester*, 51 F.3d at 1398. Rather, it regulates the conduct of paying or offering to pay remuneration in return for referrals. *Id.* (stating "[t]he statute regulates only economic conduct"). Accordingly, the AKS is not facially overbroad.

### 3. Defendant's As-Applied Challenge

Defendant lodges a First Amendment as-applied challenge. ECF 39 at 31.  He argues that the government "uses the AKS to criminalize Mr. Blair's election to use a commissioned independent contractor – rather than an employee – to market his start up pharmacy.[l]" ECF 39 at

31. In his view, this restriction is speaker based because it applies only to independent contractors, not employees or other individuals. And, the restriction is content-based because it only restricts marketing speech. He insists that his "alleged acts are not like any other federal AKS prosecution…that has been reported." ECF 65 at 14-15.

Further, Blair maintains that the government ignores "significant intervening precedent." ECF 65 at 3.  He relies, *inter alia*, on *Sorrell*, 564 U.S. 552, to support his argument that the marketing of pharmaceutical products is protected activity.

In *Sorrell*, to address certain practices through which pharmaceutical manufacturers promote their drugs, known as "data mining" and "detailing," Vermont enacted a statute providing that, absent the prescriber's consent, prescriber-identifying information could not be sold by pharmacies, disclosed by pharmacies for marketing purposes, or used for marketing by pharmaceutical manufacturers. *Id.* at 558-59. In striking down the law, the Supreme Court determined that the law was subject to "heightened scrutiny" as a speaker-based restriction, and that it unconstitutionally disfavored not only certain content, but also specific speakers, namely pharmaceutical manufacturers. *Id.* at 564, 571. In concluding that the statute could not survive heightened scrutiny, the Court rejected the state's argument that the law regulated mere "conduct," not speech, reasoning that "the creation and dissemination of information are speech within the meaning of the First Amendment." *Id.* at 570.

*Sorrell* supports the conclusion that disseminating and marketing pharmaceutical information is protected activity. However, Blair has mischaracterized the government's theory of liability. Defendant describes the government's theory of liability as a blanket restriction on the use of all independent contractors. But, in Counts 30 to 33, the government contends that defendant knowingly and willfully offered to pay and paid remuneration through commission-

based payments to induce referrals to the Pharmacy.  The alleged conduct is subject to penalty under the AKS to the extent it involved the improper inducement of a contractor to steer TRICARE business to his Pharmacy.

The First Amendment protects speech, not "mere conduct.[1]"  *Miselis*, 972 F.3d 578 at 535.  Although expressive conduct may fall under the protection of the First Amendment, *id.* at 535 n.8, this case is not about expressive conduct or speech.  It is about restrictions on conduct—payments to an independent contractor to induce referrals.  The charges target speech only insofar as the speech constitutes an offer to pay kickbacks in return for referrals. But, speech "used as an integral part of conduct in violation of the valid criminal statute" is not protected by the First Amendment. *Giboney*, 336 U.S. at 498; *see Central Hudson Gas*, 447 U.S. at 566 ("[F]or commercial speech to come within [the First Amendment], it at least must concern lawful activity....").

Based on the allegations in the Superseding Indictment, the prosecution is not foreclosed here by the First Amendment.  In *United States v. Balotin*, No. 3:19-CR-191-MMH-JBT, 2021 WL 2351738, at *5 (M.D. Fla. June 9, 2021), the Court explained: "As alleged in the Indictment, [defendant's] speech was not merely salesmanship; he is alleged to have engaged in unlawful activities by paying TRICARE beneficiaries kickbacks in exchange for their participation in the scheme to defraud TRICARE and recruiting doctors to write fraudulent prescriptions. Thus, based on the face of the Indictment, [defendant's] speech would not be protected under the First Amendment because it concerned unlawful activity." (citing *Sorrell*, 564 U.S. 552; *Central Hudson Gas*, 447 U.S. at 566); *see Berkeley HeartLab*, 2017 WL 4803911, at *12 (rejecting identical First Amendment challenge because government was only targeting speech that is used as a part of conduct in violation of the AKS, which is not protected by the First Amendment).

Moreover, the statute at issue in *Sorrell* involved a civil statute that specifically proscribed the dissemination of information for the purposes of advertising—a form of commercial speech. In contrast, the AKS, including as it is applied to Blair, does not specifically restrict Blair's communications. Rather, as noted, it targets the conduct of providing remuneration to independent contractors with the intent to induce referrals, not the statements related to those payments.

Defendant has cited no cases in which a court has found that an AKS prosecution violates the First Amendment, even after *Sorrell*.   To the contrary, other courts considering First Amendment challenges to alleged AKS violations, including cases that were decided after the Court's ruling in *Sorrell*, have uniformly rejected such challenges. *See, e.g., United States v. Regeneron Pharms., Inc.*, No. CV 20-11217-FDS, 2020 WL 7130004, at *16 (D. Mass. Dec. 4, 2020) ("A pharmaceutical manufacturer has no First Amendment right to pay kickbacks intended to induce prescriptions and purchases of its drugs. Unlike the cases cited by defendant, which involved the imposition of criminal or civil penalties for speech and information-sharing itself, this complaint only alleges that defendant's donations, not its communications, were illegal."); *Mathur*, 2012 WL 4742833, at *4 ("Courts have uniformly rejected the notion that bribery is protected speech ... The Indictment alleges Mathur made payments ranging from $1,500 to $5,400 in exchange for patient referrals. The Anti–Kickback Act criminalizes corrupt payments in exchange for referrals, not statements related to those payments."); *see also U.S. ex rel. Nevyas v. Allergan, Inc.*, No. 09-432, 2015 WL 3429381, at *1 n.1 (E.D. Pa. May 26, 2015) ("Relators allege a scheme by Allergan to induce physicians to write prescriptions for Allergan products in violation of the AKS; it is Allergan's conduct in providing 'illegal remuneration' to physicians and optometrists and not its speech that is at issue in the AKS claim."); *United States*

*ex rel. Bergman v. Abbot Lab'ys*, 995 F. Supp. 2d 357, 376 (E.D. Pa. 2014) ("Because Relator

has alleged that Defendant's marketing of TriCor included false and misleading statements…this

Court finds that Abbott's commercial speech does not warrant First Amendment protection at this

stage.").

Blair's equal protection claim is grounded in the same argument as his First Amendment

claim.  For the same reasons, it also lacks merit.

### G.  MOTION TO STRIKE (ECF 40)

Pursuant to Fed. R. Crim. P. 7(d), Blair seeks to strike: (1) certain allegations in

paragraph 35 of the Superseding Indictment concerning copayment and/or coinsurance collection

practices with respect to private insurance companies; and (2) allegations concerning certain

"loss amounts" listed in paragraphs 25-27 and 34 of the Superseding Indictment. ECF 40.

Paragraph 35 of the Superseding Indictment states:

> It was further part of the scheme to defraud that, in a continuing course of conduct
> starting in approximately September 2014 and continuing through on or about
> August 30, 2015, **BLAIR** knowingly failed to bill for and collect copayments and
> coinsurance from beneficiaries of health care benefit programs. Blair entered into
> contractual agreements with health care benefit programs, such as TRICARE,
> BCBS and CVS/Caremark, which required Blair to collect copayments and
> coinsurance. However, **BLAIR** failed to collect the required copayments and
> coinsurance, and he would sometimes pay the copayment and coinsurance for the
> beneficiary, without the knowledge of the beneficiary. **BLAIR** engaged in this
> conduct for the purpose of: inducing prescriptions to be filled at his pharmacy;
> concealing the cost of repeated copayments and coinsurance; reducing patient
> complaints regarding copayments and coinsurance; and reducing patient visibility
> and complaints regarding his pharmacy's dispensing process and the high cost of
> his compounded drugs.

The paragraphs in the Superseding Indictment with allegations concerning certain "loss

amounts" state, in relevant part, ECF 20 at 6-9 (underline added to indicate the portions that

Blair seeks to strike):

25. … **BLAIR** received reimbursement from health care benefit programs related to these invalid and misbranded claims into his Bank of America Account # 9799 <u>in the approximate amount of $2,987,000.00</u>.

26. … **BLAIR** received reimbursement from health care benefit program related to these invalid, misbranded and overbilled claims into his Bank of America Account # 9799 <u>in the approximate amount of $1,599,000.00</u>.

27. … **BLAIR** received reimbursement from health care benefit programs related to these invalid, overbilled and under filled compound drugs into his Bank of America Account # 9799 <u>in the approximate amount of $5,776,000.00</u>.

34. … **BLAIR** received reimbursement from TRICARE related to this altered prescription form and Vitamin Formula #2 into his Bank of America Account # 9799 <u>in the approximate amount of $364,000.00</u>.

As to the loss amounts, the government agreed at the motions hearing to strike the loss amounts from paragraphs 25, 26, 27, and 34. Therefore, as to those paragraphs, I need not recount the parties' arguments. Instead, I shall deny that portion of ECF 40 as moot.

As to paragraph 35, Blair invokes Rule 7(d) of the Federal Rules of Criminal Procedure. It grants discretion to the trial court to "strike surplusage from the indictment." However, a court should grant a motion to strike surplusage "'only if it is clear that the allegations are not relevant to the charge and are inflammatory and prejudicial.'" *United States v. Williams*, 445 F.3d 724, 733 (4th Cir. 2006) (quoting *United States v. Rezaq*, 134 F.3d 1121, 1134 (D.C. Cir. 1998)), *cert. denied*, 549 U.S. 933 (2006); *see United States v. Hartsell*, 127 F.3d 343, 353 (4th Cir. 1997) (finding no abuse of discretion in denial of motion to strike alleged surplusage from indictment where defendant was not prejudiced by the allegations at issue). The standard for striking surplusage is exacting. *See United States v. Hedgepeth*, 434 F.3d 609, 612 (3d Cir. 2006) ("[I]nformation that is prejudicial, yet relevant to the indictment, must be included for any future conviction to stand and information that is irrelevant need not be struck if there is no evidence

that the defendant was prejudiced by its inclusion."); *United States v. Jordan*, 626 F.2d 928, 930 n. 1 (D.C. Cir. 1980).

Blair argues that the alleged practices in paragraph 35—that Blair failed to bill and/or collect copayments and coinsurance from beneficiaries of *private insurance programs*—should be stricken because such conduct does not constitute a federal offense, is not relevant to the charged offenses, is immaterial and prejudicial, and will only serve to confuse the jury. ECF 40 at 2-8; *see* ECF 62 at 2. Moreover, he argues that the allegations "are not probative of the wire fraud charges…." ECF 40 at 10. In his view, the allegations in paragraph 35 "conflate the waiver of copayments in a commercial setting (*i.e.*, Caremark, BCBS, etc.) with the waiver of copayments in a federal health care program…." *Id.* at 11.

Blair is correct that his alleged copayment misconduct, as it pertains to a private health care beneficiary, does not violate the AKS. However, this does not mean that the alleged conduct was necessarily lawful and it certainly does not mean it is irrelevant. Rather, the submission of claims to health care benefit companies based on misrepresentations and false pretenses would still be subject to numerous other criminal sanctions, such as mail fraud, wire fraud, health care fraud, or money laundering. *See* ECF 73 at 7 n.4. Moreover, under Rule 7(d), the question is whether the allegations in paragraph 35 are irrelevant, inflammatory, or prejudicial. *Williams*, 445 F.3d at 773.

In his reply, Blair relies on Fed. R. Evid. 404(b), which pertains to evidence of other crimes, wrongs, or acts of a defendant. *See United States v. Campbell*, 963 F.3d 309, 317 (4th Cir. 2020). He asserts that the allegations in paragraph 35 constitute "other act evidence" under Fed. R. Evid. 404(b) that the government has improperly "used to prove Mr. Blair acted in

conformity" with the charged offenses. ECF 62 at 2-3. In his view, the allegations are inadmissible under Rule 404(b). *Id.*

In contrast, the government argues that the allegations are "inextricabl[y] intertwined with the charged conduct in this case" and "arise[] out of the same transaction[s]… as the charged counts in the Indictment." ECF 73 at 11. It asserts that the conduct "is direct evidence of the scheme to commit wire fraud, which is the specified unlawful activity underlying the money laundering charges . . . ."   *Id.* at 10. Thus, argues the government, the allegations as to defendant's copayment misconduct are "intrinsic to" defendant's scheme and "complete[] the story of the crimes charged." *Id.* at 2, 11. And, according to the government, the alleged conduct is relevant and necessary to prove the defendant's scheme, *i.e.*, that defendant sought to induce patients not to complain about receipt of pharmaceuticals by not seeking to obtain copays.

Rule 404(b) does not bar admission of evidence that is intrinsic to the alleged crime. *United States v. Webb*, 965 F.3d 262, 266 (4th Cir. 2020); *see Campbell*, 963 F.3d at 317; *United States v. Bush*, 944 F.3d 189, 195 (4th Cir. 2019); *United States v. Chin*, 83 F.3d 83, 88 (4th Cir. 1996).  Accordingly, "the provisions of Rule 404(b) are only applicable when the challenged evidence is extrinsic, that is, 'separate' from or 'unrelated' to the charged offense." *Bush*, 944 F.3d at 195.

Of import here, "[e]vidence of uncharged conduct is not other crimes evidence subject to Rule 404 if the uncharged conduct arose out of the same series of transactions as the charged offense, or . . . is necessary to complete the story of the crime on trial." *United States v. Basham*, 561 F.3d 302, 326 (4th Cir. 2009) (internal quotations and citation omitted); *see also Webb*, 965 F.3d at 266; *United States v. McBride*, 676 F.3d 385, 396 (4th Cir. 2012); *United States v. Siegel*, 536 F.3d 306, 316 (4th Cir. 2008); *United States v. Kennedy*, 32 F.3d 876, 886 (4th Cir. 1994).

And, evidence is intrinsic when it is "inextricably intertwined" with evidence of the charged offenses and forms an integral part of the testimony concerning them. *United States v. Lighty*, 616 F.3d 321, 352 (4th Cir. 2010) (internal quotation marks omitted); *see also United States v. Denton*, 964 F.3d 170, 186 (4th Cir. 2019), *cert. denied*, ___ U.S. ___, 140 S. Ct. 2585 (2020); *Bush*, 944 F.3d at 196; *McBride*, 676 F.3d at 396.   Moreover, evidence of uncharged conduct is intrinsic when the conduct is "part of a single criminal episode." *United States v. Otuya*, 720 F.3d 183, 188 (4th Cir. 2013)

In deciding if evidence is "intrinsic" to a charged offense, and thus not prohibited under Rule 404(b), a court must conduct a "case-by-case, fact-based analys[i]s." *United States v. Brizuela*, 962 F.3d 784, 794 (4th Cir. 2020). Whether evidence of uncharged conduct "completes the story" requires a finding that the evidence is "probative of an integral component of the crime on trial or provide[s] information without which the factfinder would have an incomplete or inaccurate view of the other evidence or of the story of the crime itself." *Id.* at 795.

Defendant relies on *Brizuela*, 962 F.3d at 795, to support his argument that the allegations in paragraph 35 constitute "other act" evidence that is not needed to "complete the story of the crime." ECF 62 at 3. But, that case is distinguishable. There, the defendant was a physician who was convicted by the jury of multiple counts of unlawfully distributing controlled substances outside the bounds of professional medical practice, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C). 962 F.3d at 786, 789. Each count was "related to specific prescriptions written for five of [the defendant's] patients[.]" *Id.* at 789. At trial, the government called six of the defendant's patients to testify about their treatment. Two of the patients were among the five whose prescriptions were subject to the indictment, but the other four patients had no charges associated with their treatment. *Id.* The government introduced the additional patients' testimony

under Rule 404(b) "because it was 'necessary to complete the story of the crime on trial.'" *Id.* at 791.

The Fourth Circuit determined that none of the testimony challenged in *Brizuela* "reference[d] or encompass[ed] any of the 21 prescriptions listed in the indictment," nor did these patients describe acts arising "from the same transaction, series of transactions or single criminal episode as the charged offenses." *Id.* at 796. Moreover, the Fourth Circuit reasoned that the patients did not offer testimony "necessary to prove a specific element of a charged offense or provide information that was essential to understanding how the offense was committed." *Id.* On the contrary, their testimony was completely unnecessary to prove the charges, and merely invited jurors to find the defendant guilty by association and pattern. *Id.*

In contrast to *Brizuela,* Blair's alleged failure to collect copayments from private insurers occurred in the same series of transactions as his failure to collect copayments as to TRICARE beneficiaries. They occurred at the same location—Blair Pharmacy—and over the same time period. Moreover, the allegations are relevant to the commission of the fraud scheme.

In the context of this case, *United States v. Bajoghli*, 785 F.3d 957 (4th Cir. 2015), is instructive. There, the Fourth Circuit reversed the district court's decision limiting the government's proof in connection with health care fraud charges and concluded that evidence of conduct not charged in the "specific execution" of a fraudulent scheme may still be relevant to the "nature and scope of the scheme charged." *Id.* at 964. The Court reasoned that "[w]hile fraud can be committed simply by engaging in an isolated transaction, *a scheme to defraud* requires a plot, plan, or arrangement that is executed by a fraudulent transaction." *Id.* at 962-63 (emphasis in original). In its view, "evidence of the entire scheme [was] relevant to proving each particular execution." *Id.* at 963.

Further, the Court explained that it is especially important to give "the government adequate latitude to prove its case…in a large and complex healthcare-fraud case where the defendant's criminal intent is placed at issue." *Id.* at 964; *see United States v. Janati*, 374 F.3d 263, 270 (4th Cir. 2004) ("It is well established that when seeking to prove a conspiracy, the government is permitted to present evidence of acts committed in furtherance of the conspiracy even though they are not all specifically described in the indictment"); *see also United States v. Pless*, 79 F.3d 1217, 1220 (D.C. Cir. 1996) ("That the government chose to charge as the execution of the scheme only the three deposits in National [Bank] does not reduce the boundaries of the scheme, which the statute requires the government to prove.... [I]t is not necessary for the government to charge every single act of execution of the scheme in order to prove the whole scheme." (emphases omitted)), *cert. denied*, 519 U.S. 900 (1996).

This is clearly a complex case about a scheme to defraud and the defendant's criminal intent is a key element of the case. Defendant mistakenly views paragraph 35 in isolation. As noted, the copayment misconduct is an essential part of defendant's alleged scheme to defraud health care companies. In particular, regardless of whether the patient was a TRICARE beneficiary or privately insured, defendant needed to retain the patients' business in order to continue filling their prescriptions, while avoiding any red flags or complaints.

As the Court said in *Bajoghli*, the government must be given latitude to try to prove the existence of a scheme and to show that Blair knowingly and willfully conducted it. To that end, the allegations presented in paragraph 35 are relevant to the "nature and scope of the scheme charged." *Bajoghli*, 785 F.3d at 964; *see Siegel*, 536 F.3d at 320-21 (evidence of prior identity theft and fraud admissible as "intrinsic" to charged offenses of fraud, identity theft, and murder, and reversing district court's pretrial ruling to the contrary); *see Janati*, 374 F.3d at 275 ("[T]he

government has the right and the burden to prove in its case-in-chief a conspiracy broader than the individual overt acts alleged [and] therefore the district court must give the government a reasonable opportunity to carry this burden"); *Pless*, 79 F.3d at 1220  ("[T]he government is [not] artificially limited to presenting to the jury only that portion of the scheme that directly related to [the charged executions]").

Accordingly, at this juncture, I decline to strike paragraph 35. *See Kennedy*, 32 F.3d at 886 (finding that testimony relating to uncharged distribution activities was admissible because it placed the charged activity in context, addressed the source of the drugs the defendant was charged with distributing, and "proved [the defendant's] participation in drug distribution activities").

In any event, redaction of the indictment at this point in time would be premature, because a court does not always submit an indictment to the jury. A final decision regarding redaction will be made in light of developments at trial, in connection with the decision whether to submit the indictment to the jury. Regardless, the Court always instructs the jury that an indictment is merely the charging instrument and not evidence. *Williams*, 445 F.3d at 734.

### H.  DEFENDANT'S PARTIAL MOTION TO DISMISS COUNTS 6, 8, 9, 12-14, 16-19, AND 21 OF THE INDICTMENT AND TO STRIKE RELATED PARAGRAPH 27  (ECF 119)

Defendant moves to dismiss portions of Counts 6, 8, 9, 12-14, 16-19, and 21 of the Superseding Indictment and to strike the related allegations in paragraph 27. Alternatively, Blair seeks the production of Grand Jury material on the ground that the government's allegations are "scientifically flawed" and without factual support. ECF 119 at 2, 12.

Counts 6, 8, 9, 12-14, 16-19, and 21 are eleven of the 21 counts of wire fraud lodged against Blair for allegedly overbilling TRICARE by underfilling prescription amounts. In these counts, the government states, in relevant part, that Blair submitted claims for 360 grams of

certain compounded medications (e.g., "360 grams of scar cream"), but dispensed an amount less than the amount billed—"approximately 300 grams *and* milliliters." ECF 20 at 7, 10-23 (emphasis added); *id.* at 11 (Count 6 – pain cream), *id.* at 11 (Count 8 – scar cream); *id.* at 11 (Count 9 – pain cream); *id.* at 12 (Count 12 – migraine cream); *id.* at 12 (Count 13 – scar cream); *id.* at 12 (Count 14 – pain cream); *id.* at 13 (Count 16 – migraine cream); *id.* at 13 (Count 17 – pain cream); *id.* at 13 (Count 18 – scar cream); *id.* at 14 (Count 19 – pain cream); *id.* at 14 (Count 21 – migraine cream).

These charges are tied to the allegations contained in paragraph 27 of the Superseding Indictment, which states, *id.* at 7:

> It was further part of the scheme to defraud that, in a continuing course of conduct, from on or about December 1, 2014 and continuing through on or about August 30, 2015, **BLAIR** submitted and caused to be submitted, reimbursement claims to health care benefit programs for a specific amount of compounded medication, namely "360 grams." In actuality, **BLAIR** caused the compound prescriptions related to those reimbursement claims to be filled and dispensed from his pharmacy in an amount less than the amount billed, namely approximately 300 grams and milliliters. **BLAIR** received reimbursement from health care benefit programs related to these invalid, overbilled and under filled compound drugs into his Bank of America Account # 9799 in the approximate amount of $5,776,000.00.

Defendant posits that the Superseding Indictment is "premised on the scientific assertion that 360 *grams* must yield 360 *milliliters*," which "unequivocally defies science" because the "two measurements are incongruent." ECF 119 at 6 (emphasis in original). Accordingly, he contends that "erroneous and false science" was presented to the Grand Jury as to these counts. *Id.* at 3.[14]

---

[14] As mentioned, the government provided the Court with the Grand Jury transcripts for in camera review.  I am satisfied that the Grand Jury would not have been misled by erroneous science.

To be sure, "grams measure mass or weight, whereas milliliters measure volume" and, except in regard to pure water, one gram does not equal one milliliter." ECF 119 at 6. But, the government denies that it made an erroneous assertion. ECF 129 at 19-20. Rather, it contends that the "gravamen of paragraph 27 is simply that Defendant…billed for a specific amount of compounded medication (360 grams) and that an amount less than 360 grams was provided to patients." *Id.* at 19.

Indeed, as the government argues, nowhere does the Superseding Indictment indicate that 360 grams must equal 360 milliliters. There is no indication that the government's inclusion of the word "milliliters" in the charging document had any significance in how it instructed the Grand Jury. There is no ground for dismissal on this basis.

### IV. CONCLUSION

For the foregoing reasons, I shall deny the motions (ECF 37; ECF 38; ECF 39; ECF 108; ECF 119). And, I shall deny as moot the portion of ECF 40 seeking to strike the loss amounts in paragraphs 25-27 and 34 of the Superseding Indictment.

An Order follows.

Date: September 23, 2021                          _____/s/_____

                                                 Ellen L. Hollander
                                                 United States District Judge