**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | **CRIMINAL NO.  ELH-19-410** |
| | * | |
| MATTHEW BLAIR, | * | |
| | * | |
| Defendant. | * | |

**\*\*\*\*\*\*\*\*\*\***

## GOVERNMENT'S RESPONSE TO
## DEFENDANT'S OMNIBUS MOTION *IN LIMINE*

The United States of America hereby responds to Defendant Matthew Blair's Omnibus Motion *in Limine*. ECF No. 160. For the reasons set forth below, the Court should deny Defendant's motion.

**I.  Defendant's Motion *in Limine* Seeking to Prohibit the Government from Characterizing Defendant's use of Pre-Printed Prescription Forms and Defendant's use of an Electronic System for Receiving and Processing Claims ("eFax") as "Unlawful, Improper or Nefarious" is Meritless.**

Defendant's use of pre-printed forms—and the process that he established to refer prescriptions back to his pharmacy to be submitted to health care benefit programs for reimbursement—were part and parcel of Defendant's scheme to defraud in this case. The evidence related to the forms and processes is relevant and admissible. Defendant's motion *in limine* essentially boils down to a request to prohibit the Government from introducing manner and means evidence regarding Defendant's scheme to defraud. Defendant's request to preclude the Government from describing Defendant's actions as "unlawful, improper or nefarious"[1] is without merit, and his motion should be denied.

---

[1] The terms "unlawful, improper or nefarious" are words used by Defendant in his motion *in limine* to describe the Government's purported characterizations. And the defense—not the Government—repeatedly used the term "nefarious" during the last hearing in this matter too. *See also* Sept. 28, 2021 Hearing Tr. at 112, 115.

As part of the scheme to defraud, Defendant created a process by which he was reimbursed large amounts of money from health care benefit programs, as described in detail in the Superseding Indictment ("Indictment"). *See* ECF No. 20. The allegations in the Indictment describe the scheme to defraud and the object of the scheme to defraud—to obtain money from insurance companies and health care benefit companies, including BCBS and TRICARE, by means of materially false and fraudulent, pretenses, representations, and promises. Indictment ¶¶ 14-15.

The Government alleged numerous acts as the manner and means underlying Defendant's scheme to defraud. These acts include the process that Defendant created and used at his pharmacy for directing compound cream and vitamin prescriptions to his pharmacy. One of the purposes of this process was to allow his pharmacy to submit claims to health care benefit programs, which in turn, caused payments of money to be deposited into Defendant's bank account. Generally speaking, Defendant created this process—he chose chemical ingredients and percentages of ingredients for his compound formulations; he marketed those formulations on pre-printed prescription forms that were provided to doctors' offices; and he created an eFax process by which signed forms would be electronically directed via eFax to his pharmacy.

The process that Defendant utilized at his pharmacy is highly probative of material facts directly related to elements of the crimes charged in the Indictment. Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action. Fed. R. Evid. 401. The relevance of the words, descriptions, and numbers that Defendant chose to include on his pre-printed prescription forms has been previously briefed and argued.[2] In devising these chemical formulations, in marketing these formulations to doctors, and in directing signed forms to be submitted exclusively

---

[2] *See* Government's Response to Defendant's Amended Motion to Exclude. ECF No. 115, p. 2-31.

to, processed by, and dispensed from, his pharmacy, Defendant's actions are material facts of consequence related to the overall scheme and artifice to defraud health care benefit programs. Defendant's conduct related to this process is, of course, probative of consequential facts related to substantive wire fraud counts, as well as the aggravated identity theft and anti-kickback allegations in the Indictment. This evidence is clearly relevant and admissible, and will certainly be characterized in the Government's case-in-chief as part of Defendant's scheme to defraud and his actions in violation of the Anti-Kickback Statute ("AKS").

The Court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence. Fed. R. Evid. 403. However, all evidence suggesting guilt is prejudicial to a defendant. *United States v. Williams*, 445 F.3d 724, 730 (4th Cir. 2006). "The mere fact that the evidence will damage the defendant's case is not enough - the evidence must be *unfairly* prejudicial, and the *unfair* prejudice must substantially outweigh the probative value of the evidence." *United States v. Hammoud*, 381 F.3d 316, 341 (4th Cir. 2004) (en banc) (internal quotation marks omitted), *vacated on other grounds*, 543 U.S. 1097, 125 S. Ct. 1051, 160 L. Ed. 2d 997 (2005). Evidence is unfairly prejudicial and thus should be excluded under Rule 403 "when there is a genuine risk that the emotions of a jury will be excited to irrational behavior, and … this risk is disproportionate to the probative value of the offered evidence." *United States v. Aramony*, 88 F.3d 1369, 1378 (4th Cir. 1996) (internal quotation marks omitted).

Defendant asserts, that because Maryland law does not prohibit fax transmittals of prescriptions to pharmacies, that in describing Defendant's process as part of his scheme to defraud, the Government will "improperly" suggest to the jury that a prescription is "rendered

fraudulent or improper solely due to the means of its transmission." ECF No. 160, p. 10. This argument is fallacious and distorts and exaggerates the Government's charges in this case.

It is certainly true that doctors regularly fax and electronically transmit prescriptions to pharmacies, and that such practice is permitted by Maryland law. But, contrary to Defendant's assertions, the Government has not made representations that electronic transmission of prescriptions is improper or impermissible. The fact that Maryland law permits faxed prescriptions does not detract, in any way, from facts of consequence in this case—namely, that Defendant used a manner and means in his fraud scheme that involved the creation of chemical formulations on pre-printed prescription forms, which he marketed to doctors, and through which he induced referrals to his pharmacy via eFax. The electronic transmission itself is not the issue, as Defendant well knows; rather, it is the content he curated on his pre-printed prescription forms and the referral inducement process of the forms back to his pharmacy that is probative of Defendant's scheme to defraud and violations of the AKS.

Contrary to Defendant's contentions, this evidence is not unfairly prejudicial, nor will it confuse or mislead the jury. Since this evidence is probative of an element of the crime charged, "the balance under Rule 403 should be struck in favor of admissibility, and evidence should be excluded only sparingly." *United States v. Aramony*, 88 F.3d 1369, 1378 (4th Cir. 1996); *see also United States v. Siegel*, 536 F.3d 306, 319-20 (4th Cir. 2008). There is simply no risk that this evidence will cause the emotions of the jury will be excited to irrational behavior based on this evidence. *Aramony*, 88 F.3d at 1378.

As is customary in criminal trials, Defendant is free to characterize his pre-printed forms and eFax process in the way he chooses (as long as he does so, if he chooses to do so, in a proper and admissible format).[3] Defendant cites no authority for his assertion that the Government should

_____

[3] Of course, no witness should be permitted to testify that that certain actions, procedures, or processes are

be precluded from describing manner and means evidence as "unlawful" or "improper" or "nefarious." Nor could he, as this manner and means evidence is clearly relevant and admissible to prove elements of several of the charged offenses. What's more, the evidence is neither prejudicial, nor confusing. For these reasons, the Government respectfully requests that the Court deny Defendant's motion.

## II. Defendant's Motion *in Limine* Seeking to Prohibit "the Government from Commenting on Reimbursement Amounts Received by Blair Pharmacy" is Meritless and Seeks to Prevent the Government from Putting on Evidence Related to Essential Elements that the Government is Required to Prove.

The Government is required to prove beyond a reasonable doubt the elements of Defendant's fraud scheme, the elements of money laundering as it related to Defendant's fraud scheme, and the violations of the AKS charged in the Indictment. The monetary amounts that Defendant received in reimbursement, for claims that he caused to be submitted to health care benefit programs, is direct evidence of the overarching fraud scheme, including the specific substantive wire fraud counts. Further, it is direct evidence of essential elements of the money laundering and AKS counts. Indeed – the reimbursement rate evidence is so central to the Government's case, that it is described as an object of Defendant's scheme to defraud:

---

lawful or "not prohibited by law. *See, e.g.*, Gov't Motion to Exclude (ECF No. 107) at 25.

## THE OBJECT OF THE SCHEME TO DEFRAUD

15.   It was the object of the scheme to defraud that **BLAIR** sought and obtained reimbursement and payment for compounded drugs, and that he caused to be sought and obtained reimbursement and payment for compounded drugs, based upon fraudulent pretenses, representations and promises that compounded drugs were authorized by a doctor; that the compounded drugs were dispensed for a medical purpose and not based upon reimbursement rate; that the compounded drugs were medically necessary; that the compounded drugs contained the specific ingredients that were billed to health care benefit companies; and that the compounded drugs contained the amount and quantity of ingredients that were billed to health care benefit companies.

Indictment ¶ 15.

Defendant moves *in limine* to limit the Government's financial reimbursement evidence to only those specific amounts detailed in substantive wire fraud counts (and only those substantive counts which were committed without an authorization by a doctor).[4]  Defendant seeks to preclude all other evidence related to any other amount of money that Defendant received from health care benefit programs related to the other substantively charged wire fraud counts.  Additionally, Defendant seeks to prohibit evidence of money received from claims related to his Sterabase substitution scheme, his overbilling / underfilling scheme, his vitamin scheme, and his copayment collection misconduct, as alleged in the manner and means portion of Defendant's scheme to defraud, detailed in the Indictment.  Further still, Defendant seeks to preclude evidence related to the remuneration he paid in violation of the AKS.  In this motion *in limine*, Defendant seeks to shut down the Government's case in its entirety.

In support of his position, Defendant asserts that these monetary reimbursement amounts are "probative of nothing."  ECF No. 160, p. 11.  Defendant is incorrect.  The reimbursement

---

[4] Defendant appears to concede that reimbursement amounts are relevant evidence related to Counts 1-5, 7, 10, 11, 15 and 20.  ECF No. 160, p. 11, n.9.

6

amounts are highly probative evidence of essential elements in this case, Defendant's motion *in limine* is entirely devoid of merit, and appears to be a second attempt in this case, to limit / preclude important financial evidence.[5]

First, the amount of money that Defendant received in reimbursement from health care benefit programs is highly probative of an essential element in this case—Defendant's *mens rea*. The Government must establish Defendant's state of mind—his intent to defraud *and* his willful violation of the AKS. Defendant has made clear on the record that he will testify at trial regarding his *mens rea* (or lack thereof). Thus, it is clear that Defendant's state of mind—his intent—will be the central issue in this case.

Evidence of reimbursement amounts is evidence of financial gain. Evidence of financial gain is critical to establish a defendant's intent to defraud. The Fourth Circuit has held that evidence of financial gain is a particularly probative type of evidence in a fraud case to establish a defendant's intent to defraud. *United States v. Bajoghli*, 785 F.3d 957, 966-67 (4th Cir. 2015); *United States v. Beverly*, 284 F. App'x 36, 40 (4th Cir. 2008) (per curiam); *see also United States v. Grow*, 977 F.3d 1310, 1324 (11th Cir. 2018) (concluding that "a reasonable jury could find an intent to defraud from the money Grow made from billing Tricare for creams and vitamins that were not medically necessary", '[e]vidence that the defendant profited from a fraud may ... provide circumstantial evidence of the intent to participate in that fraud'") (citing *United States v. Machado*, 886 F.3d 1070, 1083 (11th Cir. 2018); and *Bajoghli*, 785 F.3d at 966–67; *United States v. Davis*, 490 F.3d 541, 549 (6th Cir. 2007); *United States v. Dearing*, 504 F.3d 897, 901 (9th Cir. 2007) (endorsing the Sixth Circuit's declaration in *Davis* that evidence of profits can serve as

---

[5] Defendant previously filed a motion to strike loss amounts that were initially detailed in the Indictment. In Defendant's motion and response, Defendant attempted to limit the Government's evidence related to the overarching fraud scheme, and he incorrectly characterized the direct and intrinsic evidence of his scheme to defraud as extrinsic / 404(b) evidence. *See* ECF No. 40 & 102, and the Government's Response and Sur-Reply at ECF Nos. 49 & 73.

indirect proof of one's intent to defraud); *United States v. Wheeler*, 889 F. Supp. 2d 64, 68 (D.D.C. 2012) (intent [to defraud] can be inferred . . . from profits" (quoting *Dearing*, 504 F.3d at 901)).

Here, the reimbursement amounts that Defendant received from health care benefit programs is evidence of Defendant's intent to financially gain and profit from his fraud scheme, and these facts of consequence are highly probative of Defendant's intent to defraud in this case.[6] Further, reimbursement amount evidence is direct evidence of the remuneration that Defendant paid to Atlas, which is an essential element of the AKS violations. As alleged in paragraph 21 and Counts 30-33 of the Indictment, Defendant paid independent contractors, such as Atlas, remuneration in the amount of: $301,164 on March 17, 2015; $1,000,000 on April 22, 2015; $2,866 on May 6, 2015; and $240,000 on May 28, 2015. Defendant paid this remuneration based upon the value and volume of specific referrals of federal health business, directed to his pharmacy and deposited into Defendant's bank account. The amount of money that Defendant received from health care benefit programs is direct – and highly probative of remuneration – evidence related to the value and volume of the commissions that Defendant paid to Atlas. Reimbursement amount evidence is probative of essential elements that the Government must prove beyond a reasonable doubt in this case.

Second, the Government is not required to charge every instance of fraud substantively, in order for proof of the overarching fraud scheme to be admissible. Defendant's assertion that evidence of reimbursement amount is only admissible for substantive counts involving prescriptions not authorized by a doctor is simply not in accord with controlling Fourth Circuit law. Indeed, the Fourth Circuit has held that when the government charges a defendant with a

---

[6] At various points in this litigation, Defendant has asserted that it is not his fault he was paid so much money, because he did not control the amount of money that health care benefit companies reimbursed for specific drugs. This assertion is a red herring because Defendant curated the content of the drugs in his compound formulations to maximize reimbursement—based on widely available data regarding each of the drugs specific reimbursement value. To claim that Defendant had no control over the amount of money he received in this case is to engage in logical fallacy.

scheme to defraud, and when the government "elects to charge only some of the executions of that scheme, its election does not limit its proof to only the charged executions. It may introduce other evidence of uncharged executions to prove the scheme." *Bajoghli*, 785 at 963. Here, the reimbursement amount evidence is even more applicable, because in addition to the fraud scheme charged in the Indictment, Defendant is also charged with laundering the money he derived from his fraud scheme.

Further, the Government must prove that proceeds from the fraud scheme were part of the monetary transactions described in Counts 34 – 36 of the Indictment. The Government will introduce evidence related to the specific reimbursement amounts received into Defendant's bank account, and trace those fraud proceeds to the monetary transactions described in the Indictment.[7] Defendant's motion to limit this highly probative evidence of essential elements, including Defendant's intent to defraud related to the specified unlawful activity, is tantamount to prohibiting the Government from proving its money laundering case.

As this Court previously noted, ECF No. 156 (Memorandum Opinion) at 60-61, the Fourth Circuit reversed the district court's decision in *Bajoghli*, which had limited the Government's proof in a health care fraud case. *Bajoghli*, 785 F.3d at 964. The Court held that that evidence of

---

[7] As part of the scheme to defraud (which is the specified unlawful activity alleged in the money laundering charges), the Indictment alleges Defendant made misrepresentations and promises as follows: (1) the submission of reimbursement claims to health care benefit companies for compounds that were not authorized by a doctor, and for which there was no medical necessity (Paragraphs 24, 28); (2) the submission of reimbursement claims, in which health care benefit companies were billed for one ingredient, but were filled with a different (less expensive) ingredient, between December 2014 – August 2015 (Paragraph 25); (3) the submission of reimbursement claims, in which health care benefit companies were billed for specific amounts of ingredients and quantities, and then filled with lesser amounts of ingredients and quantities between December 2014 – August 2015 (Paragraphs 26 – 27); (4) the submission of reimbursement claims, in which health care benefit companies were billed for vitamins that were not medically necessary, and which were derived from an altered prescription formula, between March 2015 – August 2015 (Paragraphs 28-34); and (5) the failure to bill and collect co-payments and coinsurance from health care beneficiaries, and to sometimes pay the co-payments himself, in order to conceal costs and reduce beneficiary complaints, all for the purpose of inducing prescriptions to be filled at his pharmacy, from September 2014 through August 30, 2015 (Paragraph 35). The Government will not claim, as Defendant appears to opine, that every prescription processed by Blair Pharmacy was fraudulent – the Government will seek to introduce evidence related to only those submissions alleged as part of Defendant's scheme to defraud, those submissions involved in the money laundering transactions, and those submissions tainted by the AKS violations, as described in the Indictment.

conduct not charged in the "specific execution" of a fraudulent scheme may still be relevant to the "nature and scope of the scheme charged." The Court reasoned that "[w]hile fraud can be committed simply by engaging in an isolated transaction, a scheme to defraud requires a plot, plan, or arrangement that is executed by a fraudulent transaction." *Id*. at 962-63 (emphasis in original). In the Fourth Circuit's view, "evidence of the entire scheme [was] relevant to proving each particular execution." *Id*. at 963.[8]

Here, of course, the reimbursement amounts Defendant sought to receive and did receive were not just part of the scheme to defraud—they were its very basis. They were also the entire basis upon which Defendant paid remuneration in violation of the AKS. Moreover, evidence of financial gain is particularly probative in health care-related fraud cases, to establish the defendant's intent to defraud," *Bajoghli*, 785 F.3d at 966-67, and that is precisely the situation here.

Defendant asserts that precluding all financial evidence related to reimbursement amounts is simply an extension of the principle underlying the striking of the total loss amounts from the face of the Indictment. ECF No. 160, p. 12. Defendant is incorrect. As the Government previously noted, the Government fully intends to introduce all of the underlying financial evidence related to the misrepresentations and promises outlined in paragraphs 25-35 of the Indictment. The Government must introduce this evidence, not only to establish Defendant's intent to defraud and the overarching scheme to defraud, but also to establish and trace the fraud proceeds which underly

---

[8] In this respect, a scheme to defraud and a conspiracy are similar concepts. *Bajoghli*, 785 F.3d at 963. The court reasoned that it was important to recognize that, just as all the overt acts of a conspiracy need not be charged in an indictment, *see United States v. Janati*, 374 F.3d 263, 270 (4th Cir. 2004) ("It is well established that when seeking to prove a conspiracy, the government is permitted to present evidence of acts committed in furtherance of the conspiracy even though they are not all specifically described in the indictment"), all executions of a scheme to defraud, likewise, need not be charged, *see United States v. Pless*, 79 F.3d 1217, 1220, 316 U.S. App. D.C. 417 (D.C. Cir. 1996) ("That the government chose to charge as the execution of the scheme only the three deposits in National [Bank] does not reduce the boundaries of the scheme, which the statute requires the government to prove. . . . [I]t is not necessary for the government to charge every single act of execution of the scheme in order to prove the whole scheme). Thus, evidence of transactions and conduct not charged is relevant to proving the existence of and the boundaries of the conspiracy or scheme. *Bajoghli*, 785 F.3d at 963.

the financial transactions alleged in Counts 34-36. The fraud scheme information alleged in paragraphs 25-35 provides notice of Defendant's wire fraud scheme as it relates to the specified unlawful activity element of the money laundering counts in the Indictment. The information in these paragraphs is direct evidence of essential elements the Government is required to prove regarding Defendant's transfer of criminally derived property derived from specified unlawful activity, in an amount over $10,000.00.

Defendant asserts that admission of the reimbursement amounts would be prejudicial. But this evidence is not unfairly prejudicial, and because this evidence is probative of essential elements, "the balance under Rule 403 should be struck in favor of admissibility, and evidence should be excluded only sparingly." *United States v. Aramony*, 88 F.3d at 1378; *see also Siegel*, 536 F.3d at 319-20. There is no risk that this evidence will cause emotions of the jury to become so excited, that it would lead the jury to irrational behavior or decisions based on this evidence. *Aramony*, 88 F.3d at 1378. Defendant again maintains that "he did not have any control over the costs (reimbursement amounts) of the compounds," ECF No. 160, p. 13, but he fails to note that he chose the specific ingredients, in the specific formulations that he marketed to doctors, based upon the specific reimbursement rate he knew he would receive for the ingredients he curated into his compound formulations. This evidence is not unfairly prejudicial – indeed, it would be unfair to preclude the jury from considering this highly probative evidence. The jury would be left with a gaping hole in context and background information if they were precluded from learning about the reimbursement amounts Defendant received in this case. This evidence is relevant to Defendant's state of mind, his intent to defraud, the manner and means of the fraud scheme, and it forms the basis of the essential elements related to the remuneration Defendant paid in violation of the AKS.

As noted above, "the balance under Rule 403 should be struck in favor of admissibility, and evidence should be excluded only sparingly." *Aramony*, 88 F.3d 1369 at 1378; *see also Siegel*, 536 F.3d at 319-20.[9]  Reimbursement amount evidence is not the type of evidence that would lure the factfinder into declaring guilt on some basis other than specific proof of the charged offense. Indeed – the reimbursement amount evidence is specific, direct proof of essential elements in this case.  This highly probative evidence is not substantially outweighed by any prejudicial effect.  In fact, the opposite is true—the probative value of this evidence far outweighs any prejudicial effect. Defendant's motion to preclude this evidence should be denied.

### III. Defendant's Motion in Limine Seeking to Prohibit "the Government from Commenting on Medical Necessity" is Meritless.

Defendant asserts that this case alleges fraud "in connection with only a handful of prescriptions."  ECF No. 160, p. 14.  Not so.  Defendant appears to view the Indictment in a vacuum, consisting only of Counts 1-21, and that medical necessity can only be evaluated as to those prescriptions that were not authorized by a doctor.  This view does not appear to account for the general allegations or the object and scheme to defraud, described in detail in paragraphs 1-35 of the Indictment.  This view also does not appear to account for the other charges in the Indictment, for instance claims submissions that were tainted by violations of the AKS, because

---

[9] The authority cited by Defendant to support his assertion that evidence related to reimbursement amounts is unfairly prejudicial does not apply.  For instance, in *Aristocrat Leisure Ltd. v. Deutsche Bank Tr. Co. Ams.*, Civ. No. 04-10014, 2009 WL 3111766, at *6-7 (S.D.N.Y. Sept. 28, 2009), a declaratory civil action involving convertible bonds issued to qualified institutional buyers, the court was weighing the admissibility of evidence related to the compensation of current and former employees of Consequential Damages Parties and Non–Consequential Damages Parties in a case involving an issue related to whether hedging decisions made by these parties were based on compensation rather than mitigation.  The court in that case determined that the amount of compensation would not shed light on the plaintiff's theory in that case, and limited the compensation amount evidence *in limine*. *Id.*  The opposite is true in the present case – the reimbursement amounts that Defendant wishes to preclude are directly relevant to essential elements the Government is required to prove, and unlike in *Aristocrat*, this evidence sheds a great deal of light as to facts of consequence in this case.  Further, *United States v. Rush*, 807 F. Supp. 1263, 1265-66 (E.D. La. 1992), a case that has only been cited by another court once in nearly three decades and whose reasoning has not been adopted by any other court, is inapposite.  The court there struck an allegation that the defendant's misconduct had caused a $10 million loss from the face of the indictment, but the court specifically held that "[t]he government is free to prove during trial specific monetary harm," thus acknowledging that the actual monetary amounts in that case was relevant and admissible at trial.  *Rush* actually supports the Government's position here— that reimbursement amounts are relevant and admissible in this case.

Defendant improperly induced prescription referrals to his pharmacy and remunerated those referrals with volume and value based commission payments to independent marketers and waivers of beneficiary copayments, as charged in Counts 29-33. This view also does not appear to account for the wire fraud scheme that was incorporated into the money laundering counts, which is the basis of the specified unlawful activity charged in Counts 34-36.

Contrary to Defendant's assertions, as noted above, the Government will not introduce evidence that every prescription processed by Defendant's pharmacy was fraudulent. That claim is an exaggerated characterization of the Government's evidence in this case. Instead, the Government will, in accordance with Fourth Circuit law, introduce evidence of the fraud scheme detailed in paragraphs 1-35 of the Indictment, and in Counts 1-36 of the Indictment. Again, as described above, the Fourth Circuit has held that when the government charges a defendant with a scheme to defraud, and when the government "elects to charge only some of the executions of that scheme, its election does not limit its proof to only the charged executions. It may introduce other evidence of uncharged executions to prove the scheme." *Bajoghli*, 785 at 963.

Additionally, evidence related to medical necessity (and whether the Defendant caused the compounds to be dispensed from his pharmacy based on a medical purpose as opposed to reimbursement rate) is highly probative evidence, based upon the facts and circumstances alleged in the fraud scheme described in paragraphs 1-35 of the Indictment. For instance, as has been previously briefed and litigated in this case, evidence related to the legitimacy of the chemical ingredients – and the amount of the chemical ingredients – that Defendant chose to include in his curated "transdermal" formularies for "neuropathic," "anti-inflammatory," "migraine," "scar," and "metabolic" compounded medications is highly relevant to the issue of whether Defendant "obtained reimbursement and payment for compounded drugs, based upon fraudulent pretenses, representations and promises that compounded drugs were … dispensed for a medical purpose and

not based upon reimbursement rate" and whether "the compounded drugs were medically necessary." Indictment ¶ 15.

Defendant claims that information related to medical necessity will be misleading, confusing, and prejudicial. The opposite is true. The jury will need an explanation related to the words and numbers that Defendant chose to include in his compound formulations, which he marketed to doctors, and for which he remunerated independent contractors in order to induce referrals back to his pharmacy.

The explanation about the content of Defendant's curated formulations will be very helpful to the jury in their ultimate evaluation and determination of material facts in this case. Testimony related to Defendant's words and numbers—which will be derived from reliable, generally accepted, peer reviewed principles regarding the pharmacology of the chemical ingredients which Defendant chose to include in his prescription form—is necessary for the jury to evaluate Defendant's intent related to his inclusion of those words and numbers. Testimony about these matters will be helpful to the jury, as the information is highly probative of essential elements in this case. This information will not confuse or mislead the jury. The opposite is true—the information if not within the knowledge base of the average juror, and the jury would be confused without any explanation as to what the words and numbers mean.

Further, "the mere fact that the evidence will damage the defendant's case is not enough - the evidence must be unfairly prejudicial, and the unfair prejudice must substantially outweigh the probative value of the evidence." *Hammoud*, 381 F.3d at 341. Evidence should only be excluded under Rule 403 "when there is a genuine risk that the emotions of a jury will be excited to irrational behavior, and … this risk is disproportionate to the probative value of the offered evidence." *Aramony*, 88 F.3d at 1378. There is no risk that evidence related to medical necessity or the

legitimacy of the Defendant's compound formulations will excite the jury to irrational behavior. The Defendant's motion to limit reference to these matters should be denied.

IV.     **Defendant's Motion *in Limine* Seeking to Prohibit "the Government from Commenting on Mr. Blair's Personal Expenditures" is Meritless in the Context of Defendant's Purported Expert Witness Testimony.**

The Government will introduce evidence of Defendant's finances and expenditures related to the Money Laundering charges in Counts 34-36 of the Indictment. Further, as noted in the Government's motion *in limine* regarding intrinsic and extrinsic 404(b) evidence, *see* ECF No. 162, p. 3, the Government will seek to admit evidence related to Defendant's finances and expenditures consistent with the Court's ruling on the pending motion.

Further, the Government will seek to introduce financial evidence in this matter to counter Defendant's stated defense in this case. Defendant appears to put his finances at issue in this case, though his expert witness testimony. The in-flow of money into Defendant's bank accounts, as well as the costs and expenditures from his bank accounts, is highly probative as it relates to the proffered defense expert testimony of Mr. A. Greg Kelly, Jr.

Mr. Kelly is a CPA and, purportedly, a health care business expert witness. Defendant seeks to have Mr. Kelly provide the jury with numerous explanations regarding financial matters. Although Defendant has failed to provide the Government with notice of any particular opinion or testimony related to facts at Blair Pharmacy (and the Government has objected to Mr. Kelly's expert testimony), Defendant nonetheless desires to have Mr. Kelly testify about how expensive and costly health care businesses are to operate, especially "start-up" pharmacies.

For instance, Defendant wishes to have Mr. Kelly provide testimony to the jury about the "financial challenges" associated with starting up and winding down health care business; the "substantial" costs required to be borne by the business; the "significant" rate at which businesses fail; the process and costs of seeking an OIG Advisory Opinion; and a comparison of "the costs of

employing an individual as a W-2 employee … with the costs of hiring that individual as an independent contractor." ECF No. 107-1, p. 7 & 107-7, p. 10.

Further, Defendant wishes Mr. Kelly to testify to the jury "that it can be very difficult to manage salary costs for marketers before a company has even filled its first prescription." ECF No. 107-7, p. 10. Additionally, Defendant lists various financial matters and costs that he wishes Mr. Kelly to testify about, including Mr. Kelly's opinion that "a start-up company must bear significant costs and capital responsibilities – with little, if any, cash flow in – to get off the ground and survive."[10] ECF No. 107-7, p. 10-11.

As noted in the Government's objections to Mr. Kelly's expert testimony, the purported testimony about "other health care start-ups" appears to be a thinly veiled suggestion to the jury that these onerous costs are borne – not just by other businesses – but that Defendant also suffered under these onerous costs and challenges at his pharmacy as well. The testimony appears to also suggest an excuse, or defense, of Defendant's compensation arrangements with 1099 independent contractors in this case. Indeed, for what other purpose could Mr. Kelly possibly offer his expert opinions regarding the cost comparison of W-2 employees to costs of hiring an independent contractor.[11] Defendant appears to offer this testimony as a defense to violations of the AKS charged in Counts 30-33.

If this expert testimony related to theoretical financial costs of other businesses is permitted, then the Government should certainly be permitted to counter such evidence with

---

[10] Relatedly, Mr. Kelly's purported testimony that "a start-up company must bear significant costs and capital responsibilities – *with little, if any, cash flow in*" (emphasis added), bears directly upon Defendant's previous motion *in limine*, which seeks to prohibit the Government from disclosing before the jury, the amount of health care benefit program reimbursement payments to Defendant. Evidence regarding the amount of reimbursement Defendant received (in addition to being probative of Defendant's *mens rea* and the overall scheme to defraud) is surely relevant and highly probative to counter Defendant's narrative that there was "little, if any, cash flow in" at Defendant's pharmacy.

[11] The Government has provided notice that it will call Ms. Kathy McNamara to rebut Mr. Kelly's testimony related to marketer compensation arrangements in the health care industry, should Mr. Kelly be permitted to testify as such.

factual information about Defendant's actual financial expenditures during the relevant time period. This underlying evidence about Defendant's actual expenditures is very reliable – it is detailed in business records, bank and credit card expenditures and records, and invoice and purchase records, all occurring in the 2014 and 2015 time period that Mr. Kelly purports to testify about. Defense testimony that costs were onerous, there was little cash-flow in, and that there was no financially feasible way to pay for marketing (other than to offer independent agents volume and value based commissions) is an excuse / defense in this case that the Government should be permitted to counter.

What's more, evidence regarding Defendant's expenditures (made possible by his earnings) is likewise relevant because they represent the product of Defendant's fraud, making them far more probative of his motive and intent to engage in the charged crime. The fact that Defendant gained a variety of benefits from his fraud tends to show that he intended to defraud in order to obtain those benefits.

Relying on *United States v. Hatfield*, 685 F. Supp. 2d 320, 326 (E.D.N.Y. 2010),[12] and other out of circuit authority, Defendant maintains that "evidence relating to Mr. Blair's wealth, economic condition, or financial decisions" is irrelevant and inadmissible. ECF No. 160, p. 17. But "[i]n the Fourth Circuit . . . evidence of lavish spending is 'clearly probative of [the defendant's] motive (e.g., wealth accumulation and maintenance).'" *United States v. Abdulwahab*, No. 3:10CR248, 2016 WL 2349109, at *7 (E.D. Va. May 3, 2016) (quoting *United States v. Cole*,

---

[12] Defendant's reliance on *United States v. Mitchell*, 172 F.3d 1104, 1108 (9th Cir. 1999), is misplaced. In *Mitchell*, the trial court admitted evidence of the defendant's poverty to prove motive to commit a bank robbery. *Id.* The Ninth Circuit reversed because evidence of wealth or poverty without a nexus to an "inclination, desperation, or other evidence that the person was likely to commit the crime" is not relevant. *Id.* at 1109. However, the force of Mitchell's holding is diminished because "wealth evidence, unlike poverty evidence, does not entail the same risk of unfair prejudice." *United States v. Flores*, 510 F. App'x 594, 595 (9th Cir. 2013).

Indeed, as with evidence of poverty, evidence of wealth or lavish lifestyle is not admissible standing alone but may be admissible to prove motive, knowledge, or intent. *See United States v. Reyes*, 660 F.3d 454, 464 (9th Cir. 2011) (evidence of gains from stock option backdating is admissible to permit "jury to draw a reasonable inference that [defendant] knew what he was doing").

631 F.3d 146, 155 (4th Cir. 2011)) (noting that the "the Government presented evidence of Abdulwahab's personal spending to demonstrate both his motive for diverting investor funds for his personal use and his intent to commit fraud by using investor funds for purposes other than those represented"); *see also United States v. Lattanzio*, No. CR 15-446 (KM), 2018 WL 1837856, at \*14 (D.N.J. Apr. 16, 2018) (denying motion for new trial in securities fraud cause based and reasoning that evidence of lavish spending was appropriately admitted at trial where the court did "not permit the evidence of expenditures to be presented in a dramatic or inflammatory manner" and the court gave a jury instruction regarding evidence of spending); *see also United States v. Shelburne*, No. 2:06CR00023, 2008 WL 474094, at \*2-3 (W.D. Va. Feb. 21, 2008 (collecting cases and finding that evidence of lavish spending could be admitted under Rules 403 and 404(b) "to demonstrate the defendant's motive-greed").[13]

At bottom, the benefits Defendant received as a result of his fraud constitutes strong evidence of his motive and intent. Each time Defendant made an extravagant purchase, it is reasonable to infer that he knew his fraudulent activity allowed him to pay for those items, *see Reyes*, 660 F.3d at 464, and the benefits of these purchases are probative of Defendant's scienter. This is still another reason this evidence passes the minimal threshold for relevance.

And any prejudicial effect Defendant's expenditures may have on the jury will be significantly outweighed by the probative value that evidence has in countering Defendant's excuse / defense and in illuminating his mental state. Simply put, since Defendant has placed his financial wealth and personal expenditures at issue in this case, and the Government must be

---

[13] The Supreme Court has also weighed in on this issue in a related context. In a securities fraud action, the Supreme Court noted that the absence of a motive allegation was not fatal to a plaintiff's claim, but observed that "motive can be a relevant consideration, and personal financial gain may weigh heavily in favor of a scienter inference." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 325 (2007).

permitted to counter this narrative with factual information related to his expenditures. The probative value of the evidence is certainly not substantially outweighed by any prejudicial effect.

## V. Defendant's Motion in Limine to Prohibit "the Government from Referencing that FDA Approval was Necessary, Appropriate, or not Obtained for the Compound Drugs at Issue" is Meritless.

This case involves compounded medications created by a compounding pharmacy. The Indictment in this case alleges material facts about compounding and the relationship between compounded drugs and the Food and Drug Administration ("FDA") process as follows:

> 5.    In general, "compounding" is a practice in which a licensed pharmacist or other licensed practitioner combines, mixes, or alters ingredients of a drug or multiple drugs to create a drug tailored to the needs of an individual patient pursuant to valid prescriptions issued by licensed medical professionals. Compounded drugs are not FDA-approved, that is, the FDA does not verify the safety, potency, effectiveness, or manufacturing quality of compounded drugs. The Maryland State Board of Pharmacy regulates the practice of compounding in the State of Maryland.
>
> 6.    Compounded drugs can be prescribed by a physician, when an FDA-approved drug does not meet the health needs of a particular patient. For example, if a patient is allergic to a specific ingredient in an FDA-approved medication, such as a dye or a preservative, a compounded drug can be prepared excluding the substance that triggers the allergic reaction. Compounded drugs can also be prescribed when a patient cannot consume a medication by traditional means, such as an elderly patient or child who cannot swallow an FDA-approved pill, and needs the drug in a liquid form that is not otherwise available. Compounded medications are oftentimes more expensive than traditional, FDA-approved medications.

Indictment ¶¶ 5-6.

Knowledge about compounded medications and compounding pharmacies is not within the knowledge base of the average juror. The Government will provide the jury with an explanation about compounded drugs generally, and the FDA process, through the testimony of Dr. Stephen Thomas. *See* ECF No. 115, p. 2-31. Background information about compounding

and the FDA process will be certainly be helpful to the jury in evaluating material facts of consequence in this case.

Defendant asserts that "the Government will attempt to suggest and introduce testimony that the compounds at issue in this case were not approved by the Food and Drug Administration." ECF No. 160, p. 18. True—the compounds were not approved by the FDA. But there is no problem with this because compounds do not require FDA approval. As the Government described in the Indictment, "Compound drugs are not FDA-approved, that is, the FDA does not verify the safety, potency, effectiveness or manufacturing quality of compounded drugs." Indictment ¶ 5. The Government further described compound drugs as follows: "Compounded drugs can be prescribed by a physician, when an FDA-approved drug does not meet the health needs of a particular patient." *Id*. at ¶ 6. It appears that the Government and Defendant are in agreement that compounded drugs do not require FDA approval.

Defendant then asserts that "it is difficult to imagine how a process that expressly does not apply to compounding could conceivably pertain to any fact in this case." ECF 160, p. 19. This is where the Government and Defendant appear to disagree. The FDA process is highly probative in this case—not because Defendant failed to obtain FDA approval for his compounds (that, of course, was not required)—but because the FDA did indeed evaluate the safety and efficacy of all of the underlying *chemical ingredients* that Defendant chose to include in his curated compound formulations. Those chemical ingredients formed the basis of Defendant's marketing materials, which he submitted to doctor's offices, and which were referred and directed back to his pharmacy. Those chemical ingredients formed the basis of the claims, for which Defendant sought reimbursements from health care benefit programs. In other words, those chemical ingredients (and the clinically proven, peer reviewed information related to their safety and efficacy, as

detailed in the FDA prescribing information and the Physician's Desk Reference) are absolutely material facts of consequence related to Defendant's *mens rea* in this case.

Defendant claims that evidence related to the FDA process would confuse and mislead the jury, and would be a waste of time. On the contrary—the FDA process is a straightforward, noncontroversial process that will help the jury understand how drugs are approved, and why there is a need for compounded medications outside of the FDA-approval process. Contrary to the Defendant's assertions, the Government will not make any statement, or introduce any evidence, that FDA approval was required for the compounds in this case. The testimony related to the FDA process will simply educate the jury on the process, so that they may evaluate the factual evidence in this case with a proper basis of background knowledge. Background information related to the FDA process is necessary to provide the jury with context, so that the jury has a basis for which to evaluate Defendant's selection of chemical ingredients in his formulations. The FDA process is not prejudicial to Defendant; nor will it confuse or mislead the jury. Indeed, if the jury is not provided with background information related to the FDA process, then they may be confused about what compounded medications are, and why they are created outside of the FDA approval process. This evidence is probative of material facts, and any risk of unfair prejudice certainly does not outweigh the probative value of the evidence. Evidence related to the FDA process should not be excluded, and Defendant's motion should be denied.

**VI.     Defendant's Motion in Limine to Prohibit "the Government from Offering Physician Testimony as to the Consideration of Cost in Prescribing Drugs" is Meritless.**

Defendant cites no authority for his position that doctors are, or should be, precluded from testifying about cost considerations in this case. The cost of these compounds is a material fact. As described above, the reimbursement amount related to these compounds is probative of Defendant's state of mind, and elements of the fraud scheme. The evidence is not unfairly prejudicial. As described above, and it will not cause jury confusion, as claimed by Defendant.

Contrary to Defendant's assertions, testimony that the vitamins in Defendant's "Metabolic" formulation were available at the grocery store for a *de minimis* cost, is highly probative of defendant's scheme and intent to defraud. Especially when there is evidence that Defendant altered the ingredients of his "Metabolic" compound in order to increase the reimbursement that he received from health care benefit programs, rather than for the medical need of an individualized patient.

There is no dispute that Defendant, nor any doctor involved in this case, controlled the price of the ingredients. But this assertion by Defendant is, and always has been, a red herring. The problem for Defendant is that he had the option to choose which ingredients he included in his "neuropathic" and "anti-inflammatory" and "migraine" and "scar" creams and vitamin capsules. Defendant chose ingredients based upon their reimbursement value, as opposed to whether the ingredients actually treated illness in the way that he marketed his compound formulations. He did not control the reimbursement amount, but the Government will introduce evidence that he curated his formulas based on their reimbursement rate. Doctor's testimony regarding the costs of those formulations is probative of Defendant's mental state related to his curated formulations.

Evidence is unfairly prejudicial and thus should be excluded under Rule 403 only "when there is a genuine risk that the emotions of a jury will be excited to irrational behavior, and … this risk is disproportionate to the probative value of the offered evidence." *Aramony*, 88 F.3d at 1378. There is no danger that the probative value of this evidence will be substantially outweighed by any prejudicial effect, and accordingly the Government respectfully requests that the Court deny Defendant's motion to preclude this evidence.

## VII.    Conclusion

For all of the foregoing reasons, the Government respectfully requests that the Court deny Defendant's Motion *in limine*.

                                        Respectfully submitted,

                                        Erek L. Barron
                                        United States Attorney

            By:     _____/s/_____
                                        Christine Duey
                                        Paul Riley
                                        Assistant United States Attorneys