IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA,

v.

MATTHEW EDWARD BLAIR

Criminal No. ELH-19-00410

## MEMORANDUM OPINION

This Memorandum Opinion addresses multiple challenges to numerous proposed expert witnesses in a criminal fraud case. The motions were filed pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993), and its progeny, as well as Rule 702 of the Federal Rules of Evidence ("F.R.E.").

Defendant Matthew Blair founded the now defunct Blair Pharmacy, Incorporated (the "Pharmacy"), which dispensed compounded drugs and creams. The Pharmacy was not a retail store, nor is Blair a pharmacist. He was initially indicted on August 27, 2019 (ECF 1) and later charged in a thirty-six-count Superseding Indictment, filed on March 3, 2020. ECF 20. The Superseding Indictment alleges, *inter alia*, that from 2014 to 2016 Blair devised a scheme to defraud federal health care programs and insurance companies and laundered the funds that he derived from his fraud scheme.

In particular, Counts One through Twenty-One charge wire fraud, in violation of 18 U.S.C. § 1343; Counts Twenty-Two through Twenty-Eight charge aggravated identify theft, in violation of 18 U.S.C. § 1028A(a)(1) and (b); Counts Twenty-Nine through Thirty-Three charge payments of remuneration, in violation of the Anti-Kickback Statute ("AKS"), 42 U.S.C.

§ 1320a-7b(b); and Counts Thirty-Four through Thirty-Six allege money laundering, in violation of 18 U.S.C. § 1957.[1]

The parties have designated multiple experts. And, each witness proposes a multitude of opinions, many of which are contested. To be sure, "the line between proper and improper questions [to an expert] is not always clear. . . ." *United States v. Offill*, 666 F.3d 168, 174 (4th Cir. 2011). Thus, the rulings here are necessarily tentative, as they are dependent on a proper foundation, verification of qualifications, and the flow of evidence.

## I. Procedural Background

In a challenge to the government's experts, Blair has filed "Defendant's Amended Motion to Exclude Purported Expert Opinions" (ECF 106), supported by a memorandum (ECF 106-1) and multiple exhibits. In his submission, Blair seeks to exclude all of the opinions of Stephen Thomas, M.D., and to limit the opinions of Eric Tracy; Shauna Vistad; Steven McCall; and Melissa Parks.[2] The government's opposition is docketed at ECF 115, and includes several exhibits. Defendant's reply is at ECF 125.

In view of objections lodged by defendant as to Parks's qualifications, the government notified the defense on July 29, 2021, of its intent to substitute Kathy McNamara, CPA, C.F.E., for portions of Ms. Parks's proposed testimony. ECF 143; ECF 143-1; *see also* ECF 106-1 at 13, 36.[3] The defendant has objected. ECF 143-2.

---

[1] I set forth the factual allegations concerning the charges in my Memorandum Opinion of September 23, 2021. ECF 156. That summary is incorporated here.

[2] Because of uncertainties with scheduling, the government originally named experts in the alternative: Harriet Lewis (for Tracy); Mark Shelby (for McCall); and Kevin Jenkins (for Parks). But, it has since determined the particular individuals it seeks to call. Therefore, I need not address the challenges to the alternative experts.

[3] Throughout this Memorandum Opinion, I cite to the electronic pagination. This does not always correspond to the page number imprinted on a particular submission.

I shall refer to ECF 106, ECF 106-1, and ECF 143-2 collectively as "Defendant's Motion."

The government has filed "Government's Supplemental Omnibus Motion to Exclude Proposed Testimony of Defendant's Expert Witnesses" ("Government's Motion"). ECF 107.[4] It is supported by multiple exhibits. The Government's Motion seeks to exclude some of the opinions of Kevin G. McAnaney, Esq.; A. Greg Kelly, Jr., CPA; Donnie Calhoun, B. Pharm., R.Ph.; David S. Joseph, R.Ph., FIACP; and Ellen Bonner, Esq. ECF 107. The defendant's opposition to the Government's Motion is docketed at ECF 116, supported by exhibits. The government's reply is at ECF 126.

The government made its initial expert disclosures on November 3, 2020. These disclosures pertained, *inter alia*, to Dr. Thomas, Tracy, Vistad, and McCall. ECF 106-2; ECF 115-1 (same).[5] And, the government made its disclosure as to Parks on February 26, 2021. ECF 106-3, ECF 116-10 (same). In response to requests and inquiries from defendant, on February 4, 2021, the government provided additional information concerning the proposed testimony of Dr. Thomas (ECF 115-2), and on April 9, 2021, as to the testimony of Dr. Thomas, Lewis, Vistad, McCall, and Parks. ECF 115-4; ECF 116-4 (same).

Defendant made his initial disclosures as to Calhoun, Joseph, Kelly, and McAnaney on January 29, 2021. ECF 107-1. On February 12, 2021, the government requested additional

---

[4] The government's initial expert motion was docketed at ECF 89. Blair's original expert motion was docketed at ECF 90. After the submission of those filings, the parties provided additional disclosures regarding expert witnesses. As a result, both parties updated their original motions with the motions docketed at ECF 106 and ECF 107.

[5] There is some duplication of exhibits. In general, I have not included duplicate citations.

information. ECF 107-2. By letters of February 18, 2021 and March 11, 2021, the defense responded to the government's inquiries. ECF 107-3; ECF 107-4.

Then, on March 12, 2021, defendant submitted disclosures as to rebuttal witnesses, including Bonner, as well as additional information as to Calhoun and Joseph. ECF 107-5. Thereafter, by letter of March 29, 2021, the government made another request for additional information (ECF 107-6), to which defendant responded on April 7, 2021. *See* ECF 107-7.[6]

Defendant provided supplemental information as to Mr. Kelly on May 5, 2021. ECF 116-11. And, he provided a supplemental disclosure as to Mr. Joseph on May 14, 2021. ECF 116-9. Then, on July 30, 2021, the defense advised of four "supplemental experiments" conducted by Mr. Joseph. ECF 142.

The first *Daubert* hearing was held on July 12, 2021, at which the testimony of Dr. Thomas and Mr. Joseph was presented. ECF 133. The transcript of the hearing is docketed at ECF 138. The *Daubert* hearing resumed on September 28, 2021. ECF 159. The transcript is at ECF 163.

The parties have lodged focused attacks on the opposing side's experts, sometimes in regard to qualifications and often as to the proposed opinions. In addition, the parties argue generally that the testimony does not meet the relevance requirements of Rules 401 and 402 of

---

[6] Both sides have named additional experts, but their proposed testimony is not addressed here. For example, on March 12, 2021, the defense notified the government of its intent to call Norman Chideckel, M.D. as a rebuttal witness. ECF 107-5. By letter of April 12, 2021, the government provided an initial disclosure as to its rebuttal witness, Ashlee Mattingly. ECF 115-5. And, on April 24, 2021, the defense provided notice of its intent to call M. Timothy Renjilian, CPA. *See* ECF 107-8.

In the Government's Motion, ECF 107 at 35 n.14, and in its reply, the government seeks to compel the defendant to provide adequate disclosures for Dr. Chideckel and Mr. Renjilian, or to preclude them from testifying "altogether." ECF 126 at 33. In particular, the government asserts that Blair failed to provide any specific opinions for Dr. Chideckel. *Id.* And, the government asserts that the disclosure as to Renjilian was both untimely and inadequate. *Id.* These contentions are not addressed here.

the Federal Rules of Evidence. *See*, *e.g.*, ECF 106-1 at 38. And, they sometimes rely on F.R.E. 403.

For its part, the government asserts that it "plans to elicit testimony concerning – more generally – those practices and indicia of fraudulent billing practices that are common in complex fraud schemes such as this." ECF 115 at 42. But, the government has clarified, *id.* at 40-45:

- The Government's proposed experts "will not be discussing Defendant, his mental state, or the Blair Pharmacy at all." *Id.* at 40.

- The Government's experts will "not attempt to … explain how Defendant's scheme as alleged in the Indictment featured the hallmarks of pharmacy fraud schemes." *Id.* at 42 (citation omitted).

- The Government "does not plan to elicit testimony concerning the techniques employed by the defendant in the present case[.]" *Id.* (citation and internal quotation marks omitted).

- The Government does not plan "to elicit testimony concerning how various facts in this case are 'indicative of fraudulent billing practices designed to deceive health care benefit programs." *Id.* (citation and internal quotation marks omitted).

- "[N]one of the Government's proposed experts will testify that Defendant possessed the requisite fraudulent intent." *Id.* at 43.

- "[T]he Government's experts will not opine that Mr. Blair's activities were fraudulent." *Id.* at 44, n.16.

Initially, despite the numerous disputed opinions, counsel for both sides failed to identify them by number, which made it difficult to reference them. In response to the Court's concerns, on August 4, 2021, the defense submitted a 29-page summary of the parties' proposed expert opinions, including those in dispute. ECF 147. At the *Daubert* hearing on September 28, 2021, both sides referred to ECF 147 as a useful guidepost. I shall do the same during the course of this Memorandum Opinion.

## II. Legal Standard

### A.

Pursuant to Rule 104(a) of the Federal Rules of Evidence, the court is responsible for determining "preliminary questions concerning the qualification of a person to be a witness" and "the admissibility of evidence." This includes the admissibility of expert testimony.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme Court established that expert scientific testimony is admissible if "it rests on a reliable foundation and is relevant," and if it will assist the trier of fact to understand or determine a fact in issue. *Id.* at 597. Thereafter, in *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999), the Supreme Court extended the *Daubert* principles to all expert testimony requiring technical or specialized knowledge.

F.R.E. Rule 702 codifies those decisions and governs the admission of expert testimony. It provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> > (b) the testimony is based on sufficient facts or data;
> > (c) the testimony is the product of reliable principles and methods; and
> > (d) the expert has reliably applied the principles and methods to the facts of the case.

Rule 702 "was intended to liberalize the introduction of relevant expert evidence." *Westberry v. Gislaved Gummi AB*, 178 F. 3d 257, 261 (4th Cir. 1999). Pursuant to F.R.E. 702, a properly qualified expert witness may testify regarding technical, scientific, or other specialized knowledge in a given field if the testimony would assist the trier of fact in understanding the

evidence or to determine a fact in issue, and the testimony is both reliable and relevant. *See Sardis v. Overhead Door Corp.*, 10 F. 4th 268, 281 (4th Cir. 2021); *United States v. Smith*, 919 F.3d 825, 835 (4th Cir. 2019); *United States v. Young*, 916 F.3d 368, 379 (4th Cir. 2019).

The party seeking to present expert testimony has the burden to establish its admissibility by a preponderance of the evidence. *See Bourjailu v. United States*, 483 U.S. 171, 175-76 (1987); *Cady v. Ride-Away Handicap Equipment Corp.*, 702 Fed. App'x 120, 124 (4th Cir. 2017); *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001); *Maryland Casualty Co. v. Therm-O-Disc., Inc.*, 137 F.3d 780, 783 (4th Cir. 1998); *Casey v. Geek Squad ® Subsidiary Best Buy Stores, L.P.*, 823 F. Supp. 2d 334, 340 (D. Md. 2011); *Fireman's Fund Ins. Co. v. Tecumseh Prods. Co.*, 767 F. Supp. 2d 549, 553 (D. Md. 2011).

To be sure, "'[e]xpert evidence can be both powerful and quite misleading. . . .'" *Daubert*, 509 U.S. at 595 (citation omitted). Therefore, the trial court serves a critical "gatekeeping role" by making pretrial determinations that include "whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592–93. In addition, the gatekeeper role helps to ensure that the expert is qualified and that the expert's testimony "rests on a reliable foundation and is relevant to the task at hand." *Id.* at 597; *see Sardis*, 10 F. 4th at 282; *Smith*, 919 F.3d at 835; *Lord & Taylor, LLC v. White Flint, L.P.*, 849 F.3d 567, 577 (4th Cir. 2017).

The "importance of [the] gatekeeping function cannot be overstated." *United States v. Barton*, 909 F.3d 1323, 1331 (11th Cir. 2018) (citation and internal quotation marks omitted). Indeed, the Fourth Circuit has described the district court's "Rule 702 gatekeeping function" as "indispensable." *Sardis*, 10 F. 4th at 284. However, the gatekeeper role of the Court is not

meant to "supplant the adversary system or the role of the jury: '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1311–12 (11th Cir. 1999) (quoting *Daubert*, 509 U.S. at 596); *see United States v. Moreland*, 437 F. 3d 424, 431 (4th Cir. 2006) (recognizing that "expert testimony is subject to testing by vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof"). Thus, "the rejection of expert testimony is the exception rather then the rule." *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices & Production Liab. Litig. (No. II),* 892 F.3d 624, 631 (4th Cir. 2018) ("*In re Lipitor*") (citation and quotation marks omitted).

As indicated, to be admissible, "'the proffered expert opinion must be based on scientific, technical, or other specialized *knowledge* and not on belief or speculation . . . ." *United States v. Landersman*, 886 F.3d 393, 412 (4th Cir. 2018) (citation omitted) (emphasis added). The word "knowledge" is not superfluous. "[T]he requirement of 'knowledge' guards against the admission of subjective or speculative opinions.[]" *In re Rezulin Products Liability Litigation*, 309 F. Supp. 2d 531, 541 (S.D.N.Y. 2004) ("*In re Rezulin*"). Moreover, the term knowledge "'connotes more than subjective belief . . . .'[]" *Id.* at 543 (citation omitted). The foundation of "knowledge" also helps to ensure that a witness does not testify about lay matters, for which an expert is not appropriate. *Id.* at 541.

Proposed testimony that concerns matters within the common knowledge and experience of a lay juror does not pass muster. *United States v. Dorsey*, 45 F.3d 809, 814 (4th Cir. 1995); *Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993). "While the fit between an expert's specialized knowledge and experience and the issues before the court need not be exact . . . an expert's

opinion is helpful to the trier of fact, and therefore relevant under Rule 702, 'only to the extent the expert draws on some special skill, knowledge or experience to formulate that opinion.'" *Shreve v. Sears, Roebuck & Co.*, 166 F. Supp. 2d 378, 392–393 (D. Md. 2001) (quoting *Ancho v. Pentek Corp.*, 157 F.3d 512, 518 (7th Cir. 1998)).

District courts necessarily have "broad latitude in ruling on the admissibility of evidence," and as to "evidentiary rulings with respect to relevance and reliability." *Bryte*, *ex rel. Bryte v. Am. Household, Inc.*, 429 F.3d 469, 475 (4th Cir. 2005); *see United States v. Wilson*, 484 F.3d 267, 274 (4th Cir. 2007). But, "a district court abuses its discretion if it fails to ensure that a proffered expert opinion is 'sufficiently relevant and reliable . . . .'" *Sardis*, 10 F.4th at 282 (citation omitted).[7] This is because reliability and relevance are "'*precondition[s]* to admissibility'" of expert testimony. *Sardis*, 10 F. 4th at 282 (emphasis in *Sardis*) (citation omitted).

To be reliable, the testimony must be grounded "in the methods and procedures of science," and it must be something more than subjective belief or unsupported assumptions. *Daubert*, 509 U.S. at 589–90; *see Sardis*, 10 F. 4th at 290; *Belville*, 919 F.3d at 232; *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999). An expert's testimony is relevant if it has "'a valid scientific connection to the pertinent inquiry.'" *Belville*, 919 F.3d at 232 (citation omitted). Put another way, the evidence or testimony is relevant if it will "assist the trier of fact to understand the evidence or to determine a fact in issue." *Daubert* 509 U.S. at 591; *see also In re Lipitor*, 892 F.3d at 631; *United States v. Wolf*, 860 F.3d 175, 194 (4th Cir. 2017); *Nease*, 848 F.3d at 229; *United States v. Forrest*, 429 F.3d 73, 80–81 (4th Cir. 2005). Notably, helpfulness

---

[7] When "the admissibility of expert testimony is specifically questioned, Rule 702 and *Daubert* require that the district court make explicit findings, whether by written opinion or orally on the record, as to the challenged preconditions to admissibility." *Sardis,* 10 F.4th at 283.

to the trier of fact is "the 'touchstone'" under Rule 702. *Kopf*, 993 F.2d at 377 (citation omitted). But, "'[d]oubt regarding whether an expert's testimony will be useful should generally be resolved in favor of admissibility.'" *Mack v. Amerisource Bergen Drug Corp.*, 671 F. Supp. 2d 706, 709 (D. Md. 2009) (citation omitted).

*Daubert* articulated five non-exhaustive factors that the trial court should consider in evaluating the reliability of an expert's reasoning or methodology: (1) whether the particular scientific theory has been or can be tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error; (4) whether there are standards controlling the method; and (5) whether the technique has gained general acceptance in the relevant scientific community. *Daubert*, 509 U.S. at 593–94; *see Sardis*, 10 F.4th at 295 (reiterating that the "hallmarks of reliability" are "testing, peer review, literature, rate of error or general acceptance . . . ."); *see also United States ex rel. Lutz v. Mallory*, 988 F.3d 730, 741 (4th Cir. 2021); *Belville v. Ford Motor Co.*, 919 F.3d 224, 233 (4th Cir. 2019); *United States v. Crisp*, 324 F.3d 261, 265–66 (4th Cir. 2003).

But, as mentioned, the factors are "'not exhaustive.'" *Belville*, 919 F.3d at 233 (citation omitted). They are meant to be "helpful, not definitive," and not all factors necessarily apply in a given case. *Kumho Tire Co.*, 526 U.S. at 151; *see Nease*, 848 F.3d at 229. Indeed, the Supreme Court has said that the factors are not a "checklist." *Kumho Tire Co.*, 526 U.S. at 150. As a whole, the factors are meant to ensure that "an expert, whether basing his testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152. Thus, the evaluation "is always a flexible one . . . ." *Oglesby*, 190 F.3d at 250.

However, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Indeed, "*ipse dixit*" is the "hallmark of an unreliable opinion." *Sardis*, 10 F.4th at 295, 296.

That said, a failure to test could render an hypothesis or an opinion unreliable. *Nease v. Ford Motor Co.*, 848 F.3d 219, 232 (4th Cir. 2017). Even if a theory is plausible or correct, in the absence of testing it "'is not knowledge, nor is it based upon sufficient facts or data or the product of reliable principles and methods applied reliably to the facts of the case.'" *Id.* (alterations and citation omitted). Similarly, a court may exercise its "discretion to find that there is 'simply too great an analytical gap between the data and the opinion proffered.'" *Pugh v. Louisville Ladder, Inc.*, 361 F. App'x 448, 454 n.4 (4th Cir. 2010) (quoting *Joiner*, 522 U.S. at 146).

The trial court "should meticulously focus on the expert's principles and methodology, and not on the conclusions that they generate." *McDowell v. Brown*, 392 F.3d 1283, 1298 (11th Cir. 2004); *see Bresler v. Wilmington Trust Co.*, 855 F.3d 178, 195 (4th Cir. 2017). Moreover, expert testimony need not be "'irrefutable or certainly correct'" in order to be admissible. *Moreland*, 437 F. 3d at 431 (citation omitted); *see Daubert*, 509 U.S. at 596; *Bresler*, 855 F.3d at 195; *Westberry*, 178 F.3d at 261. And, the "subject matter of Rule 702 testimony need not be arcane or especially difficult to comprehend." *Kopf*, 993 F.2d at 377. On the other hand, a court should exclude testimony based on "belief or speculation," *Oglesby*, 190 F.3d at 250, or when not supported by the record. *See Bryte*, 429 F.3d at 477; *Tyger Const. Co. v. Pensacola Const. Co.*, 29 F.3d 137, 142 (4th Cir. 1994); *Casey*, 823 F. Supp. 2d at 340. But, "'questions regarding

the factual underpinnings of the [expert witness's] opinion affect the weight and credibility' of the witness' assessment, 'not its admissibility." *Bresler,* 855 F.3d at 195 (citation omitted).

With regard to an expert's qualifications, the Advisory Committee's notes to Rule 702 provide that experience alone, or in conjunction with "other knowledge, skill, training or education," can provide sufficient foundation for expert testimony. *See Kumho Tire Co.*, 526 U.S. at 156 (stating that "no one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience."). On the other hand, an expert witness may not offer an opinion where the subject matter goes beyond the witness's area of expertise. *See Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994); *see also Smith v. Central Admixture Pharm. Servs., Inc.*, AW–07–3196, 2010 WL 1137507, at *3 (D. Md. Mar. 19, 2010) ("It is well established that 'general expertise is not sufficient to qualify [an expert] to testify on a matter that requires particularized knowledge, training, education, or experience.'" (quoting *Fitzgerald v. Smith & Nephew Richards, Inc.*, JFM-95-3870, 1999 WL 1489199, at *3 (D. Md. Dec. 30, 1999), *aff'd*, 11 F. App'x 335 (4th Cir. 2001))).

**B.**

F.R.E. 701 governs opinion testimony by lay witnesses. It provides:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:
>
> (a) rationally based on the witness's perception;
> (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and
> (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702

Thus, in accordance with Rule 701, a lay witness may offer an opinion only if it is "rationally based on [his] perception." *United States v. Smith*, 962 F.3d 755, 766 (4th Cir. 2020) (internal quotations omitted), *cert. denied*, ___ U.S. ___, 141 S. Ct. 930 (2020).

Rule 701 was amended in 2000, adding subsection (c), but the addition "did not work a sea change to the rule." *United States v. Perkins*, 470 F.3d 150, 155 n.8 (4th Cir. 2006). The amendment "'serves . . . to prohibit the inappropriate admission of expert opinion under Rule 701 . . . .'" *Id.* (quoting *United States v. Garcia*, 291 F. 3d 127, 139 n.8 (2d Cir. 2002)). Moreover, the amendment "ensures that a party will not evade the expert witness disclosure requirements set forth in Fed. R. Civ. P. 26 and Fed. R. Cim. P. 16 by simply calling an expert witness in the guise of a layperson." Fed. R. Evid. 701 advisory committee note to 2000 amendment. In other words, "'Rule 701 forbids the admission of expert testimony dressed in lay witness clothing.'" *United States v. Johnson*, 617 F.3d 286, 293 (4th Cir. 2010) (quoting *Perkins*, 470 F.3d at 156).

Thus, for a witness to provide an opinion that is "based on scientific, technical, or other specialized knowledge", the witness *must* be presented as an expert pursuant to Rule 702. *Smith*, 962 F.3d at 766. However, "the line between lay opinion testimony under Rule 701 and expert testimony under Rule 702 'is a fine one'[.]" *Perkins*, 470 F.3d at 155 (citation omitted); *see United States v. White*, 492 F.3d 380, 401 (6th Cir. 2007) (citing cases).

In contrast to principles of common law, F.R.E. 704(a) permits expert testimony that "embraces an ultimate issue to be decided by the trier of fact." *United States v. Campbell*, 963 F.3d 309, 313 (4th Cir. 2020), *cert. denied sub nom. Washington v. United States*, ___ U.S. ___, 141 S. Ct. 927 (2020); *see United States v. McIver*, 470 F.3d 550, 561 (4th Cir. 2006); *Perkins*, 470 F.3d at 157; *United States v. Barile*, 286 F.3d 749, 759 (4th Cir. 2002). The decision whether to permit such testimony turns on an analysis of Rule 702. *Campbell*, 963 F.3d at 314. But, such testimony simply cannot "tell the jury what result to reach . . . ." *Barile*, 286 F.3d at

760. And, when testimony pertains to the ultimate issue, helpfulness to the jury is the "touchstone" of admissibility. *Kopf*, 993 F.2d at 377; *see Perkins*, 470 F.3d at 157.

In *Campbell*, 963 F.3d at 314, the Fourth Circuit observed, *id.*: "'The line between a permissible opinion on an ultimate issue and an impermissible legal conclusion is not always easy to discern.'" (Citation omitted). The Court also indicated that "drawing that line requires a case-specific inquiry of the charges, the testimony, and the context in which it was made." *Id.*

Notably, Rules 701, 702, and 704 do not relieve the party seeking admission from compliance with the requirements of other applicable rules. This includes Rule 401, concerning relevance, and Rule 403, which concerns the exclusion of relevant evidence because of undue prejudice, confusion, and delay.

Under Rule 401, evidence is relevant if: "a) it has any tendency to make a fact more or less probable then it would be without the evidence; and b) the fact is of consequence in determining the action." However, evidence found to be relevant should nonetheless be excluded under Fed. R. Evid. 403 if the probative value is "substantially outweighed" by unfair prejudice to the defendant. *See United States v. Sterling*, 860 F.3d 233, 247 (4th Cir. 2017); *see also United States v. Bajoghli*, 785 F.3d 957, 966 (4th Cir. 2015); *United States v. Lighty*, 616 F.3d 321, 352 (4th Cir. 2010). The court must also exclude evidence if it would cause confusion as to the issues or has the potential to mislead the jury. *See Casey*, 823 F. Supp. 2d at 341; *see also Westberry*, 178 F.3d at 261.

In those instances where the trial judge believes there is a genuine risk that the emotions of the jury will be excited to irrational behavior, and that this risk is disproportionate to the probative value of the proffered evidence, exclusion is warranted under Rule 403. *Morgan v. Foretich*, 846 F.2d 941, 945 (4th Cir. 1988). But, the admission of evidence ordinarily does not

result in unfair prejudice under Rule 403 where it does not involve conduct any more sensational or disturbing than the crimes with which the defendant is charged. *United States v. Boyd*, 53 F.3d 631, 637 (4th Cir. 1995); *see also United States v. Pitre*, 960 F.2d 1112, 1120 (2d Cir. 1992); *United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990).

"Unfair prejudice speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." *United States v. Basham*, 561 F. 3d 302, 327 (4th Cir. 2009) (internal quotation marks omitted). In *United States v. Wilder*, 834 Fed. App'x 782 (4th Cir. 2020) (per curiam), the Court explained, *id.* at 785: "Conduct evidence is unfairly prejudicial when, for example, 'it inflames the jury or encourages them to draw an inference against the defendant, based solely on a judgment about the defendant's criminal character or wicked disposition.'" (quoting *Sterling*, 860 F.3d at 248); *see United States v. McBride*, 676 F.3d 385 (4th Cir. 2012) (concluding that the trial court erred in admitting Rule 404(b) evidence).

## C.

The matter of whether and the extent to which a party may present an expert to discuss a complex statute and regulations is hotly contested here. Each side favors the admission of such evidence for itself while opposing it for the adversary. The government also suggests that "testimony concerning the operation of complex fraud schemes is commonplace." ECF 115 at 40.

Expert testimony that states a legal conclusion or concerns dispositive legal issues is generally inadmissible. *See Adalman v. Baker, Watts & Co.*, 807 F.2d 359, 368 (4th Cir. 1986), *abrogated on other grounds by Pinter v. Dahl*, 486 U.S. 622 (1988); *see also United States v. Melvin*, 508 Fed. App'x 209, 211 (4th Cir. 2013) (stating that "an expert generally is not

permitted to apply law to facts to reach a legal conclusion"). But, there is no absolute proscription concerning the admissibility of testimony from legal experts. *McIver*, 470 F.3d at 561-62; *see*, *e.g.*, *Adams v. New England Scaffolding, Inc.*, No. 13-12629-FDS, 2015 WL 9412518, \*5 (D. Mass. Dec. 22, 2015) (recognizing that "admission of expert evidence concerning the law is not nearly as rare as the case law might suggest" and outlining recent federal cases involving legal experts). Indeed, "[e]xpert witnesses are often uniquely qualified in guiding the trier of fact through a complicated morass of obscure terms and concepts. Because of their specialized knowledge, their testimony can be extremely valuable and probative." *United State v. Duncan*, 42 F.3d 97, 101 (2nd Cir. 1994); *see United States v. Bilzerian*, 926 F.2d 1285, 1294 (2nd Cir. 1991) (stating that "in complex cases . . . expert testimony may help a jury understand unfamiliar terms and concepts"), *cert. denied*, 502 U.S. 83 (1991).

As noted in regard to F.R.E. 704, expert testimony must be helpful to the jury. *See Perkins*, 470 F.3d at 157; *Kopf*, 993 F.2d at 377. And, "[e]xpert testimony that merely states a legal conclusion is less likely to assist the jury in its determination." *Barile*, 286 F.3d at 760. In *Perkins*, however, the Court astutely observed, 470 F.3d at 158: "To state the general rule, however, 'is not to decide the far more complicated and measured question of when there is a transgression of the rule.'" (Citation omitted). The observation is certainly apt here.

In determining whether expert testimony is unhelpful to a jury because it constitutes an impermissible legal conclusion, courts look to "whether the question [posed to the expert] tracks the language of the legal principle at issue or of the applicable statute" and "whether the terms employed have specialized legal meaning" – in other words, "'a separate, distinct and specialized meaning in the law different from that present in the vernacular.'" *Id.* (citation omitted); *see Perkins*, 470 F.3d at 158; *JFJ Toys, Inc. v. Sears Holding Corp.*, 237 F. Supp. 3d 311, 324 (D.

Md. 2017).  Courts also consider whether the proposed expert testimony would "take away from the jury its responsibility to determine the facts and ultimately, whether the defendants are liable."  *Sprint Nextel Corp. v. Simple Cell, Inc.*, No. CCB-13-617, 2016 WL 524270, at *5 (D. Md. Feb. 10, 2016) (excluding portions of expert report that were unhelpful legal conclusions).

Nevertheless, "[i]n appropriate circumstances, an expert may offer an opinion that applies the facts to a legal standard."  *Campbell*, 963 F.3d at 314; *see id.* at 315 (affirming district court's exercise of discretion in permitting doctor to testify that "heroin intoxication" was the cause of death and, "'but for the heroin,'" the victim "'would have lived'") (citation omitted); *see, e.g., In re Lipitor*, 892 F.3d at 646-47 (discussing the need for expert testimony to establish that a drug was the cause of death); *Wolf*, 860 F.3d at 193 (in a mortgage fraud case, allowing testimony of expert as to whether "categories of information would have been material to lenders"); *United States v. Chikvashvili*, 859 F.3d 285, 292-94 (4th Cir. 2017) (affirming the admission of a doctor's "expert opinion on causation" of death); *United States v. Alvarado*, 816 F.3d 242, 246 (4th Cir. 2016) (affirming the district court's admission of an expert witness's testimony that, "without the heroin, [the victim] doesn't die"); *McIver*, 470 F.3d at 562 (finding no error in the admission of testimony of a physician who opined that the defendant, also a physician, acted outside the course of legitimate medical practice in his pain medication prescriptions).  But *see, e.g., DiBella v. Hopkins*, 403 F.3d 102, 121 (2d Cir. 2005) (ruling inadmissible expert testimony that defendant's conduct constituted "extortion"); *Miller v. Clark County*, 340 F.3d 959, 963 n.7 (9th Cir. 2003) (stating that expert testimony that a dog bite constituted "deadly force," amounts to a legal conclusion); *Christiansen v. Nat'l Sav. & Trust Co.*, 683 F.2d 520, 529 (D.C. Cir. 1982) (observing that testimony regarding the existence of "fiduciary duties" constitutes a legal conclusion).

Recently, in *Mallory*, 988 F.3d 730, a False Claims Act case under 31 U.S.C. § 3729, the government presented evidence that the defendants violated the False Claims Act in various ways, "including by paying physicians" for lab work, in violation of the AKS, 42 U.S.C. § 1320a-76(b). *Id.* at 735. Among the issues on appeal, the Fourth Circuit considered the district court's exclusion of various defense experts. *Id.* at 741-742.

A health care attorney sought to testify as to whether defendants "'would have reason to know what the legal obligations were.'" *Id.* at 741. The district court determined that the testimony constituted "a legal conclusion informing the jury about how it should apply the law, which is prohibited." *Id.* The district judge also excluded the testimony of a nurse, who sought to testify as to Medicare Code calculations, because she lacked personal knowledge of Medicare's "precise methodology." And, the district judge barred a proposed expert on process and handling fees with regard to blood tests, because it found unreliable the methodology for calculations of fair market value. *Id.* at 742. The Fourth Circuit upheld the rulings, concluding that the district court did not abuse its discretion. *Id.*

Nevertheless, there is abundant authority for the proposition that when, as here, the case involves a complex statutory and regulatory scheme, expert testimony pertaining to "highly technical legal issues" may be admissible. *Offill*, 666 F.3d at 175.

*Offill* provides guidance. In that case, a lawyer was convicted of securities fraud, wire fraud, and conspiracy to commit securities registration violations. On appeal, the defendant challenged, *inter alia*, the testimony of two government experts, claiming they improperly gave opinions on the scope and meaning of certain legal terms and standards, including the meaning of the term "underwriter," criteria for securities registration, criteria for when investors can sell shares, and related issues. *Id.*

The Fourth Circuit cautioned that a witness cannot testify as to his or her view of the verdict that should be reached. Nor can the witness usurp the judge's role in determing the law and explaining it to the jury. *Id.* at 175. But, of import here, the Court recognized that expert testimony may be admitted to explain a "legal regime [that] is complex" if it would assist the jury. *Id.* The Court reasoned, *id.*:

> We conclude that the specialized nature of the legal regimes involved in this case and the complex concepts involving securities registration, registration exemptions, and specific regulatory practices make it a typical case for allowing expert testimony that arguably states a legal conclusion in order to assist the jury. The jury in this case needed to understand not only federal securities registration requirements but also the operation of several obscure Texas Code provisions and their relationship with the federal regime. To be sure, the ultimate responsibility for instructing the jury on the law belonged to the district court, but we cannot conclude that in these circumstances the district court abused its discretion by concluding that the expert testimony presented int his case would assist the jury. Indeed, we find it difficult to imagine how the government could have presented its case against Offill without the assistance of expert testimony to explain the intricate regulatory landscape and how securities practitioners function within it.

In addition, the Court recognized that "experts may offer opinions based on hypothetical questions proposed by the attorneys . . . ." *Id.* at 177. And, "[s]uch testimony would be admissible even though the hypothetical question mirrored the defendant's conduct," so long as it did not encroach on the defendant's intent. *Id.*

*Adams*, 2015 WL 9412518, a negligence case, is also instructive. There, a worker was injured when he fell from scaffolding. The plaintiff claimed that the defendant failed to comply with a lengthy and complicated regulation issued by the Occupational Safety and Health Administration ("OSHA"), 29 C.F.R. § 1926.451. The defense moved to bar the testimony of plaintiff's expert as to any claim of non-compliance with OSHA.

The district court in Massachusetts observed that the "admission of expert evidence concerning the law is not nearly as rare as the case law might suggest." *Id.* at *5. The court

added, *id.*: "Indeed, it would be unwise and unworkable to impose such a prohibition. We live in a highly complex and often bureaucratic society with a multitude of legal and regulatory requirements . . . ." Further, the court observed that often a party's conduct "can only be fully understood in the context of a particular regulatory environment [that] needs to be explained to lay persons . . . ." But, the court cautioned that expert testimony must "accurately state the law." *Id.* at *6. And, to the extent of a dispute as to the law, only the court can resolve it. *Id.* As the *Adams* Court observed, *id.*: "Put simply, any expert description of the law is admissible only if it is correct."

The *Adams* Court included various examples of cases in which experts have applied facts to law and then concluded that the law was violated. *Id.* The court pointed out, for example, that "it is routine for courts in tax evasion prosecutions to permit an IRS representative to testify that he or she performed a tax calculation, using various deductions, exemptions, and other provisions of the Internal Revenue Code . . . . Such testimony is normally labeled 'summary' or 'accounting' testimony. . . . Whatever the label, it is, in substance, expert testimony applying the facts (the defendant's income and expenses) to the law (the tax code) to reach a legal conclusion (that a tax was owed). Again, such evidence is routinely admitted, because it is helpful to the jury and it is not unfair." *Id.* (citations omitted).

The *Adams* Court summarized its discussion as follows, *id.* at *8:

1.      There is no general prohibition against an expert describing the law (including specific regulations or a regulatory framework).

2.      An expert can describe the law only if that description is accurate. If there is a dispute as to the law, it is for the court to resolve.

3.      There is no general prohibition against an expert describing the application of facts to law, or stating a conclusion based on that application. However, any such testimony must not be, in form or substance, an opinion as to a disputed issue of law.

4.      All expert testimony concerning the law must be helpful to the jury in accordance with Fed. R. Evid. 402.  Testimony by an expert concerning an ultimate legal conclusion is not likely to be helpful, and therefore should rarely be admitted.

5.      All expert testimony concerning the law is subject to the limitations of Fed. R. Evid. 403.

Given this framework, the court concluded, *inter alia*, that the plaintiff's expert could describe the OSHA regulations and set forth his view as to why the scaffolding did not comply with it.  *Id.* at *9.  Further, assuming an adequate factual basis, he could testify that the defendant violated the regulation.  But, he could not opine as to the defendant's legal duty to plaintiff under OSHA, or the breach of that duty.  *Id.*

Clearly, this is not a "one size fits all" matter.  Case law can be found that supports or rejects such testimony, and it is clear that a case-by-case analysis is required.  But, on the whole, there are many cases that support the use of legal experts in a case such as this, involving a complex statutory and regulatory scheme.  *See*, *e.g.*, *United States v. Turner*, 620 Fed. App'x 249, 252 (5th Cir. 2015) (permitting Medicare expert to testify that Medicare does not pay claims associated with kickbacks); *United States v. Onyenso*, 615 Fed. App'x 734, 738 (3rd Cir. 2015) (concluding that district court did not abuse its discretion in allowing government expert to testify regarding the purposes of the AKS and that Medicare does not allow payment of claims tainted by kickbacks); *United States v. Strange*, 23 Fed. App'x 715, 717 (9th Cir. 2001) (noting that "expert testimony regarding Medicare regulations and reimbursement procedures" is "entirely appropriate for an expert"); *United States v. Van Dyke*, 14 F.3d 415, 422 (8th Cir. 1994) (concluding that trial court erred in refusing to allow defense expert to explain a banking regulation that was addressed by a government witness); *United States v. Mohney*, 949 F.2d 1397, 1406-07 (6th Cir. 1991) (concluding that IRS agent's expert testimony created framework

for jury to understand the evidence), *cert. denied*, 504 U.S. 910 (1992); *United States v. Okoroji*, No. 3:15-cr-00559-0, 2018 WL 8756434 (N.D. Tex. June 12, 2018) (permitting defense expert to "explain how Medicare and its billing process work and whether a defendant who violated the AKS or Medicare regulations would receive reimbursements"); *United States v. Crinel*, No. 15-61, 2016 WL 6441249, at *8 (E.D. La. Nov. 1, 2016) (allowing expert to testify regarding Medicare's standards and practices, custom and practices, because of the complexity of the regulations); *id.* at *10 (where defendant sought to offer expert testimony on the AKS and safe harbors, government's motion in limine was denied to the extent it sought to exclude testimony about practice and procedures "which [experts] believe do not violate the [AKS]" but precluding testimony as to experts' belief that certain conduct was lawful and barring opinion testimony as to "what the law is . . . ."); *United States v. Pacific Gas and Electric Co.*, 14-cr-00175-THE, 2016 WL 3268994 (N.D. Calif. June 15, 2016) (permitting defense expert to testify about complex regulatory framework "that underlies this criminal prosecution"; defendant claimed that alleged regulatory violations were not "knowing and willful" because regulations are vague, contradictory, or confusing, and expert testimony would help jury to "digest" the "complex regulatory framework"); *U.S. ex rel. Ruscher v. Omnicare, Inc.*, 4:08-cv-3396, 2015 WL 5178074, at *7 (S.D. Tex. Sept. 3, 2015) (in False Claims Act case, based on claim that defendant violated AKS, rejecting Relator's objection to expert testimony providing background on the long term care industry, because it was not specific to the defendant; an expert can educate the factfinder, within reason, about general principles relevant to the case, particularly where the case "concerns a complex industry governed by a number of federal statutory and regulatory schemes").

There is also ample authority for the admission of expert testimony concerning the

features of a fraud scheme. *See*, *e.g.*, *Wolf*, 860 F.3d at 193 (in a mortgage fraud case allowing testimony of expert as to whether certain information would have been material to lenders); *United States v. Toliver*, 451 Fed. App'x 97, 104 (3rd Cir. 2011) (upholding admission of testimony concerning "typical features" of a bank fraud scheme); *United States v. McCollum*, 802 F.2d 344, 346 (9th Cir. 1986) (permitting expert testimony regarding the nature of mail fraud schemes); *United States v. Carson*, 702 F.2d 351, 369 (2nd Cir. 1983) (allowing expert testimony on "the clandestine manner in which drugs are bought and sold"); *Elat v. Ngoubene*, 993 F. Supp. 2d 497, 514 (D. Md. 2014) (permitting expert testimony concerning common aspects of human trafficking cases); *United States v. Robinson*, No. 98 Cr. 167, 2000 WL 65239, at *3 (S.D.N.Y. Jan. 26, 2000) (concluding that expert testimony regarding the "hallmark" of prime bank fraud schemes would assist the jury).

In sum, in cases such as this one, where "the legal regime is complex" and the regulatory landscape is "intricate," the testimony of a qualified expert could be helpful in providing background information to the jury with regard to the statutory and regulatory schemes. *Offill*, 666 F.3d at 175. But, the questions must be carefully posed and cannot trample on the responsibility of the Court to ascertain the law and to advise the jury accordingly.

### III. Discussion

The framework set forth above guides my analysis. The admission of all expert testimony is, of course, subject to a proper foundation. And, the rulings that follow are subject to revision, based on the actual presentation of evidence. Moreover, upon request, the Court will consider a limiting instruction where appropriate, advising the jury that their decisions must be based on the law as set forth by the Court, not by a witness.

## A. Government's Experts

### 1. Stephen Thomas, M.D., MBA

According to the government, the allegations in the case will require an understanding of medical terminology and practices, to include the use and benefits of certain pain medications, drug prescription dosages and practices, reimbursement by insurance companies for medical claims, compounding of pharmaceuticals, the pharmacology of the medications at issue, and the effect of the medications, among other things. To that end, the government has designated Stephen Thomas, M.D., MBA as a medical expert to assist the jury in understanding these topics and related issues pertinent to them. Dr. Thomas is a medical doctor ("M.D.") who specializes in anesthesiology and pain management and holds a Master of Business Administration ("MBA") degree.

Blair has launched a vigorous and "global" challenge to Dr. Thomas, seeking to exclude the testimony of Dr. Thomas in its entirety. ECF 163 at 118. The defendant asserts that "it is nearly impossible to also move on each and every specific line of the various disclosures." ECF 125 at 4 n.3. Nevertheless, he has managed to do so.

Dr. Thomas's proposed testimony is contained in three separate disclosures by the government, totaling approximately 10 single-spaced pages. ECF 125 at 4 n.3. The government's initial disclosure concerning Dr. Thomas was made on November 3, 2020. *See* ECF 106-2; ECF 115-1. On February 4, 2021, the government supplemented its disclosures with respect to Dr. Thomas. *See* ECF 115-2. And, the government provided further information about Dr. Thomas's proposed testimony on April 9, 2021. ECF 116-4 at 1-5.

As to Dr. Thomas, the defense challenges all 27 proposed opinions of Dr. Thomas. In essence, the proposed testimony concerns topics as well as opinion. They are as follows, ECF 147 at 13-18:

1.    The basic elements of medical practice, including but not limited to, the importance of taking a patient's history, examining the patient, trying small doses of single medications, the dangers and difficulties of *prescribing too many medications at once*, and the need for follow-up visits to ascertain the source of pain and the effectiveness of particular medications. He is likewise expected to testify about the risks and uncertainties of *prescribing too many medications* (or too much medication) *at once*. [Emphasis added].[8]

2.    The kind of patient examination that would be expected in advance of a prescription for any pain medication, including pain creams and patches. He will describe the type of patient and symptoms that would warrant a prescription for the ingredients in Matthew Blair's pain creams, including but not limited to ketamine, gabapentin and diclofenac, the side effects of the ingredients, and the potential harm that could result from improper prescriptions.

3.    That dispensing duplicative drug combinations with the same or similar acting mechanisms increases the chances of side effects without increasing the chances of therapeutic value.

4.    That compounding exists to meet individualized patient needs.

5.    That, to be medically necessary, a drug or combination of drugs must be prescribed by a physician to meet individualized patient need.

6.    The circumstances under which prescribing compounded drugs might be warranted, such as in the case of patients with certain allergies.

7.    The medically acceptable uses for the ingredients reflected on Matthew Blair's pre-filled prescription forms, including their ordinary use, the form in which they are FDA approved (and the FDA process generally), their effects and side effects, their likely interactions with one another, and the dearth literature evaluating their effectiveness in topical cream form.

8.    That the combination of drugs that the defendant caused to be

---

[8] I italicized the words merely to show the repetition in Topic 1.

dispensed were not of the appropriate dosage or form to have a likely clinical effect on the patient, and that in some circumstances, the drugs could have counteracted one another in the form in which they were prescribed.

9.　　That it would be outside industry standards for the owner of a pharmacy (or a pharmacy tech) to drive clinical decision making, including by creating prescription forms containing the pharmacy owner's conceived creams and chemical combinations, which were then distributed by the pharmacy owner's salesmen to doctor's offices, then prescribed by physicians to treat patients with a wide range of diagnosis codes.

10.　　That it would be outside industry standards for the owner of a pharmacy (or a pharmacy tech) to create pre-filled prescription forms containing the pharmacy owner's conceived creams and chemical combinations, and for a compounding pharmacy to dispense, creams containing ingredients that have no topical efficacy.

11.　　That certain features of Mathew Blair's prescription forms that caused his salesmen to provide to doctors and to return to Blair Pharmacy to be dispensed were outside acceptable prescription practices. For example, he will testify about the forms' vagueness as to dosage instructions, the repetition of certain medications, and the availability of "metabolic" ingredients over-the-counter.

12.　　That it would be outside industry standards for the owner of a pharmacy (or a pharmacy tech) to cause the compounded creams to be created in large batches.

13.　　That it would be outside industry standards for the owner of a pharmacy (or a pharmacy tech) to cause a prescription to be dispensed without a doctor's prior authorization, to change or alter an active ingredient in a prescription without a doctor's prior authorization, or to change or alter the amount of an active ingredient without a doctor's prior authorization.

14.　　That many of the medications prescribed in this case were prescribed in medically inappropriate dosages or forms and that many of the medications prescribed in this case have no or limited clinically proven medical utility or are indistinguishable from placebos.

15.　　That many of the medications prescribed in this case are identical to prescription medications available at *de minimis* cost and substantially similar to inexpensive medications available without a prescription.

16.　　That the combinations of drugs that defendant conceived and

included on his prescription forms, which he marketed to doctors, include duplicative drug combinations, specifically: compound medication formulas that include more than one drug of the same drug class (for instance Flurbiprofen and Diclofenac; and Ketorolac and Indomethacin), in addition to compound medication formulas in which the mechanism of action of one drug is subsumed by another drug with the same mechanism of action (for instance Fluticasone and Levocetirizine).

17.    The difference between a "topical" medication and a "transdermal" medication, in that a "topical" medication treats the skin or the localized area beneath the skin where the topical agent is applied and a "transdermal" medication is a medication that uses the skin as a delivery system of the medication to the rest of the body. Dr. Thomas is expected to opine that the term "no topical efficacy" means that there is no pharmacological effect of a drug on the skin, or the localized area directly beneath the skin, where the drug has been applied. Relatedly, Dr. Thomas will opine that the term "no transdermal efficacy" means that there is no pharmacological effect of a drug on the body when the drug is applied to the surface of the skin, because there is insufficient delivery of the medication to the drug's target organ when the drug is applied to the skin (for instance, no topical efficacy of Cyclobenzaprine, no topical efficacy of Gabapentin except involving specific nerve pain near the skin).

18.    That when a drug has been included in a compound medication formula mixture that contains more than one drug, and when the inclusion of a drug in that mixture causes another drug in the mixture to be rendered chemically inert, then there is no possible topical efficacy of the drug (such as Tetracaine, Bupivacaine and Cyclobenzaprine).

19.    That when a drug is not stable in a solution at room temperature, then the drug has no topical effect (such as Tetracaine).

20.    That "features" that the defendant included on his prescription forms and marketed to doctors, such as the specific words, medications, numbers, percentages, doses and instructions that the defendant utilized, contain information that does not make sense, and in some instances these features are inaccurate and misleading (such as the defendant's use of the word "transdermal" to describe and market the compound drug formulations he conceived and used on his forms; the defendant's use of the word "anti-inflammation" to describe drugs that are not anti-inflammatory, such as Gabapentin, Cyclobenzaprine, Tetracaine, Bupivacaine, Lidocaine and Verapamil; the defendant's use of the term "neuropathic" to described drugs that are not effective in the treatment of neuropathic pain conditions, such as Flurbiprofen, Diclofenac, and Cyclobenzaprine.

21.     The medications that the defendant included on his prescription forms, including Gabapentin, Cyclobenzaprine, Tetracaine, Bupivacaine, Lidocaine and Verapamil, and the following: the defendant's "wound care" compound medication which contains medications that counteract each other, such as Misoprostol and Fluticasone; include clinically incompatible medications, such as Mupirocin, Itraconazole and Fluticasone, for infection and a steroid. The defendant's "scar" compound medication formula, including Fluticascone, Gabapentin, Levocetirizine, Pentoxifylline, Prilocaine, Verapamil, and Tranilast contains precisely one medication intended for the treatment of scars. The defendant's "shingles" compound medication formula, including Acyclovir, Amitriptyline, DDG, Flurbiprofen and Lidocaine is not a treatment for "shingles," i.e., acute herpes zoster varicella. The defendant's "gout" compound medication formula, including Ketorolac, Indomethacin, Loperamide and Triamcinolone can exert no clinical effect on the pathophysiologic process of "gout." The defendant's "anti-fungal" medication compound formula, including Terbinafine, Fluconazole, DMSO and Flurbiprofen contains duplicative and unnecessary medications. The defendant's "migraine" compound medication formula, including Sumatriptan, Ondansetron, Naproxen and Bupivicaine could function neither to stop or prevent a "migraine headache," violating every principle of migraine treatment. The defendant's "metabolic" medication compound formula, including CoEnzyme Q10, Alpha Lipoic Acid, Methycobalimin, Reservatrol (sic), Pyridoxial, and Folic Acid is fundamentally not a "medication," as it is not for the diagnosis, treatment or cure of any human ailment.

22.     That the defendant marketed specific drugs in his compound medication formulas that have not been approved by the FDA for the purpose, dosage or manner for which the defendant marketed the drug, such as Flurbiprofen, Cyclobenzaprine, or Loperamide. The defendant's conceived numerical percentages and dosage information regarding the drugs are in amounts that exceed the dosage amount recommended by the FDA in the prescribing instructions for the intended use which the defendant usurped in marketing the drug, such as Diclofenac.

23.     That the defendant repeated certain drugs in his conceived compound medication formulas (such as Flurbiprofen, Diclofenac, Gabapentin, Cyclobenzaprine and Lidocaine) in ways that could not be pharmacologically justified and, therefore, driven by some other motivation; that the instructions that the defendant included on his form yielded medically excessive amounts with medically excessive number of applications per day; and that the paragraph that the defendant included at the bottom of his prescription form, including the words that relate to auto-refills and shipment of medication by mail, were contrary to patient interests.

24. That "prescription practices" means the generally accepted practice of prescribing medications for patients.

25. That in executing that generally accepted practice, clinical decision making should be initiated by a doctor, and not restricted by a form created by the defendant. Clinical decision making, regarding the prescription of medication, should be based upon a physician's decision about an individual patient's medical need, leading to a physician instruction to the pharmacy, i.e., a prescription for the medication required to treat the individualized need of a patient.

26. That typically, the normal and standard way in which medication is prescribed by a doctor for a patient, is that after diagnosing the patient, the doctor prescribes medication that has undergone a safety and efficacy analysis by the FDA. Through this process, the FDA determines that the drug is safe and effective for a specific medical purpose, and the FDA determines the dosage range over which the medication is deemed to be safe and effective. Drugs approved by the FDA can then be marketed by drug manufacturers to doctors for a specific medical purpose, and in a specific dosage, determined by the FDA to be safe and effective. Compounded drugs can be prescribed for a patient, based on the individualized need of a specific patient, when a manufactured drug does not meet the medical needs of an individual patient.

27. That the defendant deviated from the standard prescription practice in several ways, including by creating prescription forms which he marketed to doctors, with his conceived compound medication formulas and specific dosages containing information that does not make sense, and containing information that is inaccurate and misleading (please see detailed description of the specific features above) which were not for the benefit or medical need of any individual patient.

Blair claims, *inter alia*, that Dr. Thomas is not qualified to testify about the topics for which the government seeks to call him; many of his opinions are not reliable because they are not based on sufficient facts or data; and he has failed to identify a reliable methodology upon which he reaches his purported conclusions. ECF 106-1 at 5. Further, Blair challenges the relevancy of certain proposed testimony. For example, Blair describes as irrelevant Dr. Thomas's proposed explanation of the "basic elements of medical practice," such as "the importance of a *physician* examining the patient . . . ." ECF 106-1 at 41 (emphasis in original).

In this regard, Blair underscores that he was "*the owner of a pharmacy*," not a medical doctor, and the crimes charged do "not depend *in any way* on the duties [of] a physician . . . ." *Id.* (emphasis in original); *see also* ECF 125 at 5. Thus, Blair insists that such testimony will merely confuse the jurors. ECF 106-1 at 41.

In addition, the defense objects to a "Record Review" conducted by Dr. Thomas. *See* ECF 115-2. The Record Review is almost four single-spaced pages in length, but no details were provided concerning the objection. ECF 147 at 15.

Moreover, Blair points to the pertinent provider agreements between Blair and the health care payors, arguing strenuously that a prescription need only be "valid" or clinically effective," not "medically necessary." ECF 106-1 at 46, 47; *see also* ECF 163 at 121-146. According to the defense, the prescriptions at issue in this case were validly issued by hundreds of physicians. *See* ECF 163 at 121-146. Moreover, Blair insists that he made no representations as to medical necessity. *Id.* at 129. Therefore, he insists that Dr. Thomas's testimony as to medical necessity is both irrelevant and extremely prejudicial. ECF 106-1 at 47.

In other words, the defense maintains that the prescriptions were all valid, and Dr. Thomas should not be able to say otherwise. In this regard, the defense contends that there is no evidence of any corruption as to the issuance of prescriptions, nor has Dr. Thomas ever evaluated the patients. Thus, Blair challenges Dr. Thomas's proposed impeachment of the prescription practices of doctors who are not present at trial and who issued valid prescriptions. Further, Blair maintains that the Pharmacy had no duty to insure medical necessity.

In Blair's reply (ECF 125), he argues that, by calling Dr. Thomas, the government seeks to avoid calling the many doctors who prescribed the compounds in issue. *Id.* at 3-4. In the absence of a review of the medical records of a particular patient, Blair contends that Dr. Thomas

cannot opine on the medical necessity of a particular prescription for that patient. Further, Blair contends that the doctors who wrote the prescriptions were the ones who made representations as to medical necessity, not Mr. Blair. ECF 163 at 132-38. He asserts, *id.* at 138: "To allow Dr. Thomas to come in and create a dispute of fact over the medically necessity of 10 million dollars worth of prescriptions that are prescribed by hundreds of doctors across the country . . . will just inflame and prejudice the jury about a fact that's actually not relevant . . . ."

Blair also argues that Dr. Thomas is not qualified to opine on "pharmacy 'industry standards'" or "acceptable prescription practices." ECF 106-1 at 18; *see also id.* at 21. Given Dr. Thomas's training as an anesthesiologist who specializes in pain management, Blair contends that Dr. Thomas lacks the expertise to opine on these matters. *Id.* at 18. Moreover, he maintains that Dr. Thomas's opinions "lack an adequate factual basis" and are "purely speculative and, thus, unreliable." *Id.* In Blair's view, the "sweeping" conclusions of Dr. Thomas, *id.* at 23, are not based on "a sound foundation" of facts and are, instead "*ipse dixit*." *Id.* at 19; *see id.* at 22-23. Further, Blair contends that Dr. Thomas has not shown the methodology he used to arrive at his opinions. *Id.*

As the government observes, Dr. Thomas has specialized knowledge, skill, training, education, and years of experience, which qualify him to testify as to the specific drugs that are in issue. In particular, Dr. Thomas has developed extensive knowledge and understanding of the ways in which drugs "move into and through the human body [and] how the drugs assert their effect in the body." ECF 115 at 7. The government claims that Dr. Thomas is also qualified to address generally "the FDA process by which drugs are vetted for their safety and effectiveness." *Id.* And, he certainly has acquired extensive knowledge concerning the pharmacology of drugs. Moreover, according to the government, Dr. Thomas is qualified to testify, based on his

experience, training, and education, as to the way in which medications are generally prescribed, *i.e.*, prescription practices. And, it rejects the defendant's arguments concerning medical necessity.

Dr. Thomas testified at the first *Daubert* hearing. *See* ECF 138 at 10-74. At length, he recounted his impressive academic and clinical credentials, as reflected on his Curriculum Vitae. *See* ECF 115-1 at 12-18. As noted, Dr. Thomas is an anesthesiologist with a specialty in pain management. His undergraduate degree is from Case Western Reserve University in 1979 and in 1984 he graduated from Stanford University School of Medicine. In 2012, Dr. Thomas earned an MBA at the University of Pittsburgh.

Dr. Thomas completed an internship at the University of Pennsylvania, followed by a residency in anesthesiology at Johns Hopkins Hospital. He subsequently completed a Fellowship in pain medicine, also at Hopkins. His credentials include the following: Diplomate, American Board of Anesthesiology; Subspeciality Certification in Pain Medicine, American Board of Anesthesiology; Fellow of Interventional Pain Practice, World Institute of Pain; Certification in Controlled Substance Management, American Board of Interventional Pain Physicians; Certification in Coding Compliance and Practice Management, American Board of Interventional Pain Physicians; Certified Independent Medical Examiner. *See* ECF 115-1 at 14; ECF 115 at 5 n.3.

In 1989, Dr. Thomas became board certified in anesthesiology. ECF 138 at 23. He has participated in "tens of thousands" of surgical procedures involving anesthetics, *id.* at 27, and has extensive training and experience in the "treatment of complicated scars," *id.*, and migraines. *Id.* at 30. He has also been trained in "the use of a wide variety of classes of medications that are either directly or indirectly part of the practice of pain medicine." *Id.* at 30. use And, he has

worked with pharmacies thousands of times, and is familiar with prescription practices. *Id.* at 33. He also has experience with compounding pharmacies. *Id*. at 33-34.

According to Dr. Thomas, pharmacology "is an integral part of anesthesia. . . ." *Id.*at 13. He explained that pharmacology "is the branch of science" that studies drugs, including the way the substances "move throughout the body" and the way "they work in the body to produce the end result." *Id.* Dr. Thomas has practiced or taught in the field of pharmacology for almost four decades. *Id.* at 27.

With respect to the substances dispensed at the Pharmacy, Dr. Thomas testified that he has had "direct experience with either the administration or the prescription of all the drugs that were listed . . . on the [Pharmacy's preprinted prescription] forms, with the exception of Tranilast . . . ." *Id.* at 31. Tranilast is used in scar creams. *Id.* Dr. Thomas has "prescribed or utilized all of the rest of the drugs . . ." on those forms. *Id.* Indeed, he has prescribed these drugs "tens of thousands" of times. *Id.* at 32. And, he has been involved "hundreds" of times in the use of the topical drugs dispensed at the Pharmacy. *Id.* at 33. Moreover, with respect to the drugs that comprised the combinations that Dr. Thomas reviewed for his expert opinions, "most" were in use during his training, with the exception of ondansetron and sumatriptan. *Id.* at 50-51.

Moreover, Dr. Thomas explained the FDA's "prescribing information," *id.* at 14, as well as the FDA drug approval process. *Id.* at 14-17. He also reviewed the references and sources of information on which physicians rely to prescribe appropriate medications. *Id.* at 13-14.

According to Dr. Thomas, the prescription process has several "components." *Id.* at 34. He stated that it is the physician, not the pharmacist, who prescribes a particular medication. *Id.* But, he acknowledged that a pharmacist holds a "key" role in dispensing medications. *Id.* at 35. Although "the ultimate decisions" are made by the physician as to the appropriate drug, a

"pharmacist can be helpful" in assuring "the best interest of the patient." *Id.* And, Dr. Thomas stated that he has had "Tens of thousands" of interactions with pharmacies over the years, *id.* at 33, and on thousands of occasions he has also observed other doctors interact with pharmacies. *Id.*

In 2014, Dr. Thomas ceased the clinical practice of medicine. ECF 138 at 47. Thereafter, Dr. Thomas founded a company called "Safe Simple Effective Analgesia," which engaged in teaching physicians how to manage pain medicines. *Id.* at 29; *see* ECF 115-1 at 13. He now serves as the President of Pain & Disability Management Consultants, P.C. ECF 115-1 at 13.

As an expert, Dr. Thomas has testified approximately 12 times in state courts and 15 times in federal courts, on topics regarding pain medication, addiction, and compound drugs. *Id.* at 39. On three occasions, he testified about compound drugs similar to those in issue here. *Id.* On cross-examination, however, Dr. Thomas could not recall if he qualified specifically as an expert in matters of pharmacology. *Id.* at 51. According to Dr. Thomas, most of his testimony as an expert in criminal cases was presented in "pill mill" cases. *Id.*

Clearly, Dr. Thomas is quite familiar with pain medications, and has been involved with countless patients with a variety of medical conditions, for which pain medications were prescribed. Further, his testimony established that he has an in-depth knowledge and understanding of pharmacology.

To be sure, the defense established that Dr. Thomas does not hold a Ph.D. in pharmacology or a doctorate in pharmacy. *Id.* at 45. And, as mentioned, he ceased the clinical practice of medicine in 2014. But, he is still licensed to practice medicine. ECF 115-1 at 14. As I see it, defendant's assertion that Dr. Thomas lacks the requisite knowledge regarding

pharmacology is completely without merit. There is obvious overlap as to matters concerning medicine and pharmacology. Defendant can certainly elicit at trial that Dr. Thomas does not hold an advanced degree in pharmacy or pharmacology. But, this does not render Dr. Thomas unqualified to testify.

To the contrary, I am satisfied that, in general, Dr. Thomas is eminently qualified to serve in the role of an expert, as designated. As to methodology, Dr. Thomas's opinions are largely based upon his education, training, experience, and skill. As the government puts it, the challenge to methodology "falls flat." ECF 115 at 26. However, this does not mean that each proposed opinion is necessarily appropriate or admissible.

As noted, the defense made a wholesale objection to all 27 proposed topics or opinions of Dr. Thomas. Some of the objections are simply specious.

Topic 1 concerns "basic elements of medical practice." Defendant argues, *inter alia*, that Mr. Blair is not a physician and such testimony has no relevance.

I disagree. The government is entitled to introduce evidence, through Dr. Thomas, that provides essential background information to help the jury in understanding the evidence and the significance of allegations concerning the prescriptions in issue. The Court will permit a limited amount of background testimony about the medical field because it will be helpful to the jury for context. This extends to medical terminology and particular drugs or ingredients.

Similarly, the first sentence of Topic 2, as well as Topics 4, 5, 6, and 24, are matters within Dr. Thomas's expertise. Moreover, the topics clearly constitute relevant information that would be helpful to the jury. For example, the case concerns the prescriptions of compounded substances. To challenge testimony about the nature of compounding, its purposes, the

circumstances for which such drugs are warranted, and prescription practices (Topics 4, 6, 24) strains credulity.

The second sentence of Topic 2, as well as Topics 3, 7, 8, 11, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, and 23 are all matters within the expertise of Dr. Thomas and relevant. The government proposes to call Dr. Thomas, for example, to opine that the combination of drugs that were dispensed were not of the appropriate dosage or form to have a likely clinical effect on the patient. In addition, it seeks to establish that, in some circumstances, the drugs would have counteracted one another in the form in which they were prescribed. The government has demonstrated that Dr. Thomas is qualified to explain the drug delivery systems to the body, as well as the areas of compounding, pharmacokinetics, pharmacodynamics, and the nature and use of particular drugs, such as Gabapentin, Ketamine, and Diclofenac. Dr. Thomas may also opine that the practice of compounding is not tied to the rate of reimbursement, and he may explain that compounding is based on the need for individualization. Such information is critical for the jury to understand the issues.

As indicated, the defense vehemently maintains that Dr. Thomas cannot address medical necessity with respect to the prescriptons, given that the prescriptions were validly written by physicians, and there is no alleged corruption of that process. This contention is certainly not frivolous. But, as the Eleventh Circuit recently said in a health care fraud case, "A doctor's prescription is not a get-out-of jail free card. We have found sufficient evidence of healthcare fraud . . . even where a doctor prescribed the treatment or medication." *United States v. Grow*, 977 F.3d 1310, 1321 (11th Cir. 2020) (per curiam).

The *Grow* case is instructive. There, the defendant was convicted of conspiracy to commit health care and wire fraud involving TRICARE. *Id.* The defendant in that case formed

a company that "teamed up with a pharmacy" to market a pain cream, a scar cream, and a metabolic vitamin. *Id.* at 1314. The company "recruited" patients, not doctors, to prescribe the products. *Id.* But, doctors were an integral part of the defendant's scheme. The evidence showed that the defendant's company used telemedicine companies to prescribe the products. *Id.* at 1314.

Notably, the defendant's company marketed exclusively to persons insured by TRICARE, because it was "'the best payer' . . . ." *Id.* The defendant's sales representatives suggested prescriptions to the physicians, and sometimes used "prefilled prescription[s]" for the doctors to sign. *Id.* at 1314. And, the defendant told his representatives to use codes that generated the highest reimbursements from the insurance company, and to use the largest size, so as to obtain maximum reimbursement. *Id.* The defendant also told recruits that they did not have to pay the copays. *Id.* at 1315.

At trial, the defense claimed that, to obtain the products, the recruits had to "'need the product'" and the doctors, relying on their independent "'judgment,'" then prescribed the products. *Id.* at 1316. But, the recruits were allegedly induced by kickbacks to order the products. *Id.* at 1318. And, the doctors were told what products to prescribe, either by the use of pre-filled prescriptions or intake forms. *Id.* at 1314-15, 1322.

In upholding the fraud convictions, the Eleventh Circuit said, *id.* at 1321: "It is no answer to say, as [the defendant] does, that the creams and vitamins were 'provided pursuant to valid prescriptions issued by doctors who lawfully consulted with the patients' . . . ." Further, the court said: "[A] reasonable jury could find knowledge of the fraud, and an intent to defraud, from [defendant] sending prefilled prescriptions and intake forms to the telemedicine companies already checked off with creams and vitamins that had the highest reimbursement rates, with the

most refills, and in the largest sizes." *Id.* at 1322-23. *See also United States v. Melgen*, 967 F.3d 1250, 1255, 1263 (11th Cir. 2020) (reasoning, in a case where the defendant regularly prescribed an expensive drug and "'rarely prescribed'" the "equivalent, less expensive drug," the defendant's "profit motive was evidence of his intent to defraud").

Certainly, there are distinctions between the evidence in *Grow* and the allegations here. Yet, the allegations here share many common features with the scheme in *Grow*. In any event, *Grow* makes clear that the mere issuance of a prescription by a physician does not insulate a defendant from the claim of fraud.

As the government explains, defendant is charged with wire fraud, money laundering, and violations of the AKS. The government seeks to prove that Blair engaged in a scheme to dispense drugs based on the ingredients, and that ingredients were used based on the amount for which he would be reimbursed, and not based on medical necessity. Further, the defendant allegedly crafted the formula of drugs, and enlisted a marketer, who was paid a commission to promote them. Thus, the government contends that it has, indeed, alleged a tainted prescription process, albeit not the more conventional one that the defense considered, which would involve a kickback of money to doctors in exchange for the prescriptions. The government claims, however, that the doctors were induced to sign the prescriptions, without regard to medical necessity. And, the government claims it intends to call several of the physicians whose prescriptions are in issue.

Therefore, I conclude that, to the extent that a topic implicates medical necessity, Dr. Thomas may address the matter, subject, as always, to a proper foundation.

I take a different view of Topic 9. As the defense observes, Dr. Thomas does not own a pharmacy and is not a licensed pharmacist. No evidence was elicited from him regarding

"industry standards" or the basis for his knowledge that certain conduct is "outside industry standards for the owner of a pharmacy."  And, it is altogether unclear as to what is meant by "to drive clinical decision making . . . ."[9]  With the exception of testimony concerning "diagnosis codes," which will be permitted, Topic 9 is outside the scope of Dr. Thomas's area of expertise.

Similarly, in Topic 10, the government has designated Dr. Thomas "to opine that it would be outside industry standards for the owner of a pharmacy (or a pharmacy tech) to create pre-filled prescription forms containing the pharmacy owner's conceived creams and chemical combinations, and for a compounding pharmacy to dispense, creams containing ingredients that have no topical efficacy."  However, no testimony was presented concerning "industry standards" with regard to the use or creation of pre-filled prescription forms.  And, there is no basis to suggest that Dr. Thomas is qualified to opine on "industry standards" with respect to a pharmacy owner or a pharmacy employee generating such forms.  Nor is there any indication that the creation of a pre-filled prescription form by Mr. Blair was in itself improper.

On the other hand, Dr. Thomas may testify that he is unfamiliar with a pharmacy's use of pre-filled prescription forms or a pharmacy owner's creation of such forms.  He may also opine that certain creams contained ingredients with no topical efficacy.  But, he cannot opine that it is "outside industry standards for the owner of a pharmacy . . . to create pre-filled prescription forms . . . ."

To be clear, the Pharmacy's alleged use of pre-filled prescription forms is a matter of fact.  In contrast, the content of the pre-filled prescription forms is a matter for expert testimony.  The government will be free to elicit evidence about the content, and to make arguments as to motive, intent, and the like based on the fact that such forms were created and used.

---

[9] Government counsel explained that if the choice of words is unclear, counsel is responsible.

The same rationale applies to Topic 12, concerning "industry standards for the owner of a pharmacy . . . to cause" the creation of compounded creams in "large batches." There is no indication that such testimony is within the purview of Dr. Thomas's expertise. Such testimony would amount to *ipse dixit*.

Dr. Thomas may not testify as to the first sentence in Topic 25. The remaining portion of the paragraph is a matter within Dr. Thomas's expertise. He may testify to paragraph 26, although it appears somewhat repetitious. He may not testify to paragraph 27. For one, it is repetitive. And, it includes information that I have already rejected. It also includes conclusions that are for the jury to decide.

As to Dr. Thomas's "Record Review" (ECF 115-2), Blair objects to the Record Review in its entirety. But, the defense did not set forth the opinions in the nearly four single-spaced pages of the submission. The Court declines to rule, given the lack of particularity.

### 2. Eric Tracy

Eric Tracy is a Health Care Fraud Specialist in the Office of Program Integrity of the Department of Defense ("DoD"), Defense Health Agency ("DHA"). TRICARE is a federal health care benefit program managed by DHA. It was formerly known as the Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS"). In particular, Tracy is a "reimbursement expert." ECF 106 at 1.

Mr. Tracy's credentials appear at ECF 115-1 at 19-22. He has been a Certified Fraud Examiner since 2019. *Id.* at 20. The government has asked Mr. Tracy to address 19 discrete topics. These include "an overview of the TRICARE and Express Scripts government program and the various codes and processes used in TRICARE and Express Scripts claims." ECF 106-2 at 5.

Set forth below are the proposed opinions of Tracy to which Blair objects. *See* ECF 147 at 18-21.

     5.    TRICARE's requirement that a product or service be medically necessary and consistent with industry standards as a prerequisite for reimbursement.

     6.    TRICARE would not reimburse claims for ingredients that TRICARE knew were not medically necessary, and trusts doctors to prescribe, and pharmacies to dispense, only those medications that patients require for treatment of the accepted condition.

     7.    The trust-based nature of the TRICARE claims-submissions and claims- payment regimes, and the importance of trust in the process of claims submissions.

     10.    That TRICARE would not have approved or reimbursed a claim for compounded ingredients if: TRICARE knew that the compound's ingredients were dispensed in smaller quantities then the amount the pharmacy submitted it its claim to TRICARE; TRICARE would not have approved or reimbursed a claim for a compounded ingredients if TRICARE knew that the pharmacy submitted a claim to TRICARE for a specific base ingredient, but substituted and dispensed a different, less expensive, base ingredient; TRICARE would not have approved or reimbursed a claim for compounded ingredients if TRICARE knew that the ingredients and amounts of ingredients submitted in the claim to TRICARE were not previously authorized by a doctor; and that TRICARE would not have authorized or reimbursed a claim for compounded ingredients if TRICARE knew that the pharmacy intentionally did not collect a co-pay from a patient for the purpose of reducing the patient's awareness, the possibility of a complaint, and the possibility that the patient would refuse the compound.

     15.    That the prescriptions submitted to TRICARE for reimbursement by a pharmacy must be appropriate and medically necessary (see ESI Provider Manuals, 32 CFR §§ 199.4, 199.9(a)(4)), that TRICARE/ESI can perform a review after claims are paid in order to determine appropriateness of claim coding, services billed and medical necessity; that during the review process, TRICARE/ESI can examine records and / or conduct an audit to review claim to ensure the records appropriately support the services billed on the claim; that if any claim is determined to be not medically necessary or appropriate, that TRICARE/ESI can deny any such claim, collect overpayments through a future offset of payments, and, regarding past claims that are not medically necessary claw any payments back.

According to the defense, under the pertinent provider agreements between Mr. Blair and

the health care payors, a prescription must be "valid, not medically necessary." ECF 106-1 at 46. Therefore, Blair contends that it was not his "duty to insure" that the prescriptions were medically necessary. *Id.* It follows, argues Blair, that the proposed testimony concerning medical necessity is irrelevant. *Id.* at 46-47. Moreover, Blair argues that, "if the jury were to accept [the expert's] opinions, the jury could confuse the alleged inappropriateness of the *prescribing physician's conduct* with the alleged guilt of Mr. Blair." *Id.* at 48 (emphasis in original).

Further, Blair contends that because Tracy has not "reviewed the underlying patient medical files or prescription forms in this matter," his testimony is problematic. ECF 106-1 at 5. Defendant also argues that the proposed testimony "is sheer speculation" and Tracy "should be excluded from offering hypothetical opinions…about what TRICARE (allegedly) *might* have done under different conditions not present here." ECF 106-1 at 7 (emphasis in original); *see also id.* at 28, 49. Blair adds that the proposed expert fails to identify the facts that support his view, "begging the question of what specifically leads" to his conclusions. *Id.* at 29. And, defendant contends that Tracy should not be able to offer testimony as it relates to "medical necessity" and the "trust-based nature" of TRICARE. *Id.* at 7.

In addition, Blair insists that any testimony as to the importance of "trust" on the part of the payor is simply irrelevant, because this is not a case about breach of trust. *Id.* at 51. In the defendant's view, such testimony lacks any connection to any fact or issue of consequence. *Id.* And, he argues that such testimony fails the balancing test under Rule 403. *Id.*

I begin with Topic 5 and proposed opinion 6.

The Superseding Indictment alleges, ECF 20, ¶ 7: "In order for pharmacies to be reimbursed for compounded medications, insurance companies and health care benefit programs

require that these drugs be dispensed pursuant to a valid prescription and that they be medically necessary for the treatment of a covered illness." In ¶ 15, the Superseding Indictment alleges that, as part of a scheme to defraud, defendant represented that "the compounded drugs were dispensed for a medical purpose and . . . were medically necessary . . . ."

As the government suggests, "The medical necessity of services and supplies supplied pursuant to TRICARE is one of its bedrock principles." ECF 115 at 47 (citing 32 C.F.R. § 199.4(a)(1)(i)). And, the trust-based nature of the insurance claim submission process is intertwined with the reimbursement process, including the alleged "instantaneous nature" of the claim submission process, the vast number of claims that are submitted for reimbursement "without human intervention," and the insurers' reliance on the submission of proper claims. *Id.* at 48. It is hardly surprising that, in any number of businesses, including health insurance coverage, there is an element of reliance on integrity and honesty. Such evidence is certainly relevant and is not unfairly prejudicial.

With respect to proposed opinion 10, the proposed testimony "tracks the allegations in the Indictment, and necessarily the facts the Government intends to establish at trial." ECF 115 at 32. The portion of the proposed testimony concerning dispensing ingredients "in smaller quantities then [sic] the amount the pharmacy submitted" is relevant to Count One, ¶ 27, as well as Counts Eight, Twelve, Thirteen, Sixteen, Eighteen, and Twenty-One. The unauthorized substitution of a base ingredient pertains to Count One, ¶ 25. It also pertains to Counts Six, Nine, Fourteen, Seventeen, and Nineteen. The portion of the proposed opinion concerning claims not authorized by a physician pertains to Count One, ¶¶ 24, 28, as well as Counts Two, Five, Seven. And, the portion of the proposed testimony concerning failure to collect a copay from a patient pertains to Count One, ¶ 35, as well as Count Twenty-Nine.

As with proposed opinion 6, Topic 15 hardly seems controversial. The witness merely seeks to recount TRICARE's process for review of health insurance claims. The testimony is material and relevant.

Testimony about the reimbursement practices of the health insurance company will assist the jurors in the evaluation of the evidence. Moreover, the claim of inadmissibility on the grounds that the testimony is speculative is without merit. Indeed, "an expert can answer hypothetical questions . . . ." *Certain Underwriters at Lloyd's, London v. Sinkovich*, 232 F.3d 200, 203 (4th Cir. 2000); *see Offill*, 666 F.3d at 177; *see also United States v. Henderson*, 409 F.3d 1293, 1300 (11th Cir. 2005) (recognizing that "the ability to answer hypothetical questions is 'the essential difference' between expert and lay witnesses") (citation omitted).

### 3. Shauna Vistad

The government seeks to call Shauna Vistad, the Program Manager at CareFirst BlueCross BlueShield ("BCBS"), a health care and prescription benefit program administered by CVS Caremark. She works in special investigations and corporate governance.

According to the government, Vistad will provide "an overview of the BCBS health care benefit program and the various codes and processes used in BCBS claims." ECF 106-2 at 6-7. Further, Vistad is expected to opine, *id.* at 7: "BCBS would not reimburse claims for ingredients that BCBS knew were not medically necessary" and "BCBS would not have approved or reimbursed a claim for compounded ingredients" if it had been aware of Blair's practices.

The following opinions are in dispute, ECF 147 at 21-22:

> 5. BCBS's requirement that a product or service be medically necessary and consistent with industry standards as a prerequisite for reimbursement.

> 6. BCBS would not reimburse claims for ingredients that BCBS knew were not medically necessary, and trusts doctors to prescribe, and pharmacies to

dispense, only those medications that patients require for treatment of the accepted condition.

7. The trust-based nature of the BCBS claims-submissions and claims-payment regimes, and the importance of trust in the process of claims submissions.

9. BCBS would not have approved or reimbursed a claim for compounded ingredients if: BCBS knew that the compound's ingredients were dispensed in smaller quantities then the amount the pharmacy submitted it its claim to BCBS; BCBS would not have approved or reimbursed a claim for a compounded ingredients if BCBS knew that the pharmacy submitted a claim to BCBS for a specific base ingredient, but substituted and dispensed a different, less expensive, base ingredient; BCBS would not have approved or reimbursed a claim for compounded ingredients if BCBS knew that the ingredients and amounts of ingredients submitted in the claim to BCBS were not previously authorized by a doctor; and that BCBS would not have authorized or reimbursed a claim for compounded ingredients if BCBS knew that the pharmacy intentionally did not collect a co-pay from a patient for the purpose of reducing the patient's awareness, the possibility of a complaint, and the possibility that the patient would refuse the compound.

Blair seeks to exclude Vistad's opinions for the same reasons that he seeks to exclude the opinions of Tracy. ECF 106-1 at 8, 27. The analysis for these opinions is identical to that for Tracy. The challenge has no merit.

### 4.  Steven McCall, R.Ph., MBA

The government seeks to call Steven McCall, a registered pharmacist ("R.Ph."),[10] to testify about "medical billing issues and the detection of fraud, waste, [and] abuse in connection with pharmacy audits." ECF 106-2 at 8. McCall is also expected to opine that "CVS Caremark would not have approved of a claim for compounded ingredients" if it had been aware of Blair's practices. *Id.*

As a licensed pharmacist (ECF 115-4 at 13), McCall has practiced in several states and has been "involved with compounding operations . . . ." *Id.* His Curriculum Vitae is at ECF

---

[10] The definition of the abbreviation is found at ECF 138 at 98-99.

115-1 at 25-29. McCall holds a Bachelor of Pharmacy degree and a Master of Business Administration. *Id.* at 27. Since 2011, he serves as Director, Pharmacy Performance at CVS Caremark. *Id.* at 26. He is part of CVS's "nationwide efforts to detect pharmacy fraud by the use of audit techniques, including technology-based audit techniques and data mining processes." ECF 106-2 at 8. He has also reviewed CVS Caremark's audit records of the Pharmacy. *Id.*

The government has identified 13 topics of proposed testimony, based on McCall's "extensive nationwide experience . . . ." *Id.* According to the government, the proposed testimony "is *not* based on any scientific, technical, or other specialized knowledge," but rather on "knowledge, skill, experience, training, and education" that "exceed the knowledge and experience of the ordinary lay person . . . ." *Id.* (emphasis added). Moreover, the government claims that McCall has "testified around the nation on issues relating to fraud, waste, and abuse within the pharmacy—PBM context." *Id.*

Defendant urges the Court to exclude the testimony of McCall, claiming the opinions are "wholly speculative" and thus not reliable. ECF 106-1 at 12. In addition, Blair asserts that McCall seeks to "opine on ultimate legal issues at the heart of the Government's charges against" Blair, such as Blair's motive, intent, and state of mind, which "would improperly invade the province of the jury." *Id.*; *see also id.* at 34.

Further, Blair argues that the proposed testimony is inadmissible as to issues of law. ECF 106-1 at 30-33. In his view, the proffered opinions "attempt to apply the law to the facts . . . on outcome determinative legal questions." *Id.* at 33. As Blair puts it, such testimony is "a topic beyond the permissible scope of expert testimony . . . ." *Id.* at 35.

Mr. McCall's contested opinions are found at ECF 147 at 24-28, as follows.

12. That CVS Caremark would not have approved of a claim for compounded ingredients if: (1) it knew that the compound's ingredients were dispensed in smaller quantities then the amount the pharmacy submitted it in its claim; (2) it knew that the pharmacy submitted a claim for a specific base ingredient, but substituted and dispensed a different, less expensive, base ingredient; (3) would not have approved or reimbursed a claim for compounded ingredients if CVS Caremark knew that the ingredients and amounts of ingredients submitted in the claim were not previously authorized by a doctor; and that CVS Caremark would not have authorized or reimbursed a claim for compounded ingredients if CVS Caremark knew that the pharmacy intentionally did not collect a co-pay from a patient for the purpose of reducing the patient's awareness, the possibility of a complaint, and the possibility that the patient would refuse the compound.

13. That the failure to collect co-payments or the payment of patient co-pays by the defendant, the claims data billing patterns, the preprinted and mass-produced prescription forms (and the creation and alteration of those forms in response to reimbursement amounts) prescription brokering, among others, are individually and collectively indicative of fraudulent billing practices designed to deceive health care benefit programs.[]

20. That had Matthew Blair disclosed that Blair Pharmacy was in fact operating as a compounding mail order pharmacy rather than a retail pharmacy as represented, that CVS Caremark would have denied the Pharmacy's ability to come in the network.

22. That CVS Caremark would not have reimbursed or approved a claim for compound drugs if it was aware of the following which are part of the design and operation of the scheme alleged in this case (the purpose of was [sic] to obtain maximum reimbursement for claims for compound drug ingredients through means which constitute fraud, waste, and abuse and without regard to patient need) if it knew that that the claim was not based on a patient need but rather to obtain maximum reimbursement.

23. That CVS Caremark would have denied the Blair Pharmacy's ability to come into the network had it known that it was operating as a mail order pharmacy, rather than a retail pharmacy.

For reasons stated earlier, proposed opinion 12 passes muster. As to proposed opinion 13, the Court previously identified cases that have permitted expert testimony concerning the indicia of a fraud scheme. Subject to a proper foundation, such testimony is generally admissible. With respect to proposed opinions 20 and 23, there is no ground for preclusion of

such testimony.

However, McCall may not testify as to Opinion 22. Obviously, an insurer would not knowingly pay a fraudulent claim. But, McCall cannot testify as to a patient's need or the defendant's state of mind. Nor is it clear how the proposed testimony qualifies as "knowledge," or how it is based on skill, experience, training, or education.

### 5. Kathy McNamara

As mentioned, the government provided notice on July 29, 2021, of its intent to call Kathy McNamara, CPA, CFE. Ms. McNamara became a CPA in 1983, and a Certified Fraud Examiner in 2018. ECF 143-1 at 3. She has worked for about three decades "exclusively in the health care industry specializing in health care regulatory compliance issues, [and] healthcare related fair market examinations . . . ." *Id.*[11] She has testified as an expert on numerous occasions. *Id.*

The following proposed opinion is in issue, ECF 147 at 28:

> 1. An explanation of the data related to Blair Pharmacy, and Mr. Blair's associated business entities (such as Pharmacy Distributors). This will include an explanation regarding payments to marketers; a comparison to, and analysis of average marketing arrangements in the region related to pharmaceutical sales and marketing services; and information related to industry standards and practice as it relates to pharmaceutical sales and marketing services.[]

Initially, the government had identified Melissa Parks, a CPA and Certified Fraud Examiner, as an expert. ECF 106-3 at 5. The government had planned to call Parks to testify as to the "overall financial health of Blair Pharmacy" and associated entities; costs associated with the operation of the pharmacy; "information related to reimbursements received by Mr. Blair from health care benefit companies"; and "information related to Mr. Blair's bank accounts, including deposits, expenditures, and purchases." *Id.* Parks was also expected to offer, among

---

[11] This quote illustrates the various spellings the parties have used for health care.

other things, "a comparison to, and analysis of average marketing arrangements in the region related to pharmaceutical sales and marketing services," and "information related to industry standards and practice as it relates to pharmaceutical sales and marketing services." *Id.* However, because of the defendant's objections to Parks's qualifications (ECF 106-1 at 13, 36), the government substituted Ms. McNamara. ECF 143.

As to McNamara, the defendant contends that there has been no disclosure as to the methodology she employed to reach the "averages" about which she seeks to testify. *Id.* at 38. For example, the government has not identified the sample size, which defendant considers critical information. In the absence of a proper foundation, argues defendant, the opinions are subjective and conclusory and thus inadmissible. *Id.*

The government has explained that the testimony of Ms. McNamara will be offered in rebuttal to what it considers the proffered, vague testimony of the defense expert, CPA Kelly. ECF 115 at 51. Therefore, I shall reserve ruling.

## B. Defendant's Experts

### 1. Donnie Calhoun, B. Pharm., R.Ph.

Donnie Calhoun is a licensed pharmacist involved in the pharmaceutical industry for more than 30 years. ECF 107-1 at 1. Over the years, he has served in many positions, including pharmacy owner, manager, and pharmacist-in-charge. *Id.* Based on his education, training, and experience, the defense proposes Calhoun to offer several opinions, three of which are contested. *See* ECF 163 at 57-71; *see also* ECF 147 at 2-3:

> 1. How compounding pharmacies work, including employees who traditionally work there, what their duties/responsibilities are (under business procedures), how those responsibilities are executed, how pharmacies interact with Pharmacy Benefit Managers (PBMs) and with payors (private and government), how pharmacies receive prescriptions from physicians (including through pre-printed prescription pads) and how those prescriptions are turned into

claims for payment, including the use of internet-based software programs, and how pharmacies are compensated.

7. How compounding pharmacies receive prescriptions from physicians; how prescriptions are filled and shipped by the pharmacy; how prescriptions are billed to payors; which employees work at those pharmacies (including specifically pharmacists-in-charge); and the common practice of pharmacy owners relying on pharmacy employees – most principally, the pharmacist-in-charge – to ensure that compound prescriptions are dispensed and the pharmacy operates in compliance with applicable law and common industry practices.

8. That, at the time of Mr. Blair's alleged conduct, there was no law, rule, or regulation that proscribed the use of pre-printed prescription pads by compounding pharmacies, nor is (or was) such a practice outside industry norms.

In general, the government's quarrel with Topics 1 and 7, concerning issues such as "How compounding pharmacies work," is a bit curious, given its desire to call Dr. Thomas to explain matters such as the "basic elements of medical practice," the "importance of taking a patient's history," and the "kind of patient examination that would be expected in advance of a prescription for any pain medication . . . ." What is good for the goose is good for the gander. Such background information, on a limited basis, shall be permitted.

However, Calhoun may not offer the opinion that it is a common practice of pharmacy owners to rely primarily on the pharmacist-in-charge to ensure compliance with the law. Such a generalization does not rest on scientific, technical, or specialized knowledge. To the contrary, it is a conclusory statement about a question of fact "'masquerading behind a veneer of technical language.'" *In re Rezulin*, 309 F. Supp. 2d at 554 (citation omitted).

To be sure, the AKS includes a scienter requirement; to establish a violation, the defendant's conduct must be knowing and willful conduct. *See* ECF 156 at 41-42. But, this does not open the door to lay opinion testimony that is disguised as expert testimony. Nor may an expert, in effect, tell the jury what verdict to reach. *See Perkins*, 470 F.3d at 157-58.

As to the defendant's creation and use of pre-filled prescription forms, which is central to the case and the subject of Topic 8, I note that the defendant objected to the government's proposed testimony from Dr. Thomas on this same topic. *See* ECF 147 at 14, proposed Topics 9 and 10. I agreed with the defense, and rejected the government's effort to introduce through Dr. Thomas that it is outside industry standards for a pharmacy owner to create such forms. Mr. Blair cannot have it both ways. His expert is not better equipped to suggest that such forms were not outside industry norms than would be Dr. Thomas to state the opposite.

Therefore, Calhoun cannot offer the opinion in Topic 8. Based on what has been presented, there is no evidence of "industry norms" with regard to pre-filled prescriptions. Moreover, to the extent that the proposed testimony constitutes opinion testimony about the law, such testimony would invade the province of the court.

However, I indicated that Dr. Thomas could testify that, in his vast experience, he has not encountered such prescription forms. The converse would apply here, subject to a proper foundation.

### 2. David Joseph, R. Ph., FIACP

The defense seeks to call David Joseph, a licensed pharmacist, to testify based on his training, education, and experience. In particular, Blair seeks to introduce testimony to the effect that "test claims" are "not prohibited by law"; as to "legal and ethical obligations" of pharmacy employees; and the "effectiveness and appropriateness of procedures adopted by" Blair Pharmacy. ECF 107-4 at 3, 4; ECF 107-1 at 4, 6. The government opposes the testimony. ECF 107 at 25-26.

In addition, Joseph has been asked to testify about certain experiments that he conducted. In particular, over the course of multiple occasions, he conducted a total of 7 experiments, in

order to demonstrate that "upwards of 180 grams (or more)" (ECF 142 at 1) of a compounded formula "could be contained in a 150 ml container." ECF 107-1 at 6. The defense advises that it intends to offer documentation and other materials related to Mr. Joseph's compounding experiments. The information was disclosed to the government on March 11, 2021, May 14, 2021, and July 8, 2021. According to the defense, the experiments are "monumentally important" because they "directly contradict a central prosecutorial theory." ECF 142 at 2.

The government vigorously objects. It advances a host of challenges to the experiments, including that Joseph compounded and weighed the wrong substances, his methodology was sloppy and flawed, and his testimony is patently unreliable.

The following proposed opinions of Joseph are in dispute, ECF 147 at 6-7:

> 1. How pharmacy owners rely on their employees (including those with legal and ethical obligations).

> 3. How the Government's evidence supporting, and bases for, its allegation that less than 360 grams were supplied for certain prescriptions referenced in the pending Indictment are potentially inaccurate; because, in fact, two 150 ML containers are capable of containing 360 grams[], including for the subject prescriptions (because, among other things, the base ingredient in the compounded medications is designed to create space for active pharmaceutical ingredients which, when combined, increase the weight of the medication without increasing its volume), that the theoretical weight of the prescriptions at issue equate to 360 grams (or more), and that contemporaneous records indicate that the subject formulas associated with the prescriptions at issue weighed in excess of 360 grams.

> 4. How Mr. Joseph compounded and weighed the formula in Count 6 of the Superseding Indictment based on the formula logs maintained by Blair Pharmacy, and confirmed that 180 grams of the compounded formula could be contained in a 150 ml container.

> 5. How the analyses and procedures utilized by the Federal Bureau of Investigation (FBI) to determine and/or corroborate the Government's allegations concerning the weight of certain compounded medications at issue in this case were inadequate to determine whether the 150 ml pumps could contain 150 grams of the prescriptions relevant to this case.

6. The effectiveness and appropriateness of procedures adopted by, and actions undertaken by, the pharmacists at Blair Pharmacy, including completeness of pharmacy logs, as well as the appropriateness of other actions undertaken by the pharmacists at Blair Pharmacy.

7. The use of "test claims" by a pharmacy, how they are commonly used in the pharmacy industry, and the reasons for running them.

8. That the use of "test claims" – i.e., the practice of submitting a claim to a payor to ensure the particular patient's insurance plan pays for the prescribed medication before formally filling such prescription – is commonplace, widely accepted in the pharmacy industry, and not prohibited by law.

9. That his experiment was not dependent on the ingredients used – in other words, the experiment and its results (*i.e.*, that filling 150ML bottles with the compounded creams can equate to more than 150 grams in weight) is translatable to the myriad formulas utilized by Blair Pharmacy.

Mr. Joseph testified at the *Daubert* hearing held on July 20, 2021. *See* ECF 138 (Transcript). He obtained a BS in Science/Pharmacy from the Ohio State University in 1973. *Id.* at 76. Mr. Joseph is a licensed pharmacist in 16 States. *Id.* at 77, 80. In February 2020, he became licensed in Maryland. *Id.* at 80, 124. According to Mr. Joseph, "Compounding is [his] speciality." *Id.* at 82. And, he detailed his training with respect to pharmacy compounding. *Id.* at 121.

Since 2014, Mr. Joseph has been a Fellow of the International Association of Compounding Pharmacies ("FIACP"), now known as the Alliance for Compounding Pharmacies. *Id.* at 99-101. It is a trade organization, and it is not necessary to take a test in order to obtain this credential. *Id.* Mr. Joseph also spoke about the Pharmacy Compounding Accreditation Board ("PCAB"). *Id.* at 112. In order for a pharmacy to qualify for PCAB, the pharmacy must "observe those best practices. It's quite a rigorous process to get that accreditation." *Id.*

Currently, Mr. Joseph is the pharmacist-in-charge at an infusion pharmacy in Florida, which is a compounding pharmacy. *Id.* at 81-82. He also operates a consulting business that assists compounding pharmacies. *Id.* at 82. According to Joseph, he has dispensed "Tens of thousands" of prescriptions in his 47-year career. *Id.* at 122. Joseph responded in the affirmative when asked if he is "familiar with every step from when a prescription comes in to when it gets packaged, filled, dispensed, and billed to the payor . . . ." *Id.*

In answer to an inquiry, Mr. Joseph indicated that the physician is "in charge of determining medical necessity of a prescription[.]" *Id.* at 122. Moreover, he claimed that the doctor is the person who makes the "ultimate decision" as to what medication is appropriate. *Id.* at 86. Nevertheless, he acknowledged that a pharmacist has "a role in prescribing medications . . . ." *Id.* at 85. He explained, *id.*: "So, you know, the physician makes the ultimate decision whether it's an appropriate medication . . . it's the duty of the pharmacist to get back to the physician and talk to him about the situation and make sure that that's what the physician really wanted, and modify that prescription if necessary." He also recalled occasions when he refused to fill a prescription, believing that it was incorrectly prescribed. *Id.* at 86.

According to Mr. Joseph, in Maryland the pharmacist-in-charge is responsible for the operation of a pharmacy. *Id.* at 125. The basis or source of knowledge for his assertion was not clear, however.

Mr. Joseph conducted several experiments, all similar in nature, in an effort to demonstrate that a 150 milliliter container can hold more than 150 grams of a compound medication. *Id.* at 126.[12] Joseph conducted four exercises with a total of seven experiments.

---

[12] Milliliters measure volume, while grams measure weight. ECF 138 at 149.

ECF 163 at 204.  The defense is seeking to admit experiments three through seven.  *Id.* at 226.
Experiments four through seven are found at ECF 142, in a letter dated July 30, 2021.

On cross-examination, the government thoroughly reviewed the process Mr. Joseph used
to conduct his experiments.  Indeed, the government demonstrated numerous flaws in Mr.
Joseph's experiments, particularly early on.  But, Mr. Joseph seems to have learned from his
mistakes; he addressed the government's concerns in subsequent experiments.  And, each time,
Mr. Joseph concluded that a 150 ml. cream jar could hold the product he tested, with a weight of
about 180 grams.  *See*, *e.g.*, *id.* at 147.

Mr. Joseph also testified about the use of a so-called test claim.  He explained that, on
occasion, a pharmacy will transmit a claim to a third-party payor to determine either eligibility of
the product for coverage or the amount of the copay for the medication.  *Id.* at 149-50.  He
described the use of a test claim as "a routine activity," which is done "all the time."  *Id.* at 150.

According to Joseph, a test claim would be run "if a patient presented a
prescription . . . and you wanted to know if that prescription would be paid for.  So you run it
through what they call a test claim to see what comes back.  Maybe it's not covered.  So you tell
the patient and the patient says, well, please call my doctor so you can find something that is
covered on my insurance.  Or the co-pay is too high and the patient says forget it. . . ."  *Id.*  He
added that such a practice is "very common mode" and asserted that "retail drug stores do that all
the time."  *Id.*

I turn first to Mr. Joseph's series of experiments to demonstrate that a 150 ml. cream jar
could hold a product that weighs 180 grams.

As indicated, the government launched a vigorous attack on Mr. Joseph's methodology
with regard to his experiments, and the reliability of his experiments, focusing on some

sloppiness that led Mr. Joseph to revise and/or repeat the early experiments.  In addition, there were some issues in the substances used by Mr. Joseph, in part because at least one of the substances that is pertinent was not available to Mr. Joseph for his use.  Despite the government's fervor, it has never claimed that the underlying premise is flawed.  In other words, the government does not seem to suggest that a 150 ml. container cannot hold a substance that weighs 180 grams.

The experiments conducted by Mr. Joseph, flaws and all, were discussed at length at both *Daubert* hearings.  I rely here on what I said at those hearings.  The process Mr. Joseph outlined was not complicated science.  There were certainly errors in the early experiments, but they were corrected.  Mr. Joseph will be permitted to testify about the experiments he conducted to establish that, on the occasions of his tests, a 150 milliliter container held 180 grams of product.

Without question, the government has ample ground to attack the methodology of Mr. Joseph, and it may do so on cross-examination.  But, its challenges pertain to the weight of the evidence, not admissibility.

Nonetheless, there are other proposed areas of testimony that exceed the bounds of Mr. Joseph's expertise.  Mr. Joseph may not testify as to Topic 5.  There is nothing in Mr. Joseph's qualifications that would provide a basis for him to opine about alleged deficiencies in any process or procedure used by the FBI in weighing or measuring compound substances.  Moreover, there is absolutely no basis for Mr. Joseph to opine as to Topic 9, *i.e.*, that the outcome of his experiments would be the same, regardless of the ingredients he might use.  In short, there is nothing about Mr. Joseph's credentials or expertise that would warrant the broad extrapolation embodied in Topic 9.

As to proposed Topic 1, concerning a pharmacy owner's reliance on employees, the Court will not permit such testimony, because it does not qualify as scientific, technical, or specialized knowledge. To state the obvious, it is not unusual for a business to rely on its employees. Again, this is nothing more than a lay opinion disguised as expert testimony. *See In Re Rezulin*, 309 F. Supp. 2d at 546; *see also Andrews v. Metro North Commuter Railroad Co.*, 882 F.2d 705, 708 (2nd Cir. 1989).

The testimony in Topic 6 suffers from the same defect that pertains to Topic 1. Moreover, the proposed testimony is completely vague and imprecise. It fails to specify the "procedures" or "actions" that are within the topic. Nor is Mr. Joseph qualified to render an opinion on Maryland pharmacy law or ethical standards applicable to pharmacies. Such testimony would invade the province of the court or otherwise amount to *ipse dixit*.

As to Topics 7 and 8, the government challenges the proposed testimony of Mr. Joseph concerning the use of test claims by pharmacies, on the ground that this would be confusing for the jury. *See* ECF 163 at 50-51. In particular, the government points out that, as part of the alleged scheme, when the defendant did not obtain reimbursement from an insurance company in an amount that he anticipated, he created a new compound drug formula to maximize reimbursement. The government expresses concern that the jury will hear testimony about test claims and believe that is consistent with what Mr. Blair did in fabricating formulas based on the amount of reimbursement. *Id.* at 51.

The government's point is not frivolous. That said, it is not a basis to exclude the testimony. And, it is a matter that counsel can clarify in questions and in argument to the jury at the appropriate time. For example, the government would be permitted to establish that the

prescriptions that were allegedly manipulated by the defendant were not rejected for lack of coverage, or because copays were too high.

Therefore, as to Topics 7 and 8, Mr. Joseph will be permitted to testify generally about the use of test claims by pharmacies. But, he may not speak to whether the practice is lawful.

### 3. Kevin G. McAnaney, Esquire

Kevin McAnaney is an attorney who represents clients in the health care field. From 1997 to 2003, he served as Chief of the Industry Guidance Branch of the Office of Counsel to the Inspector General. ECF 107-1 at 8. In that role, he was responsible for issuing formal guidance to the regulated community through advisory opinions, fraud alerts, and special bulletins concerning the AKS. *Id.*

Through McAnaney, Blair seeks to offer testimony on the "history, purpose and legislative enactment of the AKS"; the "AKS Safe Harbors"; and "the application of the AKS, and its regulatory guidance." ECF 107-1 at 8-9. The government argues that the lawyer's testimony should be excluded because a witness's interpretation of the law and legal obligations is not helpful to the jury and not admissible. ECF 107 at 9-24.

In particular, the defense seeks to introduce the following contested opinions, ECF 147 at 8-9:

> 1. The history, purpose and legislative enactment of the AKS.
>
> 2. The role, history, and purpose of regulatory guidance, including, but not limited to, Advisory Opinions from the Office of the Inspector General of the U.S. Department of Health and Human Services ("OIG Advisory Opinions), the AKS Safe Harbors, OIG Notifications of Proposed Rulemaking, and OIG Special Alerts.
>
> 3. The application of the AKS, and its regulatory guidance provided by HHS-OIG, including regarding the use of independent contractors/sales agents and waivers of co-payment, to the healthcare industry.

5. The regulatory guidance and caselaw interpreting the AKS as of October 2014.

6. Background on the implementation and purpose of the AKS, its application to the health care industry and the use of sales marketers specifically, the applicable regulatory guidance concerning the same, and the legal landscape concerning these issues as of October 2014.

7. The viewpoint of the HHS-OIG that, for example, simply employing a volume-based marketer does not necessarily violate the AKS, as demonstrated by, HHS OIG Opinion No. 98-10 (Sept. 8, 1998), among others.

8. The importance of assessing the AKS on a case-by-case basis.

9. The complexity and overbroad nature of the AKS in practice, including the regulatory guidance promulgated pursuant to the AKS addressing the permissibility of utilizing independent contractors/sales agents, as well as the legal guidance surrounding the practice of collecting copayments.

10. That, as of October 2014, simply employing a volume-based marketer does not necessarily violate the AKS, as demonstrated by pertinent case law and regulatory guidance.

11. That, as of October 2014, simply failing to collect a copayment, coinsurance payment, or deductible amount, provided reasonable collection efforts are undertaken, also does not necessarily violate the AKS, as likewise demonstrated by pertinent case law and regulatory guidance.

Topic 1, Topic 2, and the first clause of Topic 6 ("Background on the implementation and purpose of the AKS") are appropriate topics for Mr. McAnaney, as they concern background information about the AKS and the regulatory process. Such information will assist the jury by providing context for the complicated issues that will be presented. In other words, he may provide an "overview of all the pieces of the puzzle." ECF 163 at 83. This includes an explanation that Congress passed a statute; regulations have been enacted to implement the statute; and the role of the agency, and in particular the Office of Inspector General in regard to the AKS. *Id.* at 83-84.

As I observed at the hearing on September 28, 2021, "It would be helpful for the jury to understand not just the history of the enactment [of the AKS], but the interplay of the agency, the OIG, [and] that [the OIG] gets requests for advisory opinions." ECF 163 at 86. Indeed, I do not see an issue with testimony providing "background about the way this all works." *Id.* Such testimony will be of help to the jury in understanding the evidence and the parties' contentions. Therefore, Mr. McAnaney may testify, *within reason*, to the matters covered by Topic 1 and Topic 2.

The defense argues, ECF 116 at 11: "Testimony that explains how the regulations are implemented, the way in which they affect the text of the statute, what those regulations were in 2014 and 2015 – not testimony concerning whether Mr. Blair did or did *not violate them* (which Mr. McAnaney does not intend to offer, nor does the defense suggest that he would be permitted to) – would be particularly helpful – if not almost necessary – to a jury trying to effectively understand a highly complex statutory and regulatory regime and evaluate the evidence of Mr. Blair's conduct to determine whether he is or is not guilty of the crimes charged . . . ." (Emphasis in original).

Mr. McAnaney may not interpret the law or testify as to his view of what the law allowed in 2014. That is the province of the Court. Thus, for example, he may not testify that a "volume-based marketer does not necessarily violate the AKS."[13] Therefore, testimony as to Topics 3, 5, 6 (except as noted), 7, 8, 9, 10, and 11 would invade the province of the court. Such testimony is not admissible.

_____

[13] At the hearing, defense counsel conceded that the defense was unable to find a case with a fact pattern akin to this one. However, in the view of the defendant, there are cases that are analogous in support of the defense position. *Id.* at 86-87.

### 4. A. Greg Kelly, Jr., CPA

The defense proposes to call A. Greg Kelly, Jr., CPA. Mr. Kelly earned a B.A. from Yale University and a MBA from Loyola University. ECF 107-1 at 19. Moreover, he has more than 30 years of experience in business, including "founding more than one dozen start-up companies" in the health care field. ECF 107-1 at 7. While working at KPMG in Baltimore, Mr. Kelly served as a senior manager in the Health Care and Life Sciences practice. *Id.* Presently, he is Chairman of the Board of Biological Mimetics, Inc., a vaccine development company. *Id.* at 17.

The defendant seeks testimony from Mr. Kelly as to the costs and challenges associated with starting and winding down health care businesses; the rate at which such businesses fail; the advantages of having marketers educate physicians regarding a business's products; the process and costs of seeking an OIG Advisory Opinion; and the different types of cost-sharing standard operating procedures. ECF 107-1 at 7.

The government argues that Kelly's proposed testimony is "not only irrelevant, it would confuse and mislead the jury" because he will be testifying about *other* businesses, not the Pharmacy. ECF 107 at 28. In other words, the government objects because Mr. Kelly's proposed testimony does not concern the initiation, operation, and wind-down of Blair Pharmacy.

The following testimony is in issue, ECF 147 at 9-10:

> 1. The financial, logistical, and staffing challenges associated with starting a health care business, including the regulatory and compliance issues presented by the health care industry, including the substantial fixed costs required to be borne by the start-up business.

> 2. The advantages and importance of having marketers to educate physicians regarding a start-up company's products.

> 3. The significant rate at which start-up healthcare companies fail, and the costs associated with starting up and winding down companies.

4. The process in 2015 by which a company could seek an OIG Advisory Opinion; and the challenges and cost associated with that process for a healthcare start-up company.

6. A comparison of the costs of employing an individual as a W-2 employee (higher because of employment taxes, social security taxes, and benefits) with the costs of hiring that individual as an independent contractor.

7. As to the benefit of hiring marketers, Mr. Kelly is expected to testify that, in general, it is impossible to effectively and successfully sell a new product unless that product becomes known to those who may use it, and that it is in the best interests of a start-up company to hire individuals who are able to describe the benefits of the product to those who may use it.

8. That it can be very difficult to manage salary costs for marketers before a company has even filled its first prescription.

9. That a start-up company must bear significant costs and capital responsibilities – with little, if any, cash flow in – to get off the ground and survive. Specifically, he will explain these "start-up costs" can include: (1) product development costs, (2) marketing costs, and (3) operating costs, and include costs associated with, for example, rent, equipment, salaries/ compensation, licensing, and management and/or billing software. Mr. Kelly further will explain that start-up companies seek (and hope) to strike a balance between these costs and their operations model in the initial (and early) stages of operating, something that Mr. Kelly will explain is especially challenging for an entrepreneur with no outside financing.

On the whole, I agree with the government that the proposed testimony is largely generic and not relevant. As to Topic 2, there is no basis for Kelly to opine on the use of marketers to educate physicians about a company's products. As to Topic 3, the proposed testimony would create an inference, without any foundation, that there is uniformity in "challenges" faced by "start up" health care businesses. Moreover, the "significant rate at which start-up healthcare companies fail" is not a proper subject for his testimony, because the failure of any business, other than the defendant's, has no relevance here. Such testimony could confuse the jury and unnecessarily prolong the trial. Nor is there any indication that the witness has a basis to opine

that the defendant operated his business in the same way that other businesses supposedly operate.

However, the Court will permit testimony from Mr. Kelly to the extent the testimony pertains to Blair Pharmacy. And, he may testify as to subjects comparable to what is proposed by the government for Ms. McNamara.

As indicated, the government previously designated Ms. McNamara to provide, *inter alia*, ECF 147 at 28-29: "An explanation of the data related to Blair Pharmacy, and Mr. Blair's associated business entities . . . . This will include an explanation regarding payments to marketers; a comparison to, and analysis of average marketing arrangements in the region . . . and information related to industry standards and practice as it relates to marketing sales and marketing services.[]" *Id.* at 28.

As to Topic 4, there is no indication that the witness has an expertise with regard to the OIG Advisory Opinion process, in 2015 or any other year. Nor is there any basis to show that the costs to pursue an advisory opinion are uniform.

However, as to Topic 6, subject to a proper foundation, Mr. Kelly may compare the costs of hiring an individual as a W-2 employee with the costs of hiring an independent contractor.

Topic 7 is akin to Topic 2, and is equally flawed. With respect to Topic 7, there is no indication that Mr. Kelly is qualified to testify that "it is impossible" to "sell a new product unless that product becomes known . . . ." Regardless, the supposed expert opinion states the obvious; such testimony is pure *ipse dixit* and not a matter of scientific, technical, or specialized knowledge. The same applies to Topic 8, concerning proposed testimony on the difficulty of managing "salary costs for marketers . . . ."

With regard to Topic 9, Mr. Kelly may address costs for product development, marketing, operating, and the like, but only to the extent that it pertains to the Pharmacy.

**5. Ellen Bonner, Esquire**

Ms. Bonner is a lawyer who represents clients in the health care field. She served as an Assistant General Counsel in the DoD, Office of the Civilian Health and Medical Program of the Uniformed Services, which later became TRICARE. ECF 107-5 at 2-3. She has also "advised on government contracts, health care fraud, health care policy, and TRICARE appeals." *Id.* at 3. And, Ms. Bonner has previously testified as an expert in a matter involving TRICARE and compound pharmaceuticals, although the nature of the testimony was not provided. *Id.* Through Ms. Bonner, Blair seeks to present testimony about the "practical interplay of the medical or clinical necessity requirements set forth" in the relevant regulations. ECF 107-5 at 4.

According to the government, Ms. Bonner merely worked in procurement while at DoD, which is unrelated to the areas of her proposed expert testimony. ECF 107 at 22. Therefore, it challenges her qualifications. Even assuming qualifications and adequate notice, however, the government insists that Ms. Bonner's proposed testimony is improper because it concerns legal interpretations. *Id.* at 23.

The defense seeks to offer testimony on the following contested topics, ECF 147 at 11-13:

> 5. An explanation related to the testimony of the Government's proposed expert relating to "TRICARE's requirement that a product or service be "medically necessary and consistent with industry standards as a prerequisite for reimbursement." It is anticipated that Ms. Bonner will discuss the practical interplay of the medical or clinical necessity requirements set forth in 10 U.S.C. § 1074g, 32 C.F.R. § 199.4 (which applies to TRICARE's health care benefits generally) and 32 C.F.R. § 199.21 (which is specific to TRICARE's pharmacy benefits program) as they relate to TRICARE's reimbursement, including the existence of prescription drugs that are non-formulary and are reimbursed regardless of medical necessity under certain other circumstances.

6. An explanation regarding any claim by a Government expert witness that TRICARE "would not reimburse claims for ingredients that TRICARE knew were not medically necessary" and/or were not consistent with industry standards, discussing specifically that TRICARE reimbursed for compound drugs in 2015 knowing that some ingredients were not FDA-approved and were in violation of TRICARE's own regulations.

14. That 32 C.F.R. §§ 199.4(g) and 199.21 are inconsistent, in that while § 199.4(g)(1) states that "[s]ervices and supplies that are not medically or psychologically necessary" are excluded from the CHAMPUS Basic Program, § 199.21, which governs prescription drugs, specifically establishes a tiered system that allows reimbursement for drugs that are not medically necessary.

15. That the Government's TRICARE experts' proposed "opinions" that TRICARE would not "reimburse claims for ingredients that TRICARE knew were not medically necessary," are belied by TRICARE's reimbursement process, Express Scripts' screening process of only the "primary" ingredient, and TRICARE's non-compliance with its own regulations in reimbursing for compounds that were not FDA-approved.

In my discussion, I shall assume, *arguendo*, that Ms. Bonner is generally qualified by experience to testify with respect to TRICARE's administration of health care and/or pharmacy benefits.

Previously, I noted that the government seeks to introduce testimony from Eric Tracy and Shauna Vistad concerning the medical necessity requirement as a condition for claim reimbursement with respect to prescriptions. As to Topics 5, 6, 14, and 15, to the extent the defense seeks to address medical necessity through an expert, the testimony would not necessarily be off limits. But, the proposed topics or opinions are defective; they are too vague to provide adequate notice to the government, nor is the Court able to assess them.

To illustrate, in Topic 5, Ms. Bonner has been asked to discuss "the practical interplay" of various statutory and regulatory requirements, without any elucidation or particulars. Similarly, the defendant proposes in Topic 5 that Ms. Bonner address the existence of non-

formulary prescription drugs that are reimbursed, without regard to medical necessity, "under certain circumstances." But, there is no specification of the drugs or the circumstances.

Topics 6 and 15 have considerable overlap. They seem to focus on reimbursement by TRICARE, in contravention of its own regulations, and with knowledge by TRICARE that some ingredients were not approved by the FDA. But, there is no disclosure as to the particular ingredients, including the relevance in this case, or the particular regulation.

Moreover, as the government argues, ECF 107 at 24; ECF 126 at 28, it is of no moment if TRICARE failed to follow a particular requirement. *See United States v. Colton*, 231 F.3d 890, 903 (4th Cir. 2000) ("The susceptibility of the victim of the fraud . . . is irrelevant to the analysis . . . it makes no difference whether the persons the schemers intended to defraud are gullible or skeptical, dull or bright."); *see also United States v. Svete*, 556 F.3d 1157, 1165 (11th Cir. 2009) (en banc) ("A perpetrator of fraud is no less guilty of fraud because his victim is also guilty of negligence."); *United States v. Allen*, 201 F.3d 163, 167 (2d Cir. 2000) (per curiam) ("The victim's negligence in permitting a crime to take place does not excuse the defendant from culpability for [the] substantive offense . . . ."); *United States v. Coyle*, 63 F.3d 1239, 1244 (3d Cir. 1995) ("The negligence of the victim in failing to discover a fraudulent scheme is not a defense to criminal conduct."); *United States v. Kreimer*, 609 F.2d 126, 132 (5th Cir. 1980) ("The victim's negligence is not a defense to criminal conduct.").

The adage, two wrongs do not make a right, seems apt. That TRICARE may have paid a claim erroneously would hardly justify the alleged conduct at issue. Nor is it a basis for the proposed testimony.

As to Topic 14, Bonner proposes to address inconsistencies in 32 C.F.R. § 199.4(g) and 32 C.F.R. § 199.21. But, defendant has not identified the text that is allegedly inconsistent, or

explained its relevance here. Nor is it clear whether any of the substances in this case fall within these provisions. Moreover, the subject matter appears to come perilously close to invading the province of the court regarding a legal interpretation.

Therefore, the proposed opinions are not appropriate, as formulated.

## IV. Conclusion

For the reasons set forth above, I shall grant Defendant's Motion in part and deny it in part. And, I shall grant the Government's Motion in part and deny it in part.

An Order follows.


Date:   October 29, 2021                          _____/s/_____
                                                  Ellen L. Hollander
                                                  United States District Judge