IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | CRIMINAL NO. ELH-19-410 |
| v. | * | |
| | * | |
| MATTHEW EDWARD BLAIR, | * | |
| Defendant. | * | |
| **********| | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America submits this memorandum in aid of sentencing and respectfully requests that the Court impose a term of imprisonment for one year and one day, a three year term of supervised release, and the issuance of a restitution order in the amount of $3,176,470.83.

**I.   Factual Summary**

The Defendant, Matthew Edward Blair, engaged in a scheme to unjustly enrich himself, at the great expense of the United States taxpayer.

In a scheme to drive-up profits at the pharmacy he owned and operated, the Defendant paid millions of dollars in illegal kickbacks to induce the referral of federal health care business to his pharmacy. Because of his unlawful payments, the Defendant accumulated millions of dollars in profits, derived from U.S. taxpayer-funded health care benefit programs.

At the time he made these payments, the Defendant knew his conduct violated the Anti-Kickback Statute ("AKS"). But this knowledge did not deter the Defendant from committing this misconduct. Instead, the Defendant willfully violated, and completely disregarded the AKS, a law intended to reduce fraud, waste and abuse in U.S. taxpayer-funded health care programs, thereby

1

amassing huge profits for pain creams, scar creams and vitamins shipped to TRICARE patients in the mail, which were largely unwanted and unnecessary.

This scheme started in 2014, when the Defendant decided to open a compound pharmacy in Timonium, Maryland. He had previously worked as an independent 1099 sales rep for other pharmacies, and he became aware of the AKS, as well as the reimbursement process related to compounded drugs. When he first sought to open his business, the Defendant named his pharmacy "Blair Compounding Pharmacy." Around this same time however, the health care industry began to apply heightened scrutiny to practices within the compounding pharmacy business. So, shortly before his pharmacy officially opened in 2014, the Defendant decided to change the name of his business from "Blair Compounding Pharmacy" to "Blair Pharmacy."

Although he dropped the word "compounding" from the name, compounds, and the profits associated with compounds were his primary concern. It is instructive that, when the Defendant applied to become part of the TRICARE / Express Scripts ("ESI") network of covered pharmacies, he attempted to obfuscate the compounding nature of his business. During the application process, he informed ESI that his pharmacy was only "minimally" involved in compounding, and he made the material misrepresentation that only "two percent" of Blair Pharmacy business related to compounded medications (when, in fact, compounds comprised well over 95% of the pharmacy's business). Acceptance into the TRICARE / ESI network of pharmacies was vital, because it was only after acceptance into this network that the Defendant was permitted to bill TRICARE for compounds related to TRICARE beneficiaries.

The Defendant created pre-filled prescription forms, containing his curated compound ingredient formulations. He knew the amount of money he would receive for each gram of each

2

ingredient he listed in his formulas. Further, he would create formulas and modify the ingredients (and amounts of ingredients) – not for the medical need of any patient – but based upon how much money he would be reimbursed for each gram of each ingredient he listed in his compounds.

A few weeks after his pharmacy opened in September 2014, while trying to recruit a marketer to work as a 1099 sales rep for him, the Defendant sent the marketer an email boasting about his compounds' reimbursement rates. The Defendant stated his reimbursement rates were "the highest in the industry due to our formulations." The Defendant also admitted to the motivation behind his business, boasting that no one was going to "exploit every opportunity to get paid as much as I am."

Dr. Stephen Thomas, a board certified pain management physician with decades of experience treating patients with serious pain conditions, reviewed the Defendant's so-called "formulations." Dr. Thomas was prepared to testify at trial that many of the ingredients (and combinations of ingredients) that the Defendant chose to include in his compound creams made absolutely no sense, because the compounds would not have provided pain relief in the manner in which the Defendant marketed the compounds. This was because the Defendant chose ingredients not to relieve pain, but because the individual ingredients in his formulas reimbursed lots of money. He chose his ingredients not based upon efficacy, but upon reimbursement value. For instance, the Defendant marketed an "anti-inflammation" compound that contained some ingredients which had no anti-inflammatory properties or effect. He marketed a "migraine" compound cream that contained drugs that would not work to relieve headache pain when rubbed topically on the skin (the Defendant received $14,365.39 per prescription, for a one month supply of this so-called "migraine" cream). The Defendant marketed a seven ingredient "scar" cream compound that

3

contained only one ingredient that would have had any effect on a scar (the Defendant received $17,336.30 per prescription for a one month supply of this "scar" cream). In another example, the Defendant marketed a "metabolic" compound capsule, which contained nothing more than a combination of several common, inexpensive, over-the-counter vitamins readily available at any supermarket or drug store (the Defendant received $4,348.25 for a one month supply of this so-called "metabolic"). The following email, sent by the Defendant to a prospective sales rep in April 2015, is an example of the way the Defendant would modify the ingredients of his "metabolic" based upon reimbursement value:

```
From:          blairmedical@aol.com
               <blairmedical@aol.com>
To:            ███████████@gmail.com
               ███████████@gmail.com>
Cc:
Bcc:
Subject:       Re: Order Forms
Date:          Wed Apr 08 2015 22:43:45 EDT
Attachments:
```

It is correct. We had to take reservatrol out of formulation because Tricare stopped paying for it and it was causing a rejection.

The Defendant removed the ingredient "reservatrol" from his "metabolic" compound. He then increased the amount of grams of "methocobalamin" – the next highest paying ingredient in his formula – from 10 mg to 25 mg, resulting in a substantial increase in the amount of money that the Defendant received in reimbursement for this "metabolic" compound.

The Defendant actively recruited a 1099 independent sales rep who worked at Walter Reed Military Medical Center, in order to leverage this marketer's military / TRICARE related contacts. The Defendant induced this sales rep to refer TRICARE related health care business to his pharmacy, by paying the sales rep 50% of the TRICARE proceeds. It was during this time that numerous U.S. military members, and their spouses, underwent minimally invasive laparoscopic

surgery at Walter Reed in the 2014 – 2015 time period.  Due to the laparoscopic nature of their surgery, many of these patients experienced little to no pain or scarring after their surgeries.  Yet, the Defendant induced referrals for scores of pain and scar creams related to these TRICARE patients by splitting TRICARE reimbursements with the sales rep 50 – 50.  These illegal kickback payments, based on the value and volume of the TRICARE referrals and reimbursements, were especially abusive to the U.S. taxpayer, because the Defendant made millions of dollars off of topical creams that many of the TRICARE patients did not need, did not want, and did not use.

Consistent with his boasts from his email correspondence, the Defendant exploited every opportunity to get paid.  And once he was paid, he did everything possible to keep the money he received.  One of the nefarious practices the Defendant engaged in, to obtain and maintain profits, was to waive patient  copayments (and in some instances, to pay copayments for patients without their knowledge).

Health care benefit programs, such as TRICARE, Blue Cross Blue Shield and CVS, require pharmacies to collect copays for several reasons, including to prevent fraudulent billing practices by pharmacies.  These health care benefit programs would not authorize payment on any claim where a copayment was intentionally waived in an unlawful manner.  Further, these programs would likely end their business relationship with any pharmacy that unlawfully and intentionally waived or paid copayments for patients.  But, waiving and paying copayments is exactly what the Defendant planned to do, and did do at his pharmacy, as detailed in this training power point slide used by the Defendant:

> **How Do we Sell This**
>
> **Make no mistake, this is a dog fight for the business**
>
> 1. Leverage Relationships
> 2. Provide them with details on *Independent testing, ISO 4 Clean room, PCAB accreditation, domestic product procurement, Lipopen/Lipoderm base, sterility, NOT a repackager, clinical affiliations, sample testing, USP <797> compliance, insurance processing, workers comp processing, no phone tree, >20 years compounding experience, IACP member, PCCA member, customer service (patient counseling, free shipping, sterile metered pumps, ==pay co-pay on behalf of the patient==, patient follow up, rapid processing, refill processing, professional packaging)*

This excerpt from a PowerPoint training presentation, which also contained the name of one of Defendant's businesses, described the compound business as a "dog fight" and detailed that one way to get business was to "pay co-pay on behalf of the patient" (yellow highlight added). Even before he opened his pharmacy, the Defendant intended to waive patient copayments. The following is an excerpt from an April 28, 2014 email within the Defendant's email account, sent to his mother to prepare her to speak on the phone to prospective patients regarding copayments:

> When you receive your medication, there will be an invoice included for the copay.
> The pharmacy is able to waive these copays through a discount program, therefore, we ask that you please disregard this invoice. This will also be the case for any refills.

Once his pharmacy opened, the Defendant used pre-paid credit cards to pay copayments for numerous private health care program beneficiaries. The pre-paid Visa and American Express cards were purchased and loaded with cash at stores such as Walgreens. Then, various different pre-paid cards were used by the Defendant at his pharmacy, on numerous occasions, to pay patient copayments. The following is an excerpt from a credit card company business record. This business transaction record provides details regarding a pre-paid credit card ending in # 8785,

6

showing an initial cash upload of $500.00 onto the card on November 7, 2014, and then nine subsequent payments where this same credit card was used to pay at least nine different copayments for different Blair Pharmacy patients (highlighted in yellow) over the course of November 7 – November 24, 2014, until the balance on the pre-paid card was zero:



In another instance of copayment misconduct, the Defendant submitted the following receipt (and a handwritten notes on the receipt) as "proof" of copayment collection, to a CVS auditor who was conducting an audit of the Defendant's copayment collection practices in 2015:

7



The Defendant made material misrepresentations to the auditor, stating that he collected and deposited a $1,607.48 copayment from a patient for a compounded cream, when in fact, the Defendant waived this high copayment and did not deposit the money. The Defendant waived the copayment, so he could receive thousands of dollars in reimbursement proceeds from the patient's health care insurance provider.

The Defendant did not waive, or pay, these patient copayments for any altruistic purpose – he paid the copayments so he would profit from the thousands of dollars in insurance reimbursements paid by the beneficiary's health care benefit program. The Defendant also waived, and failed to collect copayments as a way to avoid patient scrutiny and complaints, because he did not want to risk patients refusing to pay a copayment, or refusing to accept the creams that he mailed to their doorstep. Indeed – when some TRICARE patients became aware of the outrageous

costs and business practices related to the Defendant's creams and vitamins, many of the patients made complaints and fraud referrals to their health care providers.

The Defendant knew that paying kickbacks to induce the referral of federal health care business to his pharmacy was illegal. TRICARE would have certainly refused any and all of the claims submitted by the Defendant, if TRICARE had known that he was paying independent 1099 sales reps volume and value based commissions to induce TRICARE referrals to his pharmacy. Because TRICARE did not know the Defendant was paying illegal remuneration to marketers on each successfully reimbursed claim, TRICARE ended up paying the Defendant $6,352,941.66 in reimbursement money from November 2014 through May 2015. These reimbursements were tainted by illegal remunerations paid in violation of the Anti-Kickback Statute, and as such, the total loss amount to the TRICARE federal health care program was at least $6,352.941.66.

## II. Advisory U.S. Sentencing Guidelines

The Government concurs with the advisory sentencing guideline provisions calculated in the Presentence Investigation Report for Count 31 of the Superseding Indictment (Payment of Illegal Remunerations), as follows:

| | | | |
|---|---|---|---|
| *Base Offense Level:* | 6 | U.S.S.G. § 2B1.1(a)(2) | PSR ¶ 36 |
| *Loss Amount between $3.5 and $9.5 million:* | +18 | U.S.S.G. § 2B1.1(b)(1)(J) | PSR ¶ 37 |
| *Victim - U.S. Government Health Care Program loss Over $1,000,000:* | +2 | U.S.S.G. § 2B1.1(b)(7) | PSR ¶ 38 |
| *Subtotal* | 26 | | PSR ¶ 42 |
| *Acceptance:* | -3 | U.S.S.G. § 3E1.1 | PSR ¶¶ 44, 45 |
| **Total Offense Level:** | **23** | | |

*Criminal History Category:*    I[1]

*Advisory Guideline Range:*    46 – 57 months               PSR ¶ 139

As detailed in paragraph nine of the plea agreement, the Government and the Defendant "stipulate and agree pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C), that a sentence of Twelve (12) months and one day of imprisonment in the custody of the Bureau of Prisons, and Defendant's payment of restitution to TRICARE, pursuant to 18 U.S.C. § 3663(a)(3), in the amount of $3,176,470.83, is the appropriate disposition of this case."

Considering the facts and circumstances of this case, and considering the fact that, on January 11, 2022, it appears that the Defendant deposited the full amount of agreed-upon restitution within the Court's registry, the Government respectfully requests that the Court impose a twelve (12) month and one day term of imprisonment in this case, pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure. Although this is a below-the-advisory-guidelines jail sentence, the Government concurs that this is a reasonable sentence, considering all of the 3553(a) factors described in more detail below. The Government also respectfully requests that the Court impose a three year term of supervised release.

### III.    18 U.S.C. § 3553(a) Factors

---

[1] The Defendant is assessed with one criminal history point, based upon his 2009 conviction in Worchester County for Driving a Vehicle While Impaired by Alcohol, for which he received 60 days in jail, with 30 days suspended, and two years of supervised probation. PSR ¶ 53. Additionally, the Defendant was sentenced to: Probation Before Judgement and one year of supervised probation for a 1998 Driving While Intoxicated offense in Baltimore County; a fine for a 1999 Reckless Driving offense (he was also arrested at the same time for Driving Under the Influence of Alcohol) in Worchester County; Probation Before Judgement and three days confinement for a 2004 Driving a Vehicle While Under the Influence offense in Howard County; and Probation Before Judgement and three years of supervised probation for a 2004 Driving a Vehicle Without a License conviction in Baltimore County. PSR ¶¶ 49-52, 56.

1. **A twelve month and one day sentence reflects the seriousness of the offense, provides just punishment, promotes respect for the law, and affords some protection to the public related to the risk of future financial crimes.**

The Defendant's misconduct is very serious. He financially abused U.S. taxpayers, and the TRICARE health care benefit program, by paying illegal kickbacks to induce federal health care prescription referrals to his pharmacy. It is important to note that the Defendant's crimes are not victimless. The Defendant caused financial harm to both the TRICARE program generally, and to the American taxpayer.

The purpose of the AKS was to combat rampant fraud that was occurring in federal health care programs. The AKS is the culmination of Congressional effort to combat fraud, waste and abuse in federal health care programs. *United States v. Neufeld*, 908 F. Supp. 491, 493 (S.D. Ohio 1995). In 1977, Congress added the Antifraud and Abuse amendments to the Social Security Act, the purpose of which was to address the "disturbing degree [of] fraudulent and abusive practices associated with the provision of health services financed by the Medicare and Medicaid programs." *United States v. Shaw*, 106 F. Supp. 2d 103, 110 (D. Mass. 2000) (citing H.R. Rep. No. 95-393, pt. 2, at 44 (1977), reprinted in 1977 U.S.C.C.A.N. 3039, 3047). At the time of the amendment, Congressional findings included the following:

> In whatever form it is found … fraud in these health care financing programs adversely impacts on all Americans. It cheats taxpayers who must ultimately bear the financial burden of misuse of funds in any government-sponsored program. It diverts from those most in need, the nation's elderly and poor, scarce program dollars that were intended to provide vitally needed quality health services.

*Id.* at 110-111 (quoting 1977 U.S.C.C.A.N. at 3047).

Indeed, the Defendant's actions adversely impacted the community. His misconduct impacted taxpayers, who bear the financial burden of the Defendant's misconduct, as noted by

11

Congress. His actions diverted over six million dollars from the TRICARE program. TRICARE would not have paid any of the money to the Defendant, had the Defendant's volume and value based remunerations to marketers been known to TRICARE. The diversion of these millions of dollars occurred at a time when those funds were urgently needed to treat U.S. military members who were engaged in combat operations overseas, and who were recuperating at the Walter Reed Hospital for terrible injuries incurred while serving our county abroad. This is a serious loss that even the Defendant's hefty restitution payment cannot adequately recompense.

At the core of the Defendant's misconduct is greed. He was driven by his motive for monetary profit. He was aware of the AKS, and the restrictions imposed by the law at the time he committed paid the illegal remunerations at issue in this case. Indeed, the Defendant cited AKS provisions to other people via email, and acknowledged that the payment of commissions to independent marketers for health care business referrals was a violation of the AKS. Although he clearly understood the law, he disregarded that law. The Defendant, willing to "exploit every opportunity to get paid" demonstrated that he does not respect the law. A twelve month and one day sentence will help to promote the Defendant's respect for the law.

Further, the Defendant poses a financial danger to the community. A twelve month and one day sentence will serve to protect the public and mitigate the financial danger that the Defendant poses, especially to the U.S. taxpayer. Moreover, this sentence will also provide just punishment for the Defendant's crimes.

> 2. **A twelve month and one day sentence is necessary to afford specific and general deterrence.**

A twelve month and one day prison sentence will help to ensure that the Defendant will not commit crimes for his own personal financial gain. Such a sentence will specifically deter this Defendant from paying illegal kickbacks or committing fraud while he is incarcerated, and the sentence may also serve as a deterrent regarding further illegal activity by the Defendant into the future.

There is also an urgent need for the sentence to provide general deterrence to others in the community. Paying these illegal kickbacks, in order to maximize profits, imposed an unnecessary burden on the TRICARE health care benefit program. This type of fraud has a broad impact on Government's health care programs, and is a violation of the public's trust. The erosion of trust will become worse over time unless a clear message is sent to the community that paying illegal kickbacks to maximize profits from programs funded by federal taxpayer dollars is completely and entirely unacceptable. It is imperative that the sentence imposed in this case deter not only the Defendant from further involvement in illegal kickbacks and fraud, but also deter others who may be tempted to engage in these crimes by the allure of high profits. A twelve month and one day jail sentence, and a $3,176,470.83 order of restitution, will send a clear message to others, that if they abuse federal government health care programs such as TRICARE, then they will be caught, prosecuted, and that punishment for such crimes will be significant, and will include jail time. Indeed, the prospect of high profits has proven a powerful incentive to involvement in these crimes in the past, and the sentence in this case must serve to overcome this incentive.

A twelve month and one day sentence will demonstrate that the payment of illegal kickback in order to obtain federal health care business is fraught with substantial risk of imprisonment and must be avoided. Further, the Government seeks a three-year term of supervised release in order

13

to provide an added layer of protection to the public and an added layer of specific deterrence for this Defendant.

## IV. Restitution

The Defendant unlawfully received approximately $6,352,941.66 in reimbursement proceeds, tainted by AKS violations, from the TRICARE health care benefit program. The Defendant used this money to buy expensive real estate, luxury vehicles and personal effects, among other purchases and investments. Pursuant to 18 U.S.C. § 3663(a)(3), the Defendant has agreed to consent to a restitution order in the amount of $3,176,470.83 (which is approximately 50% of the amount of TRICARE reimbursements in this case). The Defendant has further agreed to deposit the full amount of restitution with the Court's registry, in advance of the sentencing hearing in this matter. It is the Government's understanding that the Defendant has already deposited the full amount with the Clerk of Court. Therefore, the Government respectfully requests, pursuant to the plea agreement entered into by the Defendant, and pursuant to 18 U.S.C. § 3663(a)(3), that the Court enter a Restitution Order in the amount of $3,176,470.83, payable to TRICARE immediately, at the time of the sentencing hearing in this case, currently scheduled for February 10, 2022.

## V. Conclusion

For the reasons set forth above, the Government respectfully submits that 12 months and one day of confinement, three years of supervised release, and a restitution order in the amount of $3,176,470.83, comprises a reasonable sentence in this matter, and that this sentence is sufficient, but not greater than necessary to comply with the sentencing factors set forth in 18 U.S.C. § 3553(a)(2).

        Respectfully submitted,

        Erek L. Barron
        United States Attorney

By:       /s/
        Christine Duey
        Paul Riley
        Assistant United States Attorneys