IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA,

v.

MATTHEW EDWARD BLAIR

Civil No.:  ELH-23-cv-00227
Related Criminal No.: ELH-19-00410

## MEMORANDUM OPINION

Defendant Matthew Edward Blair entered a plea of guilty on December 3, 2021 (ECF 178) to Count Thirty-One of a Superseding Indictment (ECF 20).  It charged him with payment of illegal remunerations, in violation of 42 U.S.C. § 1320a-7b(b)(2)(A), commonly known as the Anti-Kickback statute ("AKS").  The plea was tendered pursuant to a Plea Agreement.  ECF 181.  Under Fed. R. Crim. P. 11(c)(1)(C), the parties agreed to a term of incarceration of twelve months and one day, as well as payment of restitution of $3,176,470.83.  ECF ¶ 181, ¶ 19.  On February 10, 2022 (ECF 188), the Court sentenced Blair in accordance with the terms of the "C Plea."  ECF 189 (Judgment).[1]

Through counsel, defendant has filed a "Motion to Vacate Pursuant to 28 U.S.C. § 2255." ECF 195.  The motion is supported by a memorandum of law.  ECF 195-1 (collectively, the "Motion").  Blair maintains that the illegal conduct at issue — his commission-based payments to independent contractors for sales and marketing — would have been lawful if made to

---

[1] Defendant was released from imprisonment on March 27, 2023.  *See BOP Inmate Locator*, https://www.bop.gov/mobile/find_inmate/byname.jsp#inmate_results (last visited July 12, 2023).  However, defendant's release from prison does not render the Motion moot, as he is currently on supervised release and faces various collateral consequences as a result of his conviction.  *See, e.g.*, *Spencer v. Kemna*, 523 U.S. 1, 8 (1998).

employees, pursuant to the AKS's bona fide employee exception. In other words, the commission-based payments are permitted for W-2 employees, but not for individuals who receive 1099 tax forms. ECF 195-1 at 1.

Because the conduct was illegal only because the commissions were paid to an independent contractor sales representative, rather than an employee. Blair contends that "the AKS unconstitutionally burdens the First Amendment right to free speech by imposing different restrictions based on the speaker's identity." *Id*. In his view, the AKS is "a quintessential example of a regulation that distinguishes between favored and disfavored speakers," rendering it "constitutionally suspect." *Id.* at 2. And, he contends that the statute cannot "withstand[] heightened scrutiny . . . ." *Id.*[2]

The government opposes the Motion (ECF 202, the "Opposition"), supported by two exhibits. ECF 202-1; ECF 202-2. In its Opposition, the government contends that the Motion is procedurally defaulted. ECF 202 at 18-21. Alternatively, the government argues that, "[e]ven if Defendant's claims were not procedurally defaulted . . . they fail on the merits for all of the reasons already explained by the Court in [its] Opinion of September 23, 2021 (ECF No. 156)." *Id.* at 21.

Defendant replied. ECF 203 (the "Reply"). He asserts, *inter alia*, a claim of actual innocence. *Id.* at 7.

No hearing is necessary to resolve the purely legal question presented in the Motion. *See* 28 U.S.C. § 2255(b). For the reasons that follow, I shall deny the Motion.

---

[2] Defendant acknowledges that the level of scrutiny that applies to speaker-based restrictions on commercial speech is "an open question." ECF 195-1 at 9 n.2.

## I. Background[3]

### A.

The AKS is "designed to prevent" fraud and abuse in connection with federal health care programs, including Medicare and Medicaid. *United States v. Patel*, 778 F.3d 607, 612 (7th Cir. 2015). It "was enacted to 'protect the Medicare and Medicaid programs from increased costs and abusive practices resulting from provider decisions that are based on self-interest rather than cost, quality of care, or necessity of services.'" *Id*. (citation omitted). In addition, the AKS seeks "'to protect patients from doctors whose medical judgments might be clouded by improper financial consideration.'" *Id*. (citation omitted).

Section 1320a-7b(b) of 42 U.S.C. was enacted in 1977, when Congress amended the Social Security Act by adding the Medicare-Medicaid Anti-Fraud and Abuse Amendments. *See United States v. Shoemaker*, 746 F.3d 614, 626 (5th Cir. 2014) (citing H.R. Rep. No. 95-393, pt. 2, at 44 (1977)); *United States v. Shaw*, 106 F. Supp. 2d 103, 110 (D. Mass. 2000). The amendment sought to address the "disturbing degree [of] fraudulent and abusive practices associated with the provision of health services financed by the Medicare and Medicaid programs." *Shaw*, 106 F. Supp. 2d at 110 (citing H.R. Rep. No. 95-393, pt. 2, at 44 (1977), reprinted in 1977 U.S.C.C.A.N. 3039, 3047). The primary effect of these amendments was to turn fraudulent acts previously classified as misdemeanors into felonies. *Id*.; *see United States v. Neufield*, 908 F. Supp. 491, 493 (S.D. Ohio 1995).

---

[3] Where appropriate, I have drawn on the factual and procedural background, as recounted in my Memorandum Opinion of September 23, 2021 (ECF 156), as well as my Memorandum Opinion of May 24, 2023, in the related *qui tam* case, ELH-17-2335, ECF 100.

**B.**

Defendant owned and operated a now defunct pharmacy, Blair Pharmacy, Incorporated ("Pharmacy"), which dispensed compounded drugs and creams. The Pharmacy, located in Timonium, Maryland, opened in 2014 and closed in November 2017.

Blair is not a pharmacist, and the Pharmacy was not a retail business. Rather, the Pharmacy "primarily dispensed compounded drugs and creams." ECF 20, ¶ 2. "Compounding" is a practice by which a licensed pharmacist combines drug ingredients "to create a drug tailored to the need of an individual patient." *Id.* ¶ 5. Compounded drugs are not FDA approved, but may be prescribed by a physician when an FDA-approved drug does not meet the health needs of a patient. *Id.* ¶¶ 5, 6.

In order for a pharmacy to be reimbursed by an insurance company or a federal health care benefit program for a compounded medication, it must be dispensed pursuant to a valid prescription and medically necessary for the treatment of a covered illness or medical condition. ECF 20, ¶ 7. Health care benefit programs reimburse pharmacies that dispense compounded medications based on the average wholesale price of the individual ingredients contained within the compounded medication. *Id.* ¶ 13.

Blair was indicted on August 27, 2019 (ECF 1) and later charged with multiple offenses in a 23-page Superseding Indictment filed on March 3, 2020. ECF 20. He was accused, *inter alia*, of devising a scheme to defraud federal health care programs and insurance companies, and with payment of illegal remunerations in violation of the AKS.

The Superseding Indictment alleged that from October 1, 2014, to June 1, 2015, Blair engaged in a scheme to defraud health insurance companies and health care benefit companies, including Blue Cross Blue Shield ("BCBS") and TRICARE, a federal health care benefit

program that provides benefits to members of the military, military retirees, and their families. ECF 20, ¶¶ 9-11, 14, 23; ECF 181-1 at 1; ECF 202-2 at 36. TRICARE uses Express Scripts ("ESI"), a pharmacy benefit manager, to process claims submitted on behalf of TRICARE program beneficiaries. *See* ECF 181-1 at 1; ECF 202 at 3.

In particular, Blair allegedly sought and obtained reimbursement for compounded drugs based on fraudulent pretenses, representations, and promises that the drugs were authorized by physicians, medically necessary, dispensed for medical purposes, not based on reimbursement rate, and contained the amount and specific ingredients that were billed to the health care benefit programs. ECF 20, ¶ 15.

According to the Superseding Indictment, in connection with the scheme to defraud, Blair created modified compound drug prescription forms with modified lists of chemical ingredients. *Id.* ¶ 20. He paid independent sales marketers, such as Atlas Group, LLC ("Atlas"), to market his compounded drugs and provide his prescription forms to doctors. *Id.* ¶ 21.[4] And, he paid Atlas a "remuneration," in the form of a percentage of any successfully reimbursed claim that Atlas referred to the Pharmacy. *Id.*

As mentioned, on December 3, 2021, Blair pleaded guilty to payment of illegal remuneration, in violation of the AKS, 42 USC § 1320a-7b(b)(2)(A). ECF 178. The Plea Agreement (ECF 181) included a lengthy Stipulation of Facts. ECF 181-1; *see also* ECF 202-2. Relevant here, the Stipulation of Facts provided, in part, ECF 181-1 at 1-5 (first brackets in original):

> In 2013 and early 2014, Blair worked as a pharmaceutical sales marketer for several pharmacies. Blair was a "1099" independent sales marketer, which meant that he was not employed as a W-2 employee of any pharmacy, but instead, he was a self-employed independent contractor for the pharmacies. In 2014, Blair

---

[4] Atlas was formed by Ben Alavi. *See* ECF 38 at 2 n.2.

decided, after working as a sales contractor for other pharmacies, he would open his own compounding pharmacy. Blair submitted an application to the Maryland Board of Pharmacy requesting to open "Blair Pharmacy" in Timonium, Maryland. In August 2014, Blair received approval to open Blair Pharmacy, and he did so.

\*\*\*

Blair wanted his pharmacy to be part of the TRICARE / ESI network of pharmacies so he could submit claims for reimbursement to TRICARE. In August and September of 2014, Blair filled out and submitted an application to ESI, requesting that his pharmacy be accepted into the ESI network of pharmacies. Blair Pharmacy dispensed compounded "pain and scar" creams to patients via Federal Express mail delivery. As discussed in more detail below, these compounded creams reimbursed for thousands of dollars—over $14,000 for a month supply of migraine cream and over $17,000 for a month supply of scar cream.

ESI approved Blair's application, and Blair was authorized to bill TRICARE and receive payment for TRICARE beneficiary prescriptions.

Blair actively pursued several independent sales marketers to work for him at his pharmacy. In order to increase prescription referrals to his pharmacy, maximize reimbursement amounts and thereby increase profits, Blair sought these independent marketers to solicit and refer prescriptions to his pharmacy. Blair entered into 1099 independent contractor arrangements with several sales marketers, including Paladin Enterprises, Brevor Medical, Stratified Solutions and Absolute Ortho, and Blair arranged to pay the independent marketers a percentage of any reimbursement money he received from health care benefit programs, including TRICARE.

One additional 1099 independent sales marketer Blair recruited, was B.A., the owner of Atlas Group, LLC ("Atlas"). Blair knew B.A. sold medical devices to a multitude of surgeons, U.S. military surgeons, and he knew that B.A. worked with these military surgeons in the operating room at Walter Reed National Military Medical Center ("Walter Reed") in Bethesda, Maryland. Blair understood that patients who received medical care at Walter Reed . . . were covered by the TRICARE program.

\*\*\*

On September 29, 2014, Blair wrote an email to B.A. to persuade him to work for Blair. In the email, Blair described the money that he was receiving for pain and scar creams, and Blair claimed that . . . he received . . . "the highest [reimbursement] in the industry due to our formulations . . . ."

\*\*\*

On November 24, 2014, B.A. agreed to work as an independent 1099 contractor for Blair. Blair presented B.A. with a signed "Distributor Agreement" between Blair Pharmacy and Atlas, in which Blair agreed to pay B.A. as follows "commission will be 50% of gross reimbursement to [Blair Pharmacy] paid bi-weekly." The Distributor Agreement required Atlas to use Blair Pharmacy

6

exclusively, and to refer all business within his established territory to Blair Pharmacy, and Blair induced and encouraged these referrals to his pharmacy by offering B.A. a 50% percentage [sic] payment of any money that Blair received from health care benefit programs. The payment of 50% of the health care benefit program reimbursement monies was the "sole compensation" under the November 24, 2014 financial arrangement between Blair and B.A. B.A. was not paid any money or compensation, unless Blair was successful in obtaining reimbursement from a health care benefit program for a prescription that B.A. referred to Blair, and then, and only then was B.A. paid a percentage of the successful reimbursement.

This "Distributor Agreement" was thus a financial arrangement based on the value and volume of prescription referrals that B.A. caused to be directed to Blair's pharmacy, including referrals of federal health care program business, such as TRICARE.

Blair entered into this financial arrangement with B.A. in 2014, with the knowledge that such an arrangement violated federal law. Blair knew it was a violation of the Anti-Kickback Statute to pay a 1099 independent contractor a volume and value based commission regarding referrals of federal health care program business to his pharmacy. Blair had specific knowledge of the Anti-Kickback Statute. Blair signed an agreement with ESI on September 10, 2014, in which he agreed to comply with laws prohibiting a pharmacy provider from paying any person to purchase or refer compound prescriptions in violation of federal and state anti-kickback and self-referral statutes.

Blair also knew about the Anti-Kickback Statute's specific prohibition against paying independent sales marketers for referring federal healthcare program business to his pharmacy. For instance, on March 28, 2013, Blair wrote an email to a pharmacist in Virginia and he made specific reference to the Anti-Kickback Statute stating, quote, "if a 1099 sales rep (independent contractor) generates Medicare/Medicaid business for the supplier, the provider can not pay the sales rep on a commission (or other type of production) basis. Doing so violates the Medicare anti-kickback Statute." Further, Blair wrote an email to a prospective sub-rep sales marketer on April the 17, 201, stating: "keep in mind that only W2 employees can get legally compensated on Federal Healthcare business. Therefore, even though a pharmacy can fill scripts for Medicare, etc., you as a 1099 distributor, can not get paid on the federal business because that would violate the Medicare Anti-Kickback Statute."

With this knowledge of the wrongfulness of his conduct, Blair intentionally entered into agreement with B.A. to pay him a valued based 50% commission on any successfully reimbursed TRICARE pharmacy benefit claim. Blair provided B.A. with pre-printed prescription forms which listed the specific ingredients for Blair's formulations. Blair knew the amount of money that he would receive from TRICARE for each gram of each ingredient that he listed in

7

his formulas. Blair modified the ingredients and amounts of ingredients of his formulations based on the ingredient's reimbursement value.

B.A. solicited cream prescriptions from numerous doctors, including military surgeons at Walter Reed. B.A. had direct contact with these doctors, and Blair knew that B.A. was in a position to influence which pharmacy the prescriptions were sent to, and that B.A. would send the prescriptions directly back to Blair's pharmacy. By paying B.A. 50% of every successfully reimbursed TRICARE claim, Blair encouraged, induced and incentivized B.A. to refer as many cream prescriptions as possible to Blair's Pharmacy. B.A. actively pursued and solicited cream prescriptions for Blair from one military doctor, S.R., who had no idea about the amount of money that the creams reimbursed for. B.A. took advantage of S.R.'s grueling work schedule, oftentimes waiting, with a stack of Blair's pre-printed prescription forms in hand, for the doctor outside the operating room after S.R. had a long day of back-to-back surgeries. B.A. influenced the decision regarding which pharmacies the prescriptions were sent to, in that B.A. directed and sent and referred all of the pain and scar cream prescriptions S.R. authorized directly to Blair's pharmacy. Neither S.R. nor the TRICARE beneficiaries for whom the creams were authorized had a chance or opportunity to choose which pharmacy they wanted to fill the prescription because B.A. submitted the prescriptions directly to Blair.

As to S.R.'s patients, there were times when some of his TRICARE patients received cream bottles in the mail from Blair Pharmacy, the receipt of a box on their doorstep was the first time they learned that a prescription for a cream or vitamin had been written for them. In some instances, the beneficiaries did not need, did not want, and did not use the creams or vitamins that they received on their doorstep.

As to S.R.'s patients, many of these TRICARE patients underwent minimally invasive laparoscopic surgery at Walter Reed hospital. This laparoscopic surgery caused very minimal scarring and very little pain (for which the beneficiaries received free oral pain medication from the pharmacy at Walter Reed when they were discharged from the hospital). Some of the TRICARE beneficiaries had no idea of the cost to TRICARE of these creams and vitamins that they received in the mail. Other TRICARE beneficiaries learned about the high cost of the creams and vitamins after they reviewed their TRICARE Explanation of Benefits letter a month or two after they received the creams on their doorstep. Some of these TRICARE beneficiaries lodged official complaints, and made fraud referrals to TRICARE and ESI When physician S.R., referenced above, learned of the cost of the creams he had authorized prescriptions for, he was outraged at the high costs, and he immediately stopped authorizing any additional cream prescriptions and he provided notice of the problem to his management. S.R. advised TRICARE patients who made complaints about the creams, to send the creams back to the pharmacy.

Blair admits that he made payments of illegal remunerations in violation of 42 U.S.C. § 1320a-7b(b) in that he knowingly and willfully paid and offered to pay, remuneration; and that one purpose of the payment was to induce the recipients of the payment to refer an individual for the furnishing of any item or service for which payment was made, in whole or in part, by TRICARE, a federal healthcare benefit program. Blair further agrees that TRICARE would not have approved of or reimbursed any claim for compounded ingredients made by Blair Pharmacy, had TRICARE known that Blair had agreed to pay a 1099 independent sales contractor based on the volume and value-based commission of prescription referrals of TRICARE business to Blair Pharmacy.

*** 

Paragraph 12 of the Plea Agreement contained an appellate waiver. ECF 181, ¶ 12. But, it did not include a waiver of the right to pursue post-conviction relief. It stated, *id*. (emphasis added):

> In exchange for the concessions made by this Office and the Defendant in this Agreement, this Office and the Defendant waive their rights to appeal as follows:
>
> a. The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or any other statute or constitutional provision, to appeal the Defendant's conviction on any ground whatsoever. *This includes a waiver of all right to appeal the Defendant's conviction on the ground that the statute(s) to which the Defendant is pleading guilty is unconstitutional,* or on the ground that the admitted conduct does not fall within the scope of the statute(s), to the extent that such challenges legally can be waived.
>
> b. The Defendant and this Office knowingly and expressly waive all rights conferred by 18 U.S.C. § 3742 to appeal whatever sentence is imposed (including any term of imprisonment, fine, term of supervised release, or order of restitution) for any reason (including the establishment of the advisory sentencing guidelines range, the determination of the Defendant's criminal history, the weighing of the sentencing factors, and any constitutional challenges to the calculation and imposition of any term of imprisonment, fine, order of forfeiture, order of restitution, and term or condition of supervised release), except as follows:
>
> (i) The Defendant reserves the right to appeal any sentence that exceeds the statutory maximum; and
>
> (ii) This Office reserves the right to appeal any sentence below a statutory minimum.

9

> c. The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from this Office or any investigating agency.

On February 10, 2022, in accordance with the C Plea, the Court sentenced Blair to a term of imprisonment of one year and one day, to be followed by 18 months of supervised release. ECF 189. The agreed-upon sentence was a variant sentence—nearly three years below the bottom of the U.S. Sentencing Guidelines range of 46 to 57 months of imprisonment. *See* ECF 187 ("Presentence Investigation Report") at 36; *see also* ECF 202-1 ("Sentencing Transcript") at 8. No appeal was filed by Blair. Instead, Blair filed the instant Motion on January 25, 2023. ECF 195.

Notably, the criminal case was fiercely litigated. During the pendency of the criminal case, defendant's team of lawyers lodged many challenges to the charges. Of relevance here, defendant raised the same argument that underlies his Motion. *See* ECF 39. In particular, Blair moved to dismiss Counts 30 to 33 of the Superseding Indictment, arguing that "the AKS is an overbroad speaker-based regulation that violates the First Amendment's protections for commercial speech . . . ." *Id.* at 1. He asserted that, due to financial constraints, he hired a "1099" independent contractor for sales marketing, rather than a "W-2" employee. *Id.* at 2. And, he complained that his decision "uniquely and singularly" resulted in the charges that he paid unlawful remuneration, in violation of the AKS. *Id.* at 3.

Argument was held on that motion, and others, on August 6, 2021. ECF 148. In a Memorandum Opinion (ECF 156) and Order (ECF 157) of September 23, 2021, the Court rejected the contention in issue. *See* ECF 156 at 45-55.

Additional facts are discussed, *infra*.

## II. Standard of Review

Under 28 U.S.C. § 2255, a federal prisoner may move to vacate, set aside or correct, a federal prison sentence on one of the following grounds: "that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255(a); *see Hill v. United States*, 368 U.S. 424, 426-27 (1962). "[A]n error of law does not provide a basis for collateral attack unless the claimed error constituted 'a fundamental defect which inherently results in a complete miscarriage of justice.'" *United States v. Addonizio*, 422 U.S. 178, 185 (1979) (quoting *Hill*, 368 U.S. at 428). In order to prevail on a § 2255 motion, a movant bears the burden of proving his grounds for collateral relief by a preponderance of the evidence. *See Jacobs v. United States*, 350 F.2d 571, 574 (4th Cir. 1965).

The scope of a § 2255 collateral attack is far narrower than an appeal, and a "'collateral challenge may not do service for an appeal.'" *Foster v. Chatman*, 548 U.S. 488, 519 (2016) (Alito, J., concurring) (quoting *United States v. Frady*, 456 U.S. 152, 165 (1982)). Relief under § 2255 is reserved for situations in which failing to grant relief would be "'inconsistent with the rudimentary demands of fair procedure' or constitute[] a complete 'miscarriage of justice.'" *United States v. Vonn*, 535 U.S. 55, 64 (2002) (quoting *United States v. Timmreck*, 441 U.S. 780, 783 (1979)).

Any failure to raise a claim on direct appeal constitutes a procedural default that bars presentation of the claim in a § 2255 petition unless the petitioner can demonstrate "cause and prejudice" or "actual innocence." *See Dretke v. Haley*, 541 U.S. 386, 393 (2004): *Reed v. Farley*, 512 U.S. 339 (1994); *Murray v. Carrier*, 477 U.S. 478, 485 (1986); *see also Bousley v.*

*United States*, 523 U.S. 614, 621 (1998) ("Habeas review is an extraordinary remedy and will not be allowed to do service for an appeal.") (internal quotations and citations omitted); *United States v. Pettiford*, 612 F.3d 270, 280 (4th Cir. 2010); *United States v. Mikalajunas*, 186 F.3d 490, 492-93 (4th Cir. 1999).

In contrast, any "failure to raise an ineffective-assistance-of-counsel claim on direct appeal does not bar the claim from being brought in a later, appropriate proceeding under § 2255." *Massaro v. United States*, 538 U.S. 500, 509 (2003); *see also United States v. Faulls*, 821 F.3d 502, 507-08 (4th Cir. 2016) (concluding ineffective assistance claims should be raised in § 2255 motions unless there is "conclusive evidence of ineffective assistance on the face of the record" (citations omitted)). No such claim is raised by Blair.[5]

Generally, the rule governing procedural default of claims brought under § 2255 precludes consideration of any contentions that "'could have been but were not pursued on direct appeal, [unless] the movant . . . show[s] cause and actual prejudice resulting from the errors of which he complains.'" *Pettiford*, 612 F.3d at 280 (quoting *Mikalajunas*, 186 F.3d at 492-93). Under the "cause and prejudice" standard, the petitioner must show: (1) cause for not raising the claim of error on direct appeal; and (2) actual prejudice from the alleged error. *Bousley*, 523 U.S. at 622; *see Dretke*, 541 U.S. at 393; *Massaro*, 538 U.S. at 505; *see also Reed*, 512 U.S. at 354 (stating that "the writ is available only if the petitioner establishes 'cause' for the waiver and shows 'actual prejudice resulting from the alleged violation.'"); *Murray*, 477 U.S. at 496; *Frady*, 456 U.S. at 167-68.

---

[5] Blair's post-conviction counsel did not represent him during the criminal proceedings. It is hardly surprising that defendant does not assert ineffective assistance of counsel here. As indicated, a team of defense counsel vigorously pursued legal and factual defenses on defendant's behalf and they secured a very favorable plea agreement.

In order to show cause for not raising the claim of error on direct appeal, a petitioner must prove that "some objective factor external to the defense such as the novelty of the claim or a denial of effective assistance of counsel" impeded their counsel's efforts to raise the issue earlier. *Coleman v. Thompson*, 501 U.S. 722, 753 (1991); *see Carrier*, 477 U.S. at 492 ("[C]ause . . . requires a showing of some external impediment preventing counsel from constructing or raising the claim."); *Mikalajunas*, 186 F.3d at 493 (movant must demonstrate "something external to the defense, such as the novelty of the claim or a denial of effective assistance of counsel"). Additionally, the alleged error cannot simply create a possibility of prejudice, but must be proven to work to the petitioner's "*actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Frady*, 456 U.S. at 170 (emphasis in original). Pursuant to the Supreme Court's ruling in Carrier, 477 U.S. at 494, prejudice does not support relief of a procedural default in the absence of a showing of cause. *See also Engle v. Isaac*, 456 U.S. 107, 134 n.43 (1982).

The actual innocence exception "only applies in limited circumstances." *United States v. Jones*, 758 F.3d 579, 583 (4th Cir. 2014). Indeed, it must be "an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent . . . ." *Carrier*, 477 U.S. at 496.

In order to show "actual innocence," the petitioner "must demonstrate actual factual innocence of the offense of conviction, *i.e.*, that petitioner did not commit the crime of which he was convicted; this standard is not satisfied by a showing that a petitioner is legally, but not factually, innocent." *Mikalajunas*, 186 F.3d at 494 (citing *Sawyer v. Whitley*, 505 U.S. 333, 339 (1992)); *see also Bousley*, 523 U.S. at 623. Notably, the petitioner must meet this burden by clear and convincing evidence. *Mikalajunas*, 186 F.3d at 494. In other words, a "petitioner must

show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Jones*, 758 F.3d at 583; *see Bousley*, 523 U.S. at 623.

As the Fourth Circuit has said, "[a] valid actual innocence claim 'requires petitioner to support his allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial.'" *Finch v. McKoy*, 914 F.3d 292, 298 (4th Cir. 2019) (quoting *Schlup v. Delo*, 513 U.S. 298, 324 (1995)). Moreover, a petitioner must "'demonstrate that the totality of the evidence would prevent any reasonable juror from finding him guilty beyond a reasonable doubt, such that his incarceration is a miscarriage of justice.'" *Finch*, 914 F.3d at 298 (quoting *Teleguz v. Pearson*, 689 F.3d 322, 329 (4th Cir. 2012)). It is an "exacting standard," based on a "'holistic judgment about all the evidence'. . . ." *Finch*, 914 F.3d at 299 (quoting *House v. Bell*, 547 U.S. 518, 539 (2006)).

Under 28 U.S.C. § 2255(b), a hearing is required "[u]nless the motion and the files and the records of the case conclusively show that the prisoner is entitled to no relief . . . ." *See United States v. LeMaster*, 403 F.3d 216, 220-23 (4th Cir. 2005). This is such a case; no hearing is necessary.

### III. Discussion

The Court must first consider whether, as the government contends, defendant's claim is foreclosed by the Fourth Circuit's decision in *United States v. Linder*, 552 F.3d 391 (4th Cir. 2009). In *Linder*, the defendant "knowingly and voluntarily waived his right to a direct appeal of his conviction and sentence . . . ." *Id*. at 392. Nevertheless, the defendant appealed and challenged the length of his sentence. *Id*. at 393-94. The "Government invoked the appeal

14

waiver in Linder's plea agreement, and [the Fourth Circuit] dismissed Linder's appeal . . . concluding that Linder waived his right to appeal." *Id*. at 394.

After the Fourth Circuit's dismissal, the defendant in *Linder* filed a § 2255 motion, raising essentially the same challenges he had raised on appeal. *Id*. at 395. The Fourth Circuit affirmed the denial of the § 2255 motion, concluding that the defendant sought to "escape the terms of his plea agreement." *Id*. at 392. It stated that, when a petitioner, by signing a plea agreement, waives his right to pursue a direct appeal, "he is precluded from raising [on collateral review] claims that are the sort that *could have* been raised on appeal." *Id*. at 396–97 (quoting Brian R. Means, *Fed. Habeas Practitioner Guide*, Jurisdiction ¶ 1.23.0 (2006/2007) (emphasis in original)).

Blair admits in his Motion that he "waived his right to appeal, and no appeal was filed challenging the judgment and conviction." ECF 195 at 1. Blair's constitutional challenge to the offense of conviction is precisely the kind of challenge that one could lodge on appeal. It is a pure legal question. However, under the terms of the Plea Agreement, Blair knowingly and voluntarily waived his right to pursue a direct appeal. In return, he secured the government's agreement to a C plea with a sentence well below the advisory sentencing guidelines range.

It is true that the Plea Agreement does not contain an express waiver of a collateral attack. ECF 181, ¶ 12. But, Blair cannot circumvent his Plea Agreement by using § 2255 to raise a challenge that otherwise could have been part of a direct appeal, and that he knowingly agreed to forego. *See Bousley*, 523 U.S. at 621 ("Habeas review is an extraordinary remedy and 'will not be allowed to do service for an appeal.'" (quoting *Farley*, 512 U.S. at 354). Furthermore, it is well-settled that "[a] plea agreement that prevents a defendant from appealing is not sufficient cause for his procedural default." *Dorsett v. United States*, GLR-07-445, 2017

15

WL 2335603, at *1 (D. Md. May 30, 2017); *see also Ho v. United States*, JKB-19-397, 2022 WL 709402, at *4 (D. Md. Oct. 11, 2022) (reasoning that "[a]lthough Petitioner's plea agreement included a waiver of his right to pursue a direct appeal, under *Linder*, this Court may not entertain the claim now because it could have been considered on direct appeal" and concluding that claim was procedurally defaulted).

In his Reply, Blair contends that his claim is one of actual innocence because if "his conviction violates the First Amendment, his conviction is invalid." ECF 203 at 7. However, as noted, "to establish actual innocence, a petitioner must demonstrate actual factual innocence of the offense of conviction, i.e., that petitioner did not commit the crime of which he was convicted; this standard is not satisfied by a showing that a petitioner is legally, but not factually, innocent." *Mikalajunas*, 186 F.3d at 494. Additionally, "[i]n order to demonstrate that a miscarriage of justice would result from the refusal of the court to entertain the collateral attack, a movant must show actual innocence by clear and convincing evidence." *Id*. at 493.

Moreover, a movant must "demonstrate that the totality of the evidence would prevent any reasonable juror from finding him guilty beyond a reasonable doubt, such that his incarceration is a miscarriage of justice. It is an exacting standard, based on a holistic judgment about all the evidence*."* *McKoy*, 914 F.3d at 299 (cleaned up). Blair does not come close to meeting this standard.

At the time of Blair's guilty plea, he was well aware of the issue he now seeks to pursue, because it was litigated, as discussed earlier and below. Like the defendant in *Linder*, Blair waived his right to appeal his conviction and sentence. *Linder*, 552 F.3d at 392. And, Blair has made no showing of either cause and prejudice or actual innocence that would allow the Court to

reach the claim, despite the default. *Mikalajunas*, 186 F.3d at 492-93. Accordingly, the claim in Blair's Motion is procedurally defaulted.

Even assuming that the claim has not been defaulted, there is no merit to Blair's argument that the AKS is an unconstitutional speaker-based restriction that violates the First Amendment.  In particular, Blair argues that the offense of conviction "is a restriction based on the identity of the speaker that disfavors 1099 independent contractors in favor of W-2 employees." ECF 195-1 at 9-10.  He explains, *id.* at 10: "Because the AKS hinders an independent contractor's ability to market and seek referrals but simultaneously grants employees greater rights to market and seek those referrals, the law makes an impermissible speaker-based distinction on commercial speech."  This is the same argument that the Court previously considered and rejected in connection with "Defendant's Omnibus Motion To Dismiss Counts 30 to 33 of Superseding Indictment as Constitutional Violations."  ECF 39.

In that motion, Blair argued, as he does here, that the AKS "criminalize[s] speech by commissioned-based independent contractors where the same speech by an employee . . . is deemed lawful" (ECF 39 at 15), and that these restrictions "are plainly speaker-based because they apply to independent contractors and their principals, but not to employees and their employers who engage in the same speech." *Id*. at 16 (citing 2 C.F.R. § 1001.952(i)).

In my Memorandum Opinion of September 23, 2021, ECF 156, I rejected this contention and stated, *id*. at 53 (brackets in original):

> The First Amendment protects speech, not "mere conduct.[]" *Miselis*, 972 F.3d 578 at 535.  Although expressive conduct may fall under the protection of the First Amendment, *id.* at 535 n.8, this case is not about expressive conduct or speech.  It is about restrictions on conduct—payments to an independent contractor to induce referrals.  The charges target speech only insofar as the speech constitutes an offer to pay kickbacks in return for referrals. But, speech "used as an integral part of conduct in violation of the valid criminal statute" is not protected by the First Amendment. *Giboney*, 336 U.S. at 498; *see Central*

17

*Hudson Gas*, 447 U.S. at 566 ("[F]or commercial speech to come within [the First Amendment], it at least must concern lawful activity....").

Based on the allegations in the Superseding Indictment, the prosecution is not foreclosed here by the First Amendment. In *United States v. Balotin*, No. 3:19-CR-191-MMH-JBT, 2021 WL 2351738, at *5 (M.D. Fla. June 9, 2021), the Court explained: "As alleged in the Indictment, [defendant's] speech was not merely salesmanship; he is alleged to have engaged in unlawful activities by paying TRICARE beneficiaries kickbacks in exchange for their participation in the scheme to defraud TRICARE and recruiting doctors to write fraudulent prescriptions. Thus, based on the face of the Indictment, [defendant's] speech would not be protected under the First Amendment because it concerned unlawful activity." (citing *Sorrell*, 564 U.S. 552; *Central Hudson Gas*, 447 U.S. at 566); *see Berkeley HeartLab*, 2017 WL 4803911, at *12 (rejecting identical First Amendment challenge because government was only targeting speech that is used as a part of conduct in violation of the AKS, which is not protected by the First Amendment).

Defendant once again relies on *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 557 (2011), to support his argument. ECF 195-1 at 11. In my prior Memorandum Opinion, I said, ECF 156 at 54-55:

[T]he statute at issue in *Sorrell* involved a civil statute that specifically proscribed the dissemination of information for the purposes of advertising—a form of commercial speech. In contrast, the AKS, including as it is applied to Blair, does not specifically restrict Blair's communications. Rather, as noted, it targets the conduct of providing remuneration to independent contractors with the intent to induce referrals, not the statements related to those payments.

Defendant has cited no cases in which a court has found that an AKS prosecution violates the First Amendment, even after *Sorrell*. To the contrary, other courts considering First Amendment challenges to alleged AKS violations, including cases that were decided after the Court's ruling in *Sorrell*, have uniformly rejected such challenges. *See, e.g., United States v. Regeneron Pharms., Inc.*, No. CV 20-11217-FDS, 2020 WL 7130004, at *16 (D. Mass. Dec. 4, 2020) ("A pharmaceutical manufacturer has no First Amendment right to pay kickbacks intended to induce prescriptions and purchases of its drugs. Unlike the cases cited by defendant, which involved the imposition of criminal or civil penalties for speech and information-sharing itself, this complaint only alleges that defendant's donations, not its communications, were illegal."); *Mathur*, 2012 WL 4742833, at *4 ("Courts have uniformly rejected the notion that bribery is protected speech … The Indictment alleges Mathur made payments ranging from $1,500 to $5,400 in exchange for patient referrals. The Anti–Kickback Act criminalizes corrupt payments in exchange for referrals, not statements related to

those payments."); *see also U.S. ex rel. Nevyas v. Allergan, Inc.*, No. 09-432, 2015 WL 3429381, at *1 n.1 (E.D. Pa. May 26, 2015) ("Relators allege a scheme by Allergan to induce physicians to write prescriptions for Allergan products in violation of the AKS; it is Allergan's conduct in providing 'illegal remuneration' to physicians and optometrists and not its speech that is at issue in the AKS claim."); *United States ex rel. Bergman v. Abbot Lab'ys*, 995 F. Supp. 2d 357, 376 (E.D. Pa. 2014) ("Because Relator has alleged that Defendant's marketing of TriCor included false and misleading statements…this Court finds that Abbott's commercial speech does not warrant First Amendment protection at this stage.").

In a last-ditch effort to advance his contention, defendant cites to *Billups v. City of Charleston, S.C.*, 961 F.3d 673, 683 (4th Cir. 2020), in which the Fourth Circuit determined that distinctions in a statute based on the speaker's identity are suspect under the First Amendment. ECF 195-1 at 11-12. In particular, Blair claims that the Court "did not previously address the *Billups* First Amendment issue of an improper speaker-based restriction." ECF 203-at 1. However, *Billups* does not impact the Court's analysis here. The ordinance at issue in *Billups*, 961 F.3d at 683, was subject to First Amendment scrutiny because it directly prohibited tour guides from "speaking to visitors . . . on certain public sidewalks and streets." In other words, it targeted the expressive aspects of a guided tour in a public place. And, as noted previously, the AKS does not restrict expressive speech.

Accordingly, even if defendant's claim was not defaulted, his Motion lacks merit.

## IV. Certificate of Appealability

Pursuant to Rule 11(a) of the Rules Governing Proceedings under 28 U.S.C. § 2255, the Court is required to issue or deny a Certificate of Appealability ("COA") when it enters a final order adverse to the applicant. A COA is a "jurisdictional prerequisite" to an appeal from the court's earlier order. *United States v. Hadden*, 475 F.3d 652, 659 (4th Cir. 2007). In other words,

unless a COA is issued, a petitioner may not appeal the court's decision in a § 2255 proceeding. 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b).[6]

Blair argues that if the Court denies the Motion, "it should still issue a COA because a reasonable jurist would find it debatable whether the AKS violates the constitutional right to free speech." ECF 195-1 at 22 (citations omitted).

A COA may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see Buck v. Davis*, 58 U.S. 100, 115 (2017). When a district court denies a petitioner's motion on its merits, a petitioner satisfies this standard by demonstrating that reasonable jurists would find the court's assessment of the constitutional claims debatable or wrong. *See Dretke*, 542 U.S. at 282; *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see also Miller-El v. Cockrell*, 537 U.S. 322, 336-38 (2003). However, when a petition is denied on procedural grounds, the petitioner may meet the standard by showing that reasonable jurists "would find it debatable whether the petition states a valid claim of the denial of a constitutional right" and "whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484.

In my view, Blair has failed to satisfy either standard. He has not made a showing of the denial of a constitutional right. And, reasonable jurists would not find his claim debatable, either procedurally or on the merits.

An Order follows.

Date:   August 1, 2023                         /s/
                                               Ellen Lipton Hollander
                                               United States District Judge

---

[6] The denial of a COA by this Court does not preclude Blair from seeking a COA from the Fourth Circuit.